STEVEN A. GIBSON
Nevada Bar No. 6656
sgibson@gibsonlowry.com
JODI DONETTA LOWRY
Nevada Bar No. 7798
jdlowry@gibsonlowry.com
J. SCOTT BURRIS
Nevada Bar No. 10529
sburris@gibsonlowry.com

GIBSON LOWRY BURRIS LLP
City Center West
7201 West Lake Mead Boulevard
Suite 503
Las Vegas, Nevada 89128
Telephone 702.541.7888
Facsimile 702.541.7899

Attorneys for Plaintiffs

## UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| KABINS FAMILY LIMITED PARTNERSHIP, a Nevada limited partnership; LORI C. KABINS, as trustee for the LORI C. KABINS SEPARATE PROPERTY TRUST, a Nevada trust, | Case No.: 2:09-CV-1125 |
| Plaintiffs, | **COMPLAINT** |
| v. | **(Jury Trial Demanded)** |
| CHAIN CONSORTIUM, a Nevada general partnership; 3900, LLC, a Nevada limited-liability company; 99TH & INDIAN SCHOOL, LLC, a Nevada limited-liability company; 99TH & INDIAN SCHOOL MANAGEMENT, LLC, a Nevada limited-liability company; BENESSERE, LLC, a Nevada limited-liability company; BENESSERE MANAGEMENT, LLC, a Nevada limited-liability company; TODD W. BERGMAN, an individual; BUCKEYE | |

1

CANAMEX 77 ONE, LLC, a Nevada limited-liability company; BUCKEYE 80 WEST THREE, LLC, a Nevada limited-liability company; CAPRI I, LLC, a Nevada limited-liability company; CAPRI II, LLC, a Nevada limited-liability company; JEFF CHAIN, an individual; LINDA CHAIN, an individual; JEFF AND LINDA CHAIN, as trustees for the JEFF & LINDA CHAIN FAMILY TRUST, a Nevada trust; CIPRIANI, LLC, a Nevada limited-liability company; CIPRIANI MANAGEMENT, LLC, a Nevada limited-liability company; COTTONWOOD RETAIL, LLC, a Nevada limited-liability company; GEIII, LLC, also known as GE III, LLC, a Nevada limited-liability company; GILA BEND 384, LLC, a Nevada limited-liability company; EDWARD GUTZMAN III, an individual; INNOVATIVE ASSETS, LLC, a Nevada limited-liability company; J. MATTHEW KAMMEYER, an individual; KAN INVESTMENTS, LLC, a Nevada limited-liability company; GABRIEL MARTINEZ, ESQ, an individual; MICHAEL'S PLAZA, LLC, a Nevada limited-liability company; MILLENNIUM CONSTRUCTION, INC. doing business as MCI, a Nevada corporation; MILLENNIUM COMMERCIAL PROPERTIES, LLC, a Nevada limited-liability company; MILLENNIUM PROPERTIES & DEVELOPMENT, INC. a Nevada corporation; MODERN MANAGEMENT, INC. a Nevada corporation; PHOENIX 83RD, LLC, a Nevada limited-liability company; ALLYN F. POVILAITIS, also known as ALLYN F. POVILATIS, an individual; RCRE, LLC, a Nevada limited-liability company; and T.W.B. ENTERPRISES, INC., a Nevada corporation,

Defendants.

2

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22

Plaintiffs, Kabins Family Limited Partnership ("Kabins LP") and the Lori C. Kabins Separate Property Trust, by and through its trustee Lori C. Kabins ("LCK Trust"; collectively with Kabins LP, "Kabins" or "Plaintiffs"), by and through their counsel, Gibson Lowry Burris LLP, for causes of action against Defendants, complain and allege on information and belief as follows:

## JURISDICTION

1. This Court has jurisdiction over Kabins' causes of action for federal securities fraud violations, conspiracy to commit federal securities fraud violations, racketeering, and conspiracy to commit racketeering ("Federal Law Causes of Action") pursuant to 28 U.S.C. §1331, as Kabins' Federal Law Causes of Action arise under the laws of the United States.

2. The Court has jurisdiction over Kabins' federal questions pursuant to 28 U.S.C. §1331, pursuant to the Securities Exchange Act of 1934, which permits the exercise of personal jurisdiction to the limits of the Due Process Clause of the Fifth Amendment, and pursuant to the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. §1965(c) because Kabins alleges violations of 18 U.S.C. §1961 *et seq.*

3. This Court has supplemental jurisdiction over Kabins' remaining causes of action ("State Law Causes of Action") pursuant to 28 U.S.C. §1367, because Kabins' State Law Causes of Action are so closely interrelated to Kabins' Federal Law Causes of Action as to form part of the same case or controversy as Kabins' State Law Causes of Action pursuant to Article III of the United States Constitution.

4. Personal jurisdiction over Defendants is proper because Defendants reside in Nevada.

1

**VENUE**

2   5. Venue is proper in this judicial district under 28 U.S.C. §1391(c) and 28 U.S.C.

3   §1391(b)(3), because Defendants are subject to personal jurisdiction in this judicial district and

4   thus are deemed to reside in this judicial district.

5   6. Venue is proper in this judicial district under 28 U.S.C. §1391(b)(2) because a substantial

6   part of the events and omissions giving rise to the claims alleged herein occurred in this judicial

7   district.

8

9   **PARTIES**

10   7. Kabins LP is a limited partnership organized under the laws of the state of Nevada, with its

11   primary office location in Nevada.   Kabins LP's general partner is MBK LLC, which is

12   managed by Mark B. Kabins, M.D. ("Dr. Kabins").

13   8. Dr. Kabins is an orthopedic spinal surgeon practicing medicine in various office- and

14   hospital-based locations within and around Las Vegas, Nevada ("Dr. Kabins' Place of

15   Business").

16   9. Kabins LP specifically holds Kabins' investments in Gila Bend 384 LLC, Michael's Plaza

17   LLC, and 99th & Indian School, LLC.

18   10. LCK Trust is a trust established under the laws of the state of Nevada.  Lori C. Kabins is

19   the trustee of LCK Trust.

20   11. LCK Trust specifically holds Kabins' investments in Benessere LLC (formerly Buckeye

21   Canamex 77 One, LLC), Cipriani LLC (formerly Buckeye 80 West Three, LLC), Capri I LLC,

22   and Cottonwood Retail LLC.

4

1

2    ### A.      *Defendants and Relevant Direct Relationships*

3    12. 3900, LLC ("3900") is an active Nevada domestic limited-liability company.

4    13. 3900 is in fact actively and was in fact historically managed by Modern Management,

5    Inc. ("Modern Management") and Jeff Chain ("Mr. Chain").

6    14. Records maintained by the Nevada Secretary of State indicate that 3900 is actively and

7    was historically managed by Modern Management.

8    15. 99th & Indian School, LLC ("99th LLC") is an active Nevada domestic limited-liability

9    company.

10   16. 99th LLC is in fact actively and was in fact historically managed by 99th & Indian

11   School Management, LLC ("99th Management") and Mr. Chain.

12   17. Records maintained by the Nevada Secretary of State indicate that 99th LLC is actively

13   and was historically managed by 99th Management.

14   18. 99th Management is an active Nevada domestic limited-liability company.

15   19. 99th Management is in fact actively and historically managed by Gabriel Martinez, Esq.

16   ("Mr. Martinez"), GEIII LLC, also known as GE III LLC ("GEIII"), Innovative Assets, LLC

17   ("Innovative"), and Mr. Chain.

18   20. Records maintained by the Nevada Secretary of State indicate that 99th Management is

19   actively and was historically managed by Mr. Martinez, GEIII, and Innovative.

20   21. 99th Management and Mr. Chain are in fact actively and were in fact historically

21   managers of 99th LLC.

22

22. Records maintained by the Nevada Secretary of State indicate that 99th Management is actively and was historically a manager of 99th LLC.

23. Benessere, LLC ("Benessere") is an active Nevada domestic limited-liability company.

24. Benessere is in fact actively and historically managed by Mr. Chain and Benessere Management, LLC ("Benessere Management").

25. Records maintained by the Nevada Secretary of State indicate that Benessere is actively and was historically managed by Benessere Management.

26. Benessere Management is an active Nevada domestic limited-liability company.

27.  Benessere Management is in fact actively and historically managed by Mr. Chain and Edward Gutzman III ("Mr. Gutzman").

28. Records maintained by the Nevada Secretary of State indicate that Benessere Management is actively and was historically managed by Mr. Gutzman.

29. Benessere Management was historically managed by Mr. Chain.

30. Records maintained by the Nevada Secretary of State indicate that Benessere Management was historically managed by Mr. Chain.

31. Benessere Management was in fact historically managed by Innovative.

32. Records maintained by the Nevada Secretary of State indicate that Benessere Management was historically managed by Innovative.

33. Benessere Management was in fact managed by Millennium Properties & Development, Inc. ("Millennium").

34. Records maintained by the Nevada Secretary of State indicate that Benessere Management was in fact managed by Millennium.

6

35. Benessere Management and Mr. Chain are in fact actively and were in fact historically managers of Benessere.

36. Records maintained by the Nevada Secretary of State indicate that Benessere Management is actively and was historically a manager of Benessere.

37. Benessere Management and Mr. Chain are in fact actively managers of Buckeye Canamex 77 One, LLC ("Buckeye 77").

38. Records maintained by the Nevada Secretary of State indicate that Benessere Management is actively a manager of Buckeye 77.

39. Todd W. Bergman ("Mr. Bergman") is a Nevada resident.

40. Bergman is in fact actively and historically the director, president, secretary, and treasurer of T.W.B. Enterprises, Inc. ("T.W.B.")

41. Records maintained by the Nevada Secretary of State indicate that Bergman is actively and was historically the director, president, secretary, and treasurer of T.W.B.

42. Buckeye 77 is an active Nevada domestic limited-liability company which merged into Benessere LLC.

43. Buckeye 77 is in fact actively managed by Mr. Chain and Benessere Management.

44. Records maintained by the Nevada Secretary of State indicate that Buckeye 77 is actively managed by Benessere Management.

45. Buckeye 77 was in fact historically managed by Mr. Chain, GEIII, and Innovative.

46. Records maintained by the Nevada Secretary of State indicate that Buckeye 77 was historically managed by GEIII and Innovative.

47. Buckeye 80 West Three, LLC ("Buckeye 80") is a merge-dissolved Nevada domestic limited-liability company, which merged into Cipriani LLC ("Cipriani").

48. Buckeye 80 is in fact actively managed by Mr. Chain and Cipriani Management, LLC ("Cipriani Management").

49. Records maintained by the Nevada Secretary of State indicate that Buckeye 80 was last actively managed by Cipriani Management.

50. Buckeye 80 was in fact historically managed by Mr. Chain and GEIII, and Innovative.

51. Records maintained by the Nevada Secretary of State indicate that Buckeye 80 was historically managed by GEIII and Innovative.

52. Capri I, LLC ("Capri I") is an active Nevada domestic limited-liability company.

53. Capri is in fact actively and historically managed by Mr. Chain and Phoenix 83rd, LLC ("Phoenix 83rd").

54. Records maintained by the Nevada Secretary of State indicate that Capri I is actively and was historically managed by Phoenix 83rd.

55. Capri II, LLC ("Capri II") is an active Nevada domestic limited-liability company.

56. Capri II is in fact actively and was in fact historically managed by Mr. Chain and Phoenix 83rd.

57. Records maintained by the Nevada Secretary of State indicate that Capri II is actively and was historically managed by Phoenix 83rd.

58. Mr. Chain is a Nevada resident.

59. Mr. Chain was historically a manager of Benessere Management.

60. Records maintained by the Nevada Secretary of State indicate that Mr. Chain was historically a manager of Benessere Management.

61. Mr. Chain is in fact actively and was in fact historically a manager of Michael's Plaza LLC ("Michael's").

62. Records maintained by the Nevada Secretary of State indicate that Mr. Chain is actively and was historically a manager of Michael's.

63. Mr. Chain is in fact actively the director of Millennium.

64. Records maintained by the Nevada Secretary of State indicate that Mr. Chain is actively the director of Millennium.

65. Mr. Chain is in fact actively and was in fact historically a director and the president, secretary, and treasurer of Millennium.

66. Records maintained by the Nevada Secretary of State indicate that Mr. Chain is actively and was historically the president, secretary, and treasurer of Millennium.

67. Mr. Chain is in fact actively the director, president, and treasurer of Modern Management.

68. Records maintained by the Nevada Secretary of State indicate that Mr. Chain is actively the director, president, and treasurer of Modern Management.

69. Mr. Chain is in fact actively and was in fact historically the secretary of Modern Management.

70. Records maintained by the Nevada Secretary of State indicate that Mr. Chain is actively and was historically the secretary of Modern Management.

71. Mr. Chain is a trustee of the Jeff & Linda Chain Family Trust ("JLC Trust").

9

72. Mrs. Chain is a Nevada resident.

73. Mrs. Chain is a trustee of the JLC Trust.

74. Mrs. Chain was historically a director of Millennium.

75. Records maintained by the Nevada Secretary of State indicate that Mrs. Chain was historically a director of Millennium.

76. Chain Consortium is a Nevada general partnership organized under Nevada law.

77. Chain Consortium's general partners are the following individual Defendants:  Mr. Bergman, Mr. Chain, Mrs. Chain, Allyn Povilaitis ("Mr. Povilaitis"), Mr. Gutzman, Mr. Martinez, and J. Matthew Kammeyer ("Mr. Kammeyer").

78. Cipriani, LLC ("Cipriani") is an active Nevada domestic limited-liability company.

79.  Cipriani is in fact actively managed by Mr. Chain and Dana Corbo, Esq. ("Mr. Corbo"), Mr. Gutzman, and Ram Janga ("Mr. Janga").

80.  Records maintained by the Nevada Secretary of State indicate that Cipriani is actively managed by Mr. Corbo, Mr. Gutzman, and Mr. Janga.

81. Cipriani was in fact historically managed by Mr. Chain and Cipriani Management.

82. Records maintained by the Nevada Secretary of State indicate that Cipriani was historically managed by Cipriani Management.

83. Cipriani Management is an active Nevada domestic limited-liability company.

84.  Cipriani Management is in fact actively and was in fact historically managed by Mr. Chain and Mr. Gutzman.

85. Records maintained by the Nevada Secretary of State indicate that Cipriani Management is actively and was historically managed by Mr. Gutzman.

10

86. Cipriani Management and Mr. Chain are in fact actively and historically managers of Buckeye 80.

87. Records maintained by the Nevada Secretary of State indicate that Cipriani Management is actively and was historically the manager of Buckeye 80.

88. Cipriani Management was historically the manager of Cipriani.

89. Records maintained by the Nevada Secretary of State indicate that Cipriani Management was historically the manager of Cipriani.

90. Cottonwood Retail, LLC ("Cottonwood") is an active Nevada domestic limited-liability company.

91. Cottonwood is in fact actively and was in fact historically managed by Mr. Chain, Mr. Kammeyer, and Mr. Povilaitis.

92. Records maintained by the Nevada Secretary of State indicate that Cottonwood is actively and was historically managed by Mr. Kammeyer and Mr. Povilaitis.

93. GEIII is an active Nevada domestic limited-liability company.

94. GEIII is in fact actively and was in fact historically managed by Mr. Chain and Mr. Gutzman.

95. Records maintained by the Nevada Secretary of State indicate that GEIII is actively and historically managed by Mr. Gutzman.

96. GEIII and Mr. Chain are in fact actively and were in fact historically managers of 99th LLC.

97. Records maintained by the Nevada Secretary of State indicate that GEIII is actively and was historically a manager of 99th LLC.

11

98. GEIII and Chain are in fact actively and were in fact historically managers of Gila Bend 384, LLC ("Gila Bend").

99. Records maintained by the Nevada Secretary of State indicate that GEIII is actively and was historically a manager of Gila Bend.

100. GEIII was historically a manager of Buckeye 77.

101. Records maintained by the Nevada Secretary of State indicate that GEIII was historically a manager of Buckeye 77.

102. GEIII was historically a manager of Buckeye 80.

103. Records maintained by the Nevada Secretary of State indicate that GEIII was historically a manager of Buckeye 80.

104. Gila Bend is an active Nevada domestic limited-liability company.

105. Gila Bend is in fact actively and was in fact historically managed by Mr. Chain and GEIII.

106. Records maintained by the Nevada Secretary of State indicate that Gila Bend is actively and historically managed by GEIII.

107. Gila Bend was in fact historically managed by Mr. Chain and Innovative.

108. Records maintained by the Nevada Secretary of State indicate that Gila Bend was historically managed by Innovative.

109. Mr. Gutzman is a Nevada resident.

110. Mr. Gutzman and Mr. Chain are in fact actively and were in fact historically managers of Benessere Management.

111. Records maintained by the Nevada Secretary of State indicate that Mr. Gutzman is actively and was historically a manager of Benessere Management.

112. Mr. Gutzman and Mr. Chain are in fact actively and were in fact historically managers of Cipriani Management.

113. Records maintained by the Nevada Secretary of State indicate that Mr. Gutzman is actively and was historically a manager of Cipriani Management.

114. Mr. Gutzman and Mr. Chain are in fact actively and were in fact historically managers of GEIII.

115. Records maintained by the Nevada Secretary of State indicate that Mr. Gutzman is actively and was historically a manager of GEIII.

116. Mr. Gutzman and Mr. Chain are in fact actively and were in fact historically managers of Phoenix 83rd.

117. Records maintained by the Nevada Secretary of State indicate that Mr. Gutzman is actively and was historically a manager of Phoenix 83rd.

118.  Mr. Gutzman and Mr. Chain are in fact actively managers of Cipriani.

119. Records maintained by the Nevada Secretary of State indicate that Mr. Gutzman is actively a manager of Cipriani.

120. Innovative is an active Nevada domestic limited-liability company.

121. Innovative is in fact actively and historically managed by Mr. Chain and Modern Management.

122. Records maintained by the Nevada Secretary of State indicate that Innovative is managed actively and historically by Modern Management.

13

123. Innovative and Mr. Chain are in fact actively and historically managers for 99th Management.

124. Records maintained by the Nevada Secretary of State indicate that Innovative is actively and was historically a manager for 99th Management.

125. Innovative and Mr. Chain were in fact historically managers for Buckeye 77.

126. Records maintained by the Nevada Secretary of State indicate that Innovative was historically a manager for Buckeye 77.

127. Innovative and Mr. Chain were in fact historically managers for Benessere Management.

128. Records maintained by the Nevada Secretary of State indicate that Innovative was historically a manager for Benessere Management.

129. Innovative and Mr. Chain were in fact historically managers for Gila Bend.

130. Records maintained by the Nevada Secretary of State indicate that Innovative was historically a manager for Gila Bend.

131. The JLC Trust is a trust established under the laws of the state of Nevada.

132. The JLC Trust is an active and historical manager of Phoenix 83rd.

133. Records maintained by the Nevada Secretary of State indicate that the JLC Trust is an active and historical manager of Phoenix 83rd.

134. Mr. Kammeyer is a Nevada resident.

135. Mr. Kammeyer and Mr. Chain are in fact actively and were in fact historically managers of Cottonwood.

136. Records maintained by the Nevada Secretary of State indicate that Mr. Kammeyer is actively and was historically a manager of Cottonwood.

137. KAN Investments, LLC ("KAN") is an active Nevada domestic limited-liability company.

138. KAN is in fact actively and historically managed by Mr. Chain and Mr. Povilaitis.

139. Records maintained by the Nevada Secretary of State indicate that KAN is actively and historically managed by Mr. Povilaitis.

140. Mr. Martinez is a Nevada resident.

141. Mr. Martinez and Mr. Chain are in fact actively and were in fact historically managers of 99th Management.

142. Records maintained by the Nevada Secretary of State indicate that Mr. Martinez is actively and was historically a manager of 99th Management.

143. Mr. Martinez and Mr. Chain are in fact actively and were in fact historically managers of Phoenix 83rd.

144. Records maintained by the Nevada Secretary of State indicate that Mr. Martinez is actively and was historically a manager of Phoenix 83rd.

145. Millennium Construction, Inc., doing business as MCI ("MCI"), is an active Nevada domestic corporation.

146. Mr. Povilaitis is in fact actively and historically the director, secretary, and treasurer of MCI.

147. Records maintained by the Nevada Secretary of State indicate that Mr. Povilaitis is actively and was historically the director, secretary, and treasurer of MCI.

148. Rick W. Rainey ("Mr. Rainey") is in fact actively and historically the president of MCI.

149. Records maintained by the Nevada Secretary of State indicate that Mr. Rainey is actively and was historically the president of MCI.

150. Millennium Commercial Properties, LLC ("MCP") is an active Nevada domestic limited-liability company.

151. MCP is in fact actively and historically managed by Mr. Chain and RCRE, LLC ("RCRE").

152. Records maintained by the Nevada Secretary of State indicate that MCP is actively and was historically managed by RCRE.

153. Michael's Plaza, LLC ("Michael's") is an active Nevada domestic limited-liability company.

154. Michael's is in fact actively managed by Mr. Chain and Modern Management.

155. Records maintained by the Nevada Secretary of State indicate that Michael's is actively managed by Modern Management.

156. Michael's was historically managed by Mr. Chain and, initially, by Mr. Gutzman.

157. Records maintained by the Nevada Secretary of State indicate that Michael's was historically managed by Mr. Chain.

158. Modern Management is an active Nevada domestic corporation.

159. Mr. Chain is in fact actively the director, president, and treasurer, and in fact actively and historically the secretary, of Modern Management.

160. Records maintained by the Nevada Secretary of State indicate that Mr. Chain is actively the director, president, and treasurer, and actively and historically the secretary, of Modern Management

161. Mr. Povilaitis was historically the director, president, and treasurer of Modern Management.

162. Records maintained by the Nevada Secretary of State indicate that Mr. Povilaitis was historically the director, president, and treasurer of Modern Management

163. Modern Management and Mr. Chain are in fact actively and were in fact historically managers of Innovative.

164. Records maintained by the Nevada Secretary of State indicate that Modern Management is actively and was historically a manager of Innovative.

165. Modern Management and Mr. Chain are in fact actively and were in fact historically managers of Innovative.

166. Records maintained by the Nevada Secretary of State indicate that Modern Management is actively and was historically a manager of Innovative.

167. Modern Management and Mr. Chain are in fact actively managers of Michael's.

168. Records maintained by the Nevada Secretary of State indicate that Modern Management is actively a manager of Michael's.

169. Millennium is an active Nevada domestic corporation.

170. Mr. Chain is in fact actively the director of Millennium.

171. Records maintained by the Nevada Secretary of State indicate that Mr. Chain is actively the director of Millennium.

172. Mr. Chain is in fact actively and historically the president, secretary, and treasurer of Millennium.

173. Records maintained by the Nevada Secretary of State indicate that Mr. Chain is actively and was historically the president, secretary, and treasurer of Millennium.

174. Mrs. Chain was historically a director of Millennium.

175. Records maintained by the Nevada Secretary of State indicate that Mrs. Chain was historically a director of Millennium.

176. Millennium was in fact a manager for Benessere Management.

177. Records maintained by the Nevada Secretary of State indicate that Millennium was in fact a manager for Cipriani Management.

178. Phoenix 83rd is an active Nevada domestic limited-liability company.

179. Phoenix 83rd is in fact actively and historically managed by Mr. Chain and Mr. Gutzman.

180. Records maintained by the Nevada Secretary of State indicate that Phoenix 83rd is actively and was historically managed by Mr. Gutzman.

181. Phoenix 83rd is in fact actively and historically managed by Mr. Chain and Mr. Martinez.

182. Records maintained by the Nevada Secretary of State indicate that Phoenix 83rd is actively and was historically managed by Mr. Martinez.

183. Phoenix 83rd is in fact actively and historically managed by Mr. Chain and JLC Trust.

184. Records maintained by the Nevada Secretary of State indicate that Phoenix 83rd is actively and was historically managed by JLC Trust.

18

1    185. Phoenix 83rd is in fact actively and historically managed by Mr. Chain and Capri I.

2    186. Records maintained by the Nevada Secretary of State indicate that Phoenix 83rd is

3    actively and was historically managed by Capri I.

4    187. Phoenix 83rd is in fact actively and historically managed by Mr. Chain and Capri II.

5    188. Records maintained by the Nevada Secretary of State indicate that Phoenix 83rd is

6    actively and was historically managed by Capri II.

7    189. Mr. Povilaitis is a Nevada resident.

8    190. Mr. Povilaitis and Mr. Chain are in fact actively and were in fact historically managers

9    of Cottonwood.

10    191. Records maintained by the Nevada Secretary of State indicate that Mr. Povilaitis is

11    actively and was historically a manager of Cottonwood.

12    192. Mr. Povilaitis and Mr. Chain are in fact actively and were in fact historically managers

13    of KAN.

14    193. Records maintained by the Nevada Secretary of State indicate that Mr. Povilaitis is

15    actively and was historically a manager of KAN.

16    194. Mr. Povilaitis was historically the director, president, and treasurer of Modern

17    Management.

18    195. Records maintained by the Nevada Secretary of State indicate that Mr. Povilaitis was

19    historically the director, president, and treasurer of Modern Management.

20    196. Mr. Povilaitis and Mr. Chain were in fact historically the directors, secretaries, and

21    treasurers of MCI.

22

197. Records maintained by the Nevada Secretary of State indicate that Mr. Povilaitis was historically the director, secretary, and treasurer of MCI.

198. RCRE is an active Nevada domestic limited-liability company.

199. RCRE is in fact actively managed by Mr. Chain and Modern Management.

200. Records maintained by the Nevada Secretary of State indicate that RCRE  is actively managed by Modern Management.

201. RCRE and Mr. Chain are in fact actively managers of MCP.

202. Records maintained by the Nevada Secretary of State indicate that RCRE is actively managed by MCP.

203. T.W.B. Enterprises, Inc. ("T.W.B.") is an active Nevada domestic corporation.

204.  Mr. Bergman is in fact actively and historically the director, president, secretary, and treasurer of T.W.B.

205. Records maintained by the Nevada Secretary of State indicate that Bergman is actively and was historically the director, president, secretary, and treasurer of T.W.B.

### B.    *Collective Defendant Parties*

206. 99th LLC, Benessere, Capri I, Cipriani, Cottonwood, Gila Bend, and Michael's are collectively referred to as the "Millennium Investment Companies."

207. Exhibit 1, attached hereto and incorporated herein, comprises the original operating agreement and the amended and restated operating agreement of 99th LLC (the "99th LLC Operating Agreement").

208. Exhibit 2, attached hereto and incorporated herein, is the operating agreement of Benessere (the "Benessere Operating Agreement").

209. Exhibit 3, attached hereto and incorporated herein, is the operating agreement of Capri I (the "Capri I Operating Agreement").

210. Exhibit 4, attached hereto and incorporated herein, is the operating agreement of Cipriani (the "Cipriani Operating Agreement").

211. Exhibit 5, attached hereto and incorporated herein, is the operating agreement of Cottonwood (the "Cottonwood Operating Agreement").

212. Exhibit 6, attached hereto and incorporated herein, is the operating agreement of Gila Bend (the "Gila Bend Operating Agreement").

213. Exhibit 7, attached hereto and incorporated herein, is the operating agreement of Michael's (the "Michael's Operating Agreement"; collectively with the 99th LLC Operating Agreement, the Benessere Operating Agreement, the Capri I Operating Agreement, the Cipriani Operating Agreement, the Cottonwood Operating Agreement, and the Gila Bend Operating Agreement, the "Operating Agreements").

214. MCP, MCI, and Millennium are collectively referred to as the "Millennium Entities."

215. The Chain Consortium exerts influence or control over every other Defendant through the Millennium Entities, Modern Management, or Innovative.

216. The Chain Consortium formed and managed the Millennium Investment Companies for the purpose of effecting business transactions associated with obtaining investments from Kabins.

217. The Chain Consortium instituted the following respective individuals as respective managers of the respective Millennium Investment Companies as follows:

a.  99th Management (for 99th LLC): Mr. Chain, Mrs. Chain, Mr. Povilaitis, Mr. Gutzman, and Mr. Martinez acted on behalf of, and as agents for, the management and ownership of 99th Management.

b.  Benessere Management (for Benessere): Mr. Chain, Mrs. Chain, Mr. Povilaitis, Mr. Gutzman, and Mr. Martinez acted on behalf of, and as agents for, the management and ownership of Benessere Management.

c.  Phoenix 83rd (for Capri I): Mr. Chain and Mrs. Chain (through JLC Trust), Mr. Povilaitis, Mr. Gutzman, and Mr. Martinez (through Capri II) acted on behalf of, and as agents for, the management and ownership of Phoenix 83rd.

d.  Cipriani Management (for Cipriani): Mr. Chain, Mrs. Chain, Mr. Povilaitis, and Mr. Gutzman acted on behalf of, and as agents for, the management and ownership of Cipriani Management.

e.  Mr. Kammeyer and Mr. Povilaitis (for Cottonwood): Mr. Chain, Mr. Kammeyer, and Mr. Povilaitis acted on behalf of, and as agents for, the management and ownership of Cottonwood, including Modern Management and Innovative.

f.  GEIII and Innovative (for Gila Bend): Mr. Chain, Mrs. Chain, Mr. Povilaitis, and Mr. Gutzman acted on behalf of, and as agents for, the management and ownership of GEIII and Innovative.

g.  Modern Management, Innovate, and 3900 LLC (for Michael's): Mr. Chain, Mrs. Chain, and Mr. Povilaitis acted on behalf of, and as agents for, the management and

1       ownership of Modern Management.  Mr. Gutzman was a member/manager at the time

2       of formation of Michael's.

3   h.  The Defendants described in subparagraphs 217a through 217g are collectively

4       referred to as "Managers."

5  218. Other businesses or individuals in which the Chain Consortium, by way of one or more

6 of the Chain Consortium's general partners, had pecuniary interests, but in which Kabins did not

7 have a pecuniary interest, are referred to as "Misappropriation Beneficiaries."

8

9            **ALLEGATIONS COMMON TO ALL CLAIMS FOR RELIEF**

10  219.  The Chain Consortium, the Millennium Entities, and the Managers created the

11 Millennium Investment Companies.

12  220. Mr. Chain, personally, and on behalf of Millennium, the Millennium Entities, and the

13 Chain Consortium, gave a guarantee to Kabins that Kabins respectively would never lose any of

14 the money invested by Kabins in the Millennium Investment Companies.

15  221. The Chain Consortium managed and controlled the Managers, the Millennium Entities,

16 and the Millennium Investment Companies.

17  222. The Managers controlled the respective Millennium Investment Companies' day-to-day

18 business operations, checking accounts, and authorization or consent to disbursements of

19 Kabins' invested capital to and through the Defendants.

20  223. The Chain Consortium is and was part of a common enterprise using the

21 instrumentalities of interstate commerce for the Chain Consortium's individual, respective, and

22 joint pecuniary interests in a scheme to defraud Kabins (the "Enterprise").

23

224. The Chain Consortium organized, created, and controlled the Enterprise's entities associated with the Millennium Investment Companies to create a façade of an apparently legitimate portfolio of securities associated with investments in real properties.

225. The Chain Consortium agreed, as evidenced by the Operating Agreements and the Millennium Investment Companies' check registers, maliciously to concoct inducement misrepresentations, oppressive concealment protocols, and supporting documentation that was spurious, deceptive, incomplete, and unintelligible, with the intent to defraud Kabins out of approximately $11 million.

226. The Chain Consortium, the Managers, and the Millennium Entities used the Millennium Investment Companies to receive large, undisclosed commissions immediately after Kabins invested capital in the respective Millennium Investment Companies.

227. The Chain Consortium used the Managers and the Millennium Entities to pay the Chain Consortium millions of dollars of commissions and other up-front compensation from Kabins' invested money, which commissions and compensation the Chain Consortium, the Managers, and the Millennium Entities intentionally, maliciously, and oppressively concealed from Kabins.

228. The Chain Consortium, the Managers, and the Millennium Entities deliberately conspired and agreed to create the circumstances for communicating a series of malicious, oppressive, and fraudulent misrepresentations and for failing to reveal material omissions to induce Kabins to purchase securities with the Millennium Investment Companies.

229. The Chain Consortium exercised actual power or control over the Managers, the Millennium Entities, and the Millennium Investment Companies when the Defendants effected the respective transactions with Kabins.

230. The Chain Consortium, the Managers, and the Millennium Entities intended for Kabins to rely on the Chain Consortium's, the Managers', and the Millennium Entities' efforts, communications, and special or fiduciary relationships with Kabins because the Chain Consortium knew that Kabins did not possess skills or knowledge applicable to investments for real property acquisition, property development, or sales.

231. The Chain Consortium, the Managers, and the Millennium Entities routinely breached the duty, arising out of the Chain Consortium's, Managers', and Millennium Entities' fiduciary duties as expressed in the Operating Agreements and pursuant to Nevada law, to exercise reasonable care in obtaining and communicating information to Kabins regarding the affairs of the respective Millennium Investment Companies and regarding Kabins' investments in the respective Millennium Investment Companies.

232. Each Defendant substantially assisted and encouraged each of the other Defendants, through direct communication with, or conduct in close proximity to or in furtherance of, the Chain Consortium, the Managers, the Millennium Entities, and the Millennium Investment Companies, to engage in a pattern of unlawful activity pursuant to a common design and concert of action based upon fraudulent misrepresentations used to defraud Kabins and to misappropriate Kabins' respective money through sales of securities associated with each of the Millennium Investment Companies.

233. In or about 1995, Dr. Kabins met Mr. Bergman when Mr. Bergman was a sales representative and Dr. Kabins was one of Mr. Bergman's customers.

234. In or about 2004, Mr. Bergman entered into an agreement with Mr. Chain, who was acting on behalf of the Chain Consortium and as an agent for the Managers, the Millennium

25

Entities, and the Millennium Investment Companies, under which agreement Mr. Chain agreed that, if Mr. Bergman could bring Mr. Chain invested money from Kabins, Mr. Chain would pay Mr. Bergman an undisclosed up-front finder's fee or commission out of Kabins' respective invested capital.

235. Mr. Bergman touted Mr. Chain to Kabins and introduced Mr. Chain to Kabins in approximately 2004.

236. Mr. Bergman and Mr. Chain intentionally concealed the agreement for the Chain Consortium to pay Mr. Bergman from Kabins' respective investments in the form of kickbacks—undisclosed, up-front, commissions—to Mr. Bergman.

237. The Millennium Investment Companies' check registers provide evidence of the agreement between Mr. Bergman and Mr. Chain whereby Millennium Investment Companies received Kabins' investments and then, almost immediately, paid a percentage of Kabins' investment to Mr. Bergman through Mr. Bergman's entity, T.W.B.

238. In November 2006, Mr. Bergman specifically told Kabins that, if Kabins would invest money with any companies affiliated with Mr. Chain, Mr. Bergman would not receive any up-front compensation, commission, or kickback from Kabins' respective investments.

239. Mr. Bergman's statement to Kabins regarding up-front compensation was false and misleading, and Mr. Bergman knew Mr. Bergman's statement to Kabins regarding up-front compensation statement was false and misleading when Bergman made that statement to Kabins.

240. Kabins tendered Kabins' first of seven total investments in November 2004 by purchasing an equity interest in Benessere, formerly Buckeye 77.

241. On or about November 30, 2004, Mr. Bergman created T.W.B. to create a corporate veil for Mr. Bergman's fraudulent activities.

242. The prospect of obtaining the millions of dollars worth of undisclosed up-front compensation was the motivation for each of the general partners of the Chain Consortium, the Managers, and the Millennium Entities to set up a fraudulent scheme and to gamble with Kabins' money in an inflated and highly speculative land market while maliciously and oppressively misrepresenting to Kabins that Kabins' invested principal in the Millennium Investment Companies would not be subject to losses.

243. The Chain Consortium, the Managers, and the Millennium Entities took Kabins' personal property, specifically, Kabins' invested money, in denial of, or inconsistent with, Kabins' rights, or in derogation, exclusion, or defiance of such rights, by misrepresenting to Kabins that, for each of Kabins' investments, Kabins' invested money had been, and would be, preserved with each of the Millennium Investment Companies.

244. The Chain Consortium, the Managers, and the Millennium Entities took Kabins' invested money and exercised dominion and control over Kabins' money, to the exclusion of Kabins, to pay the Chain Consortium and others substantial amounts of up-front, undisclosed, commissions, fees, and expenses out of Kabins' invested money.

### A.    *The Inducement Misrepresentations*

245. In or about October 2004, before making any investments in the Millennium Investment Companies, Kabins communicated to Mr. Bergman and Mr. Chain that Kabins would invest in a

real property venture only if the real properties could be acquired and maintained without any loans, *i.e.,* without leverage risk (the "Leverage Risk Condition").

246. Mr. Bergman and Mr. Chain communicated Kabins' Leverage Risk Condition to the Chain Consortium, the Managers, and the Millennium Entities.

247. The Chain Consortium, the Managers, and the Millennium Entities touted to Kabins the Chain Consortium's, the Managers', and the Millennium Entities' skill and success with real property investments to induce Kabins to rely on the Chain Consortium, the Managers, and the Millennium Entities as competent and trustworthy.

248. The Chain Consortium, the Managers, and the Millennium Entities had access to information regarding the Millennium Investment Companies not possessed by or available to Kabins.

249. The Managers were fiduciaries with respect to Kabins because of the Managers' status as managers of the Millennium Investment Companies and because of the fiduciary duties expressed in and arising from the Operating Agreements.

250. Kabins reasonably relied on the Chain Consortium, the Managers, the Millennium Entities, and the Millennium Investment Companies because of the fiduciary relationships expressed in the Operating Agreements and arising out of Nevada law, the exclusive access to facts and information possessed by Defendants, and the skills that Defendants claimed Defendants possessed regarding investments in real property.

28

1.    *The "Free and Clear Misrepresentation" concerning Michael's, 99th*

*LLC, Capri I, and Cottonwood*

251. Directly prior to every investment of money by a Kabins entity in a Millennium Investment Company, Mr. Bergman and Mr. Chain, as agents for the Chain Consortium, the Managers, and the Millennium Entities, told Kabins that each of the Millennium Investment Companies was, and would be, free of any debts, or "free and clear," such that Kabins' respective investments could not be subject to foreclosures or leverage risks associated with creditors (the "Free and Clear Misrepresentation").

252. Kabins reasonably relied on the Free and Clear Misrepresentation with respect to each of the Millennium Investment Companies.

253. The Chain Consortium maliciously intended for Kabins to rely on the Free and Clear Misrepresentation, which was material, false and oppressive, with respect to Michael's, which carried approximately $6,000,000 in debt.

254. The Chain Consortium maliciously intended for Kabins to rely on the Free and Clear Misrepresentation, which was material, false and oppressive, with respect to 99th LLC, which carried approximately $21,000,000 in debt.

255. The Chain Consortium maliciously intended for Kabins to rely on the Free and Clear Misrepresentation, which was material, false and oppressive, with respect to Capri I, which carried approximately $23,000,000  in debt.

256. The Chain Consortium maliciously intended for Kabins to rely on the Free and Clear Misrepresentation, which was material, false, and oppressive, with respect to Cottonwood, which carried approximately $2,600,000 in debt.

257. The Chain Consortium knew the Free and Clear Misrepresentation was false when made with respect to Michael's, 99th LLC, Capri I, and Cottonwood.

### 2. *The Distribution Misrepresentation*

258. Directly prior to every investment of money by a Kabins entity in a Millennium Investment Company, Mr. Bergman and Mr. Chain, as agents for the Chain Consortium, the Managers, and the Millennium Entities, told Kabins that each of the Millennium Investment Companies and each of the Managers would not permit any member, any manager, Mr. Bergman, or any other "insider" to take substantial distributions or up-front commissions from Kabins' invested funds until after the successful sale of the business or property associated with each of the Millennium Investment Companies (the "Distribution Misrepresentation"), specifically telling Kabins that no one would be paid any compensation except on the "back end."

259. Kabins reasonably relied on the Distribution Misrepresentation as limiting the Managers to incurring only conservative, reasonable expenses that would not adversely affect the viability of the Millennium Investment Companies or Kabins' invested principal.

260. The Chain Consortium, the Managers, and the Millennium Entities maliciously intended for Kabins to rely on the Distribution Misrepresentation, which was material, false, and oppressive.

261. The Chain Consortium, the Managers, and the Millennium Entities knew the Distribution Misrepresentation was false and fraudulent when made with respect to each of the Millennium Investment Companies.

30

262. For each of Kabins' respective investments in the respective Millennium Investment Companies, and at the time when the Chain Consortium, the Managers, and the Millennium Entities made the Distribution Misrepresentation, the Chain Consortium, the Managers, and the Millennium Entities also had prepared disclosures to deliver to Kabins *after* Kabins relied on the Distribution Misrepresentation and after Kabins had already invested in each of the Millennium Investment Companies (the "Untimely Disclosures").

263. The Untimely Disclosures purported to reveal, partially, that the Chain Consortium, the Managers, and the Millennium Entities had indeed intended to take substantial distributions from Kabins' invested capital to pay the Chain Consortium, the Managers, and the Millennium Entities in the form of front-end compensation.

264. Mr. Bergman routinely traveled to Dr. Kabins' Place of Business and, while at Dr. Kabins' Place of Business, misrepresented to Kabins that, if Kabins invested money with Mr. Chain's businesses, Mr. Bergman would not receive any up-front compensation, commission, or kickback emanating from Kabins' respective investments, a representation Mr. Bergman knew was false when Mr. Bergman made such misrepresentation to Kabins.

265. Kabins relied on Mr. Bergman's statements because Mr. Bergman was in the best position to know whether or not Mr. Bergman would be compensated from a part of Kabins' respective invested money, such as a front-end commission.

266. Kabins insisted that no front-end commissions could be paid from Kabins' respective investments, because Kabins wanted to ensure that the respective investments would be used to maximize the property acquisitions and minimize the need for any debt financing.

267. Mr. Bergman's failure to disclose to Kabins that Mr. Bergman would receive up-front commissions paid from Kabins' respective invested money constituted a material omission, because Kabins would not have invested under such conditions if Kabins had known that Mr. Bergman would receive such up-front commissions paid from Kabins' respective invested money.

### 3.     *The Principal Protection Misrepresentation*

268. Directly prior to every investment of money by a Kabins entity in a Millennium Investment Company, Mr. Bergman and Mr. Chain, as agents for the Chain Consortium, the Managers, and the Millennium Entities, told Kabins that each of the Millennium Investment Companies was "not possibly going to lose money," and that "the worst thing that could happen is that [Kabins] would get [Kabins'] money back," misleading Kabins to perceive that Kabins' invested principal was nearly as safe as a bank savings account or an investment in United States Treasury bills (the "Principal Protection Misrepresentation").

269. Kabins reasonably relied on the Principal Protection Misrepresentation because Kabins believed Mr. Bergman and Mr. Chain to possess, and Mr. Bergman and Mr. Chain in fact possessed, knowledge superior to that of Kabins regarding the Millennium Investment Companies' operations and financial conditions.

270. The Chain Consortium, the Managers, and the Millennium Entities maliciously intended for Kabins to rely on the Principal Protection Misrepresentation, which was material, false, and oppressive. The Chain Consortium, the Managers, and the Millennium Entities knew the Principal Protection Misrepresentation was false and fraudulent with respect to the Millennium

271. The Chain Consortium, the Managers, and the Millennium Entities made the Principal Protection Misrepresentation with respect to each of Kabins' respective investments in each of the Millennium Investment Companies, while planning to misrepresent Kabins' principal on tax forms and financial reports from each of the respective Millennium Investment Companies, which forms and reports falsely represented to Kabins that Kabins' principal remained intact even after the Chain Consortium, the Managers, and the Millennium Entities made substantial disbursements to the Chain Consortium, the Managers, and the Millennium Entities out of Kabins' invested capital.

272. The Chain Consortium, the Managers, and the Millennium Entities first delivered the Buckeye 77 (Benessere) 2004 K-1 to Kabins misrepresenting that, despite the substantial disbursements to the Chain Consortium, the Managers, and the Millennium Entities, every dollar of Kabins' principal had been protected.

273. For each of Kabins' subsequent respective investments in Cipriani, Gila Bend, Michael's Plaza, 99th LLC, Capri I, and Cottonwood, the Chain Consortium, the Managers, and the Millennium Entities knew, at the time when the Chain Consortium, the Managers, and the Millennium Entities made the Principal Protection Misrepresentation, that the Principal Protection Misrepresentation was false and would be reported falsely to Kabins on every year-end K-1 for each of the Millennium Investment Companies.

274. The Chain Consortium, the Managers, and the Millennium Entities did deliver false reporting of Kabins' principal for each of the Millennium Investment Companies on year-end K-1s at each year-end following the investment of such principal.

275. The Chain Consortium, the Managers, and the Millennium Entities knew that the Distribution Misrepresentation and the Principal Protection Misrepresentation were false every time the Defendants made the  Distribution Misrepresentation and the Principal Protection Misrepresentation to Kabins, based on the Chain Consortium's, the Managers', and the Millennium Entities' preparation of documents, lack of reserve funds, and the protocol of reporting to Kabins on K-1 tax forms, financial reports, and correspondence that Kabins' principal investment never diminished.


### 4.    *The Liquidity Misrepresentation*

276. Directly prior to every investment of money by a Kabins entity in a Millennium Investment Company, Mr. Bergman and Mr. Chain, as agents for the Chain Consortium, the Managers, and the Millennium Entities, told Kabins that the Millennium Investment Companies were "ground-floor" opportunities and that people "wanted to get in" and that the Managers for Kabins' investments could find investors who would purchase Kabins' equity interests for a reasonable price if Kabins wanted to sell at any time (the "Liquidity Misrepresentation").

277. Kabins reasonably relied on the Principal Protection Misrepresentation because Kabins believed Mr. Bergman and Mr. Chain to possess, and Mr. Bergman and Mr. Chain in fact possessed, knowledge superior to that of Kabins regarding the Millennium Investment

Companies' operations and financial conditions, including the Millennium Investment Companies' liquidity.

278. The Chain Consortium, the Managers, and the Millennium Entities maliciously intended for Kabins rely on the Liquidity Misrepresentation, which misrepresentation was material, false, and oppressive.

279. The Chain Consortium, the Managers, and the Millennium Entities knew the Liquidity Misrepresentation was false and fraudulent with respect to the Millennium Investment Companies.

280. Before Kabins invested money in Benessere and Cipriani, Mr. Gutzman personally, and as an agent for the Chain Consortium, the Managers, and the Millennium Entities, verified the Liquidity Misrepresentation and the Principal Protection Misrepresentations to Kabins for the purpose of inducing Kabins to invest in Benessere and Cipriani.  As part of the mix of investment information upon which Kabins relied in making Kabins' decision to invest in Benessere and in Cipriani, Kabins reasonably relied on Mr. Gutzman's misrepresentations in making Kabins' decision to invest in Benessere and in Cipriani.

### 5.   *The Risk of Loss Omission*

281. Directly prior to every investment of money by a Kabins entity in a Millennium Investment Company, Mr. Bergman and Mr. Chain, as agents for the Chain Consortium, the Managers, and the Millennium Entities, failed to disclose to Kabins the material fact that Kabins should be entitled to claim tax losses associated with each of the investments, because the Chain

Consortium, the Managers, and the Millennium Entities intended to conceal the fact that the Kabins' principal was subject to risk of loss.

282. Mr. Bergman and Mr. Chain, as agents for the Chain Consortium, the Managers, and the Millennium Entities, failed to disclose to Kabins the material fact that 100 percent of any economic losses (prior to the generation of net profits) would be allocable to Kabins and other cash investors until the Millennium Investment Companies completely depleted Kabins' invested capital, and the Chain Consortium, the Managers, and the Millennium Entities intended to commingle and embezzle Kabins' capital (the "Risk of Loss Omission").

283. Kabins reasonably relied on the absence of risk of loss in making Kabins' investments in the Millennium Investment Companies, because Kabins believed Mr. Bergman and Mr. Chain to possess, and Mr. Bergman and Mr. Chain in fact possessed, knowledge superior to that of Kabins regarding the Millennium Investment Companies' operations and financial conditions.

284. The Chain Consortium, the Managers, and the Millennium Entities maliciously intended for Kabins to rely on the Risk of Loss Omission, which omission was material, misleading, false, and oppressive, and the Chain Consortium, the Managers, and the Millennium Entities knew that the Chain Consortium, the Managers, and the Millennium Entities should have disclosed the Risk of Loss Omission, pursuant to a duty to speak, in order to make the perception of low risk not be misleading to Kabins.

285. Had the Chain Consortium, the Managers, and/or the Millennium Entities disclosed the Risk of Loss Omission to Kabins at any time prior to any of Kabins' respective investments in the respective Millennium Investment Companies, that disclosure would have substantially

altered the mix of investment information available to Kabins such that Kabins would not have invested in the Millennium Investment Companies.

### 6.    *The Inducement Misrepresentations*

286. The Free and Clear Misrepresentation, Distribution Misrepresentation, Principal Protection Misrepresentation, Liquidity Misrepresentation, and Risk of Loss Omission are collectively referred to as the "Inducement Misrepresentations."  Kabins did not know that the Inducement Misrepresentations were untrue or misleading, and Kabins could not have known, with the exercise of reasonable care or diligence, that the Inducement Misrepresentations were untrue or misleading.

287. The Inducement Misrepresentations would have been viewed by a reasonable investor, and are viewed by Kabins, as significantly altering the total mix of information that Defendants communicated to Kabins concerning the Millennium Investment Companies.  If Kabins had known the truth regarding the Inducement Misrepresentations, Kabins would not have invested in the Millennium Investment Companies.

288. The Inducement Misrepresentations were material and caused Kabins to invest in each of the Millennium Companies, which, in turn, caused substantial losses of Kabins' respective invested capital and Kabins' benefit of the respective bargains.

289. The Chain Consortium, the Managers, and the Millennium Entities assented to communicating the Inducement Misrepresentations to Kabins.

290. The Chain Consortium, the Managers, and the Millennium Entities failed to disclose to Kabins the material fact that, every time Kabins invested money in a Millennium Investment

Company, the Chain Consortium, the Managers, and the Millennium Entities intended to transfer substantial amounts of Kabins' invested money to the Misappropriation Beneficiaries.

291. The Chain Consortium, the Managers, and the Millennium Entities failed to disclose to Kabins the material fact that, every time Kabins invested money in a Millennium Investment Company, the Chain Consortium, the Managers, and the Millennium Entities did transfer substantial amounts of Kabins' invested money to the Misappropriation Beneficiaries.

292. The Chain Consortium, the Managers, and the Millennium Entities failed to disclose to Kabins the material fact that, every time Kabins invested money in a Millennium Investment Company, the Chain Consortium, the Managers, and the Millennium Entities intended to commingle Kabins' invested money with money belonging to the Misappropriation Beneficiaries.

293. The Chain Consortium, the Managers, and the Millennium Entities failed to disclose to Kabins the material fact that, every time Kabins invested money in a Millennium Investment Company, the Chain Consortium, the Managers, and the Millennium Entities did commingle Kabins' invested money with money belonging to the Misappropriation Beneficiaries.

**B.** ***The Pattern of Inducement Misrepresentations***

  *1.*   *2004-2005: Benessere, Cipriani, and Gila Bend*

294. The Chain Consortium, the Managers, and the Millennium Entities told Kabins, before Kabins made each of Kabins' respective investments, that the standard procedure of the Chain Consortium, the Managers, and the Millennium Entities was for Kabins to invest money first, and then review and sign supporting documentation at a later date.

38

295. This procedural requirement described for Kabins was materially false, misleading, and allowed the Chain Consortium, the Managers, and the Millennium Entities to create an opportunity for the Chain Consortium, the Managers, and the Millennium Entities to commit fraud in the execution or inception.

296. The Chain Consortium, the Managers, and the Millennium Entities first obtained Kabins' respective investments for the following real property ventures:

    a. Benessere, on or about November 9, 2004, from LCK Trust, for $1,000,000.00 (the "Benessere Investment";

    b. Cipriani, on or about April 27, 2005, from LCK Trust, for $1,000,000.00, with $200,000.00 paid on April 27, 2005, and $800,000.00 paid on May 5, 2005 (collectively, the "Cipriani Investment"); and

    c. Gila Bend, on or about May 12, 2005, from Kabins LP, for $1,000,000.00 (the "Gila Bend Investment").

297. Kabins made the Benessere Investment, the Cipriani Investment, and the Gila Bend Investment based on the Inducement Misrepresentations, with the exception of the Free and Clear Misrepresentation.

298. After Kabins had made the Benessere Investment, the Cipriani Investment, and the Gila Bend Investment, the Chain Consortium, the Managers, and the Millennium Entities built relationships with Kabins by routinely delivering to Kabins through the United States mail false reports, misleading Millennium Investment Company statements, and misleading K-1 tax forms.

299. Before Kabins LP invested in Michael's, the false reports delivered to Kabins misrepresented the status of the Benessere Investment, the Cipriani Investment, and the Gila

Bend Investment by showing that all of Kabins' initial capital had been preserved, while, in fact, the Managers had paid the Managers' selves, the Millennium Entities, the Chain Consortium, and others, substantial amounts of money from Kabins' respective invested capital such that Kabins' initial investments had, in fact, diminished.

300. On or about January 21, 2006, the Chain Consortium, the Managers, and the Millennium Entities used the Chain Consortium's, the Managers', and the Millennium Entities' control over the Benessere Investment, the Cipriani Investment, and the Gila Bend Investment to influence Kabins to invest in four additional Millennium Investment Companies—Michael's, 99th LLC, Capri I, and Cottonwood.

### 2.   *2006: Michael's*

301. In furtherance of the Chain Consortium's interests, Mr. Chain, Mr. Bergman, Mr. Gutzman, and Mr. Povilaitis, along with Mr. Chain's, Mr. Bergman's, Mr. Gutzman's, and Mr. Povilaitis' respective entities including, without limitation, 3900, Modern Management, Innovative, T.W.B., GEIII, KAN, MCP, MCI, and Millennium (collectively, the "Michael's Conspirators") fashioned a scheme to mislead Kabins LP into believing that Kabins' fourth respective investment, Michael's, would have the same purportedly negligible financial risks as the Benessere Investment, the Cipriani Investment, and the Gila Bend Investment.

302. By communicating the Free and Clear Misrepresentation to Kabins with respect to Michael's, the Michael's Conspirators maliciously and oppressively misled Kabins into believing that Kabins LP's investment in Michael's would satisfy the Leverage Risk Condition.

303. Michael's did not own any real property.

304. At all times, the Michael's Conspirators knew that Michael's did not own any real property.

305. On or about February 10, 2006, at Dr. Kabins' Place of Business, Mr. Chain and Mr. Bergman, as agents for the Michael's Conspirators and in furtherance of the Chain Consortium's interests, misrepresented to Kabins that Kabins LP would be investing in a company that owned real property, as had been the case with respect to the Benessere Investment, the Cipriani Investment, and the Gila Bend Investment.

306. The Michael's Conspirators told Kabins that Michael's was capable of producing rental income from a small retail plaza while concealing from Kabins the fact that the rental income would not be sufficient to satisfy the requisite debt financing.

307. On or about February 10, 2006, Mr. Bergman misrepresented to Kabins again that Mr. Bergman would not receive any up-front commissions as a result of any of Kabins' respective investments, and Mr. Bergman specifically told Kabins that Mr. Bergman would not receive any up-front payment related to Kabins LP's investment in Michael's.

308. The Michael's Conspirators' misrepresentations to Kabins LP were oppressive, malicious, false and fraudulent, and the Michael's Conspirators knew those misrepresentations were false when the Michael's Conspirators communicated those misrepresentations to Kabins.

309. The Michael's Conspirators had created Michael's to be an 80 percent member of 3900, while intentionally concealing this material fact from Kabins LP.

310. 3900 was subject to a bank loan of approximately six million dollars ($6,000,000) in debt both before and after the Michael's Conspirators told Kabins LP that Kabins LP's investment in Michael's would not be subject to any debt financing, loans, or leverage risk.

41

311. 3900 owned the actual real property that Michael's was purported to Kabins LP by the Michael's Conspirators to own, while Mr. Chain and Mr. Povilaitis, through Modern Management and KAN, owned the remaining 20 percent of 3900 in addition to Mr. Chain and Mr. Povilaitis' membership interest in Michael's, which was unknown to Kabins because the Michael's Conspirators intentionally concealed this material fact from Kabins LP.

312. The Michael's Conspirators concealed the actual leverage risk associated with the Michael's investment based on the fact that, even though Michael's is only a member of 3900, and Michael's itself does not appear to have any debt, Kabins LP's investment in Michael's was subject to the leverage risk attributable to 3900's loan of nearly $6,000,000.00 (the "Michael's Artifice").

313. Kabins LP reasonably relied on the Michael's Conspirators' communication of the Free and Clear Misrepresentation regarding the absence of leverage risk.

314. Mr. Gutzman secretly resigned from Michael's at approximately the same time that Kabins LP invested in Michael's, a fact not communicated to Kabins LP, demonstrating Mr. Gutzman's knowledge of the actual financial risk associated with investments in Michael's.

315. On approximately February 10, 2009, Mr. Bergman and Mr. Chain, as agents for the Michael's Conspirators, communicated the Inducement Misrepresentations to Kabins LP at Dr. Kabins' Place of Business.

316. In February and March 2006, Kabins LP invested $3 million to obtain equity interests in Michael's as follows:

    a.  $1,000,000.00 on February 24, 2006;

    b.  $1,000,000.00 on February 27, 2006;

    c.   $300,000.00 on March 6, 2006; and

    d.   $600,000.00 on or about March 7, 2006 (the "Michael's Investments").

317. Almost immediately after the Michael's Conspirators received Kabins LP's $3 million investment, the Michael's Conspirators paid the Michael's Conspirators $2.37 million as follows:

    a.   $2,000,000 on March 2, 2006 to Innovative;

    b.   $150,000.00 on March 7, 2006 to T.W.B.;

    c.   $50,000.00 on March 8, 2006 to T.W.B.; and

    d.   $165,870.00 on March 21, 2006, to Innovative (collectively, the "Michael's Disbursements").

318. The Michael's Conspirators made the Michael's Disbursements within approximately one month of the first of the Michael's Investments.

319. The Michael's Conspirators delayed providing the Michael's Operating Agreement to Kabins LP for nearly four months following the last of the Michael's Investments.

320. At the time the Michael's Conspirators provided the Michael's Operating Agreement to Kabins LP, Mr. Chain and Mr. Bergman made the Execution Misrepresentation to Kabins.

321. Kabins LP could only have relied on the Inducement Misrepresentations in making the Michael's Investments, as well as the prior pattern of Inducement Misrepresentations surrounding the Benessere Investment, the Cipriani Investment, and the Gila Bend Investment, in making Kabins LP's investment in Michael's, because Kabins LP had no source of information with respect to Michael's other than the Michael's Conspirators and the documentation provided to Kabins LP by the Michael's Conspirators.

43

322.  The Michael's Conspirators concealed the Michael's Operating Agreement and any other written disclosures regarding Michael's from Kabins LP until well after the Michael's Conspirators had made the Michael's Disbursements.

323. The Michael's Conspirators had paid an up-front commission to Mr. Bergman, through T.W.B., consisting of five percent of Kabins LP's investment in Michael's, in breach of the Distribution Misrepresentation and in breach of Mr. Bergman's representations.

324. The Michael's Conspirators knowingly acted in derogation, exclusion, or defiance of Kabins LP's rights to Kabins LP's capital invested via the Michael's Investments, to the exclusion of Kabins LP, to make undisclosed payments from the Michael's Investments to Mr. Bergman and the other Michael's Conspirators.

325. The income generated by Michael's was not enough to cover debt service, and the Michael's Conspirators had no plan for protecting investors, which resulted in the insolvency of Michael's and damaged Kabins LP in an amount to be determined at trial.

326. The Michael's Conspirators subsequently concealed the precarious financial position of Michael's by delivering false financial statements and K-1s to Kabins through use of the United States mail, which statements and K-1s misrepresented that all of Kabins LP's investments in Michael's had been preserved.  Kabins LP relied on the false financial statements and K-1s, which prevented Kabins LP from discovering the fraud associated with Michael's until early 2009, when Kabins LP's attorney received and analyzed Michael's financial statements.

3. *2006-2007: 99th LLC, Capri I, and Cottonwood*

327. After the Michael's Conspirators defrauded Kabins LP with the Michael's Artifice, the Chain Consortium, the Managers, and the Millennium Entities used the Chain Consortium's, the Managers', and the Millennium Entities' prior pattern of fraudulent misrepresentations to induce Kabins to invest in 99th LLC, Capri I, and Cottonwood, all of which were highly leveraged and supported exclusively with short-term financing.

328. On or about April 10, 2006, Kabins LP invested $1,000,000.00 to obtain equity interests in 99th LLC; on November 30, 2006, Kabins LP invested $35,635.19 to obtain equity interests in 99th LLC; and on February 14, 2007, Kabins LP invested $1,500,000.00 to obtain equity interests in 99th LLC (the "99th LLC Investments").

329. On or about May 10, 2007, LCK Trust invested $2,000,000.00 to obtain equity interests in Capri I (the "Capri I Investment").

330. On or about August 3, 2007, LCK Trust invested $650,000.00 to obtain equity interests in Cottonwood (the "Cottonwood Investment").

331. Directly prior to Kabins making the respective 99th LLC Investments, the Capri I Investment, and the Cottonwood Investment, the Chain Consortium, the Managers, and the Millennium Entities concealed the leverage risk associated with 99th LLC, Capri I, and Cottonwood, respectively, by telling Kabins that 99th LLC, Capri I, and Cottonwood, respectively, were subject to no leverage risk or debt financing and that the 99th LLC Investments, the Capri I Investment, and the Cottonwood Investment, respectively, would carry the same purportedly minimal risks associated with the Benessere Investment, the Cipriani Investment, and the Gila Bend Investment.

45

332. The Chain Consortium, the Managers, and the Millennium Entities took Kabins' respective invested money and paid the Chain Consortium, the Managers, and the Millennium Entities significant, undisclosed up-front buyer's commissions and management and consulting fees.

333. The Chain Consortium, the Managers, and the Millennium Entities failed to disclose when Kabins tendered the 99th LLC Investments, the Capri I Investment, and the Cottonwood Investment that the Managers had taken for the Managers' selves high ownership percentages— 60 percent in 99th LLC, 67 percent in Capri I, and 60 percent in Cottonwood—obtained with nominal equity contributions, equity purchased with wrongfully-obtained fees, or no equity contributions at all.

334. Following Kabins' making the respective 99th LLC Investments, the Capri I Investment, and the Cottonwood Investment, the Chain Consortium, the Managers, and the Millennium Entities concealed the fact that the Chain Consortium, the Managers, and the Millennium Entities had taken more than 50 percent of the ownership equity from 99th LLC, Capri I, and Cottonwood by misrepresenting to Kabins that the basis of ownership of 99th LLC, Capri, and Cottonwood was the same as for Benessere, Cipriani, and Gila Bend, with respect to which equity ownership was, allegedly, based solely on cash investment.

335. The Chain Consortium, the Managers, and the Millennium Entities used Kabins' respective 99th LLC Investments, Capri I Investment, and Cottonwood Investment to pay the Chain Consortium, the Managers, and the Millennium Entities buyer's commissions not only as a percentage of Kabins' invested capital amount, but also as a percentage of the total amount of

acquisition financing, *i.e.,* the bank loans used to finance the acquisition of 99th LLC, Capri I, and Cottonwood.

336. From at least as early as 2006, the Chain Consortium, the Managers, and the Millennium Entities obtained high loan amounts 99th LLC, Capri I, and Cottonwood; took up-front buyer's commissions from the 99th LLC Investments, the Capri I Investment, and the Cottonwood Investment based, in large part, on the bank loans; and wasted Kabins' respective invested money, while gambling that the real estate market might go up and the Chain Consortium might find a later investor with which to pay the Chain Consortium, the Managers, and the Millennium Entities—and Kabins—on the back end as well.

337. The Chain Consortium, the Managers, and the Millennium Entities invested Kabins' money in 99th LLC, Capri I, and Cottonwood without disclosing to Kabins that the Chain Consortium, the Managers, and the Millennium Entities had no replacement or permanent financing in place and no prospective purchasers identified with respect to 99th LLC, Capri I, and Cottonwood.

338. The Managers' plan with respect to 99th LLC, Capri I, and Cottonwood was to purchase those properties and resell those properties quickly and at a higher value than the purchase price before the short-term loans with respect to those properties came due.  The Managers and Mr. Bergman concealed this plan from Kabins by misrepresenting that 99th LLC, Capri I, and Cottonwood were free and clear of debt, that the Managers had serious plans to develop 99th LLC, Capri I, and Cottonwood, that Kabins' invested principal in 99th LLC, Capri I, and Cottonwood was completely safe, and that the Managers, Mr. Bergman, and other insiders would only receive payments, *e.g.,* commissions or profits, after the successful sale of the property, in

accordance with the Inducement Misrepresentations concocted by the Chain Consortium, the Managers, and the Millennium Entities.

339. As of this date, 99th LLC, Capri I, and, Cottonwood have become insolvent and subject to foreclosure proceedings connected to those properties' respective outstanding loan amounts because of the Managers' pattern of fraud and failure, at a minimum, to exercise reasonable care in the undertaking of managing the Millennium Investment Companies, which resulted in unreasonable risk of harm and far-reaching damages to Kabins.

340. The Chain Consortium, the Managers, and the Millennium Entities should have had back-up financing plans or prospective purchasers, or both, with respect to 99th LLC, Capri I, and Cottonwood, and the Chain Consortium's, the Managers', and the Millennium Entities' failure to have such back-up financing plans or prospective purchasers in place with respect to 99th LLC, Capri I, and Cottonwood constitutes a breach of the Chain Consortium's, the Managers', and the Millennium Entities' duty of care to Kabins.

341. If the Chain Consortium, the Managers, and the Millennium Entities had disclosed the true risks to Kabins of investing in 99th LLC, Capri I, and Cottonwood, the mix of investment information available to Kabins would have been substantially altered and Kabins would not have invested in 99th LLC, Capri I, and Cottonwood.

### C. *Fraud in the Inducement Dates, Locations, and Identities*

342. The Chain Consortium, the Managers, and the Millennium Entities  agreed to send two individuals, Mr. Chain and Mr. Bergman, to Dr. Kabins' Place of Business on the following dates in order to make the Inducement Misrepresentations as agents for the Chain Consortium,

the Managers, and the Millennium Entities to induce Kabins to agree to invest money and purchase securities offered by the Chain Consortium, the Michael's Conspirators, and the Millennium Investment Companies, and to induce Kabins, subsequently, to write the checks or wire the money for Kabins' respective investments without Kabins having access to supporting documentation with respect to those investments, obtaining agreements to invest as follows:

    a.  On or about November 1, 2004, Mr. Gutzman, Mr. Bergman and Mr. Chain fraudulently induced Kabins to agree to invest $1,000,000.00 in Benessere.

    b.  On or about April 20, 2005, Mr. Gutzman, Mr. Bergman and Mr. Chain fraudulently induced Kabins to agree to invest $1,000,000.00 in Cipriani.

    c.  On or about May 2, 2005, Mr. Bergman and Mr. Chain fraudulently induced Kabins to agree to invest $1,000,000.00 in Gila Bend.

    d.  On or about February 10, 2006, Mr. Bergman and Mr. Chain fraudulently induced Kabins to agree to invest $3,000,000.00 in Michael's.

    e.  On or about April 1, 2006, Mr. Bergman and Mr. Chain fraudulently induced Kabins to agree to invest $1,000,000.00 in 99th LLC.

    f.  On or about February 4, 2007, Mr. Bergman and Mr. Chain fraudulently induced Kabins to agree to invest an additional $1,500,000.00 with 99th LLC.

    g.  On or about May 1, 2007, Mr. Bergman and Mr. Chain fraudulently induced Kabins to agree to invest $2,000,000.00 with Capri I.

    h.  On or about July 25, 2007, Mr. Bergman and Mr. Chain fraudulently induced Kabins to agree to invest $650,000.00 with Cottonwood.

343. Mr. Bergman and Mr. Chain used high-pressure sales tactics to induce Kabins into investing in Cottonwood on or about July 25, 2007, and falsely told Kabins on that date that Cottonwood would be an investment opportunity exclusive to Kabins and Mr. Chain. Mr. Bergman and Mr. Chain further falsely touted Cottonwood as subject to even lower risk and higher returns than Benessere, Cipriani, Gila Bend, Michael's, 99th LLC, and Capri I.

### D. *Kabins' Payments for Each of the Millennium Investment Companies' Securities*

344. Mr. Bergman and Mr. Chain, as agents for the Managers, the Chain Consortium, the Millennium Entities, and each of the Millennium Investment Companies, and through Mr. Bergman's and Mr. Chain's respective control over those Defendants, obtained money from Kabins based on Kabins' reliance on the Inducement Misrepresentations as follows:

   a. On November 9, 2004, Kabins delivered $1,000,000.00 to Mr. Chain, with the intent that such money serve as Kabins' investment in Buckeye 77 (subsequently, Benessere).

   b. On April 27, 2005, Kabins delivered $200,000.00 to Mr. Chain, in the form of Kabins LP's check number 259, with the intent that such money serve as Kabins' investment in Buckeye 80 (subsequently, Cipriani).

   c. On May 5, 2005, Kabins delivered $800,000.00 to Mr. Chain, in the form of Kabins LP's check number 550, with the intent that such money serve as Kabins' investment in Buckeye 80 (subsequently, Cipriani).

d.   On May 12, 2005, Kabins delivered $1,000,000.00 to Mr. Chain, in the form of
Kabins LP's check number 552, with the intent that such money serve as Kabins'
investment in Gila Bend.

e.   On February 24, 2006, Kabins delivered $1,100,000.00, in the form of Kabins LP's
check number 350, to Mr. Chain, on behalf of the Michael's Conspirators and
Michael's, with the intent that such money serve as Kabins' investment in Michael's.

f.   On February 27, 2006, Kabins delivered $1,000,000.00, in the form of check number
5373 from Dr. Kabins' professional corporation, to Mr. Chain, on behalf of the
Michael's Conspirators and Michael's, with the intent that such money serve as
Kabins' investment in Michael's.

g.   On March 6, 2006, Kabins delivered $300,000.00, in the form of check number 5374
from Dr. Kabins' professional corporation, to Mr. Chain, on behalf of the Michael's
Conspirators and Michael's, with the intent that such money serve as Kabins'
investment in Michael's.

h.   On or about approximately March 7, 2006, Kabins delivered $600,000.00 to Mr.
Chain, on behalf of the Michael's Conspirators and Michael's, with the intent that
such money serve as Kabins' investment in Michael's.

i.   On April 10, 2006, Kabins delivered $500,000.00, in the form of check number 5392
from Dr. Kabins' professional corporation, to Mr. Chain, with the intent that such
money serve as Kabins' investment in 99th LLC.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

    j.   On April 10, 2006, Kabins delivered another $500,000.00, in the form of Kabins LP's check number 385, to Mr. Chain, with the intent that such money serve as Kabins' investment in 99th LLC.

    k.   On November 30, 2006, Kabins delivered $35,635.19, in the form of Kabins LP's check number 753, to Mr. Chain, with the intent that such money serve as Kabins' investment in 99th LLC.

    l.   On February 14, 2007, Kabins delivered $1,500,000.00, in the form of Kabins LP's check number 755, to Mr. Chain, with the intent that such money serve as Kabins' investment in 99th LLC.  Kabins received a partial return of $500,000.00 of this invested capital on or about February 26, 2007.

    m.   On May 10, 2007, Kabins delivered $2,000,000.00, in the form of Kabins LP's check number 389, to Mr. Chain, with the intent that such money serve as Kabins' investment in Capri I.

    n.   On August 3, 2007, Kabins delivered $650,000.00, in the form of LCK Trust check number 1011, to Mr. Chain, with the intent that such money serve as Kabins' investment in Cottonwood.

345. On August 21, 2007, Cottonwood paid $20,000.00 of LCK Trust's invested money to Mr. Bergman through T.W.B. as a commission for LCK Trust's investment in Cottonwood, in breach of the Distribution Misrepresentation and of Mr. Bergman's personal misrepresentations to Kabins that Mr. Bergman would not be compensated as a result of Kabins' respective investments.

346. On September 24, 2007, Cottonwood paid $40,000.00 of LCK Trust's invested money to Mr. Bergman through T.W.B. as a commission for LCK Trust's investment in Cottonwood in breach of the Distribution Misrepresentation and of Mr. Bergman's personal misrepresentations to Kabins that Mr. Bergman would not be compensated as a result of Kabins' respective investments.

347. The Chain Consortium, the Managers, and the Millennium Entities obtained Kabins' invested money by lying about the risks associated with the investments, without presenting Kabins with a private placement memorandum or any other appropriate investment disclosures or documentation.  The Chain Consortium, the Managers, and the Millennium Entities told Kabins, through Mr. Bergman and Mr. Chain, that this procedure was normal and typical.

348. Kabins reasonably and justifiably relied on Mr. Bergman's and Mr. Chain's representations that Defendants'  procedure was normal and typical because Kabins knew several attorneys who had relationships with Mr. Chain and Mr. Gutzman who told Kabins that those attorneys had followed the same procedure for other investments with Mr. Chain and Mr. Gutzman.

349. Kabins' reasonable and justifiable reliance on the serial Inducement Misrepresentations led Kabins to deliver, over time, a substantial amount of Kabins' savings—approximately $11 million—to the Managers and the Millennium Investment Companies well before Kabins had an opportunity to see the Operating Agreements with respect to each of the Millennium Investment Companies.

**E.** ***Fraud in the Execution or Inception Misrepresentations***

350. After the Chain Consortium, the Managers, and the Millennium Entities obtained Kabins' respective invested money based on the Inducement Misrepresentations, Mr. Bergman and Mr. Chain, or agents for the Chain Consortium, would return to Dr. Kabins' Place of Business to obtain Kabins' signatures on investment documents.  On those occasions, Mr. Bergman and Mr. Chain rushed Kabins through the investment documents to obtain Kabins' signature while maliciously and oppressively telling Kabins that the documents merely reflected the Inducement Misrepresentations' standard language.

351. The Chain Consortium, the Managers, and the Millennium Entities incorporated the written contractual agreements associated with each Millennium Investment Company as *de facto* exhibits to the Inducement Misrepresentations when, on the dates on which Defendants' fraud in the execution or inception with respect to Kabins took place, as outlined *infra,* Mr. Bergman and Mr. Chain, as agents for the Managers, the Chain Consortium, and the Millennium Investment Companies, maliciously directed Kabins to sign the documents and told Kabins that the written agreements merely reflected "standard language" documenting the Inducement Misrepresentations, which Mr. Bergman and Mr. Chain knew was fraudulent (the "Execution Misrepresentation").

352. Because Mr. Chain and Mr. Bergman, as agents for the Managers, the Chain Consortium, and the Millennium Investment Companies, encouraged and intended Kabins to sign each of the sets of documents for each of the Millennium Investment Companies without reading the documents, the Managers, the Chain Consortium and the Millennium Investment

1   Companies materially omitted the terms in the documents that varied from the Inducement

2   Misrepresentations.

3       353. The Managers, the Chain Consortium, and the Millennium Investment Companies had a

4   duty to speak, based, at a minimum, on the Managers', the Chain Consortium's, and the

5   Millennium Investment Companies' fiduciary relationships with Kabins, to tell Kabins about the

6   written terms that varied from the oral Inducement Misrepresentations, because a reasonable

7   investor would have considered, as Kabins did consider, those material omissions as

8   substantially altering the mix of information Kabins considered for investing in each of the

9   Millennium Investment Companies.

10       354. After Kabins relied on the Managers' Inducement Misrepresentations and Kabins

11   delivered money to the Chain Consortium, the Managers, and the Millennium Entities in reliance

12   on the Inducement Misrepresentations, Mr. Bergman and Mr. Chain traveled once again to Dr.

13   Kabins' Place of Business to obtain Kabins' signatures on the Operating Agreements, which set

14   forth additional misrepresentations, inconsistencies, and inaccuracies with respect to Kabins'

15   investments in, and the operations of, the respective Millennium Investment Companies.

16       355. The Inducement Misrepresentations and the Execution Misrepresentations are

17   collectively referred to as the "Collective Misrepresentations."

18

19               **F.**      ***Fraud in the Execution or Inception Identities, Location, and Dates***

20       356. As agents for the Managers, the Chain Consortium, and the Millennium Investment

21   Companies, Mr. Chain and Mr. Bergman traveled to Dr. Kabins' Place of Business and acquired

22   Kabins' signatures on each of the Operating Agreements purporting to memorialize the

Inducement Misrepresentations and to memorialize Kabins' membership in each of the Millennium Investment Companies.

357. The Operating Agreements were entirely different in character and nature from what Mr. Chain and Mr. Bergman had represented to Kabins, but Mr. Chain and Mr. Bergman maliciously and oppressively concealed the content of the Operating Agreements by making the Execution Misrepresentation.

358. The Operating Agreements demonstrate that Defendants did not have a legitimate business plan, but simply wanted to provide the appearance of legitimacy to cover up Defendant's artifice with illegitimate documentation, designed to gain Kabins' confidence and to help Defendants conceal the fact that Defendants had taken millions of dollars worth of up-front commissions and fees by taking Kabins' invested dollars and disbursing substantial amounts to the Chain Consortium.

359. On behalf of the Defendants, Mr. Chain and Mr. Bergman scheduled times of the day for Kabins to sign the investment documents when Kabins would be at Dr. Kabins' Place of Business and when Dr. Kabins would otherwise be busy servicing patients and not at liberty to engage in detailed review and analysis of the Operating Agreements and other investment documents.

360. On or about April 20, 2006, Mr. Chain and Mr. Bergman acquired Kabins' signature on documents that Mr. Chain and Mr. Bergman misrepresented as embodying Mr. Chain's and Mr. Bergman's oral Inducement Misrepresentations regarding 99th LLC.

361. On or about January 25, 2007, Mr. Chain and Mr. Bergman acquired Kabins' signature on documents that Mr. Chain and Mr. Bergman misrepresented as embodying Mr. Chain's and

Mr. Bergman's oral Inducement Misrepresentations regarding the 99th LLC Amended and Restated Operating Agreement stating that the value of Kabins' equity position was $1,032,387.44.

362. On or about October 30, 2007, Kabins received page 24 of the 99th LLC Amended and Restated Operating Agreement, which stated that the value of Kabins' equity position in 99th LLC was $2,532,387.44.

363. On or about November 20, 2004, Mr. Chain and Mr. Bergman acquired Kabins' signature on documents that Mr. Chain and Mr. Bergman misrepresented as embodying Mr. Chain's and Mr. Bergman's oral Inducement Misrepresentations regarding Benessere.

364. On or about May 20, 2007, Mr. Chain and Mr. Bergman acquired Kabins' signature on documents that Mr. Chain and Mr. Bergman misrepresented as embodying Mr. Chain's and Mr. Bergman's oral Inducement Misrepresentations regarding Capri I.

365. On or about May 25, 2005, Mr. Chain and Mr. Bergman acquired Kabins' signature on documents that Mr. Chain and Mr. Bergman misrepresented as embodying Mr. Chain's and Mr. Bergman's oral Inducement Misrepresentations regarding Cipriani.

366. On or about August 13, 2007, Mr. Chain and Mr. Bergman acquired Kabins' signature on documents that Mr. Chain and Mr. Bergman misrepresented as embodying Mr. Chain's and Mr. Bergman's oral Inducement Misrepresentations regarding Cottonwood.

367. On or about May 25, 2005, Mr. Chain and Mr. Bergman acquired Kabins' signature on documents that Mr. Chain and Mr. Bergman misrepresented as embodying Mr. Chain's and Mr. Bergman's oral Inducement Misrepresentations regarding Gila Bend.

368. On or about June 15, 2006, Mr. Chain and Mr. Bergman acquired Kabins' signature on documents that Mr. Chain and Mr. Bergman misrepresented as embodying Mr. Chain's and Mr. Bergman's oral Inducement Misrepresentations regarding Michael's.

369. If the Chain Consortium, or the Managers, or the Millennium Investment Companies, had disclosed the fact that each of the Millennium Investment Companies carried extremely high risks of loss, pursuant to the short-term plans to "flip" the properties, Kabins would not have invested in any of the Millennium Investment Companies.

370. The Chain Consortium, the Managers, and the Millennium Entities knew that, if Kabins had understood the true risks associated with investment in any of the Millennium Investment Companies, the Chain Consortium, the Managers, and the Millennium Entities would not have been able to pay themselves exorbitant commissions and expenses from Kabins' respective invested money, and would not have been able to commingle Kabins' respective money with money belonging to the Misappropriation Beneficiaries.

### G.   *Fraud in the Offering Documents*

371. The documentation created by the Chain Consortium, the Managers, and the Millennium Entities, delivered to Kabins by Mr. Chain and Mr. Bergman in connection with each of Kabins' respective investments in the Millennium Investment Companies, typically including a "Deal Structure Memorandum," an "Executive Summary," "Risk Factors," and a "Contribution Agreement," as well as that respective Millennium Investment Company's Operating Agreement" (collectively, the "Offering Documents"), as well as subsequent

correspondence from the Managers (the "Correspondence"), contained numerous misrepresentations and material omissions (the "Document-Based Fraud").

372. The Document-Based Fraud is based on material terms that Defendants did not disclose to Kabins at all, or that Defendants inadequately disclosed, as well as misrepresentations expressly set forth in the Offering Documents and the Correspondence.

373. The Offering Documents with respect to Michael's, 99th LLC, Capri I, and Cottonwood purport to disclose loans, contrary to the Free and Clear Misrepresentation.

374. Defendants' subsequent disclosures as set forth in the Offering Documents regarding the loans with respect to Michael's, 99th LLC, Capri I, and Cottonwood are misleading and fraudulent, in that Defendants did not disclose in the Offering Documents material terms of the acquisition loans with respect to Michael's, 99th LLC, Capri I, and Cottonwood to Kabins, such as those loans' maturity dates and default provisions.

375. The Chain Consortium, the Managers, and the Millennium Entities intentionally, maliciously, and oppressively failed to disclose to Kabins the fact that the acquisition loans with respect to Michael's, 99th LLC, Capri I, and Cottonwood were short-term, which constituted additional material omissions, given that the short-term nature of those acqustion loans made the investments in Michael's, 99th LLC, Capri I, and Cottonwood extremely risky because those properties had to be sold almost immediately or else be lost to foreclosure.

376. The Offering Documents provided grossly inadequate, if any, disclosure of fees and commissions to be paid to the Defendants, and in some cases the Offering Documents failed to disclose that buyer's commissions were paid to the Chain Consortium, the Managers, and the

Millennium Entities, not merely as a percentage of Kabins' invested capital, but also as a percentage of total acquisition loans.

377. The check registers for the Millennium Investment Companies show substantial unauthorized payments to the Defendants in breach of the written representations set forth in the Offering Documents.

378. Section 7.04 of the 99th LLC Operating Agreement provided that the Managing Member of 99th LLC was to receive no fees for services, except for the buyer's commission, but the Chain Consortium, the Managers, and the Millennium Entities took fees inappropriately in contravention of that section of the 99th LLC Operating Agreement, further diluting the Millennium Investment Companies' and Kabins' invested capital, while the Defendants routinely reported to Kabins, through tax forms and correspondence, that all of Kabins' invested principal had been preserved.

379. The Chain Consortium, the Managers, and the Millennium Entities set forth numerous misrepresentations in the Offering Documents regarding development plans for the real property owned by the respective Millennium Investment Companies, when, in fact, there were no feasible plans to develop any of the real property owned by the respective Millennium Investment Companies.

380. The section of each Operating Agreement regarding distributions demonstrates that the Chain Consortium, the Managers, and the Millennium Entities' sole intent was to sell those respective properties in the short term, with no buyers lined up in advance, a very risky procedure referred to as "flipping."

381. The Offering Documents demonstrate the Managers' and the Chain Consortium's plans to sell each of the properties owned by the respective Millennium Investment Companies and wrap up all loans, expenses and distributions at the same time as those properties were sold, rather than to operate those properties as going concerns.

382. Where additional capital was or would be needed with respect to a Millennium Investment Company, the Defendants failed to provide in the Offering Documents with respect to that Millennium Investment Company a method for calculating the dilution of ownership interests that would occur if Kabins chose not to contribute additional capital.

383. The Managers ensured in the Offering Documents for each Millennium Investment Company that the Managers' ownership interests in each of the respective Millennium Investment Companies would not be diluted under any circumstances.

384. The Chain Consortium, the Managers, and the Millennium Entities intentionally and maliciously intended to provide for the dilution of Kabins' ownership interests in the respective Millennium Investment Companies if Kabins declined to contribute additional capital, while the Defendants intended to ensure no corresponding dilution for the Defendants' ownership interests in the respective Millennium Investment Companies if the Defendants declined to contribute additional capital.

385. The Defendants intentionally, maliciously, oppressively, and fraudulently concealed Defendants' provisions for the dilution of Kabins' ownership interest and the non-dilution of the Defendants' ownership interests (the "Dilution Provisions") from Kabins in connection with Kabins' purchase of the securities for 99th LLC, which constituted another material omission on the part of the Defendants.

386. If the Managers had disclosed the Dilution Provisions to Kabins, Kabins would not have invested in 99th LLC, because that information would have substantially altered the mix of information available to Kabins.

387. 99th LLC is now insolvent, with Kabins' investment in 99th LLC of approximately $2.53 million now lost.

388. The Defendants failed to disclose in the Offering Documents that, except in the event of net profits, which never occurred, all economic losses would be allocated to Kabins and other cash investors, but not to the Managers (the "Loss Allocation Omission").

389. In order for Kabins to have ascertained the existence of the Loss Allocation Omission, Kabins would have had to engage in sophisticated analysis of the Offering Documents under federal tax regulations.

390. The Managers knew that Kabins did not possess high-level tax analysis skills and the Managers intentionally concealed the Loss Allocation Omission, when the Managers should have explained to Kabins the nature and existence of the economic loss allocation with respect to the Millennium Investment Companies because that information would have substantially altered the mix of information available to Kabins in Kabins' respective decisions to invest in the respective Millennium Investment Companies.

391. The Managers knew that Kabins would not invest under such unfair circumstances, if those circumstances had been known to Kabins, and Kabins would thus not have invested in the respective Millennium Investment Companies if the Managers or the Chain Consortium had disclosed the Loss Allocation Omission to Kabins.

392. The Document-Based Fraud with respect to Cipriani included a plan to form a master limited-liability company that would ultimately consolidate 41 different adjacent properties held by 41 different LLCs named "Buckeye" into one parent limited-liability company (the "Consolidation").

393. Contrary to §7.03(q) of the Cipriani Operating Agreement, when the Consolidation occurred, there was no book-up to fair market value of the value of Kabins' investment in Buckeye 80, which provided more recent investors with a higher capital margin as part of a scheme intended at the time of Kabins' investment and creation of cost basis in Buckeye 80.  The Chain Consortium, the Managers, and the Millennium Entities did not account for unwarranted dilution of Kabins' unrealized appreciation existing at the time of the Consolidation, as compared to other Buckeye 80 investors that obtained interests in Buckeye 80 after Kabins.

394. One member of 99th LLC, the Boyce Family Trust ("Boyce") wanted to sell Boyce's ownership interest in 99th LLC (the "Boyce Interest").  Mr. Chain, Mr. Gutzman and Mr. Martinez delivered letters to Kabins dated November 21, 2006, January 19, 2007 and February 1, 2007 (the "Boyce Letters") explaining that Kabins had a right to purchase a portion of the Boyce Interest.

395. Kabins did purchase a portion of the Boyce Interest.

396. Mr. Chain, Mr. Gutzman and Mr. Martinez did not disclose to Kabins in the Boyce Letters the fact that Kabins' increased ownership in 99th LLC after Kabins purchased a portion of the Boyce Interest would increase the share of additional capital that would thereafter be required for Kabins to purchase a second portion of the Boyce Interest, or another portion of

ownership interest in 99th LLC, without suffering onerous dilution of Kabins' ownership interest in 99th LLC.

397. The Boyce Letters were fraudulent and misleading, and Kabins relied on Mr. Chain's, Mr. Gutzman's and Mr. Martinez's misrepresentations as set forth in the Boyce Letters, which caused Kabins to lose a portion of Kabins' respective investment with respect to the Boyce Interest.

398. Letters dated November 21, 2006, February 1, 2007 and February 12, 2007 from Mr. Chain, Mr. Gutzman, and Mr. Martinez regarding 99th LLC (the "99th LLC Letters") fail to disclose the method of dilution to be employed in connection with a call for additional capital for purchasing a second parcel of land, and for not disclosing that purchasing a second parcel of land would increase Kabins' share of the additional capital required for purchase of a second parcel of the Boyce Interest without Kabins consequently suffering from Defendants' oppressive and undisclosed dilution methods.

399. The 99th LLC Letters also include the misleading statement that purchasing the related portion of Boyce's accrued 12 percent preferred return would constitute a "prepayment" of interest and that Kabins would be reimbursed for such "prepayment," when such reimbursement would not in fact occur if not enough funds remained available for 99th LLC's investors to receive those investors' full preferred returns in the future.

400. The 99th LLC Letters, which were delivered via United States mail within ten (10) years of each other, constitute mail fraud in violation of 18 U.S.C. §1341 and thus constitute predicate acts under the Racketeering Influenced and Corrupt Organizations Act ("RICO").

401. Where additional capital was or would be needed with respect to a Millennium Investment Company, the Offering Documents with respect to that respective Millennium Investment Company did not adequately disclose the method of dilution that would occur if Kabins chose not to contribute additional capital to that respective Millennium Investment Company.

402. With respect to 99th LLC, the Managers required additional capital for purchasing a second parcel of land.  The Managers did not disclose until after the time the Managers called for that additional capital the method by which the Managers would calculate the dilution of the 99th LLC investors' pre-existing interests in 99th LLC.

403. The Chain Consortium, the Managers, and the Millennium Entities intentionally concealed from Kabins, at the time Kabins made Kabins' respective initial investment in 99th LLC, the method by which the Managers would calculate the dilution of the 99th LLC investors' pre-existing interests in 99th LLC following a call for additional capital.

404. The method of dilution of the 99th LLC investors' pre-existing interests ultimately used by the Managers, not anticipated by Kabins, later created economic compulsion for Kabins to contribute additional capital to 99th LLC because of the non-disclosed, detrimental method of dilution unilaterally imposed by the Managers.

405. The Chain Consortium's, the Managers', and the Millennium Entities' omissions with respect to the potential requirement for additional capital with respect to 99th LLC, and with respect to the method of dilution of pre-existing investors' interests in 99th LLC following a call for such additional capital, were material omissions, which substantially altered the general mix of information to Kabins such that Kabins would not have invested in 99th LLC if the Chain

Consortium, the Managers, and the Millennium Entities had disclosed the potential additional

capital requirement and the intended method of dilution with respect to 99th LLC.

### H.    *Additional Fraud-Related Facts*

406. As a part of the Chain Consortium's, the Managers', and the Millennium Entities'

fraudulent scheme, the Managers misrepresented the declining value of Kabins' principal by

delivering to Kabins, through the United States mail, K-1s and reports with respect to each

respective Millennium Investment Company showing the exact cash value Kabins had invested

in that respective Millennium Investment Company rather the actual reduced and declining value

of Kabins' investments in that respective Millennium Investment Company.

407. The actual value of Kabins' investments in each Millennium Investment Company,

which, with respect to each Millennium Investment Company, resulted from a combination of

the Chain Consortium's, the Managers', and the Millennium Entities' concealment of up-front

commissions, high fees and expenses, lack of any viable business plan, and general declining

market values, at a minimum.

408. The Chain Consortium's, the Managers', and the Millennium Entities'

misrepresentations regarding the actual value of Kabins' respective investments in each

respective Millennium Investment Company began to occur almost immediately after each

respective investment by Kabins in each respective Millennium Investment Company, when each

of the Millennium Investment Companies began losing substantial value.

409. The Chain Consortium, the Managers, and the Millennium Entities intentionally,

maliciously, and oppressively delayed Kabins' ability to discover the Chain Consortium's, the

Managers', and the Millennium Entities' fraud and other wrongs by concealing the facts that would have enabled Kabins to discover the fraud and other wrongs upon occurrence.

410. Kabins did not discover the fraud and other wrongs perpetrated by the Chain Consortium, the Managers, and the Millennium Entities with respect to Kabins' respective investments in the Millennium Investment Companies until in or about January 2009, after approximately two months of due diligence, when Kabins was able to examine the Millennium Investment Companies' check registers and financial statements, as well as other evidence of the Managers' and the Chain Consortium's fraudulent scheme.

411. In or about October 2008, after reviewing the Millennium Investment Companies' portfolio assembled by the Millennium Entities and the Chain Consortium, Kabins questioned Mr. Bergman and Mr. Chain about the risk of loss of Kabins' principal.

412. In response, on or about October 27, 2008, Mr. Chain and Mr. Bergman again intentionally concealed the risks associated with Kabins' respective investments in a effort to delay Kabins from discovering the Chain Consortium's, the Millennium Entities', and the Managers' fraudulent scheme by giving Kabins a "personal guarantee" [*sic*], signed by Mr. Chain on behalf of "Jeff Chain and Millennium Properties and Development Inc.," verbally verified by Mr. Bergman, and notarized on November 4, 2008 by Ms. Elida Davila ("Mr. Chain's Guaranty"), attached hereto and incorporated herein as Exhibit 8, insuring Kabins from all losses of principal associated with each Millennium Investment Company.

413. Mr. Chain provided Mr. Chain's Guaranty to demonstrate that Kabins should continue to rely, at a minimum, on the Liquidity Misrepresentation and the Principal Protection Misrepresentation.

414. Mr. Bergman and Mr. Chain told Kabins in writing that Mr. Chain's Guaranty must remain "strictly confidential" and that Mr. Chain's Guaranty was just for "Kabins and *not to any other investors*" (emphasis added).

415. Mr. Chain completely disregarded any separate entity of Mr. Chain in making Mr. Chain's Guaranty to Kabins by preparing Mr. Chain's Guaranty on Millennium letterhead, and signing Mr. Chain's Guaranty personally and as Millennium's "President."

416. At or about the same time as Mr. Chain issued Mr. Chain's Guaranty, Mr. Bergman told Kabins that Kabins should trust Mr. Chain because Mr. Chain "is the man," as Mr. Bergman touted Mr. Chain's ability to manage Kabins' portfolio.

417. At the same time Mr. Chain was executing Mr. Chain's Guaranty for Kabins, Mr. Chain failed to disclose to Kabins that Mr. Chain was in the process of confessing a judgment for $5,000,000 in November 2008, which, according to recent assertions by Mr. Chain, caused Mr. Chain to become insolvent.

418. In late December 2008, Mr. Chain further misrepresented the value of exchanges Mr. Chain could offer to Kabins for Kabins' equity positions in 99th LLC, Cottonwood, Capri I, and Michael's.

419. Subsequently, on January 5, 2009, Mr. Chain offered to purchase Kabins' equity in 99th LLC and Cottonwood with cash from Mr. Chain as the "President" of Millennium, but Mr. Chain failed to follow through with those offers, and subsequently refused to return Kabins' telephone calls and electronic mail communications.

420. Kabins was damaged by Defendants' fraud because, of the seven companies comprising the Millennium Investment Companies, 99th LLC, Capri I, Cottonwood, and Michael's are all

1   insolvent; Benessere, Cipriani, and Gila Bend have lost nearly all of Benessere's, Cipriani's, and

2   Gila Bend's respective equity; and the Managers have begun leveraging, at a minimum, Cipriani,

3   for millions of dollars.

4

5   ### I.   *Alter Ego Allegations*

6   421. The individual Defendants used the entities owned by those individual Defendants, or

7   otherwise affiliated with the Chain Consortium, to perpetuate, as mere alter egos of the Chain

8   Consortium, fraud on Kabins.

9   422. The Chain Consortium consistently disregarded the separateness of the entities owned

10  by the members of the Chain Consortium, or otherwise affiliated with the Chain Consortium, in

11  correspondence and documentation furnished to Kabins.  For example, with respect to 99th LLC,

12  Chain Consortium partners Mr. Chain, Mr. Gutzman, and Mr. Martinez routinely referred to Mr.

13  Chain, Mr. Gutzman, and Mr. Martinez individually as "managing members," when the

14  members of the Chain Consortium were not *de jure* managers of 99th LLC—instead, 99th

15  Management was the manager of 99th LLC.

16  423. The entities owned by members of, or otherwise affiliated with, the Chain Consortium

17  were not sufficiently capitalized to carry out the business those entities were purportedly

18  designed to accomplish, *i.e.,* successful sale of each of the Millennium Investment Companies.

19  As a result, many of the entities owned by members of, or otherwise affiliated with, the Chain

20  Consortium have fallen into default or insolvency.

21  424. The Chain Consortium general partners' agreement to defraud Kabins is evidenced by

22  the general partners' signatures on the Operating Agreements, and by disbursements made to the

69

Chain Consortium's general partners and the Chain Consortium's general partners' affiliated entities taken from Kabins' invested capital.

425. The Defendant entities disregarded the Defendant entities' separateness by routinely commingling money when paying bills for one another, and by receiving disbursements from each other, as evidenced by the Millennium Investment Companies' check registers.  For example, Millennium, by and through Mr. Chain and/or Mrs. Chain, caused each one of the seven Millennium Investment Companies to pay bills for Millennium.  Additional representative examples of commingling occurred as follows, without limitation:

    a.   In 2007 and 2008, 99th LLC paid bills and made disbursements out of 99th LLC's accounts to Millennium, to Innovative, to MCP, and to GEIII, as well as to Mr. Gutzman and Mr. Martinez individually.

    b.   In 2006, 2007, and 2008, Benessere paid bills and made disbursements out of Benessere's accounts to Millennium, to Innovative, to MCP, and to GEIII, as well as to Mr. Gutzman and Mr. Martinez individually.

    c.   In 2006, 2007, and 2008, Benessere commingled funds with, at a minimum, one other Millennium Investment Company, specifically, Cipriani.

**FIRST CAUSE OF ACTION**

**FEDERAL SECURITIES LAW VIOLATIONS UNDER 17 C.F.R. § 240.10b-5**

**(Against All Defendants)**

426. Plaintiffs incorporate, repeat, and reallege every allegation set forth above.

427. Mr. Chain, Mr. Bergman, and Mr. Gutzman, as general partners and agents of the Chain Consortium, the Managers, the Millennium Entities, and each of the Millennium Investment Companies, created and conspired to deliver the Collective Misrepresentations to Kabins in connection with offers to sell securities in the Millennium Investment Companies.

428. When the Defendants made the Collective Misrepresentations to Kabins, the Defendants made false or misleading statements of a material fact to Kabins with malice and the intent to oppress and defraud Kabins, while taking substantial amounts of Kabins' respective invested money from Nevada across state lines to Arizona, and/or through the wires or United States mail.

429. The Defendants knew, or had reasonable grounds to believe, that the Collective Misrepresentations were misleading to Kabins because the Defendants knew, before Kabins invested money, respectively, in each of the Millennium Investment Companies, that the Defendants intended to pay to the Defendants undisclosed up-front commissions, fees, and reimbursements, and to commingle parts of Kabins' invested capital to fund the Defendants' Misappropriation Beneficiaries.

430. When the Defendants made the Collective Misrepresentations to Kabins, the Defendants, with malice and oppression, fraudulently omitted to state material facts necessary in order to make the Collective Misrepresentations not misleading to Kabins in light of the circumstances under which the Defendants made the Collective Misrepresentations, *e.g.,* that the

71

Defendants would protect Kabins' invested capital against up-front disbursements, payments, fees, and commissions to the Defendants, as well as protect Kabins' invested capital against any leverage risk. These material omissions substantially altered the mix of available information such that Kabins would not have invested in any of the Millennium Investment Companies if the Defendants had disclosed the material omissions to Kabins.

431. The Defendants knew, or had reasonable grounds to believe, that the Collective Misrepresentations omitted material facts necessary in order to make the Collective Misrepresentations not misleading to Kabins in light of the circumstances under which the Defendants made the Collective Misrepresentations, specifically, that the Defendants maliciously and oppressively concealed clandestine agreements to pay themselves up-front commissions directly and through sham entities, and Defendants knew that Kabins' invested capital was subject to substantial risk of loss.

432. Kabins did not know, and, with the exercise of reasonable diligence, could not have known, about the up-front commissions, the risks to Kabins' invested capital, or the truth about the Collective Misrepresentations.

433. Kabins justifiably relied on the Collective Misrepresentations because the Defendants touted the partners of the Chain Consortium, the Managers, and the Millennium Entities as experts in real property investments, and Kabins justifiably relied on the Chain Consortium's, the Managers', and the Millennium Entities' misrepresentations, purported experience, and active roles in managing the Millennium Investment Companies.

434. The Defendants' Collective Misrepresentations separately and collectively caused Kabins to invest in each of the Millennium Investment Companies.

435. The Defendants' misrepresentations and omissions with respect to the Collective Misrepresentations were material because the Defendants' Collective Misrepresentations and omissions with respect to the Millennium Investment Companies directly and proximately caused substantial damages to Kabins, in an amount to be determined at trial.

436. As a direct and proximate result of Defendants' violations of 17 C.F.R. §240.l0b-5, Kabins sustained damages in an amount to be determined at trial.

437. Defendants could reasonably foresee that the complexities of Defendants' fraud would require Kabins to hire and retain attorneys, incurring substantial attorneys' fees and costs, and Defendants are thus liable for Kabins' attorneys' fees and costs incurred herein as a result of same.

438. The Defendants acted with malice, oppression, and intent to defraud Kabins, and Plaintiffs are accordingly entitled to an award of punitive damages for the Defendants' intentional misconduct.

## SECOND CAUSE OF ACTION

## CONSPIRACY TO COMMIT SECURITIES FRAUD

### (Against All Defendants)

439. Plaintiffs incorporate, repeat, and reallege every allegation set forth above.

440. Each general partner of the Chain Consortium conspired and agreed with one another and with the Managers, the Millennium Entities, and the Millennium Investment Companies to create the fraudulent scheme and to commit acts in furtherance of Defendants' pattern of securities fraud against Kabins at least seven (7) times over a period of four (4) years.

441. The Defendants' agreement to conspire is evidenced, at a minimum, by the Operating Agreements for each of the Millennium Investment Companies and the disbursements flowing to the conspirators from the Millennium Investment Companies and the conspirators' shell companies.

442. Defendants could reasonably foresee that the complexities of Defendants' fraud would require Kabins to hire and retain attorneys, incurring substantial attorneys' fees and costs, and Defendants are thus liable for Kabins' attorneys' fees and costs incurred herein as a result of same.

443. The Defendants acted with malice, oppression, and intent to defraud Kabins, and Plaintiffs are accordingly entitled to an award of punitive damages for the Defendants' intentional misconduct.

## THIRD CAUSE OF ACTION

## CIVIL CONSPIRACY

### (Against All Defendants)

444.  Plaintiffs incorporate, repeat, and reallege all of the allegations set forth above.

445. The Defendants agreed to act in concert with each other, and, individually and collectively, intended to accomplish the unlawful objective of fraudulently selling securities to Kabins for each of seven (7) separate companies, specifically the Millennium Investment Companies, based on the fraudulent, malicious, and oppressive Collective Misrepresentations.

446. The Defendants conspired with one another to defraud Kabins, respectively, on each of the dates of Kabins' respective investments in each of the Millennium Investment Companies.

74

447. The Defendants conspired to induce Kabins to continue to rely on Defendants' misrepresentations and fraudulent reports, including year-end K-1 tax forms, to prevent or delay Kabins from discovering the Defendants' fraudulent schemes.

448. The natural-person Defendants are individually liable for concert of action with the Managers, the Millennium Entities, and the Millennium Investment Companies, because the natural-person Defendants used the natural-person Defendants' alter egos to perpetuate a fraud.

449. The Chain Consortium, the Managers, and the Millennium Entities conspired with Mr. Bergman, Mr. Chain, and Mr. Gutzman in fraudulently obtaining Kabins' respective investments.

450. Mr. Bergman and Mr. Chain conspired with the Managers and the Millennium Entities in implementing the fraudulent scheme against Kabins.

451.  Each of the Millennium Investment Companies conspired with the Managers and the Millennium Entities in breaching fiduciary duties to Kabins and in perpetuating the fraudulent scheme against Kabins.

452.  Each of the Defendants conspired with the Millennium Investment Companies and the Millennium Entities in perpetuating the fraudulent scheme against Kabins.

453.  Defendants could reasonably foresee that the complexities of Defendants' civil conspiracy would require Kabins to hire and retain attorneys, incurring substantial attorneys' fees and costs, and Defendants are thus liable for Kabins' attorneys' fees and costs incurred herein as a result of same.

454. The Defendants acted with malice, oppression, and intent to defraud Kabins, and Plaintiffs are accordingly entitled to an award of punitive damages for the Defendants' intentional misconduct.

## FOURTH CAUSE OF ACTION

## CONCERT OF ACTION

### (Against All Defendants)

455. Plaintiffs incorporate, repeat, and reallege all of the allegations set forth above.

456.  Defendants acted in concert with one another, at a minimum, to commit fraud while pursuing the common design created by the Chain Consortium, the Millennium Entities, the Managers, and the Millennium Investment Companies.

457. The natural-person Defendants are individually liable for concert of action with the Managers, the Millennium Entities, and the Millennium Investment Companies, because the natural-person Defendants used the natural-person Defendants' alter egos to perpetuate a fraud.

458.  The Chain Consortium, the Managers, and the Millennium Entities operated in concert with Mr. Bergman and Mr. Chain in fraudulently obtaining Kabins' respective investments.

459.  The Michael's Conspirators operated in concert with the Millennium Entities in fraudulently obtaining Kabins' investments.

460.  Mr. Bergman, Mr. Chain, and Mr. Gutzman operated in concert with the Millennium Investment Companies and the Millennium Entities in implementing the fraudulent scheme against Kabins.

461.  Each of the Millennium Investment Companies operated in concert with the Managers and the Millennium Entities in breaching fiduciary duties to Kabins and in perpetuating the fraudulent scheme against Kabins.

462. Each of the Defendants operated in concert with the Millennium Investment Companies and the Millennium Entities in perpetuating the fraudulent scheme against Kabins.

463. The Defendants could reasonably foresee that the complexities of the concert of action created by the Defendants would require Kabins to hire and retain attorneys, incurring substantial attorneys' fees and costs, and Defendants are thus liable for Kabins' attorneys' fees and costs incurred herein as a result of same.

464. The Defendants acted with malice, oppression, and intent to defraud Kabins, and Plaintiffs are accordingly entitled to an award of punitive damages for the Defendants' intentional misconduct.

## FIFTH CAUSE OF ACTION

## AIDING AND ABETTING

### (Against All Defendants)

465. Plaintiffs incorporate, repeat, and reallege all of the allegations set forth above.

466. Each of the Defendants substantially assisted or encouraged one another's conduct, through direct communication or conduct in close proximity to each other, in breaching the following duties owed by Defendants to Kabins:

467. The Managers, the Chain Consortium, and the Millennium Entities aided and abetted the breaches of the duty of care owed to Kabins by each of the Millennium Investment Companies.

468. The Managers, the Chain Consortium, and the Millennium Entities aided and abetted the breaches of the duty of loyalty owed to Kabins by each of the Millennium Investment Companies.

469.  The Managers, the Chain Consortium, and the Millennium Entities aided and abetted the breaches of the duty of good faith and fair dealing owed to Kabins by each of the Millennium Investment Companies.

470. The Chain Consortium, and the Millennium Entities aided and abetted the breaches of the duty of care, the duty of loyalty, and the duty of good faith and fair dealing owed to Kabins by each of the Managers.

471. Each of the Defendants assisted or encouraged the Millennium Entities, the Managers, and the Millennium Investment Companies in breaching the duties of care, loyalty, and good faith and fair dealing owed to Kabins by the Millennium Entities, the Managers, and the Millennium Investment Companies.

472. Each of the Managers, the Millennium Entities, and each of the Millennium Investment Companies owed fiduciary duties to Kabins based on the relationships created by the Managers and the Millennium Entities, between the Managers, the Millennium Investment Companies, the Millennium Entities, and Kabins.

473. The natural-person Defendants are individually liable for aiding and abetting the Managers, the Millennium Entities, and the Millennium Investment Companies, because the natural-person Defendants used the natural-person Defendants' alter egos to perpetuate a fraud.

474. The Chain Consortium, the Managers, and the Millennium Entities aided and abetted Mr. Bergman and Mr. Chain in fraudulently obtaining Kabins' respective investments.

475. Mr. Bergman and Mr. Chain aided and abetted the Managers and the Millennium Entities in implementing the fraudulent scheme against Kabins.

476. Each of the Millennium Investment Companies and the Millennium Entities aided and abetted the Managers in breaching fiduciary duties to Kabins and in perpetuating the fraudulent scheme against Kabins.

477. Each of the Defendants aided and abetted the Millennium Investment Companies and the Millennium Entities in perpetuating the fraudulent scheme against Kabins.

478. The Defendants could reasonably foresee that the complexities of aiding and abetting created by the Defendants would require Kabins to hire and retain attorneys, incurring substantial attorneys' fees and costs, and Defendants are thus liable for Kabins' attorneys' fees and costs incurred herein as a result of same.

479. The Defendants acted with malice, oppression, and intent to defraud Kabins, and Plaintiffs are accordingly entitled to an award of punitive damages for the Defendants' intentional misconduct.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

## SIXTH CAUSE OF ACTION

## FRAUDULENT OR INTENTIONAL MISREPRESENTATION

### (Against All Defendants)

480. Plaintiffs incorporate, repeat, and reallege all of the allegations set forth above.

481. Mr. Bergman, Mr. Chain and Mr. Gutzman were agents for the Millennium Entities, the respective Managers of the Millennium Investment Companies, and the Chain Consortium at the times Mr. Bergman, Mr. Chain, and Mr. Gutzman delivered the Defendants' Inducement Misrepresentations to Kabins.

482. Mr. Bergman, Mr. Chain, and Mr. Gutzman were agents for the Millennium Entities, the Managers, the Millennium Investment Companies, and the Chain Consortium when making the Inducement Misrepresentations to Kabins at Dr. Kabins' Place of Business to induce Kabins to purchase securities from each of the Millennium Investment Companies.

483. The Chain Consortium, the Managers, and the Millennium Entities knew that the Inducement Misrepresentations were false or misleading, and the Chain Consortium, the Managers, and the Millennium Entities had no reasonable basis for believing that the Inducement Misrepresentations were not false or misleading.

484. The Chain Consortium, the Managers, and the Millennium Entities intended for Kabins to rely on the Inducement Misrepresentations so that Kabins would invest Kabins' respective money with each of the Millennium Investment Companies.

485. Kabins was justified in relying on the Inducement Misrepresentations because of the Managers' role as Managers of the Millennium Investment Companies and the purported expertise of Mr. Chain, the other Managers, and the Chain Consortium.

486. For each of Kabins' respective investments in the Millennium Investment Companies, Kabins' reliance on the Inducement Misrepresentations was the immediate cause of Kabins' decision to purchase the securities associated with the Millennium Investment Companies.

487. Kabins sustained actual damages as a direct and proximate result of the Managers' fraudulent misrepresentations, and the Managers are liable to Kabins for the amount of those actual damages, which includes Kabins' net invested amounts.

488. Because of the Defendants' fraudulent misrepresentations to Kabins, Defendants hold in constructive trust for Kabins, at a minimum, all of Kabins' respective invested capital and additional damages, in an amount to be determined at trial.

489. The Defendants could reasonably foresee that the complexities of the fraudulent misrepresentations created by the Defendants would require Kabins to hire and retain attorneys, incurring substantial attorneys' fees and costs, and Defendants are thus liable for Kabins' attorneys' fees and costs incurred herein as a result of same.

490. The Defendants acted with malice, oppression, and intent to defraud Kabins, and Plaintiffs are accordingly entitled to an award of punitive damages for Defendants' intentional misconduct.

## SEVENTH CAUSE OF ACTION

## FRAUD IN THE INDUCEMENT

### (Against All Defendants)

491. Plaintiffs incorporate, repeat, and reallege all of the allegations set forth above.

81

492. On the Fraud in the Inducement dates, on behalf of the Managers and the Millennium Entities, Mr. Bergman, Mr. Chain, and Mr. Gutzman made the Inducement Misrepresentations to Kabins at Dr. Kabins' Place of Business to induce Kabins to execute agreements concerning Kabins' purchase of securities from each of the Millennium Investment Companies.

493. The Managers and Mr. Bergman knew that the Inducement Misrepresentations were false or misleading.

494. Kabins was justified in relying on the Inducement Misrepresentations when Kabins entered into the agreements for each of the Millennium Investment Companies.

495. At the times when Mr. Bergman, Mr. Chain and Mr. Gutzman delivered the Inducement Misrepresentations, Mr. Bergman, Mr. Chain and Mr. Gutzman were acting as agents for the Managers, the Millennium Entities, the Chain Consortium, and the Millennium Investment Companies.

496. For each of Kabins' seven (7) investments, Kabins' reliance on the Inducement Misrepresentations was the immediate cause of Kabins' decision to purchase the securities associated with 99th LLC, Benessere, Capri I, Cipriani, Cottonwood, Gila Bend, and Michael's.

497. Kabins has sustained actual damages as a direct and proximate result of the fraudulent Inducement Misrepresentations, and Defendants are liable to Kabins for the amount of those actual damages.

498. Because of Defendants' numerous acts of fraud in the inducement, Defendants hold in constructive trust for Kabins, at a minimum, all of Kabins' respective invested capital and additional damages, in an amount to be determined at trial.

499. The Defendants could reasonably foresee that the complexities of their fraudulent scheme would require Kabins to hire and retain attorneys, incurring substantial attorneys' fees and costs, and Defendants are thus liable for Kabins' attorneys' fees and costs incurred herein as a result of same.

500. The Defendants acted with malice, oppression, and intent to defraud Kabins, and Plaintiffs are accordingly entitled to an award of punitive damages for the Defendants' intentional misconduct.

## EIGHTH CAUSE OF ACTION

## FRAUD IN THE EXECUTION OR INCEPTION

**(Against All Defendants)**

501. Plaintiffs incorporate, repeat, and reallege all of the allegations set forth above.

502. Mr. Bergman and Mr. Chain, acting as agents for the Chain Consortium, the Michael's Conspirators, the Managers, the Millennium Investment Companies, and the Millennium Entities, told Kabins that the documents Kabins was signing consisted of standard language expressing or embodying the Inducement Misrepresentations.

503. The Defendants intended for Kabins to rely on the Inducement Misrepresentations instead of the onerous, contradictory, misleading, and fraudulent provisions of the individual Operating Agreements.

504. Kabins did not know that the documents Kabins signed, well after Kabins had already invested based on the Inducement Misrepresentations, contained onerous and fraudulent terms,

and Kabins did not know that the documents did not include, and were inconsistent with, the Inducement Misrepresentations.

505. For each of the contracts associated with each of the Millennium Investment Companies, Defendants did not deliver the contracts until well after Kabins had relied on the Inducement Misrepresentations and had already made Kabins' investment in each of the Millennium Investment Companies.

506. Based on the Millennium Investment Companies' check registers, the Defendants received and disbursed Kabins' invested capital *before* Kabins had ever signed the Operating Agreements evidencing Kabins' respective investments.

507. Kabins could only have relied on the Defendants' Inducement Misrepresentations as being embodied in the subsequently-delivered corresponding contracts for each of the Millennium Investment Companies because, by the time the Defendants delivered contracts for Kabins' signature, the Defendants had already spent a substantial portion, if not all, of Kabins' invested capital with respect to each of the Millennium Investment Companies.

508. Because of Defendants' numerous acts of fraud in the execution or inception, Defendants hold in constructive trust for Kabins, at a minimum, all of Kabins' respective invested capital and additional damages, in an amount to be determined at trial.

509. The Defendants could reasonably foresee that the complexities of Defendants' fraudulent scheme would require Kabins to hire and retain attorneys, incurring substantial attorneys' fees and costs, and Defendants are thus liable for Kabins' attorneys' fees and costs incurred herein as a result of same.

510. The Defendants acted with malice, oppression, and intent to defraud Kabins, and Plaintiffs are accordingly entitled to an award of punitive damages for the Defendants' intentional misconduct.

## NINTH CAUSE OF ACTION

## FRAUDULENT CONCEALMENT

### (Against All Defendants)

511. Plaintiffs incorporate, repeat, and reallege all of the allegations set forth above.

512. Defendants concealed or suppressed from Kabins material facts associated with the Collective Misrepresentations and with Defendants' other wrongful acts, including but not limited to those described herein (the "Concealed Facts").

513. Defendants were under a duty to disclose the Concealed Facts to Kabins based on Defendants' fiduciary relationship, at a minimum, with Kabins.

514. Defendants intentionally concealed or suppressed the Concealed Facts with the intent to defraud Kabins and for the purpose of inducing Kabins to invest approximately $11 million in the Millennium Investment Companies.

515.  Kabins was unaware of the Concealed Facts and Kabins would not have invested in any of the Millennium Investment Companies if Kabins had been apprised of the Concealed Facts.

516. As a result of Defendants' concealment or suppression of the Concealed Facts, Kabins sustained damages in an amount to be determined at trial.

517.    Because of Defendants' fraudulent concealment of the Concealed Facts, Defendants hold in constructive trust for Kabins, at a minimum, all of Kabins' respective invested capital and additional damages, in an amount to be determined at trial.

518. The Defendants could reasonably foresee that the complexities of Defendants' fraudulent concealment would require Kabins to hire and retain attorneys, incurring substantial attorneys' fees and costs, and Defendants are thus liable for Kabins' attorneys' fees and costs incurred herein as a result of same.

519. The Defendants acted with malice, oppression, and intent to defraud Kabins, and Plaintiffs are accordingly entitled to an award of punitive damages for the Defendants' intentional misconduct.

### TENTH CAUSE OF ACTION

### CONVERSION

**(Against All Defendants)**

520. Plaintiffs incorporate, repeat, and reallege all of the allegations set forth above.

521. Defendants committed multiple distinct unlawful acts of dominion wrongfully exerted over Kabins' rights to Kabins' respective capital investments in the Millennium Investment Companies.

522. The Defendants' unlawful acts were in denial of, or inconsistent with, Kabins' title or rights to Kabins' respective capital investments in the Millennium Investment Companies, and were in derogation, exclusion, or defiance of Kabins' title or rights in Kabins' respective capital investments in the Millennium Investment Companies.

523. Defendants' unlawful acts are not excusable by care, good faith, lack of knowledge, or any other basis at law.

524. Because of Defendants' unlawful acts of conversion, Defendants hold in constructive trust for Kabins, at a minimum, all of Kabins' respective invested capital and additional damages, in an amount to be determined at trial.

525. The Defendants could reasonably foresee that the complexities of their unlawful acts of conversion would require Kabins to hire and retain attorneys, incurring substantial attorneys' fees and costs, and Defendants are thus liable for Kabins' attorneys' fees and costs incurred herein as a result of same.

526. The Defendants acted with malice, oppression, and intent to defraud Kabins, and Plaintiffs are accordingly entitled to an award of punitive damages for the Defendants' intentional misconduct.

## ELEVENTH CAUSE OF ACTION

### SECURITIES FRAUD UNDER NEVADA REVISED STATUTES 90.660

**(Against All Defendants)**

527. Plaintiffs incorporate, repeat, and reallege all of the allegations set forth above.

528. Defendants are subject to civil liability for Defendants' violations of the Nevada securities laws, pursuant to NRS 90.660.

529. Each of the Chain Consortium, the Michael's Conspirators, the Millennium Entities, the Managers, and the Millennium Investment Companies, directly or indirectly, offered and sold

securities to Kabins, respectively, in violation of NRS 90.660, 90.310, 90.460, 90.500, and 90.570.

530. In violation of NRS 90.310(1), none of the Chain Consortium, the Michael's Conspirators, the Millennium Entities, the Managers, or the Millennium Investment Companies were licensed to sell securities, or were entitled to an exemption from such licensure, when offering and selling securities to Kabins.

531. In violation of NRS 90.460, the Chain Consortium, the Michael's Conspirators, the Millennium Entities, the Managers, and the Millennium Investment Companies failed to register the securities that the Chain Consortium, the Michael's Conspirators, the Millennium Entities, the Managers, and the Millennium Investment Companies sold to Kabins.

532. In violation of NRS 90.500, the Chain Consortium, the Michael's Conspirators, the Millennium Entities, the Managers, and the Millennium Investment Companies failed to deliver a prospectus to Kabins with respect to the securities that the Chain Consortium, the Michael's Conspirators, the Millennium Entities, the Managers, and the Millennium Investment Companies sold to Kabins.

533. In violation of NRS 90.570, the Chain Consortium, the Michael's Conspirators, the Millennium Entities, the Managers, and the Millennium Investment Companies, both directly and indirectly, made untrue statements of material facts and omitted to state material facts necessary in order to make the Chain Consortium's, the Michael's Conspirators', the Millennium Entities', the Managers', and the Millennium Investment Companies' statements made not misleading in the light of the circumstances under which those statements were made, as alleged herein.

534. Each of the Defendants willfully participated in the above-pled violations of Nevada securities laws against Kabins.

535. Each of the Chain Consortium controlled and materially aided the Managers and the Millennium Entities, the Millennium Investment Companies in committing the securities fraud violations.  Additionally, each of the Managers and the Millennium Entities controlled and materially aided the Millennium Investment Companies in committing the securities fraud violations.

536. Because of Defendants' violations of Nevada securities laws, Defendants hold in constructive trust for Kabins, at a minimum, all of Kabins' respective invested capital and additional damages, in an amount to be determined at trial.

537. The Defendants could reasonably foresee that the complexities of their violations of Nevada securities laws would require Kabins to hire and retain attorneys, incurring substantial attorneys' fees and costs, and Defendants are thus liable for Kabins' attorneys' fees and costs incurred herein as a result of same.

538. The Defendants acted with malice, oppression, and intent to defraud Kabins, and Plaintiffs are accordingly entitled to an award of punitive damages for the Defendants' intentional misconduct.

**TWELFTH CAUSE OF ACTION**

**NEGLIGENT MISREPRESENTATION**

**(Against All Defendants)**

539. Plaintiffs incorporate, repeat, and reallege all of the allegations set forth above.

540. Defendants made the Collective Misrepresentations at least seven (7) different times, as alleged herein, in the course of Defendants' special relationship with Kabins based on Defendants' fiduciary duties.

541. Defendants made the Collective Misrepresentations in the course of Defendants' business and in connection with businesses in which the Defendants had pecuniary interests.

542. Defendants made the Collective Misrepresentations for the guidance of Kabins in Kabins' investment transactions.

543. Kabins justifiably relied upon the Collective Misrepresentations.

544. Kabins' reliance on the Collective Misrepresentations resulted in pecuniary loss to Kabins.

545. The Defendants failed to exercise reasonable care or competence in obtaining or communicating to Kabins the information comprising the Collective Misrepresentations.

546. Because of Defendants' negligent misrepresentations, Defendants hold in constructive trust for Kabins, at a minimum, all of Kabins' respective invested capital and additional damages, in an amount to be determined at trial.

547. The Defendants could reasonably foresee that the complexities of their negligent misrepresentations would require Kabins to hire and retain attorneys, incurring substantial attorneys' fees and costs, and Defendants are thus liable for Kabins' attorneys' fees and costs incurred herein as a result of same.

## THIRTEENTH CAUSE OF ACTION

## NEGLIGENT PERFORMANCE OF AN UNDERTAKING

### (Against All Defendants)

548.  Plaintiffs incorporate, repeat, and reallege all of the allegations set forth above.

549.  The Chain Consortium, the Managers, the Millennium Investment Companies, and the Millennium Entities employed in-house counsel, accountants, and Defendants' own individual experience and alleged skill in undertaking to aid the Chain Consortium, the Managers, and the Millennium Entities in creating the Millennium Investment Companies' Operating Agreements, disclosure documents, financial statements, and other investment services purportedly serving to add value to Kabins' respective investments in the Millennium Investment Companies, which the Chain Consortium, the Managers, and Millennium Entities should have recognized as necessary for the protection of Kabins' respective investments.

550. The Defendants undertook to perform duties owed by the Managers and the Millennium Investment Companies to Kabins, and failed to exercise reasonable care with respect to such undertaking, and Kabins suffered damages as a result of Defendants' failure to exercise such reasonable care in Defendants' undertaking.

551. Additional parties, who are not yet known to Kabins, also engaged in negligent undertakings and Kabins will seek to amend Kabins' Complaint to include those additional parties as that information becomes available to Kabins.

552.  Because of the Defendants' negligent undertaking, Defendants hold in constructive trust for Kabins, at a minimum, all of Kabins' respective invested capital and additional damages, in an amount to be determined at trial.

553. The Defendants could reasonably foresee that the complexities of Defendants' negligent undertaking would require Kabins to hire and retain attorneys, incurring substantial attorneys' fees and costs, and Defendants are thus liable for Kabins' attorneys' fees and costs incurred herein as a result of same.

## FOURTEENTH CAUSE OF ACTION

## BREACH OF FIDUCIARY DUTIES: DUTY OF LOYALTY

**(Against 99th Management, the Chain Consortium, and the Millennium Entities)**

554. Plaintiffs incorporate, repeat, and reallege all of the allegations set forth above.

555. The Manager of 99th LLC, 99th Management, is a member of 99th LLC with Kabins, and 99th Management owes a fiduciary duty of loyalty to Kabins arising out of that co-member relationship, the member-manager relationship, and the 99th LLC operating agreement. Additionally, the Millennium Entities and the Chain Consortium held themselves out as possessing managerial influence, power, and control to direct the business activities of 99th LLC. (Defendants 99th Management, the Chain Consortium, and the Millennium Entities are collectively referred to as the "99th Defendants").

556. The Chain Consortium, as *de facto* officers and directors of 99th LLC, are personally liable for breaching their fiduciary duty of loyalty based on those individuals' intentional misconduct, fraud, and knowing violations of the law in committing, as alleged herein, without limitation: (a) federal securities fraud under 17 C.F.R. §240.10b-5, (b) conspiracy to commit securities fraud, (c) control person liability for securities fraud under 15 U.S.C. §78t(a), (d) civil conspiracy, (e) concert of action, (f) aiding and abetting, (g) fraud in the inducement, (h) fraud in

the execution or inception, (i) constructive fraud, (j) fraudulent concealment, (k) conversion, (l) Nevada securities fraud under NRS 90.660, (m) false pretenses under NRS 205.380, (n) negligent misrepresentation, (o) negligent performance of an undertaking, (p) negligence, (q) breach of contract, (r) breach of the duty of good faith and fair dealing, (s) violation of the Racketeering Influenced and Corrupt Organizations Act, 18 U.S.C. §1963, (t) conspiracy to violate RICO, (u) racketeering under NRS 207.470, (v) unjust enrichment, and (w) promissory estoppel.

557. The 99th Defendants further breached the 99th Defendants' fiduciary duty of loyalty to Kabins by engaging in multiple acts of self-dealing, misappropriation of 99th LLC's funds, and directing the affairs of 99th LLC for the 99th Defendants' own self-interests and to the detriment of Kabins.

558. Kabins has sustained actual damages as a direct and proximate result of the 99th Defendants' multiple breaches of the fiduciary duty of loyalty to Kabins, and the 99th Defendants are liable to Kabins for the amount of those actual damages.

559. The 99th Defendants have profited as a direct and proximate result of the 99th Defendants' breaches of the 99th Defendants' fiduciary duty of loyalty to Kabins, and the 99th Defendants are liable to Kabins for the amount of those profits.

560. Because of the 99th Defendants' breach of the 99th Defendants' fiduciary duty of loyalty to Kabins resulting in the 99th Defendants' illegitimate profits, the 99th Defendants hold the 99th Defendants' illegitimate profits in constructive trust for Kabins.

561. The 99th Defendants could foresee the requirement for attorneys' fees in prosecuting the 99th Defendants' breach of the fiduciary duty of loyalty, and the 99th Defendants are thus liable for Kabins' attorneys' fees and costs incurred herein as a result of same.

562. The 99th Defendants acted with malice, oppression, and intent to defraud Kabins, and Plaintiffs are accordingly entitled to an award of punitive damages for the 99th Defendants' intentional misconduct.

**FIFTEENTH CAUSE OF ACTION**

**BREACH OF FIDUCIARY DUTIES: DUTY OF LOYALTY**

**(Against Benessere Management, the Chain Consortium,**

**and the Millennium Entities)**

563. Plaintiffs incorporate, repeat, and reallege all of the allegations set forth above.

564. The Manager of Benessere, Benessere Management, is a member of Benessere with Kabins; and Benessere Management owes a fiduciary duty of loyalty to Kabins arising out of that co-member relationship, the member-manager relationship, and the Benessere operating agreement.  Additionally, the Millennium Entities and the Chain Consortium held themselves out as possessing managerial influence, power, and control to direct the business activities of Benessere.  (Defendants Benessere Management, the Chain Consortium, and the Millennium Entities are collectively referred to as the "Benessere Defendants").

565.  The Chain Consortium, as *de facto* officers and directors of Benessere, are personally liable for breaching their fiduciary duty of loyalty based on those individuals' intentional misconduct, fraud, and knowing violations of the law in committing, as alleged herein, without

1  limitation: (a) federal securities fraud under 17 C.F.R. §240.10b-5, (b) conspiracy to commit

2  securities fraud, (c) control person liability for securities fraud under 15 U.S.C. §78t(a), (d) civil

3  conspiracy, (e) concert of action, (f) aiding and abetting, (g) fraud in the inducement, (h) fraud in

4  the execution or inception, (i) constructive fraud, (j) fraudulent concealment, (k) conversion, (l)

5  Nevada securities fraud under NRS 90.660, (m) false pretenses under NRS 205.380, (n)

6  negligent misrepresentation, (o) negligent performance of an undertaking, (p) negligence, (q)

7  breach of contract, (r) breach of the duty of good faith and fair dealing, (s) violation of the

8  Racketeering Influenced and Corrupt Organizations Act, 18 U.S.C. §1963, (t) conspiracy to

9  violate RICO, (u) racketeering under NRS 207.470, (v) unjust enrichment, and (w) promissory

10  estoppel.

11  566. The Benessere Defendants further breached the Benessere Defendants' fiduciary duty of

12  loyalty to Kabins by engaging in multiple acts of self-dealing, misappropriation of Benessere's

13  funds, and directing the affairs of Benessere for the Benessere Defendants' own self-interests and

14  to the detriment of Kabins.

15  567. Kabins has sustained actual damages as a direct and proximate result of the Benessere

16  Defendants' multiple breaches of the fiduciary duty of loyalty to Kabins, and the Benessere

17  Defendants are liable to Kabins for the amount of those actual damages.

18  568. The Benessere Defendants have profited as a direct and proximate result of the

19  Benessere Defendants' breaches of the Benessere Defendants' fiduciary duty of loyalty to

20  Kabins, and the Benessere Defendants are liable to Kabins for the amount of those profits.

21  569. Because of the Benessere Defendants' breach of the Benessere Defendants' fiduciary

22  duty of loyalty to Kabins resulting in the Benessere Defendants' illegitimate profits, the

95

Benessere Defendants hold the Benessere Defendants' illegitimate profits in constructive trust for Kabins.

570.  The Benessere Defendants could foresee the requirement for attorneys' fees in prosecuting the Benessere Defendants' breach of the fiduciary duty of loyalty, and the Benessere Defendants are thus liable for Kabins' attorneys' fees and costs incurred herein as a result of same.

571. The Benessere Defendants acted with malice, oppression, and intent to defraud Kabins, and Plaintiffs are accordingly entitled to an award of punitive damages for the Benessere Defendants' intentional misconduct.

## SIXTEENTH CAUSE OF ACTION

## BREACH OF FIDUCIARY DUTIES: DUTY OF LOYALTY

**(Against Phoenix 83rd, the Chain Consortium, and the Millennium Entities)**

572. Plaintiffs incorporate, repeat, and reallege all of the allegations set forth above.

573. The Manager of Capri I, Phoenix 83rd, is a member of Capri I with Kabins, and Phoenix 83rd owes a fiduciary duty of loyalty to Kabins arising out of that co-member relationship, the member-manager relationship, and the Capri I operating agreement.  Additionally, the Millennium Entities and the Chain Consortium held themselves out as possessing managerial influence, power, and control to direct the business activities of Capri I.  (Defendants Phoenix 83rd, the Chain Consortium, and the Millennium Entities are collectively referred to as the "Capri Defendants").

574.  The Chain Consortium, as *de facto* officers and directors of Capri I, are personally liable for breaching their fiduciary duty of loyalty based on those individuals' intentional misconduct, fraud, and knowing violations of the law in committing, as alleged herein, without limitation: (a) federal securities fraud under 17 C.F.R. §240.10b-5, (b) conspiracy to commit securities fraud, (c) control person liability for securities fraud under 15 U.S.C. §78t(a), (d) civil conspiracy, (e) concert of action, (f) aiding and abetting, (g) fraud in the inducement, (h) fraud in the execution or inception, (i) constructive fraud, (j) fraudulent concealment, (k) conversion, (l) Nevada securities fraud under NRS 90.660, (m) false pretenses under NRS 205.380, (n) negligent misrepresentation, (o) negligent performance of an undertaking, (p) negligence, (q) breach of contract, (r) breach of the duty of good faith and fair dealing, (s) violation of the Racketeering Influenced and Corrupt Organizations Act, 18 U.S.C. §1963, (t) conspiracy to violate RICO, (u) racketeering under NRS 207.470, (v) unjust enrichment, and (w) promissory estoppel.

575. The Capri Defendants further breached the Capri Defendants' fiduciary duty of loyalty to Kabins by engaging in multiple acts of self-dealing, misappropriation of Capri I's funds, and directing the affairs of Capri I for the Capri Defendants' own self-interests and to the detriment of Kabins.

576. Kabins has sustained actual damages as a direct and proximate result of the Capri Defendants' multiple breaches of the fiduciary duty of loyalty to Kabins, and the Capri Defendants are liable to Kabins for the amount of those actual damages.

577. The Capri Defendants have profited as a direct and proximate result of the Capri Defendants' breaches of the Capri Defendants' fiduciary duty of loyalty to Kabins, and the Capri Defendants are liable to Kabins for the amount of those profits.

578. Because of the Capri Defendants' breach of the Capri Defendants' fiduciary duty of loyalty to Kabins resulting in the Capri Defendants' illegitimate profits, the Capri Defendants hold the Capri Defendants' illegitimate profits in constructive trust for Kabins.

579. The Capri Defendants could foresee the requirement for attorneys' fees in prosecuting the Capri Defendants' breach of the fiduciary duty of loyalty, and the Capri Defendants are thus liable for Kabins' attorneys' fees and costs incurred herein as a result of same.

580. The Capri Defendants acted with malice, oppression, and intent to defraud Kabins, and Plaintiffs are accordingly entitled to an award of punitive damages for the Capri Defendants' intentional misconduct.

## SEVENTEENTH CAUSE OF ACTION

## BREACH OF FIDUCIARY DUTIES: DUTY OF LOYALTY

**(Against Mr. Corbo, Mr. Gutzman, Cipriani Management, the Chain Consortium, and the Millennium Entities)**

581. Plaintiffs incorporate, repeat, and reallege all of the allegations set forth above.

582. The Managers of Cipriani, Mr. Corbo, Mr. Gutzman and Cipriani Management, are currently members or were at the relevant times herein, members of Cipriani with Kabins, and Corbo, Gutzman and Cipriani Management owe a fiduciary duty of loyalty to Kabins arising out of that co-member relationship, the member-manager relationship, and the Cipriani operating

agreement.  Additionally, the Millennium Entities and the Chain Consortium held themselves out as possessing Managerial influence, power, and control to direct the business activities of Cipriani.  (Defendants Mr. Corbo, Mr. Gutzman, Cipriani Management, the Chain Consortium, and the Millennium Entities are collectively referred to as the "Cipriani Defendants").

583.  The Chain Consortium, as *de facto* officers and directors of Cipriani, are personally liable for breaching their fiduciary duty of loyalty based on those individuals' intentional misconduct, fraud, and knowing violations of the law in committing, as alleged herein, without limitation: (a) federal securities fraud under 17 C.F.R. §240.10b-5, (b) conspiracy to commit securities fraud, (c) control person liability for securities fraud under 15 U.S.C. §78t(a), (d) civil conspiracy, (e) concert of action, (f) aiding and abetting, (g) fraud in the inducement, (h) fraud in the execution or inception, (i) constructive fraud, (j) fraudulent concealment, (k) conversion, (l) Nevada securities fraud under NRS 90.660, (m) false pretenses under NRS 205.380, (n) negligent misrepresentation, (o) negligent performance of an undertaking, (p) negligence, (q) breach of contract, (r) breach of the duty of good faith and fair dealing, (s) violation of the Racketeering Influenced and Corrupt Organizations Act, 18 U.S.C. §1963, (t) conspiracy to violate RICO, (u) racketeering under NRS 207.470, (v) unjust enrichment, and (w) promissory estoppel.

584. The Cipriani Defendants further breached the Cipriani Defendants' fiduciary duty of loyalty to Kabins by engaging in multiple acts of self-dealing, misappropriation of Cipriani's funds, and directing the affairs of Cipriani for the Cipriani Defendants' own self-interests and to the detriment of Kabins.

585. Kabins has sustained actual damages as a direct and proximate result of the Cipriani Defendants' multiple breaches of the fiduciary duty of loyalty to Kabins, and the Cipriani Defendants are liable to Kabins for the amount of those actual damages.

586. The Cipriani Defendants have profited as a direct and proximate result of the Cipriani Defendants' breaches of the Cipriani Defendants' fiduciary duty of loyalty to Kabins, and the Cipriani Defendants are liable to Kabins for the amount of those profits.

587. Because of the Cipriani Defendants' breach of the Cipriani Defendants' fiduciary duty of loyalty to Kabins resulting in the Cipriani Defendants' illegitimate profits, the Cipriani Defendants hold the Cipriani Defendants' illegitimate profits in constructive trust for Kabins.

588.  The Cipriani Defendants could foresee the requirement for attorneys' fees in prosecuting the Cipriani Defendants' breach of the fiduciary duty of loyalty, and the Cipriani Defendants are thus liable for Kabins' attorneys' fees and costs incurred herein as a result of same.

589. The Cipriani Defendants acted with malice, oppression, and intent to defraud Kabins, and Plaintiffs are accordingly entitled to an award of punitive damages for the Cipriani Defendants' intentional misconduct.


### EIGHTEENTH CAUSE OF ACTION

### BREACH OF FIDUCIARY DUTIES: DUTY OF LOYALTY

**(Against Mr. Kammeyer, Mr. Povilaitis, the Chain Consortium,**

**and the Millennium Entities)**

590. Plaintiffs incorporate, repeat, and reallege all of the allegations set forth above.

591. The Managers of Cottonwood, Mr. Kammeyer and Mr. Povilaitis, are currently members or were at the relevant times herein, members of Cottonwood with Kabins; and Mr. Kammeyer and Mr. Povilaitis owe or owed a fiduciary duty of loyalty to Kabins arising out of that co-member relationship, the member-manager relationship, and the Cottonwood operating agreement.  Additionally, the Millennium Entities and the Chain Consortium held themselves out as possessing managerial influence, power, and control to direct the business activities of Cottonwood.  (Defendants Mr. Kammeyer, Mr. Povilaitis, the Chain Consortium, and the Millennium Entities are collectively referred to as the "Cottonwood Defendants").

592.  The Chain Consortium, as *de facto* officers and directors of Cottonwood, are personally liable for breaching their fiduciary duty of loyalty based on those individuals' intentional misconduct, fraud, and knowing violations of the law in committing, as alleged herein, without limitation: (a) federal securities fraud under 17 C.F.R. §240.10b-5, (b) conspiracy to commit securities fraud, (c) control person liability for securities fraud under 15 U.S.C. §78t(a), (d) civil conspiracy, (e) concert of action, (f) aiding and abetting, (g) fraud in the inducement, (h) fraud in the execution or inception, (i) constructive fraud, (j) fraudulent concealment, (k) conversion, (l) Nevada securities fraud under NRS 90.660, (m) false pretenses under NRS 205.380, (n) negligent misrepresentation, (o) negligent performance of an undertaking, (p) negligence, (q) breach of contract, (r) breach of the duty of good faith and fair dealing, (s) violation of the Racketeering Influenced and Corrupt Organizations Act, 18 U.S.C. §1963, (t) conspiracy to violate RICO, (u) racketeering under NRS 207.470, (v) unjust enrichment, and (w) promissory estoppel.

593. The Cottonwood Defendants further breached the Cottonwood Defendants' fiduciary duty of loyalty to Kabins by engaging in multiple acts of self-dealing, misappropriation of Cottonwood's funds, and directing the affairs of Cottonwood for the Cottonwood Defendants' own self-interests and to the detriment of Kabins.

594. Kabins has sustained actual damages as a direct and proximate result of the Cottonwood Defendants' multiple breaches of the fiduciary duty of loyalty to Kabins, and the Cottonwood Defendants are liable to Kabins for the amount of those actual damages.

595. The Cottonwood Defendants have profited as a direct and proximate result of the Cottonwood Defendants' breaches of the Cottonwood Defendants' fiduciary duty of loyalty to Kabins, and the Cottonwood Defendants are liable to Kabins for the amount of those profits.

596. Because of the Cottonwood Defendants' breach of the Cottonwood Defendants' fiduciary duty of loyalty to Kabins resulting in the Cottonwood Defendants' illegitimate profits, the Cottonwood Defendants hold the Cottonwood Defendants hold in constructive trust for Kabins.

597. The Cottonwood Defendants could foresee the requirement for attorneys' fees in prosecuting the Cottonwood Defendants' breach of the fiduciary duty of loyalty, and the Cottonwood Defendants are thus liable for Kabins' attorneys' fees and costs incurred herein as a result of same.

598. The Cottonwood Defendants acted with malice, oppression, and intent to defraud Kabins, and Plaintiffs are accordingly entitled to an award of punitive damages for the Cottonwood Defendants' intentional misconduct.

### NINETEENTH CAUSE OF ACTION

### BREACH OF FIDUCIARY DUTIES: DUTY OF LOYALTY

**(Against GEIII, Innovative, the Chain Consortium,**

**and the Millennium Entities)**

599. Plaintiffs incorporate, repeat, and reallege all of the allegations set forth above.

600. The Managers of Gila Bend, GEIII and Innovative, are currently members or were at the relevant times herein, members of Gila Bend with Kabins, and GEIII and Innovative owe or owed a fiduciary duty of loyalty to Kabins arising out of that co-member relationship, the member-manager relationship, and the Gila Bend operating agreement.  Additionally, the Millennium Entities and the Chain Consortium held themselves out as possessing managerial influence, power, and control to direct the business activities of Gila Bend.  (Defendants GEIII, Innovative, the Chain Consortium, and the Millennium Entities are collectively referred to as the "Gila Bend Defendants").

601.  The Chain Consortium, as *de facto* officers and directors of Gila Bend, are personally liable for breaching their fiduciary duty of loyalty based on those individuals' intentional misconduct, fraud, and knowing violations of the law in committing, as alleged herein, without limitation: (a) federal securities fraud under 17 C.F.R. §240.10b-5, (b) conspiracy to commit securities fraud, (c) control person liability for securities fraud under 15 U.S.C. §78t(a), (d) civil conspiracy, (e) concert of action, (f) aiding and abetting, (g) fraud in the inducement, (h) fraud in the execution or inception, (i) constructive fraud, (j) fraudulent concealment, (k) conversion, (l) Nevada securities fraud under NRS 90.660, (m) false pretenses under NRS 205.380, (n) negligent misrepresentation, (o) negligent performance of an undertaking, (p) negligence, (q)

breach of contract, (r) breach of the duty of good faith and fair dealing, (s) violation of the Racketeering Influenced and Corrupt Organizations Act, 18 U.S.C. §1963, (t) conspiracy to violate RICO, (u) racketeering under NRS 207.470, (v) unjust enrichment, and (w) promissory estoppel.

602. The Gila Bend Defendants further breached the Gila Bend Defendants' fiduciary duty of loyalty to Kabins by engaging in multiple acts of self-dealing, misappropriation of Gila Bend's funds, and directing the affairs of Gila Bend for the Gila Bend Defendants' own self-interests and to the detriment of Kabins.

603. Kabins has sustained actual damages as a direct and proximate result of the Gila Bend Defendants' multiple breaches of the fiduciary duty of loyalty to Kabins, and the Gila Bend Defendants are liable to Kabins for the amount of those actual damages.

604. The Gila Bend Defendants have profited as a direct and proximate result of the Gila Bend Defendants' breaches of the Gila Bend Defendants' fiduciary duty of loyalty to Kabins, and the Gila Bend Defendants are liable to Kabins for the amount of those profits.

605. Because of the Gila Bend Defendants' breach of the Gila Bend Defendants' fiduciary duty of loyalty to Kabins resulting in the Gila Bend Defendants' illegitimate profits, the Gila Bend Defendants hold the Gila Bend Defendants' illegitimate profits in constructive trust for Kabins.

606. The Gila Bend Defendants could foresee the requirement for attorneys' fees in prosecuting the Gila Bend Defendants' breach of the fiduciary duty of loyalty, and the Gila Bend Defendants are thus liable for Kabins' attorneys' fees and costs incurred herein as a result of same.

607. The Gila Bend Defendants acted with malice, oppression, and intent to defraud Kabins, and Plaintiffs are accordingly entitled to an award of punitive damages for the Gila Bend Defendants' intentional misconduct.

## TWENTIETH CAUSE OF ACTION

## BREACH OF FIDUCIARY DUTIES: DUTY OF LOYALTY

### (Against Modern Management, Mr. Chain, Mr. Gutzman, the Chain Consortium, and the Millennium Entities)

608. Plaintiffs incorporate, repeat, and reallege all of the allegations set forth above.

609. The Managers of Michael's, Modern Management, Mr. Chain and Mr. Gutzman, are currently members, or were at the relevant times herein members of Michael's with Kabins; and Modern Management, Mr. Chain and Mr. Gutzman owe or owed a fiduciary duty of loyalty to Kabins arising out of that co-member relationship, the member-manager relationship, and the Michael's operating agreement.  Additionally, the Millennium Entities and the Chain Consortium held themselves out as possessing managerial influence, power, and control to direct the business activities of Michael's.  (Defendants Modern Management, Mr. Chain, Mr. Gutzman, the Chain Consortium, and the Millennium Entities are collectively referred to as the "Michael's Defendants").

610.  The Chain Consortium, as *de facto* officers and directors of Michael's, are personally liable for breaching their fiduciary duty of loyalty based on those individuals' intentional misconduct, fraud, and knowing violations of the law in committing, as alleged herein, without limitation: (a) federal securities fraud under 17 C.F.R. §240.10b-5, (b) conspiracy to commit

1   securities fraud, (c) control person liability for securities fraud under 15 U.S.C. §78t(a), (d) civil

2   conspiracy, (e) concert of action, (f) aiding and abetting, (g) fraud in the inducement, (h) fraud in

3   the execution or inception, (i) constructive fraud, (j) fraudulent concealment, (k) conversion, (l)

4   Nevada securities fraud under NRS 90.660, (m) false pretenses under NRS 205.380, (n)

5   negligent misrepresentation, (o) negligent performance of an undertaking, (p) negligence, (q)

6   breach of contract, (r) breach of the duty of good faith and fair dealing, (s) violation of the

7   Racketeering Influenced and Corrupt Organizations Act, 18 U.S.C. §1963, (t) conspiracy to

8   violate RICO, (u) racketeering under NRS 207.470, (v) unjust enrichment, and (w) promissory

9   estoppel.

10      611. The Michael's Defendants further breached the Michael's Defendants' fiduciary duty of

11   loyalty to Kabins by engaging in multiple acts of self-dealing, misappropriation of Michael's

12   funds, and directing the affairs of Michael's for the Michael's Defendants' own self-interests and

13   to the detriment of Kabins.

14      612. Kabins has sustained actual damages as a direct and proximate result of the Michael's

15   Defendants' multiple breaches of the fiduciary duty of loyalty to Kabins, and the Michael's

16   Defendants are liable to Kabins for the amount of those actual damages.

17      613. The Michael's Defendants have profited as a direct and proximate result of the

18   Michael's Defendants' breaches of the Michael's Defendants' fiduciary duty of loyalty to

19   Kabins, and the Michael's Defendants are liable to Kabins for the amount of those profits.

20      614. Because of the Michael's Defendants' breach of the Michael's Defendants' fiduciary

21   duty of loyalty to Kabins resulting in the Michael's Defendants' illegitimate profits the

22

1   Michael's Defendants hold the Michael's Defendants' illegitimate profits in constructive trust for

2   Kabins.

3      615.  The Michael's Defendants could foresee the requirement for attorneys' fees in

4   prosecuting the Michael's Defendants' breach of the fiduciary duty of loyalty, and the Michael's

5   Defendants are thus liable for Kabins' attorneys' fees and costs incurred herein as a result of

6   same.

7      616. The Michael's Defendants acted with malice, oppression, and intent to defraud Kabins,

8   and Plaintiffs are accordingly entitled to an award of punitive damages for the Michael's

9   Defendants' intentional misconduct.

10

11                     **TWENTY-FIRST CAUSE OF ACTION**

12              **BREACH OF FIDUCIARY DUTIES: DUTY OF CARE**

13                        **(Against the 99th Defendants)**

14      617. Plaintiffs incorporate, repeat and reallege all of the allegations set forth above.

15      618. The 99th Defendants wasted Kabins' capital investment in 99th LLC by making

16   numerous uninformed decisions, routinely ignoring obvious risks in a manner constituting gross

17   negligence, and acting contrary to the best interests of 99th LLC in bad faith, while wasting 99th

18   LLC's assets.

19      619. The Chain Consortium, as *de facto* officers and directors of 99th LLC, are personally

20   liable for breaching their fiduciary duty of care based on those individuals' intentional and

21   unintentional misconduct, fraud, and knowing violations of the law, as alleged herein, in

22   committing, as alleged herein, without limitation: (a) federal securities fraud under 17 C.F.R.

§240.10b-5, (b) conspiracy to commit securities fraud, (c) control person liability for securities fraud under 15 U.S.C. §78t(a), (d) civil conspiracy, (e) concert of action, (f) aiding and abetting, (g) fraud in the inducement, (h) fraud in the execution or inception, (i) constructive fraud, (j) fraudulent concealment, (k) conversion, (l) Nevada securities fraud under NRS 90.660, (m) false pretenses under NRS 205.380, (n) negligent misrepresentation, (o) negligent performance of an undertaking, (p) negligence, (q) breach of contract, (r) breach of the duty of good faith and fair dealing, (s) violation of the Racketeering Influenced and Corrupt Organizations Act, 18 U.S.C. §1963, (t) conspiracy to violate RICO, (u) racketeering under NRS 207.470, (v) unjust enrichment, and (w) promissory estoppel.

620. The 99th Defendants further breached the 99th Defendants' fiduciary duty of loyalty to Kabins by engaging in multiple acts of self-dealing, misappropriation of 99th LLC's funds, and directing the affairs of 99th LLC for the 99th Defendants' own self-interests and to the detriment of Kabins.

621.  Kabins has sustained actual damages as a direct and proximate result of the breaches by the 99th Defendants of the 99th Defendants' fiduciary duty of care to Kabins, and the 99th Defendants are liable to Kabins for the amount of those actual damages.

622. The 99th Defendants have profited as a direct and proximate result of the 99th Defendants' breaches of the 99th Defendants' fiduciary duty of care to Kabins, and the 99th Defendants are liable to Kabins for the amount of those profits.

623. Because of the 99th Defendants' breach of the 99th Defendants' fiduciary duty of care to Kabins resulting in the 99th Defendants' illegitimate profits, the 99th Defendants hold the 99th Defendants' illegitimate profits in constructive trust for Kabins.

624. The 99th Defendants could foresee the requirement for attorneys' fees in prosecuting the 99th Defendants' breaches of the duty of care, and the 99th Defendants are thus liable for Kabins' attorneys' fees and costs incurred herein as a result of same.

625. The 99th Defendants acted with malice, oppression, and intent to defraud Kabins, and Plaintiffs are accordingly entitled to an award of punitive damages for the 99th Defendants' intentional misconduct.

## TWENTY-SECOND CAUSE OF ACTION

## BREACH OF FIDUCIARY DUTIES: DUTY OF CARE

### (Against the Benessere Defendants)

626. Plaintiffs incorporate, repeat and reallege all of the allegations set forth above.

627. The Benessere Defendants wasted Kabins' capital investment in Benessere by making numerous uninformed decisions, routinely ignoring obvious risks in a manner constituting gross negligence, and acting contrary to the best interests of the company in bad faith, while wasting Benessere's assets.

628. The Chain Consortium, as *de facto* officers and directors of Benessere, are personally liable for breaching their fiduciary duty of care based on those individuals' intentional and unintentional misconduct, fraud, and knowing violations of the law, as alleged herein, in committing, as alleged herein, without limitation: (a) federal securities fraud under 17 C.F.R. §240.10b-5, (b) conspiracy to commit securities fraud, (c) control person liability for securities fraud under 15 U.S.C. §78t(a), (d) civil conspiracy, (e) concert of action, (f) aiding and abetting, (g) fraud in the inducement, (h) fraud in the execution or inception, (i) constructive fraud, (j)

109

fraudulent concealment, (k) conversion, (l) Nevada securities fraud under NRS 90.660, (m) false

pretenses under NRS 205.380, (n) negligent misrepresentation, (o) negligent performance of an

undertaking, (p) negligence, (q) breach of contract, (r) breach of the duty of good faith and fair

dealing, (s) violation of the Racketeering Influenced and Corrupt Organizations Act, 18 U.S.C.

§1963, (t) conspiracy to violate RICO, (u) racketeering under NRS 207.470, (v) unjust

enrichment, and (w) promissory estoppel.

629. The Benessere Defendants further breached the Benessere Defendants' fiduciary duty of

loyalty to Kabins by engaging in multiple acts of self-dealing, misappropriation of Benessere's

funds, and directing the affairs of Benessere for the Benessere Defendants' own self-interests and

to the detriment of Kabins.

630.  Kabins has sustained actual damages as a direct and proximate result of the breaches by

the Benessere Defendants of the Benessere Defendants' fiduciary duty of care to Kabins, and the

Benessere Defendants are liable to Kabins for the amount of those actual damages.

631. The Benessere Defendants have profited as a direct and proximate result of the

Benessere Defendants' breaches of the Benessere Defendants' fiduciary duty of care to Kabins,

and the Benessere Defendants are liable to Kabins for the amount of those profits.

632. Because of the Benessere Defendants' breach of the Benessere Defendants' fiduciary

duty of care to Kabins resulting in the Benessere Defendants' illegitimate profits, the Benessere

Defendants hold the Benessere Defendants' illegitimate profits in constructive trust for Kabins.

633.  The Benessere Defendants could foresee the requirement for attorneys' fees in

prosecuting the Benessere Defendants' breaches of the duty of care, and the Benessere

Defendants are thus liable for Kabins' attorneys' fees and costs incurred herein as a result of same.

634. The Benessere Defendants acted with malice, oppression, and intent to defraud Kabins, and Plaintiffs are accordingly entitled to an award of punitive damages for the Benessere Defendants' intentional misconduct.

## TWENTY-THIRD CAUSE OF ACTION

## BREACH OF FIDUCIARY DUTIES: DUTY OF CARE

### (Against the Capri Defendants)

635. Plaintiffs incorporate, repeat and reallege all of the allegations set forth above.

636. The Capri Defendants wasted Kabins' capital investment in Capri by making numerous uninformed decisions, routinely ignoring obvious risks in a manner constituting gross negligence, and acting contrary to the best interests of the company in bad faith, while wasting Capri's assets.

637. The Chain Consortium, as *de facto* officers and directors of Capri I, are personally liable for breaching their fiduciary duty of care based on those individuals' intentional and unintentional misconduct, fraud, and knowing violations of the law, as alleged herein, in committing, as alleged herein, without limitation: (a) federal securities fraud under 17 C.F.R. §240.10b-5, (b) conspiracy to commit securities fraud, (c) control person liability for securities fraud under 15 U.S.C. §78t(a), (d) civil conspiracy, (e) concert of action, (f) aiding and abetting, (g) fraud in the inducement, (h) fraud in the execution or inception, (i) constructive fraud, (j) fraudulent concealment, (k) conversion, (l) Nevada securities fraud under NRS 90.660, (m) false

111

pretenses under NRS 205.380, (n) negligent misrepresentation, (o) negligent performance of an undertaking, (p) negligence, (q) breach of contract, (r) breach of the duty of good faith and fair dealing, (s) violation of the Racketeering Influenced and Corrupt Organizations Act, 18 U.S.C. §1963, (t) conspiracy to violate RICO, (u) racketeering under NRS 207.470, (v) unjust enrichment, and (w) promissory estoppel.

638. The Capri Defendants further breached the fiduciary duty of loyalty to Kabins by engaging in multiple acts of self-dealing, misappropriation of Capri I's funds, and directing the affairs of Capri I for the Capri Defendants' own self-interests and to the detriment of Kabins.

639.  Kabins has sustained actual damages as a direct and proximate result of the breaches by the Capri Defendants of the Capri Defendants' fiduciary duty of care to Kabins, and the Capri Defendants are liable to Kabins for the amount of those actual damages.

640. The Capri Defendants have profited as a direct and proximate result of the Capri Defendants' breaches of the Capri Defendants' fiduciary duty of care to Kabins, and the Capri Defendants are liable to Kabins for the amount of those profits.

641. Because of the Capri Defendants' breach of the Capri Defendants' fiduciary duty of care to Kabins resulting in the Capri Defendants' illegitimate profits, the Capri Defendants hold the Capri Defendants' illegitimate profits in constructive trust for Kabins.

642. The Capri Defendants could foresee the requirement for attorneys' fees in prosecuting the Capri Defendants' breaches of the duty of care, and the Capri Defendants are thus liable for Kabins' attorneys' fees and costs incurred herein as a result of same.

643. The Capri Defendants acted with malice, oppression, and intent to defraud Kabins, and Plaintiffs are accordingly entitled to an award of punitive damages for the Capri Defendants' intentional misconduct.

**TWENTY-FOURTH CAUSE OF ACTION**

**BREACH OF FIDUCIARY DUTIES: DUTY OF CARE**

**(Against the Cipriani Defendants)**

644. Plaintiffs incorporate, repeat and reallege all of the allegations set forth above.

645. The Cipriani Defendants wasted Kabins' capital investment in Cipriani by making numerous uninformed decisions, routinely ignoring obvious risks in a manner constituting gross negligence, and acting contrary to the best interests of the company in bad faith, while wasting Cipriani's assets.

646. The Chain Consortium, as *de facto* officers and directors of Cipriani, are personally liable for breaching their fiduciary duty of care based on those individuals' intentional and unintentional misconduct, fraud, and knowing violations of the law, as alleged herein, in committing, as alleged herein, without limitation: (a) federal securities fraud under 17 C.F.R. §240.10b-5, (b) conspiracy to commit securities fraud, (c) control person liability for securities fraud under 15 U.S.C. §78t(a), (d) civil conspiracy, (e) concert of action, (f) aiding and abetting, (g) fraud in the inducement, (h) fraud in the execution or inception, (i) constructive fraud, (j) fraudulent concealment, (k) conversion, (l) Nevada securities fraud under NRS 90.660, (m) false pretenses under NRS 205.380, (n) negligent misrepresentation, (o) negligent performance of an undertaking, (p) negligence, (q) breach of contract, (r) breach of the duty of good faith and fair

1   dealing, (s) violation of the Racketeering Influenced and Corrupt Organizations Act, 18 U.S.C.

2   §1963, (t) conspiracy to violate RICO, (u) racketeering under NRS 207.470, (v) unjust

3   enrichment, and (w) promissory estoppel.

4   647. The Cipriani Defendants further breached the fiduciary duty of loyalty to Kabins by

5   engaging in multiple acts of self-dealing, misappropriation of Cipriani's funds, and directing the

6   affairs of Cipriani for the Cipriani Defendants' own self-interests and to the detriment of Kabins.

7   648.  Kabins has sustained actual damages as a direct and proximate result of the breaches by

8   the Cipriani Defendants of the Cipriani Defendants' fiduciary duty of care to Kabins, and the

9   Cipriani Defendants are liable to Kabins for the amount of those actual damages.

10   649. The Cipriani Defendants have profited as a direct and proximate result of the Cipriani

11   Defendants' breaches of the Cipriani Defendants' fiduciary duty of care to Kabins, and the

12   Cipriani Defendants are liable to Kabins for the amount of those profits.

13   650. Because of the Cipriani Defendants' breach of the Cipriani Defendants' fiduciary duty

14   of care to Kabins resulting in the Cipriani Defendants' illegitimate profits, the Cipriani

15   Defendants hold the Cipriani Defendants' illegitimate profits in constructive trust for Kabins

16   651.  The Cipriani Defendants could foresee the requirement for attorneys' fees in

17   prosecuting the Cipriani Defendants' breaches of the duty of care, and the Cipriani Defendants

18   are thus liable for Kabins' attorneys' fees and costs incurred herein as a result of same.

19   652. The Cipriani Defendants acted with malice, oppression, and intent to defraud Kabins,

20   and Plaintiffs are accordingly entitled to an award of punitive damages for the Cipriani

21   Defendants' intentional misconduct.

22

## TWENTY-FIFTH CAUSE OF ACTION

## BREACH OF FIDUCIARY DUTIES: DUTY OF CARE

### (Against the Cottonwood Defendants)

653. Plaintiffs incorporate, repeat and reallege all of the allegations set forth above.

654. The Cottonwood Defendants wasted Kabins' capital investment in Cottonwood by making numerous uninformed decisions, routinely ignoring obvious risks in a manner constituting gross negligence, and acting contrary to the best interests of the company in bad faith, while wasting Cottonwood's assets.

655. The Chain Consortium, as *de facto* officers and directors of Cottonwood, are personally liable for breaching their fiduciary duty of care based on those individuals' intentional and unintentional misconduct, fraud, and knowing violations of the law, as alleged herein, in committing, as alleged herein, without limitation: (a) federal securities fraud under 17 C.F.R. §240.10b-5, (b) conspiracy to commit securities fraud, (c) control person liability for securities fraud under 15 U.S.C. §78t(a), (d) civil conspiracy, (e) concert of action, (f) aiding and abetting, (g) fraud in the inducement, (h) fraud in the execution or inception, (i) constructive fraud, (j) fraudulent concealment, (k) conversion, (l) Nevada securities fraud under NRS 90.660, (m) false pretenses under NRS 205.380, (n) negligent misrepresentation, (o) negligent performance of an undertaking, (p) negligence, (q) breach of contract, (r) breach of the duty of good faith and fair dealing, (s) violation of the Racketeering Influenced and Corrupt Organizations Act, 18 U.S.C. §1963, (t) conspiracy to violate RICO, (u) racketeering under NRS 207.470, (v) unjust enrichment, and (w) promissory estoppel.

115

656. The Cottonwood Defendants further breached the Cottonwood Defendants' fiduciary duty of loyalty to Kabins by engaging in multiple acts of self-dealing, misappropriation of Cottonwood's funds, and directing the affairs of Cottonwood for the Cottonwood Defendants' own self-interests and to the detriment of Kabins.

657.  Kabins has sustained actual damages as a direct and proximate result of the breaches by the Cottonwood Defendants of the Cottonwood Defendants' fiduciary duty of care to Kabins, and the Cottonwood Defendants are liable to Kabins for the amount of those actual damages.

658. The Cottonwood Defendants have profited as a direct and proximate result of the Cottonwood Defendants' breaches of the Cottonwood Defendants' fiduciary duty of care to Kabins, and the Cottonwood Defendants are liable to Kabins for the amount of those profits.

659. Because of the Cottonwood Defendants' breach of the Cottonwood Defendants' fiduciary duty of care to Kabins resulting in the Cottonwood Defendants' illegitimate profits, the Cottonwood Defendants hold the Cottonwood Defendants' illegitimate profits in constructive trust for Kabins.

660.  The Cottonwood Defendants could foresee the requirement for attorneys' fees in prosecuting the Cottonwood Defendants' breaches of the duty of care, and the Cottonwood Defendants are thus liable for Kabins' attorneys' fees and costs incurred herein as a result of same.

661. The Cottonwood Defendants acted with malice, oppression, and intent to defraud Kabins, and Plaintiffs are accordingly entitled to an award of punitive damages for the Cottonwood Defendants' intentional misconduct.

### TWENTY-SIXTH CAUSE OF ACTION

### BREACH OF FIDUCIARY DUTIES: DUTY OF CARE

**(Against the Gila Bend Defendants)**

662. Plaintiffs incorporate, repeat and reallege all of the allegations set forth above.

663. The Gila Bend Defendants wasted Kabins' capital investment in Gila Bend by making numerous uninformed decisions, routinely ignoring obvious risks in a manner constituting gross negligence, and acting contrary to the best interests of the company in bad faith, while wasting Gila Bend's assets.

664. The Chain Consortium, as *de facto* officers and directors of Gila Bend, are personally liable for breaching their fiduciary duty of care based on those individuals' intentional and unintentional misconduct, fraud, and knowing violations of the law, as alleged herein, in committing, as alleged herein, without limitation: (a) federal securities fraud under 17 C.F.R. §240.10b-5, (b) conspiracy to commit securities fraud, (c) control person liability for securities fraud under 15 U.S.C. §78t(a), (d) civil conspiracy, (e) concert of action, (f) aiding and abetting, (g) fraud in the inducement, (h) fraud in the execution or inception, (i) constructive fraud, (j) fraudulent concealment, (k) conversion, (l) Nevada securities fraud under NRS 90.660, (m) false pretenses under NRS 205.380, (n) negligent misrepresentation, (o) negligent performance of an undertaking, (p) negligence, (q) breach of contract, (r) breach of the duty of good faith and fair dealing, (s) violation of the Racketeering Influenced and Corrupt Organizations Act, 18 U.S.C. §1963, (t) conspiracy to violate RICO, (u) racketeering under NRS 207.470, (v) unjust enrichment, and (w) promissory estoppel.

117

665. The Gila Bend Defendants further breached the fiduciary duty of loyalty to Kabins by engaging in multiple acts of self-dealing, misappropriation of Gila Bend's funds, and directing the affairs of Gila Bend for the Gila Bend Defendants' own self-interests and to the detriment of Kabins.

666.  Kabins has sustained actual damages as a direct and proximate result of the breaches by the Gila Bend Defendants of the Gila Bend Defendants' fiduciary duty of care to Kabins, and theGila Bend Defendants are liable to Kabins for the amount of those actual damages.

667. The Gila Bend Defendants have profited as a direct and proximate result of the Gila Bend Defendants' breaches of the Gila Bend Defendants' fiduciary duty of care to Kabins, and the Gila Bend Defendants are liable to Kabins for the amount of those profits.

668. Because of the Gila Bend Defendants' breach of the Gila Bend Defendants' fiduciary duty of care to Kabins resulting in the Gila Bend Defendants' illegitimate profits, the Gila Bend Defendants hold the Gila Bend Defendants' illegitimate profits in constructive trust for Kabins.

669.  The Gila Bend Defendants' conduct in breaching the Gila Bend Defendants' fiduciary duty of care to Kabins was malicious, fraudulent, and oppressive, and Kabins is thus entitled to punitive damages, in an amount subject to proof at trial.

670. Kabins has been required to retain attorneys to prosecute this action, and the Gila Bend Defendants are liable to Kabins for Kabins' attorneys' fees incurred in connection with the prosecution of this action.  The Gila Bend Defendants could foresee the requirement for attorneys' fees in prosecuting the Gila Bend Defendants' breaches of the duty of care.

671. Kabins has incurred costs of suit in connection with bringing this action, and the Gila Bend Defendants are liable to Kabins for those costs of suit.

1

2

**TWENTY-SEVENTH CAUSE OF ACTION**

3

**BREACH OF FIDUCIARY DUTIES: DUTY OF CARE**

4

**(Against the Michael's Defendants)**

5

672. Plaintiffs incorporate, repeat and reallege all of the allegations set forth above.

6

673. The Michael's Defendants wasted Kabin' capital investment in Michael's by making

7

numerous uninformed decisions, routinely ignoring obvious risks in a manner constituting gross

8

negligence, and acting contrary to the best interests of the company in bad faith, while wasting

9

Michael's assets.

10

674. The Chain Consortium, as *de facto* officers and directors of Michael's, are personally

11

liable for breaching their fiduciary duty of care based on those individuals' intentional and

12

unintentional misconduct, fraud, and knowing violations of the law, as alleged herein, in

13

committing, as alleged herein, without limitation: (a) federal securities fraud under 17 C.F.R.

14

§240.10b-5, (b) conspiracy to commit securities fraud, (c) control person liability for securities

15

fraud under 15 U.S.C. §78t(a), (d) civil conspiracy, (e) concert of action, (f) aiding and abetting,

16

(g) fraud in the inducement, (h) fraud in the execution or inception, (i) constructive fraud, (j)

17

fraudulent concealment, (k) conversion, (l) Nevada securities fraud under NRS 90.660, (m) false

18

pretenses under NRS 205.380, (n) negligent misrepresentation, (o) negligent performance of an

19

undertaking, (p) negligence, (q) breach of contract, (r) breach of the duty of good faith and fair

20

dealing, (s) violation of the Racketeering Influenced and Corrupt Organizations Act, 18 U.S.C.

21

§1963, (t) conspiracy to violate RICO, (u) racketeering under NRS 207.470, (v) unjust

22

enrichment, and (w) promissory estoppel.

675. The Michael's Defendants further breached the fiduciary duty of loyalty to Kabins by engaging in multiple acts of self-dealing, misappropriation of Michaels' funds, and directing the affairs of Michael's for the Michael's Defendants' own self-interests and to the detriment of Kabins.

676.  Kabins has sustained actual damages as a direct and proximate result of the breaches by the Michael's Defendants of the Michael's Defendants' fiduciary duty of care to Kabins, and the Michael's Defendants are liable to Kabins for the amount of those actual damages.

677. The Michael's Defendants have profited as a direct and proximate result of the Michael's Defendants' breaches of the Michael's Defendants' fiduciary duty of care to Kabins, and the Michael's Defendants are liable to Kabins for the amount of those profits.

678. Because of the Michael's Defendants' breach of the Michael's Defendants' fiduciary duty of care to Kabins resulting in the Michael's Defendants' illegitimate profits, the Michael's Defendants hold the Michael's Defendants' illegitimate profits in constructive trust for Kabins.

679.  The Michael's Defendants could foresee the requirement for attorneys' fees in prosecuting the Michael's Defendants' breaches of the duty of care, and the Michael's Defendants are thus liable for Kabins' attorneys' fees and costs incurred herein as a result of same.

680. The Michael's Defendants acted with malice, oppression, and intent to defraud Kabins, and Plaintiffs are accordingly entitled to an award of punitive damages for the Michael's Defendants' intentional misconduct.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

## TWENTY-EIGHTH CAUSE OF ACTION

## BREACH OF CONTRACT

### (Against the 99th Defendants)

681. Plaintiffs incorporate, repeat, and reallege all of the allegations set forth above.

682. The manager of 99th LLC, 99th Management, executed the 99th LLC Operating Agreement, including all amendments and exhibits.

683. The managers of 99th Management executed the 99th LLC Operating Agreement individually and on behalf of GEIII, Innovative, and as agents for 99th LLC and for the undisclosed principals of 99th LLC, specifically, the Chain Consortium and the Millennium Entities.

684. Kabins performed or was excused from performing all acts required of Kabins pursuant to the 99th LLC Operating Agreement.

685. The 99th Defendants failed to perform the 99th Defendants' obligations as provided for and arising out of the 99th LLC Operating Agreement.

686. As a result of the 99th Defendants' numerous breaches of the 99th LLC Operating Agreement, Kabins suffered substantial economic losses.

687. The 99th Defendants breached the contractual duty of good faith applicable to the 99th Defendants pursuant to §7.06 of the 99th LLC Operating Agreement, which provides that "[t]he Managing Member shall not be liable, responsible or accountable in damages or otherwise to the Company *or to the Members* for any act performed by the Managing Member, *provided such act is performed in good faith and without willful misconduct*."  (Emphasis added.)  As such, all of the 99th Defendants' conduct giving rise to Kabins' claims for breaches of the fiduciary duties of

121

care and loyalty by the 99th Defendants, in combination with all of the other causes of action alleged herein, constitutes a material breach of the contractual duty of good faith.

688. The 99th Defendants breached the provisions of the 99th LLC Operating Agreement requiring that accurate and complete books and records be kept by the managing member, to be available for inspection and examination by the members or their representatives; that accurate financial reports be provided to the members as necessary for the preparation of the members' tax returns; and that meetings of the members be held at least annually.

689. The 99th Defendants have taken fees, and misappropriated funds, in excess of the compensation authorized for the 99th Defendants to receive, in breach of §7.04 of the 99th LLC Operating Agreement.

690. The 99th Defendants have engaged in extensive commingling of 99th LLC's funds with funds of other persons and entities, in breach of §7.08 of the 99th LLC Operating Agreement.

691. The 99th Defendants could foresee the requirement for attorneys' fees in prosecuting the 99th Defendants' breach of the 99th Operating Agreement, and the 99th Defendants are thus liable for Kabins' attorneys' fees and costs incurred herein as a result of same.

## TWENTY-NINTH CAUSE OF ACTION

## BREACH OF CONTRACT

### (Against the Benessere Defendants)

692. Plaintiffs incorporate, repeat, and reallege all of the allegations set forth above.

693. The manager of Benessere, Benessere Management, executed the Benessere Operating Agreement, including all amendments and exhibits.

694. The managers of Benessere Management executed the Benessere Operating Agreement individually and on behalf of Innovative and as agents for Benessere and the undisclosed principals of Benessere, specifically, the Chain Consortium and the Millennium Entities.

695. Kabins performed or was excused of performing all acts required of Kabins pursuant to the Benessere Operating Agreement.

696. The Benessere Defendants failed to perform the Benessere Defendants' obligations as provided for and arising out of the Benessere Operating Agreement.

697. As a result of the Benessere Defendants' numerous breaches of the Benessere Operating Agreement, Kabins suffered substantial economic losses.

698. The Benessere Defendants breached the contractual duty of good faith applicable to the Benessere Defendants pursuant to §7.06 of the Benessere Operating Agreement, which provides that "[t]he Managing Member shall not be liable, responsible or accountable in damages or otherwise to the Company *or to the Members* for any act performed by the Managing Member, *provided such act is performed in good faith and without willful misconduct.*"  (Emphasis added.)  As such, all of the Benessere Defendants' conduct giving rise to Kabins' claims for breaches of fiduciary duty by the Benessere Defendants, in combination with all of the other causes of action alleged herein, constitutes a material breach of the contractual duty of good faith.

699. The Benessere Defendants breached the provisions of the Benessere Operating Agreement requiring that accurate and complete books and records be kept by the managing member, to be available for inspection and examination by the members or their representatives;

that accurate financial reports be provided to the members as necessary for the preparation of the members' tax returns; and that meetings of the members be held at least annually.

700. The Benessere Defendants have taken fees, and misappropriated funds, in excess of the compensation authorized for the Benessere Defendants to receive, in breach of §7.04 of the Benessere Operating Agreement.

701. The Benessere Defendants have engaged in extensive commingling of Benessere's funds with funds of other persons and entities, in breach of §7.08 of the Benessere Operating Agreement.

702. Mr. Chain has transferred a portion of his membership interest in Benessere to Susan Licata, Dawn Meidinger and Christine Thornton, under unknown terms and conditions, without allowing the other Benessere members to excuse their rights of first refusal, in breach of §§8.01 and 8.02 of the Benessere Operating Agreement.

703. The Benessere Defendants could foresee the requirement for attorneys' fees in prosecuting the Benessere Defendants' breach of the Benessere Operating Agreement, and the Benessere Defendants are thus liable for Kabins' attorneys' fees and costs incurred herein as a result of same.


## THIRTIETH CAUSE OF ACTION

## BREACH OF CONTRACT

### (Against the Capri Defendants)

704. Plaintiffs incorporate, repeat, and reallege all of the allegations set forth above.

705. The manager of Capri I, Phoenix 83rd, executed the Capri I Operating Agreement, including all amendments and exhibits.

706. Mr. Gutzman, Mr. Martinez and the JLC Trust executed the Capri I Operating Agreement on behalf of Phoenix 83rd and as agents for Capri I and the undisclosed principals of Capri I, specifically, the Chain Consortium and the Millennium Entities.

707. Kabins performed or was excused from performing all requirements for Kabins pursuant to the Capri Operating Agreement.

708. The Capri Defendants failed to perform the Capri Defendants' obligations as provided for and arising out of the Capri I Operating Agreement.

709. As a result of the Capri Defendants' numerous breaches of the Capri I Operating Agreement, Kabins suffered substantial economic losses.

710. The Capri Defendants breached the contractual duty of good faith applicable to the Capri Defendants pursuant to §7.06 of the Capri I Operating Agreement, which provides that "[t]he Managing Member shall not be liable, responsible or accountable in damages or otherwise to the Company *or to the Members* for any act performed by the Managing Member, *provided such act is performed in good faith and without willful misconduct.*"  (Emphasis added.)  As such, all of the Capri Defendants' conduct giving rise to Kabins' claims for breaches of the fiduciary duties of care and loyalty by the Capri Defendants, in combination of all of the other causes of action alleged herein, constitutes a material breach of the contractual duty of good faith.

711. The Capri Defendants breached the provisions of the Capri I Operating Agreement requiring that accurate and complete books and records be kept by the managing member, to be

125

available for inspection and examination by the members or their representatives; that accurate

financial reports be provided to the members as necessary for the preparation of the members'

tax returns; and that meetings of the members be held at least annually.

712. The Capri Defendants have taken fees, and misappropriated funds, in excess of the

compensation authorized for the Capri Defendants to receive, in breach of §7.04 of the Capri I

Operating Agreement.

713. The Capri Defendants have engaged in extensive commingling of Capri I's funds with

funds of other persons and entities, in breach of §7.08 of the Capri I Operating Agreement.

714. The Capri Defendants could foresee the requirement for attorneys' fees in prosecuting

the Capri Defendants' breach of the Capri I Operating Agreement, and the Capri Defendants are

thus liable for Kabins' attorneys' fees and costs incurred herein as a result of same.

### THIRTY-FIRST CAUSE OF ACTION

### BREACH OF CONTRACT

**(Against the Cipriani Defendants)**

715. Plaintiffs incorporate, repeat, and reallege all of the allegations set forth above.

716. Mr. Gutzman or Cipriani Management, or both, executed the Cipriani Operating

Agreement, including all amendments and exhibits, individually and on behalf of Cipriani

Management and as agents for Cipriani and the undisclosed principals of Cipriani, specifically,

the Chain Consortium and the Millennium Entities.

717. Kabins performed or was excused from performing all acts required of Kabins pursuant

to the Cipriani Operating Agreement.

718. The Cipriani Defendants failed to perform the Cipriani Defendants' obligations as provided for and arising out of the Cipriani Operating Agreement.

719. As a result of the Cipriani Defendants' numerous breaches of the Cipriani Operating Agreement, Kabins suffered substantial economic losses.

720. The Cipriani Defendants breached the contractual duty of good faith applicable to the Cipriani Defendants pursuant to § 7.06, of the Cipriani Operating Agreement, which provides that "[t]he Managing Member shall not be liable, responsible or accountable in damages or otherwise to the Company *or to the Members* for any act performed by the Managing Member, *provided such act is performed in good faith and without willful misconduct.*"  (Emphasis added.)  As such, all of the Cipriani Defendants' conduct giving rise to Kabins' claims for breaches of the fiduciary duties of care and loyalty by the Cipriani Defendants, in combination with all of the other causes of action alleged herein, constitutes a material breach of the contractual duty of good faith.

721. The Cipriani Defendants breached the provisions of the Cipriani Operating Agreement requiring that accurate and complete books and records be kept by the managing member, to be available for inspection and examination by the members or their representatives; that accurate financial reports be provided to the members as necessary for the preparation of the members' tax returns; and that meetings of the members be held at least annually.

722. The Cipriani Defendants have taken fees, and misappropriated funds, in excess of the compensation authorized for the Cipriani Defendants to receive, in breach of §7.04 of the Cipriani Operating Agreement.

723. The Cipriani Defendants have engaged in extensive commingling of Cipriani's funds with funds of other persons and entities, in breach of §7.08 of the Cipriani Operating Agreement.

724. When the master limited-liability company was formed for Cipriani, Kabins' invested capital was blended with more recent investors' capital, thereby depriving Kabins of credit for unrealized appreciation, in violation of §7.03(Q) of the Cipriani Operating Agreement, which specifically required a "book-up" for unrealized appreciation.

725. Mr. Chain has transferred a portion of Mr. Chain's membership interest in Cipriani to Susan Licata and Christine Thornton, under unknown terms and conditions, without allowing the other members to exercise their rights of first refusal, in violation of §§8.01 and 8.02 of the Cipriani Operating Agreement.

726. The Cipriani Defendants could foresee the requirement for attorneys' fees in prosecuting the Cipriani Defendants' breach of the Cipriani Operating Agreement, and the Cipriani Defendants are thus liable for Kabins' attorneys' fees and costs incurred herein as a result of same.

## THIRTY-SECOND CAUSE OF ACTION

## BREACH OF CONTRACT

### (Against the Cottonwood Defendants)

727. Plaintiffs incorporate, repeat, and reallege all of the allegations set forth above.

728. The managers of Cottonwood, Mr. Kammeyer and Mr. Povilaitis, executed the Cottonwood Operating Agreement, including all amendments and exhibits, individually and as

agents for Cottonwood and the undisclosed principals of Cottonwood, specifically, the Chain Consortium and the Millennium Entities.

729. Kabins performed or was excused from performing all acts required of Kabins pursuant to the Cottonwood Operating Agreement.

730. The Cottonwood Defendants failed to perform the Cottonwood Defendants' obligations as provided for and arising out of the Cottonwood Operating Agreement.

731. As a result of the Cottonwood Defendants' numerous breaches of the Cottonwood Operating Agreement, Kabins suffered substantial economic losses.

732. The Cottonwood Defendants breached the contractual duty of good faith applicable to the Cottonwood Defendants pursuant to §7.06 of the Cottonwood Operating Agreement, which provides that "[t]he Managing Member shall not be liable, responsible or accountable in damages or otherwise to the Company *or to the Members* for any act performed by the Managing Member, *provided such act is performed in good faith and without willful misconduct.*" (Emphasis added.)  As such, all of the Cottonwood Defendants' conduct giving rise to Kabins' claims for breaches of the fiduciary duties of care and loyalty by the Cottonwood Defendants, in combination with all of the other causes of action alleged herein, constitutes a material breach of the contractual duty of good faith.

733. The Cottonwood Defendants breached the provisions of the Cottonwood Operating Agreement requiring that accurate and complete books and records be kept by the managing member, to be available for inspection and examination by the members or their representatives; that accurate financial reports be provided to the members as necessary for the preparation of the members' tax returns; and that meetings of the members be held at least annually.

734. The Cottonwood Defendants have engaged in extensive commingling of Cottonwood's funds with funds of other persons and entities, in breach of §7.08 of the Cottonwood Operating Agreement.

735. The Cottonwood Defendants could foresee the requirement for attorneys' fees in prosecuting the Cottonwood Defendants' breach of the Cottonwood Operating Agreement, and the Cottonwood Defendants are thus liable for Kabins' attorneys' fees and costs incurred herein as a result of same.

## THIRTY-THIRD CAUSE OF ACTION

## BREACH OF CONTRACT

### (Against the Gila Bend Defendants)

736. Plaintiffs incorporate, repeat, and reallege all of the allegations set forth above.

737. GEIII or Innovative, or both, executed the Gila Bend Operating Agreement, including all amendments and exhibits, individually and on behalf of Modern Management and as agents for Gila Bend and the undisclosed principals thereof, specifically, the Chain Consortium and the Millennium Entities.

738. Kabins performed or was excused from performing all acts required of Kabins pursuant to the Gila Bend Operating Agreement.

739. The Gila Bend Defendants failed to perform the Gila Bend Defendants' obligations as provided for and arising out of the Gila Bend Operating Agreement.

740. As a result of the Gila Bend Defendants' numerous breaches of the Gila Bend Operating Agreement, Kabins suffered substantial economic losses.

741. The Gila Bend Defendants breached the contractual duty of good faith applicable to the Gila Bend Defendants pursuant to §7.06 of the Gila Bend Operating Agreement, which provides that "[t] he Managing Member shall not be liable, responsible or accountable in damages or otherwise to the Company *or to the Members* for any act performed by the Managing Member, *provided such act is performed in good faith and without willful misconduct.*"  (Emphasis added.)  As such, all of the Gila Bend Defendants' conduct giving rise to Kabins' claims for breaches of the fiduciary duties of care and loyalty by the Gila Bend Defendants, in combination with all of the other causes of action alleged herein, constitutes a material breach of the contractual duty of good faith.

742. The Gila Bend Defendants breached the provisions of the Gila Bend Operating Agreement requiring that accurate and complete books and records be kept by the managing member, to be available for inspection and examination by the members or their representatives; that accurate financial reports be provided to the members as necessary for the preparation of the members' tax returns; and that meetings of the members be held at least annually.

743. The Gila Bend Defendants have taken fees, and misappropriated funds, in excess of the compensation authorized for the Gila Bend Defendants to receive, in breach of §7.04 of the Gila Bend Operating Agreement.

744. The Gila Bend Defendants have engaged in extensive commingling of Gila Bend's funds with funds of other persons and entities, in breach of §7.08 of the Gila Bend Operating Agreement.

745. The Gila Bend Defendants could foresee the requirement for attorneys' fees in prosecuting the Gila Bend Defendants' breach of the Gila Bend Operating Agreement, and the

Gila Bend Defendants are thus liable for Kabins' attorneys' fees and costs incurred herein as a result of same.

**THIRTY-FOURTH CAUSE OF ACTION**

**BREACH OF CONTRACT**

**(Against the Michael's Defendants)**

746. Plaintiffs incorporate, repeat, and reallege all of the allegations set forth above.

747. Mr. Gutzman, Mr. Chain, and/or Modern Management executed the Michael's Operating Agreement, including all amendments and exhibits, individually and on behalf of Modern Management, and as agents for Michael's and for the undisclosed principals of Michael's, specifically, the Chain Consortium and the Millennium Entities.

748. Kabins performed or was excused from performing all acts required of Kabins pursuant to the Michael's Operating Agreement.

749. The Michael's Defendants failed to perform the Michael's Defendants' obligations as provided for and arising out of the Michael's Operating Agreements.

750. As a result of the Michael's Defendants' numerous breaches of the Michael's Operating Agreement, Kabins suffered substantial economic losses.

751. The Michael's Defendants breached the contractual duty of good faith applicable to the Michael's Defendants pursuant to §7.06 of the Michael's Operating Agreement, which provides that "no person…may receive indemnification hereunder or avoid liability therefore pursuant to this Section unless such person determined in good faith that such conduct was in the best interest of the Company, and so long as such conduct did not constitute fraud or misconduct."

132

As such, all of the Michael's Defendants' conduct giving rise to Kabins' claims for breaches of fiduciary duty by the Michael's Defendants, in combination with all of the other causes of action alleged herein, constitutes a material breach of the contractual duty of good faith.

752. The Michael's Defendants breached the provisions of the Michael's Operating Agreement requiring that accurate and complete books and records be kept by the managing member, to be available for inspection and examination by the members or their representatives; that accurate financial reports be provided to the members as necessary for the preparation of the members' tax returns; and that meetings of the members be held at least annually.

753. The Michael's Defendants have taken fees, and misappropriated funds, in excess of the compensation authorized for the Michael's Defendants to receive, in breach of §7.04 of the Michael's Operating Agreement.

754. The Michael's Defendants have engaged in extensive commingling of Michael's funds with funds of other persons and entities, in breach of §7.08 of the Michael's Operating Agreement.

755. The Michael's Defendants could foresee the requirement for attorneys' fees in prosecuting the Michael's Defendants' breach of the Michael's Operating Agreement, and the Michael's Defendants are thus liable for Kabins' attorneys' fees and costs incurred herein as a result.

## THIRTY-FIFTH CAUSE OF ACTION

## BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING

### (Against the 99th Defendants)

756. Plaintiff incorporates, repeats, and realleges all the allegations set forth above.

757. Kabins' relationship with the 99th Defendants was governed by contracts, including, without limitation, the 99th Operating Agreement.

758. Kabins performed or was excused from performing all, or substantially all, of the acts required of Kabins by the 99th Operating Agreement.

759. The 99th Defendants, individually and as agents for the other 99th Defendants, unfairly interfered with Kabins' right to receive the benefits of the 99th Operating Agreement by performing and/or failing to perform the 99th Defendants' duties under the 99th Operating Agreement in bad faith and in a manner inconsistent with the purpose of the 99th Operating Agreement.

760. The 99th Defendants, individually and as agents for the other 99th Defendants, unfairly interfered with Kabins' right to receive the benefits of the 99th Operating Agreement by violating Kabins' justified expectations that the 99th Defendants would preserve Kabins' invested capital and that the 99th Defendants would work diligently to achieve the purpose of the 99th Operating Agreement.

761. The 99th Defendants, individually and as agents for the other 99th Defendants, unfairly interfered with Kabins' right to receive the benefits of the 99th Operating Agreement by making the Distribution Misrepresentation in the expectation that Kabins would rely on the Distribution Misrepresentation, and then failing or refusing to abide by the Distribution Misrepresentation.

134

762. The 99th Defendants, individually and as agents for the other 99th Defendants, unfairly interfered with Kabins' right to receive the benefits of the 99th Operating Agreement by interfering with Kabins' ability to receive Kabins' share of profits from 99th LLC.

763. The 99th Defendants, individually and as agents for the other 99th Defendants, unfairly interfered with Kabins' right to receive the benefits of the 99th Operating Agreement by diluting Kabins' principal investment by taking substantial up-front fees and incurring excessive expenses.

764. The 99th Defendants, individually and as agents for the other 99th Defendants, unfairly interfered with Kabins' right to receive the benefits of the 99th Operating Agreement by failing to disclose material information to Kabins regarding the 99th Defendants' negotiations for the purchase of membership interests in 99th LLC and the value potential buyers were willing to pay for membership interests in 99th LLC.

765. The 99th Defendants, individually and as agents for the other 99th Defendants, unfairly interfered with Kabins' right to receive the benefits of the 99th Operating Agreement by engaging in further conduct giving rise to the additional causes of action against the 99th Defendants alleged herein.

766. As a result of the 99th Defendants' unfair interference with Kabins' right to receive the benefits of the 99th Operating Agreement, Kabins sustained actual damages, in an amount to be proven at trial, and the 99th Defendants are liable to Kabins for those actual damages.

767. The 99th Defendants could foresee the requirement for attorneys' fees in prosecuting the 99th Defendants' breach of the duty of good faith and fair dealing, and the 99th Defendants are thus liable for Kabins' attorneys' fees and costs incurred herein as a result of same.

### THIRTY-SIXTH CAUSE OF ACTION

### BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING

#### (Against the Benessere Defendants)

768.  Plaintiff incorporates, repeats, and realleges all the allegations set forth above.

769. Kabins' relationship with the Benessere Defendants was governed by contracts, including, without limitation, the Benessere Operating Agreement.

770. Kabins performed or was excused from performing all, or substantially all, of the acts required of Kabins by the Benessere Operating Agreement.

771. The Benessere Defendants, individually and as agents for the other Benessere Defendants, unfairly interfered with Kabins' right to receive the benefits of the Benessere Operating Agreement by performing and/or failing to perform the Benessere Defendants' duties in bad faith and in a manner inconsistent with the purpose of the Benessere Operating Agreement.

772. The Benessere Defendants, individually and as agents for the other Benessere Defendants, unfairly interfered with Kabins' right to receive the benefits of the Benessere Operating Agreement by violating Kabins' justified expectations that the Benessere Defendants would preserve Kabins' invested capital and that the Benessere Defendants would work diligently to achieve the purpose of the Benessere Operating Agreement.

773. The Benessere Defendants, individually and as agents for the other Benessere Defendants, unfairly interfered with Kabins' right to receive the benefits of the Benessere Operating Agreement by making the Distribution Misrepresentation in the expectation that

136

Kabins would rely on the Distribution Misrepresentation, and then failing or refusing to abide by the Distribution Misrepresentation.

774. The Benessere Defendants, individually and as agents for the other Benessere Defendants, unfairly interfered with Kabins' right to receive Kabins' share of profits from Benessere LLC.

775. The Benessere Defendants, individually and as agents for the other Benessere Defendants, unfairly interfered with Kabins' right to receive the benefits of the Benessere Operating Agreement by diluting Kabins' principal investment by taking substantial up-front fees and incurring excessive expenses.

776. The Benessere Defendants, individually and as agents for the other Benessere Defendants, unfairly interfered with Kabins' right to receive the benefits of the Benessere Operating Agreement by failing to disclose material information to Kabins regarding the Benessere Defendants' negotiations for the purchase of membership interests in Benessere and the value potential buyers were willing to pay for membership interests in Benessere.

777. The Benessere Defendants, individually and as agents for the other Benessere Defendants, unfairly interfered with Kabins' right to receive the benefits of the Benessere Operating Agreement by engaging in further conduct giving rise to all of the causes of action alleged herein.

778. As a result of the Benessere Defendants' unfair interference with Kabins' right to receive the benefits of the Benessere Operating Agreement, Kabins sustained actual damages, in an amount to be proven at trial, and the Benessere Defendants are liable to Kabins for those actual damages.

779. The Benessere Defendants could foresee the requirement for attorneys' fees in prosecuting the Benessere Defendants' breach of the duty of good faith and fair dealing, and the Benessere Defendants are thus liable for Kabins' attorneys' fees and costs incurred herein as a result of same.

## THIRTY-SEVENTH CAUSE OF ACTION

## BREACH OF THE DUTY OF GOOD FAITH AND FAIR DEALING

### (Against the Capri Defendants)

780. Plaintiff incorporates, repeats, and realleges all the allegations set forth above.

781. Kabins' relationship with the Capri Defendants was governed by contracts, including, without limitation, the Capri I Operating Agreement.

782. Kabins performed, or was excused from performing, all or substantially all of the acts required of Kabins by the Capri I Operating Agreement.

783.  The Capri Defendants, individually and as agents for the other Capri Defendants, unfairly interfered with Kabins' right to receive the benefits of the Capri I Operating Agreement by performing and/or failing to perform the Capri Defendants' duties in bad faith and in a manner inconsistent with the purpose of the Capri I Operating Agreement.

784. The Capri Defendants, individually and as agents for the other Capri Defendants, unfairly interfered with Kabins' right to receive the benefits of the Capri I Operating Agreement by violating Kabins' justified expectations that the Capri Defendants would preserve Kabins' invested capital and that the Capri Defendants would work diligently to achieve the purpose of the Capri I Operating Agreement.

785. The Capri Defendants, individually and as agents for the other Capri Defendants, unfairly interfered with Kabins' right to receive the benefits of the Capri I Operating Agreement by making the Distribution Misrepresentation in the expectation that Kabins would rely on the Distribution Misrepresentation, and then failing or refusing to abide by the Distribution Misrepresentation.

786. The Capri Defendants, individually and as agents for the other Capri Defendants, unfairly interfered with Kabins' right to receive the benefits of the Capri I Operating Agreement by unfairly interfering with Kabins' right to receive the benefits of any profits from Capri I.

787. The Capri Defendants, individually and as agents for the other Capri Defendants, unfairly interfered with Kabins' right to receive the benefits of the Capri I Operating Agreement by diluting Kabins' principal investment by taking substantial up-front fees and incurring excessive expenses.

788. The Capri Defendants, individually and as agents for the other Capri Defendants, unfairly interfered with Kabins' right to receive the benefits of the Capri I Operating Agreement by failing to disclose material information to Kabins regarding negotiations for the purchase of membership interests in Capri I and the value potential buyers were willing to pay for membership interests in Capri I.

789. The Capri Defendants, individually and as agents for the other Capri Defendants, unfairly interfered with Kabins' right to receive the benefits of the Capri I Operating Agreement by engaging in further conduct giving rise to the additional causes of action against the Capri Defendants alleged herein.

790. As a result of the Capri Defendants' unfair interference with Kabins' right to receive the benefits of the Capri I Operating Agreement, Kabins sustained actual damages, in an amount to be proven at trial, and the Capri Defendants are liable to Kabins for those actual damages.

791. The Capri Defendants could foresee the requirement for attorneys' fees in prosecuting the Capri Defendants' breach of the duty of good faith and fair dealing, and the Capri Defendants are thus liable for Kabins' attorneys' fees and costs incurred herein as a result of same.

**THIRTY-EIGHTH CAUSE OF ACTION**

**BREACH OF THE DUTY OF GOOD FAITH AND FAIR DEALING**

**(Against the Cipriani Defendants)**

792. Plaintiff incorporates, repeats, and realleges all the allegations set forth above.

793. Kabins' relationship with the Cipriani Defendants was governed by contracts, including, without limitation, the Cipriani Operating Agreement.

794. Kabins performed or was excused from performing all, or substantially all, of the acts required of Kabins by the Cipriani Operating Agreement.

795. The Cipriani Defendants, individually and as agents for the other Cipriani Defendants, unfairly interfered with Kabins' right to receive the benefits of the Cipriani Operating Agreement by performing and/or failing to perform the Cipriani Defendants' duties in bad faith and in a manner inconsistent with the purpose of the Cipriani Operating Agreement.

796. The Cipriani Defendants, individually and as agents for the other Cipriani Defendants, violated Kabins' justified expectations that the Cipriani Defendants would preserve Kabins'

invested capital and that the Cipriani Defendants would work diligently to achieve the purpose of the Cipriani Operating Agreement.

797. The Cipriani Defendants, individually and as agents for the other Cipriani Defendants, unfairly interfered with Kabins' right to receive the benefits of the Cipriani Operating Agreement by making the Distribution Misrepresentation in the expectation that Kabins would rely on the Distribution Misrepresentation, and then failing or refusing to abide by the Distribution Misrepresentation.

798. The Cipriani Defendants, individually and as agents for the other Cipriani Defendants, unfairly interfered with Kabins' right to receive the benefits of the Cipriani Operating Agreement by interfering with Kabins' ability to receive Kabins' share of profits from Cipriani LLC.

799. The Cipriani Defendants, individually and as agents for the other Cipriani Defendants, unfairly interfered with Kabins' right to receive the benefits of the Cipriani Operating Agreement by diluting Kabins' principal investment by taking substantial up-front fees and incurring excessive expenses.

800. The Cipriani Defendants, individually and as agents for the other Cipriani Defendants, unfairly interfered with Kabins' right to receive the benefits of the Cipriani Operating Agreement by taking up-front fees despite the Cipriani Defendants' representations to Kabins that the Cipriani Defendants would not do so.

801. The Cipriani Defendants, individually and as agents for the other Cipriani Defendants, unfairly interfered with Kabins' right to receive the benefits of the Cipriani Operating Agreement by failing to disclose material information to Kabins regarding negotiations for the purchase of

membership interests in Cipriani and the value potential buyers were willing to pay for membership interests in Cipriani.

802. The Cipriani Defendants, individually and as agents for the other Cipriani Defendants, unfairly interfered with Kabins' right to receive the benefits of the Cipriani Operating Agreement by engaging in further conduct giving rise to the additional causes of action against the Cipriani Defendants alleged herein.

803. As a result of the Cipriani Defendants' unfair interference with Kabins' right to receive the benefits of the Cipriani Operating Agreement, Kabins sustained actual damages, in an amount to be proven at trial, and the Cipriani Defendants are liable to Kabins for those actual damages.

804. The Cipriani Defendants could foresee the requirement for attorneys' fees in prosecuting the Cipriani Defendants' breach of the duty of good faith and fair dealing, and the Cipriani Defendants are thus liable for Kabins' attorneys' fees and costs incurred herein as a result of same.

## THIRTY-NINTH CAUSE OF ACTION

## BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

### (Against the Cottonwood Defendants)

805. Plaintiff incorporates, repeats, and realleges all the allegations set forth above.

806. Kabins' relationship with the Cottonwood Defendants was governed by contracts, including, without limitation, the Cottonwood Operating Agreement.

807. Kabins performed or was excused from performing all, or substantially all, of the acts required of Kabins by the Cottonwood Operating Agreement.

808. The Cottonwood Defendants, individually and as agents for the other Cottonwood Defendants, unfairly interfered with Kabins' right to receive the benefits of the Cottonwood Operating Agreement by performing and/or failing to perform the Cottonwood Defendants' duties under the Cottonwood Operating Agreement in bad faith and in a manner inconsistent with the purpose of the Cottonwood Operating Agreement.

809. The Cottonwood Defendants, individually and as agents for the other Cottonwood Defendants, unfairly interfered with Kabins' right to receive the benefits of the Cottonwood Operating Agreement by violating Kabins' justified expectations that the Cottonwood Defendants would preserve Kabins' invested capital and that the Cottonwood Defendants would work diligently to achieve the purpose of the Cottonwood Operating Agreement.

810. The Cottonwood Defendants, individually and as agents for the other Cottonwood Defendants, unfairly interfered with Kabins' right to receive the benefits of the Cottonwood Operating Agreement by making the Distribution Misrepresentation in the expectation that Kabins would rely on the Distribution Misrepresentation, and then failing or refusing to abide by the Distribution Misrepresentation.

811. The Cottonwood Defendants, individually and as agents for the other Cottonwood Defendants, unfairly interfered with Kabins' right to receive the benefits of the Cottonwood Operating Agreement by interfering with Kabins' ability to receive Kabins' share of profits from Cottonwood.

812. The Cottonwood Defendants, individually and as agents for the other Cottonwood Defendants, unfairly interfered with Kabins' right to receive the benefits of the Cottonwood Operating Agreement by diluting Kabins' principal investment by taking substantial up-front fees and incurring excessive expenses.

813. The Cottonwood Defendants, individually and as agents for the other Cottonwood Defendants, unfairly interfered with Kabins' right to receive the benefits of the Cottonwood Operating Agreement by failing to disclose material information to Kabins regarding negotiations for the purchase of membership interests in Cottonwood and the value potential buyers would be willing to pay for membership interests in Cottonwood.

814. The Cottonwood Defendants, individually and as agents for the other Cottonwood Defendants, unfairly interfered with Kabins' right to receive the benefits of the Cottonwood Operating Agreement by engaging in further conduct giving rise to the additional causes of action alleged herein.

815. As a result of the Cottonwood Defendants' unfair interference with Kabins' right to receive the benefits of the Cottonwood Operating Agreement, Kabins sustained actual damages, in an amount to be proven at trial, and the Cottonwood Defendants are liable to Kabins for those actual damages.

816. As a result of the Cottonwood Defendants unfair interference with Kabins' right to receive the benefits of the Cottonwood Operating Agreements, Kabins sustained special damages, including, but not limited to, damages arising from Kabins' based on the Cottonwood Operating Agreements and fraudulent misrepresentations and material omissions, in an amount not yet fully ascertained to be proven at trial.

817. The Cottonwood Defendants could foresee the requirement for attorneys' fees in prosecuting the Cottonwood Defendants' breach of the duty of good faith and fair dealing. Kabins has been required to retain attorneys to prosecute this action, and the Cottonwood Defendants are liable to Kabins for Kabins' attorneys' fees and costs incurred in connection with the prosecution of this action.

**FORTIETH CAUSE OF ACTION**

**BREACH OF THE DUTY OF GOOD FAITH AND FAIR DEALING**

**(Against the Gila Bend Defendants)**

818. Plaintiff incorporates, repeats, and realleges all the allegations set forth above.

819. Kabins' relationship with the Gila Bend Defendants was governed by contracts, including, without limitation, the Gila Bend Operating Agreement.

820. Kabins performed or was excused from performing all, or substantially all, of the acts required of Kabins by the Gila Bend Operating Agreement.

821. The Gila Bend Defendants, individually and as agents for the other Gila Bend Defendants, unfairly interfered with Kabins' right to receive the benefits of the Gila Bend Operating Agreement by performing and/or failing to perform the Gila Bend Defendants' duties under the Gila Bend Operating Agreement in bad faith and in a manner inconsistent with the purpose of the Gila Bend Operating Agreement.

822. The Gila Bend Defendants, individually and as agents for the other Gila Bend Defendants, unfairly interfered with Kabins' right to receive the benefits of the Gila Bend Operating Agreement by violating Kabins' justified expectations that the Gila Bend Defendants

145

would preserve Kabins' invested capital and that the Gila Bend Defendants would work

diligently to achieve the purpose of the Gila Bend Operating Agreement.

823. The Gila Bend Defendants, individually and as agents for the other Gila Bend

Defendants, unfairly interfered with Kabins' right to receive the benefits of the Gila Bend

Operating Agreement by making the Distribution Misrepresentation in the expectation that

Kabins would rely on the Distribution Misrepresentation, and then failing or refusing to abide by

the Distribution Misrepresentation.

824. The Gila Bend Defendants, individually and as agents for the other Gila Bend

Defendants, unfairly interfered with Kabins' right to receive the benefits of the Gila Bend

Operating Agreement by interfering with Kabins' ability to receive Kabins' share of profits from

Gila Bend.

825. The Gila Bend Defendants, individually and as agents for the other Gila Bend

Defendants, unfairly interfered with Kabins' right to receive the benefits of the Gila Bend

Operating Agreement by diluting Kabins' principal investment by taking substantial up-front

fees and incurring excessive expenses.

826. The Gila Bend Defendants, individually and as agents for the other Gila Bend

Defendants, unfairly interfered with Kabins' right to receive the benefits of the Gila Bend

Operating Agreement by failing to disclose material information to Kabins regarding

negotiations for the purchase of membership interests in Gila Bend and the value potential

buyers would be willing to pay for membership interests in Gila Bend.

827. The Gila Bend Defendants, individually and as agents for the other Gila Bend

Defendants, unfairly interfered with Kabins' right to receive the benefits of the Gila Bend

Operating Agreement by engaging in further conduct giving rise to the additional causes of action alleged herein.

828. As a result of the Gila Bend Defendants' unfair interference with Kabins' right to receive the benefits of the Gila Bend Operating Agreement, Kabins sustained actual damages, in an amount to be proven at trial, and the Gila Bend Defendants are liable to Kabins for those actual damages.

829.  The Gila Bend Defendants could foresee the requirement for attorneys' fees in prosecuting the Gila Bend Defendants' breach of the duty of good faith and fair dealing, and the Gila Bend Defendants are thus liable for Kabins' attorneys' fees and costs incurred herein as a result of same.

## FORTY-FIRST CAUSE OF ACTION

## BREACH OF THE DUTY OF GOOD FAITH AND FAIR DEALING

### (Against the Michael's Defendants)

830. Plaintiff incorporates, repeats, and realleges all the allegations set forth above.

831. Kabins' relationship with the Michael's Defendants was governed by contracts, including, without limitation, the Michael's Operating Agreement.

832. Kabins performed or was excused from performing all, or substantially all, of the acts required of Kabins by the Michael's Operating Agreement.

833. The Michael's Defendants, individually and as agents for the other Michael's Defendants, unfairly interfered with Kabins' right to receive the benefits of the Michael's Operating Agreement by performing and/or failing to perform the Michael's Defendants' duties

147

under the Michael's Operating Agreement in bad faith and in a manner inconsistent with the purpose of the Michael's Operating Agreement.

834. The Michael's Defendants, individually and as agents for the other Michael's Defendants, unfairly interfered with Kabins' right to receive the benefits of the Michael's Operating Agreement by violating Kabins' justified expectations that the Michael's Defendants would preserve Kabins' invested capital and that the Michael's Defendants would work diligently to achieve the purpose of the Michael's Operating Agreement.

835. The Michael's Defendants, individually and as agents for the other Michael's Defendants, unfairly interfered with Kabins' right to receive the benefits of the Michael's Operating Agreement by making the Distribution Misrepresentation in the expectation that Kabins would rely on the Distribution Misrepresentation, and then failing or refusing to abide by the Distribution Misrepresentation.

836. The Michael's Defendants, individually and as agents for the other Michael's Defendants, unfairly interfered with Kabins' right to receive the benefits of the Michael's Operating Agreement by interfering with Kabins' ability to receive Kabins' share of profits from Michael's.

837. The Michael's Defendants, individually and as agents for the other Michael's Defendants, unfairly interfered with Kabins' right to receive the benefits of the Michael's Operating Agreement by diluting Kabins' principal investment by taking substantial up-front fees and incurring excessive expenses.

838. The Michael's Defendants, individually and as agents for the other Michael's Defendants, unfairly interfered with Kabins' right to receive the benefits of the Michael's

Operating Agreement by failing to disclose material information to Kabins regarding negotiations for the purchase of membership interests in Michael's and the value potential buyers were willing to pay for membership interests in Michael's.

839. The Michael's Defendants, individually and as agents for the other Michael's Defendants, unfairly interfered with Kabins' right to receive the benefits of the Michael's Operating Agreement by engaging in further conduct giving rise to the additional causes of action alleged herein.

840. As a result of the Michael's Defendants' unfair interference with Kabins' right to receive the benefits of the Michael's Operating Agreement, Kabins sustained actual damages, in an amount to be proven at trial, and the Michael's Defendants are liable to Kabins for those actual damages.

841.  The Michael's Defendants could foresee the requirement for attorneys' fees in prosecuting the Michael's Defendants' breach of the duty of good faith and fair dealing, and the Michael's Defendants are thus liable for Kabins' attorneys' fees and costs incurred herein as a result of same.

**FORTY-SECOND CAUSE OF ACTION**

**FEDERAL RACKETEERING UNDER 18 U.S.C. §1962**

**(Against All Defendants)**

842. Plaintiffs incorporate, repeat, and reallege all the allegations set forth above.

843. The Enterprise comprises individuals and entities associated in fact to defraud Kabins.

844. The Enterprise is an enterprise engaged in, and the activities of which affect, interstate commerce.

845. Defendants, as "persons" within the meaning of 18 U.S.C. §1961(3), through a pattern of racketeering activity, acquired and maintained, directly or indirectly, an interest in and/or control of the Enterprise in violation of 18 U.S.C. §1962(c).

846. The Defendants engaged in at least two predicate acts of "racketeering activity," in the form of securities fraud, wire fraud, and mail fraud, as defined in 18 U.S.C. §1961(1) and as described in detail *supra*, which predicate acts occurred within ten (10) years of one another, constituting a pattern of racketeering activity under 18 U.S.C. §1961(5).

847. Each member of the Enterprise assented to the plan of the conspiracy created by the Chain Consortium and the Millennium Entities to commit predicate acts of securities fraud in violation of 15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5.

848. The Enterprise's pattern of racketeering activity threatens to continue indefinitely into the future, or at least so long as Kabins owns interests in any of the Millennium Entities.

849. Kabins was injured in Kabins' respective business and property by reason of Defendants' violations of 18 U.S.C. §1962 in that, as a direct and proximate result of Defendants' acts, Kabins suffered damages, including lost income and property value, based on a conservative return on investment, equaling, at a minimum, $13,600,000, in a total amount to be determined by the trier of fact.

850. By reason of Defendants' violations of 18 U.S.C §1962, Kabins is entitled to three times the damages Kabins sustained, plus pre- and post-judgment interest at the statutory rate, pursuant to 18 U.S.C. §1964(c).

851. Kabins has been required to retain attorneys to prosecute this action, and Defendants are liable to Kabins for Kabins' attorneys' fees and costs incurred in connection with the prosecution of this action.

## FORTY-THIRD CAUSE OF ACTION

## CONSPIRACY TO VIOLATE RICO

**(Against All Defendants)**

852. Kabins incorporates, repeats, and realleges all the allegations set forth above.

853. The Enterprise Defendants objectively manifested the Enterprise Defendants' agreement to participate in a racketeering enterprise through the commission of two or more predicate acts of racketeering activity in violation of 18 U.S.C. §1962(d).

854. Kabins was injured in Kabins' respective business and property by reason of the Enterprise Defendants' conspiracy to violate 18 U.S.C. §1962(d) and, as a direct and proximate result of the Enterprise Defendants' acts, Kabins suffered damages, including lost income  and property value, based on a conservative return on investment, equaling, at a minimum, $13,600,000, in a total amount to be determined by the trier of fact.

855. By reason of the Enterprise Defendants' conspiracy to violate 18 U.S.C §1962, Kabins is entitled to three times the damages Kabins sustained, plus pre- and post-judgment interest at the statutory rate pursuant to 18 U.S.C. §1964(c).

856. Kabins has been required to retain attorneys to prosecute this action, and Defendants are liable to Kabins for Kabins' attorneys' fees and costs incurred in connection with the prosecution of this action.

**FORTY-FOURTH CAUSE OF ACTION**

**RACKETEERING UNDER NRS 207.470**

**(Against All Defendants)**

857. Kabins incorporates, repeats, and realleges all the allegations set forth above.

858. Defendants have engaged in at least two crimes related to racketeering, including, without limitation, multiple instances of securities fraud in violation of NRS 90.570 as described fully *supra,* after July 1, 1983, with Kabins as the victim and otherwise interrelated by distinguishing characteristics, with all such crimes taking place within the same five-year period.

859. The individual Defendant entities' officers, directors, and managers personally authorized, directed, or participated in each company's crimes related to racketeering.

860. Kabins was injured in Kabins' respective business and property by reason of Defendants' violations of NRS 207.410 in that, as a direct and proximate result of Defendants' acts, Kabins suffered damages, including lost income and property value in an amount to be determined at trial.

861. By reason of Defendants' violations of NRS 207.390, Kabins is entitled, pursuant to NRS 207.390, to three times the damages Kabins sustained as a result of Defendants' racketeering activity, plus pre- and post-judgment interest at the statutory rate.

862. Kabins has been required to retain attorneys to prosecute this action, and Defendants are thus liable for Kabins' attorneys' fees and costs incurred herein as a result of same.

## FORTY-FIFTH CAUSE OF ACTION

## UNJUST ENRICHMENT

### (Against All Defendants)

863. Kabins incorporates, repeats, and realleges all the allegations set forth above.

864. Kabins conferred upon Defendants a benefit of at least $11 million of respective invested funds, which Defendants accepted, retained, and enjoyed to Kabins' detriment.

865. Defendants misappropriated, commingled, and inappropriately disbursed Kabins' invested capital, resulting in unjust enrichment to the Defendants.

866. Kabins was injured as a direct and proximate result of Defendants' acts, including lost income and property in an amount to be determined at trial.

867. Defendants could foresee the requirement for attorneys' fees in prosecuting Defendants' unjust enrichment, and Defendants are thus liable for Kabins' attorneys' fees and costs incurred herein as a result of same.

## FORTY-SIXTH CAUSE OF ACTION

## PROMISSORY ESTOPPEL

### (Against All Defendants)

868. Kabins incorporates, repeats, and realleges all the allegations set forth above.

869. Defendants knew that Kabins' respective investments would be subject to extremely high risks.

870. The Defendants undertook extraordinary measures to ensure the Kabins believed that Kabins' principal would not be subject to high risks, including routine mailings of K-1 tax

153

statements and other financial statements incorrectly reflecting undiminished value in Kabins'
principal and incorrectly stating that Mr. Chain's Guaranty would protect Kabins against all
losses.

871.  Kabins was not aware of the true nature of the high risks associated with the Millennium
Investment Companies because Kabins relied on the Inducement Misrepresentations and on Mr.
Chain's Guaranty.

872.  Kabins' detrimental reliance on Mr. Chain's Guaranty constitutes consideration with
respect to Mr. Chain's Guaranty.

873.  Defendants made representations and gave assurances to Kabins, upon which
Defendants intended for Kabins to rely, to Kabins' detriment.

874.  Kabins was injured in Kabins' business and property by reason of Defendants' acts
giving rise to a claim for promissory estoppel in that, as a direct and proximate result of
Defendants' acts, Kabins suffered damages, including lost income and property in an amount to
be determined at trial.

875.  Defendants could foresee the requirement for attorneys' fees in prosecuting Defendants'
breached promises to Kabins, and Defendants are thus liable for Kabins' attorneys' fees and
costs incurred herein as a result of same.

### PRAYER FOR RELIEF

Kabins prays for judgment against Defendants as follows:

1.  For general damages, in an amount in excess of $75,000.00, to be proven at trial;

154

2.  For treble damages with respect to Defendants' RICO violations, in an amount to be proven at trial;

3.  For special damages, in an amount to be proven at trial;

4.  For punitive or exemplary damages pursuant to NRS 42.001 and 42.005, based on Defendants' malice, oppression, and fraud, in an amount to be determined by the trier of fact;

5.  For rescission of each of the Operating Agreements and other investment contracts associated with the Millennium Investment Companies, and recovery of Kabins' capital investments upon tender of the consideration Kabins received for Kabins' capital;

6.  For imposition of a constructive trust on Defendants for the benefit of Kabins with respect to, at a minimum, all of Kabins' respective invested capital and additional damages, in an amount to be determined at trial; and for preliminary and permanent injunctive or other equitable relief, or both, with respect to such imposition of constructive trust;

7.  For attorneys' fees and costs of suit incurred herein;

8.  For pre- and post-judgment interest as allowed by law;

9.  For further relief pursuant to 15 U.S.C. 78a *et seq.*, 18 U.S.C. §1964, NRS 90.660, NRS 207.390 and NRS 207.400 *et seq.* as this Court may deem proper; and

10. For any other relief this Court may deem proper.

1

## DEMAND FOR JURY TRIAL

2     Kabins hereby requests trial by jury on all causes of action set forth in this Complaint.

3     Dated this twenty-third day of June, 2009.

4

5                                         GIBSON LOWRY BURRIS LLP

6

7                                         By /s/J.D. Lowry_____
                                          STEVEN A. GIBSON
8                                         Nevada Bar No. 6656
                                          JODI DONETTA LOWRY
9                                         Nevada Bar No. 7798
                                          J. SCOTT BURRIS
10                                        Nevada Bar No. 10529
                                          City Center West
11                                        7201 West Lake Mead Boulevard, Suite 503
                                          Las Vegas, Nevada 89128
12                                        *Attorneys for Plaintiffs*

13

14

15

16

17

18

19

20

21

22