1  STEVEN A. GIBSON
   Nevada Bar No. 6656
2  sgibson@dickinsonwright.com
   JODI DONETTA LOWRY
3  Nevada Bar No. 7798
   jdlowry@dickinsonwright.com
4

5       DICKINSON WRIGHT PLLC
6              City Center West
7     7201 West Lake Mead Boulevard, Suite 503
             Las Vegas, Nevada 89128
8           Telephone (702) 541-7888
             Facsimile (702) 541-7899
9

   *Attorneys for Plaintiffs*
10
            UNITED STATES DISTRICT COURT
11
              DISTRICT OF NEVADA
12

13  KABINS FAMILY LIMITED PARTNERSHIP,        Case No.: 2:09-CV-01125-GMN-RJJ
    a Nevada limited-liability company, *et al.*,
14                                            **PLAINTIFFS' SUPPLEMENT TO**
              Plaintiffs,                     **PLAINTIFFS' MOTION FOR LEAVE TO**
15                                            **FILE FIRST AMENDED COMPLAINT**
         vs.                                  **(DOC. NO. 383)**
16
    CHAIN CONSORTIUM, a Nevada general
17  partnership, *et al.*,

18            Defendants.

19  _____

20   And related cases and parties

21         Plaintiffs, Kabins Family Limited Partnership ("Kabins Family"), the Lori C. Kabins

22  Separate Property Trust (and Lori C. Kabins as trustee for the Lori C. Kabins Separate Property

23  Trust ("Mrs. Kabins"; collectively the "Kabins Parties") and Third-Party Defendant Dr. Mark B.

24  Kabins ("Dr. Kabins") (collectively, "Movants"), by and through their counsel, Dickinson Wright

25  PLLC, submit this Supplement to Plaintiffs' Motion for Leave to File First Amended Complaint

26  ("Plaintiffs' Motion for Leave"; Doc. No. 383), in order to provide this Court with additional

27  evidence in support of Plaintiffs' Motion for Leave that has been obtained through discovery

28  since the time of Plaintiffs' filing thereof.

## Contents

I.    INTRODUCTION ....................................................................................2

II.   FACTS ...................................................................................................4

    A.    Facts Related To Plaintiffs' Claims .............................................4

        1.    Mr. Massi's Role In The Investment Partnership ...................4

            a.    The Massi Participation Deal .................................4

            b.    The Massi Reimbursement Deal ............................8

            c.    The "Massi Crew" ................................................8

            d.    The "Massi Camp" ...............................................9

            e.    Mr. Massi's Loans To Buckeye Canamex 286 LLC And Buckeye 80 West LLC .....................................9

            f.    Mr. Massi's Active Engagement Meetings ............9

            g.    Mr. Gutzman's Conflicted Declaration ................10

            h.    Continued Administrative Responsibility For Cipriani ...............11

        2.    The Partnership Model ...........................................................12

            a.    The Gutzman Experience ....................................12

               i.    Mr. Gutzman's Modus Operandi ...........13

               ii.    The "Mitchell Era" ...............................13

                   (a)  Mr. Gutzman Acknowledged Partnership With Mr. Oxman. ..............14

                  (b)  The Partners Agreed To Share Profits ......14

              iii.    The Mitchell-Era Investment Process .................15

                   (a)  The Gutzman/Oxman General Partnership Identified Land ..............15

                   (b)  The Gutzman/Oxman General Partnership Conducted Due Diligence ..............15

(c)   The Gutzman/Oxman General Partnership Solicited Investors ........................................................ 16

(d)   The Gutzman/Oxman General Partnership Obtained Verbal Commitments From Investors.............................. 17

(e)   Only After Investor Commitments, The Gutzman/Oxman General Partnership Formed An Entity To Be Funded With Investors' Already-Pledged Funds ........ 18

(f)   Mere Investors In Gutzman/Oxman General Partnership Deals Only Received *Pro Rata* Returns Based On Initial Investment Amounts......................................... 19

(g)   Non-Partner Investors In Gutzman/Oxman General Partnership Deals Did Not Receive Any "Kickers." ........ 19

iv.   The "Mitchell Era" Ends And The "Chain Era" Begins ..............................................................20

v.   The "Chain Era," Incorporating The Same Modus Operandi, Begins................................................20

(a)   Mr. Gutzman Acknowledged Being In A Partnership Structure Involving Mr. Chain And Others. .................... 21

(b)   The Investment Partnership Used The Same Investment Process As The Gutzman/Oxman General Partnership. ....................................................... 21

(c)   Messrs. Gutzman And Chain Agreed To Share Profits. 22

(d)   The Investment Partnership Identified And Purchased Land Prior To Entity Formation. ....................................... 23

(e)   The Investment Partnership Solicited Investors. ...... 23

(f)   The Investment Partnership Offered Potential Investors A Range Of Investments. ................................. 24

(g)   The Investment Partnership Obtained Investor

Commitments. .................................................................... 26

(h)   Only After Obtaining Investor Commitments, The

Investment Partnership Formed Entities. ......................... 26

(i)   The Investment Partnership Formed Sham Entities To

Hold The Investment Partnership's Real Estate

Investments. .................................................................... 27

(j)   Mere Investors In Investment Partnership Deals Only

Received *Pro Rata* Returns Based On Initial Investment

Amount. ........................................................................... 28

(k)   Mere Investors Did Not Receive "Kickers." ............ 30

vi.   The Investment Partnership Was Composed Of

More Than Mr. Chain And Mr. Gutzman. ........................ 30

**b.**   The Martinez Experience ........................................................ 35

i.   Mr. Martinez Was A Partner With Respect To Prior

Real Estate Investments ...................................................... 35

ii.   Mr. Martinez Recognized That The Investment

Partnership, Not Another Entity, Was Offering

Investments. ...................................................................... 35

iii.   Mr. Martinez Knowingly Solicited Investors Prior

To Entity Formation ............................................................ 38

iv.   Mr. Martinez Received Partnership Proceeds .................. 40

v.   Mr. Martinez Delegated Managerial Duties To

Other Investment Partners .................................................. 43

vi.   Mr. Massi Took Issue With The "Roll-Ups" Of

Benessere And Cipriani. .................................................... 45

vii.    Mr. Massi Engaged With Mr. Martinez Regarding Cipriani And Benessere Management And Operations. ...................................................46

viii.   Mr. Martinez Acted With Respect To Gila Bend In A Manner Consistent With Partnership ............................46

c.   The Moehrle Experience ...............................................48

i.    Dr. Moehrle Previously Invested In Real Estate Through A General Partnership Including Mr. Massi. ...................................................................48

ii.    Dr. Moehrle Obtained Information Regarding Cipriani From Messrs. Gutzman And Massi. ...................50

iii.   Mr. Gutzman Solicited Dr. Moehrle Prior To Entity Formation. ..............................................................51

iv.   Dr. Moehrle Recognized That The Investment Partnership's Investments Were "All Part Of A Holistic Project." ..........................................................52

v.    Dr. Moehrle Expected To Be Part Of The "Massi Crew" Or "Massi Camp." .................................................52

vi.   Dr. Moehrle Agreed That Cipriani LLC Members Are Not Entitled To Preferred Distributions Under The Operating Agreement..................................................53

vii.   Mr. Massi Apparently Set Up A Cost-Sharing Arrangement For This Litigation Between The Three Massi-Represented Entities. ..................................55

d.   The Corbo Experience ................................................55

i.    Mr. Corbo Has A History Of Real Estate Investment With Messrs. Gutzman And Massi. ...............55

ii. Mr. Corbo Was Initially Solicited By Mr. Chain On Behalf Of The Investment Partnership. ............................56

iii. Mr. Corbo Was Solicited For Multiple Investments Prior To Entity Formation.................................................57

iv. Mr. Corbo Became Part Of The Massi-Instigated Members' Advisory Committee. ......................................58

v. Mr. Corbo Admitted Mr. Massi Was In A "Very Unique Position to Influence Management" Of The Massi-Represented Entities.................................................58

e. The Bergman Experience................................................................59

i. Mr. Chain Described Mr. Gutzman To Mr. Bergman As A "Partner." ..................................................59

ii. Mr. Bergman Received Referral Fees From, And Introduced Investors To, The Investment Partnership. ......................................................................59

iii. Mr. Bergman Referred Potential Investors To Mr. Massi For Further Information.........................................61

iv. Mr. Bergman's Referral Fees Constituted Profit-Sharing. .................................................................................62

v. Mr. Bergman Engaged In Investment Solicitation On Behalf Of No Entity Other Than The Investment Partnership. ......................................................................63

f. The Povalaitis Experience...............................................................65

i. Mr. Povalaitis Was Set Up By The Investment Partnership As President Of Modern Management, Inc. ...................................................................................65

ii.    The Investment Partnership Had A Routine Structure For Setting Up Real Estate Holding Companies.........................................................66

iii.    Modern Management Was A Sham Entity Set Up As Manager Of The Various Investment Partnership LLCs. .........................................................70

iv.    Cottonwood Retail Gained Investors Prior To Entity Formation.........................................................73

v.    Millennium Properties & Development, Inc. Did Not Own The Investment Partnership's Properties. ..........74

vi.    Cottonwood Retail's Day-to-Day Operations Illustrate The Sham Nature of Investment Partnership Entities. .........................................................75

vii.    Cottonwood Retail Paid Various Entities For Acting As "Consultant[s]," For "Development," And For Unknown Reasons. .........................................................77

viii.    Mr. Povalaitis Could Not Explain Innovative Assets' Role Or Why Innovative Assets Received Payments. .........................................................80

ix.    Mr. Povalaitis Received "Management" And/Or "Consulting" Payments Through KAN Investments. ........82

x.    Modern Management And Innovative Assets Engaged In Business Unknown To Mr. Povalaitis. ...........83

xi.    The Investment Partnership Solicited Investments From Mr. Povalaitis. .........................................................87

**g.**    The Janga Experience ....................................................88

i.    Mr. Janga Could Not Explain The Convoluted Investment Partnership Hierarchy Of Sham Entities.........88

|  |  | ii. | Mr. Janga Acknowledged Conflicts Between Cipriani Members. | 94 |
|  |  | iii. | Mr. Janga Recognized That Mr. Massi's Interests Might Conflict With Other Cipriani Members' Interests. | 95 |
|  |  | iv. | Cipriani's Day-To-Day Operations Demonstrate The Sham Nature of The Various Investment Partnership Entities. | 100 |
|  |  | v. | Mr. Massi's Legal Assistant Is A Cipriani Administrative Assistant As Well. | 102 |
|  |  | vi. | The Investment Partnership Solicited Mr. Janga's Investment. | 103 |
|  | B. | Procedural Facts | | 105 |
| III. | ARGUMENT | | | 106 |
|  | A. | Plaintiffs Have Standing To Sue Mr. Massi For Negligence | | 106 |
|  |  | 1. | Plaintiffs Continue To Suffer A "Concrete And Particularized," "Actual" Injury As A Result Of Mr. Massi's Conflicted Activity. | 108 |
|  |  | 2. | Plaintiffs' Injury Is Eminently Traceable To Mr. Massi's Actions. | 110 |
|  |  | 3. | Plaintiffs' Injury Is Redressable By Disqualification Of Mr. Massi. | 110 |
|  | B. | The Investment Partnership Is A General Partnership | | 111 |
|  |  | 1. | Mr. Gutzman Established The Model For The Investment Partnership During The Mitchell Era | 111 |
|  |  | | a. Mr. Gutzman Acknowledged Partnership With Mr. Oxman. | 111 |
|  |  | | b. Mr. Gutzman And Mr. Oxman Shared Profits | 112 |
|  |  | | c. The Gutzman/Oxman General Partnership Operated Independently | 112 |
|  |  | | d. The Gutzman/Oxman General Partnership Utilized A Consistent Investment Process | 112 |

2.  Mr. Gutzman And Others Adopted The Partnership Model From The Mitchell Era For The Investment Partnership. ...............................113

    a.  Mr. Gutzman And Others Adopted The Gutzman/Oxman General Partnership Profit- and Commission-Sharing Model For The Investment Partnership. ......................................113

        i.  Mr. Gutzman Acknowledged Partnership With, At A Minimum, Messrs. Chain And Martinez. ...................113

        ii.  Mr. Gutzman And Mr. Chain Agreed To Share Profits. .............................................................................113

        iii.  Mr. Bergman Expected To Share Profits With The Investment Partnership.....................................113

        iv.  Mr. Martinez Shared Profits With The Investment Partnership. ................................................113

    b.  The Investment Partnership Used The Same Investment Process As The Gutzman/Oxman General Partnership. .............115

        i.  Mr. Gutzman Acknowledged That The Investment Partnership Used The Gutzman/Oxman General Partnership's Investment Process. ...................................115

        ii.  The Investment Partnership Identified Land, Conducted Due Diligence, Solicited Investors, Obtained Investor Commitments, And Potentially Purchased Land Prior To Entity Formation....................115

        iii.  The Investment Partnership Waited Until Investors Had Committed Prior To Forming Entities. ...................116

3.  No Entity Other Than The Investment Partnership Could Have Identified Land, Conducted Due Diligence, Solicited Investors, Obtained Investor Commitments, Or Purchased Land Prior To Formation Of Entities. .........................................................116

a.    The Members Of The Investment Partnership Did Not Claim Or Appear To Act On Behalf Of A Specific Entity. .........116

b.    The Investment Partnership Offered Prospective Investors A Range Of Potential Investments In To-Be-Formed Entities. ........................................................................118

4.    The Investment Partnership Has An Overarching Bureaucratic Structure. ...............................................................118

5.    The Investment Partnership's Multiplicity Of Shell Entities Is Consistent With General Partnership. ..........................119

C.    Mr. Massi Is An Investment Partner. ...................................120

1.    Mr. Massi Was Clearly Not A Mere "Passive Investor" In The Massi-Represented Entities, As Mr. Massi Led This Court To Believe. .......................................................................120

a.    Mr. Massi Was Entitled To Preferred Reimbursement of Mr. Massi's Investments. ........................................120

b.    Mr. Massi Was Entitled To A Preferred Distribution Of Cipriani Profits. ...........................................................121

c.    Mr. Massi Effectuated Loans To Millennium Investment Companies From Funds Under Mr. Massi's Apparent Control. .......................................................................122

d.    Mr. Massi Is Part Of The "Community Of Power In Administration" Of The Investment Partnership. ........................122

e.    Mr. Massi Holds "Some Degree And Right Of Control" Over, At A Minimum, The Massi-Represented Entities.............123

f.    Mr. Massi Continues To Act As A Partner In The Investment Partnership. ............................................124

D.    Mr. Massi's Actionable Conflict Of Interest Is Exacerbated By Mr. Massi's Active Role In The Investment Partnership. ........................124

1        1.      Magistrate Judge Johnston's Order Was Premised On Mr. Massi's
2                Passive-Investor Status. ........................................................................124
3        2.      New Information Exacerbates Mr. Massi's Conflict. .............................125
4        3.      Mr. Massi's "Defense" Of The Massi-Represented Entities Is
5                Compromised By Mr. Massi's Self-Interest. ...........................................126
6    E.  Mr. Massi's Declarations Have Misled The Court. ...........................................127
7        1.      "Unlike Dr. Kabins, I never had any secret deals with Mr. Chain."
8                (Doc. No. 386-2 at ¶18) ........................................................................127
9        2.      "Other than the ownership interests I have itemized… I have not
10               personally engaged in any business transactions or financial
11               dealings with the LLC Defendants." (Doc. No. 290 at ¶20)....................127
12       3.      "I have never had anything to do with any aspect of the promotion,
13               assemblage, development, engineering, improvements, sales,
14               marketing and/or operations of the LLC Defendants or any other
15               companies and/or investments relating to this Action." (Doc. No.
16               386-2 at ¶11) ........................................................................................129
17       4.      "I have never been a partner, either real or imagined, with… Mr.
18               Chain… or… Mr. Gutzman… or any of the other party-Defendants
19               in this Action relating to any matter involving the LLC Defendants
20               and/or this Action." (Doc. No. 386-2 at ¶6)...........................................130
21       5.      "I am merely an investor in the [Massi-Represented Entities],
22               amongst numerous other investors." (Doc. No. 382 at ¶3) / "I and
23               my family members have acted only as investors in the LLC
24               Defendants, just as hundreds of other person(s) and/or entity(ies)."
25               (Doc. No. 386-2 at ¶8) ...........................................................................130
26   F.  Mrs. Kabins' Inability To Explain The Fine Points Of Plaintiffs' Complex Claims
27       Does Not Give Defendants A Defense Under Fed.R.Civ.P. 9(b). .......................131
28  IV.  CONCLUSION..............................................................................................132

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**TABLE OF AUTHORITIES**

**Cases**

*Bennett v. Spear,* 520 U.S. 154 (1997)                                                                          108

*Colyer v. Smith,* 50 F.Supp.2d 966 (C.D. Cal. 1999)                                          107, 108

*Fenwick v. Unemployment Comp. Comm'n of N.J.,* 44 A.2d 172, 174 (N.J. 1945)            123

*FMC Technologies, Inc.,* 420 F.Supp.2d 1153 (W.D. Wash. 2006)                             107

*Lujan v. Defenders of Wildlife,* 504 U.S. 555 (1992)                                             108

*U.S. Small Business Admin. v. Smith Stratton, Wise, Heher & Brennan, LLP,* civil action
    no. 05-190, 2009 U.S. Dist. LEXIS 9411, *17 (E.D. Pa., February 9, 2009)            119

*Whitmore v. Arkansas,* 495 U.S. 149 (1990)                                                       108

**Statutes**

Nevada Revised Statute 87.060 ................................................................ 111

NRS 87.070........................................................................................ 111, 121

**TABLE OF EXHIBITS**

| Exhibit | Title |
|---|---|
| 1 | Evidentiary Supplement |
| 2 | February 2, 2012 Deposition of Jeffrey Chain |
| 3 | May 1 Chain Letter (Plaintiffs' Deposition Exhibit 65) |
| 4 | Van Aken/Massi Letter (Plaintiffs' Deposition Exhibit 49) |
| 5 | Plaintiffs' Deposition Exhibit 54 |
| 6 | Plaintiffs' Deposition Exhibit 61 |
| 7 | Plaintiffs' Deposition Exhibit 64 |
| 8 | Plaintiffs' Deposition Exhibit 62 |
| 9 | Plaintiffs' Deposition Exhibit 52 |
| 10 | Plaintiffs' Deposition Exhibit 53 |
| 11 | Excerpts from Deposition of Ram Janga |
| 12 | Plaintiffs' Deposition Exhibit 56 |
| 13 | February 13, 2012 Cipriani investor communication |
| 14 | Excerpts from Deposition of Edward Gutzman III |
| 15 | Excerpts from Deposition of Gabriel Martinez, Esq. |
| 16 | Excerpts from Deposition of John Moehrle, D.C. |
| 17 | Plaintiffs' Deposition Exhibit 48 |
| 18 | Excerpts from Deposition of Dana Corbo, Esq. |
| 19 | Excerpts from Deposition of Todd Bergman |
| 20 | Excerpts from Deposition of Allyn Povalaitis |
| 21 | Plaintiffs' Deposition Exhibit 66 |

**MEMORANDUM OF POINTS AND AUTHORITIES**

## I.   INTRODUCTION

Plaintiffs recognize that Plaintiffs' motion presently before this Court is one for leave to file a First Amended Complaint, with respect to which the evidentiary threshold Plaintiffs must meet is low.  Plaintiffs thus find it somewhat regrettable that Plaintiffs must burden this Court with this voluminous submission, which itself is hardly exhaustive.  Plaintiffs believe, however, that to make clear the propriety of Plaintiffs' First Amended Complaint, Plaintiffs must substantively apprise this Court of relevant evidence adduced since the time Plaintiffs originally filed Plaintiffs' Motion.

Discovery has now made clear that the Investment Partnership is and was an overarching association constituting a general partnership that comprised, *inter alia,* most of the individual Defendants in this matter.  It is also now remarkably clear that Albert Massi, Esq. is and was not "merely an investor," [1]  but a ***central figure*** in Investment Partnership business from the time of origin of the Investment Partnership.  Discovery has demonstrated, without limitation, the following:

- Mr. Massi was entitled to ***preferred profit distribution and capital reimbursement*** with respect to Mr. Massi's investments in Investment Partnership properties.

- Mr. Massi provided a level of assistance to the Investment Partnership sufficient to entitle Mr. Massi to such preferred profit distribution and capital reimbursement, described by Mr. Chain (as discussed *infra*) as "being a good corporate partner."

- Mr. Massi was part of the original core group of partners that arose out of a prior real estate investment partnership and began, in the first stages of the Investment

---

[1] September 22, 2011 Declaration of Albert Massi, Esq. (Doc. No. 382) at ¶3; *see also* October 7, 2011 Declaration of Albert Massi, Esq. (Doc. No. 386-2) at ¶8.

Partnership's scheme, investing in and promoting the limited-liability companies ultimately "rolled up" into Cipriani LLC.

- Mr. Massi was the **head of a "crew" or "camp" of investors**, responsible for passing Investment Partnership communications on to those investors.

- Mr. Massi **loaned money** to Investment Partnership entities.

- Mr. Massi has taken and continues to take responsibility for aspects of management of, at a minimum, Defendant Cipriani LLC, including apparently loaning Mr. Massi's legal assistant to Cipriani LLC as an administrative assistant.

- Mr. Massi was cited as an information source to new potential Investment Partnership investors by Investment Partnership tout Todd Bergman.

- Mr. Massi obtained one-on-one updates on Investment Partnership business from Investment Partnership co-architect Edward Gutzman III.

Evidence thus makes clear that Plaintiffs' claims against Mr. Massi meet at a minimum any test this Court might apply for determining the viability of Plaintiffs' proposed First Amended Complaint and granting Plaintiffs leave to file same.

Troublingly, Mr. Massi also now appears to have proffered to this Court declarations under the penalty of perjury that are, at best, lacking in candor, and appear in fact to contain out-and-out falsehoods.  Mr. Massi has declared that Mr. Massi has "**not personally engaged in any business transactions or financial dealings with the LLC Defendants**"[2] (emphasis supplied), when evidence demonstrates not only that Mr. Massi was entitled to preferred profit distribution and capital reimbursement by Cipriani LLC, but that Mr. Massi effectuated loans to at least two entities ultimately "rolled up" into Defendants Benessere LLC and Cipriani LLC.  Mr. Massi has declared that Mr. Massi "never had anything to do with any aspect of the **promotion**, assemblage, **development**, engineering, improvements, **sales**, **marketing** and/or **operations** of the LLC Defendants or any other companies and/or investments relating to this Action"[3] (emphasis supplied), when evidence shows that Mr. Massi participated in recruiting investors, providing

---

[2] May 14, 2010 Declaration of Albert Massi, Esq. (Doc. No. 290) at ¶20.
[3] October 7, 2011 Declaration of Albert Massi, Esq. (Doc. No. 386-2) at ¶11.

information to new investors, and participating actively in the management and operations of, at a minimum, Cipriani. Mr. Chain testified that for Mr. Massi to have been entitled to preferred profit distribution or capital reimbursement, Mr. Massi must have engaged in conduct consistent with "being a good corporate partner," including, by way of example, "helping discuss the projects, giving advice on direction, on engineering or zoning… [g]o[ing] to Phoenix, look[ing] at the properties, put[ting] in constructive input, [and/or] disseminat[ing] information to fellow investors."[4] Mr. Massi's repeated claims to be "merely a passive investor" in the Investment Partnership's scheme have become less credible with every deposition taken in this matter, in which Mr. Massi's name continues to come up on an unsolicited basis.

Further, Mr. Massi procured, in Mr. Massi's original Response to Plaintiffs' Motion, the declaration of Mr. Gutzman attesting to Mr. Massi's purported "passive investor" status with respect to the General Partnership, which declaration Mr. Gutzman has now indicated may not be accurate.  In Mr. Gutzman's deposition, Mr. Gutzman was made aware of documents providing information not made available by the Massi-Represented Entities to Mr. Gutzman at the time of Mr. Gutzman's declaration regarding Mr. Massi's role in the Investment Partnership, including information regarding Mr. Massi's preferred profit distribution and return of capital.  Mr. Gutzman thereupon admitted that such evidence was in conflict with Mr. Gutzman's declaration.

## II. FACTS

### A. Facts Related To Plaintiffs' Claims

Plaintiffs herein summarize the extensive newly-discovered facts in support of Plaintiffs' claims that are documented more fully in the Evidentiary Supplement attached hereto as Exhibit 1.

### 1. Mr. Massi's Role In The Investment Partnership

#### a. The Massi Participation Deal

Evidence recently produced by Mr. Chain (but not by Defendant Benessere, LLC ["Benessere"], notwithstanding the apparent availability of the same documents to Benessere)

---

[4] February 2, 2012 deposition of Jeffrey Chain ("February 2012 Chain Dep.," attached hereto as Exhibit 2) at 128:15-129:18.

illustrates that on May 1, 2004, Mr. Chain wrote to Mr. Massi, on Millennium Properties & Development, Inc. letterhead (the "May 1 Chain Letter," attached hereto as Exhibit 3 [emphasis supplied]), regarding Mr. Massi's apparent efforts in support of the real estate investment project ultimately characterized as Cipriani LLC:

> Dear Al,
>
> I would like to thank you for all of your investment and assistance in regards to the various Buckeye Arizona LLC's that make up Cipriani.  This is an exciting project for everybody.
>
> During the course of presentations to you and ***the many investors that you have allowed us to meet with***, some potential confusion has occurred.  As a good[-]faith effort I would like to do the following:
>
> Upon the sale and distributions of the profits from Cipriani LLC to the Managing Members, ***I will distribute to Albert Massi the first Four Hundred Thousand*** received by Jeff Chain or any assigns.
>
> Respectfully,
> Jeff Chain

The Massi-Represented Clients apparently contend that the May 1 Chain Letter (as well as the Van Aken/Massi Letter discussed *infra*) is of dubious evidentiary value.  However, Mr. Chain produced the May 1 Chain Letter and the Van Aken/Massi letter, among other unsigned correspondence, presumably in the belief that those letters were of relevance and significance to this litigation, responsive to Plaintiffs' requests for production of documents, and initially drafted by Mr. Chain for some business purpose.  Mr. Chain testified as follows[5] in authentication of the May 1 Chain Letter and the Van Aken/Massi Letter, which Mr. Chain had apparently discussed with Mr. Massi at length prior to Mr. Chain's February 2, 2012 deposition:

---

[5] All of the deposition testimony excerpted herein and in the Evidentiary Supplement has been edited for clarity (*e.g.,* to excise transcribed stammering; to clarify questions and answers during which attorney and deponent spoke over one another; to substitute defined terms used in this brief for more colloquial designations for the same referents that might have been used during depositions), and, in most cases, objections (many of which led to lengthy colloquies on the record).  All such editorial omissions of any kind have been denoted with ellipses.  The referenced transcript pages are all attached hereto as exhibits so that the Court may review the full content and context of questions, objections, and answers.  Plaintiffs intend in no way to mislead the Court regarding any witness' testimony, but, mindful of the length of this brief and of the Evidentiary Supplement, intend only to avoid consuming time and space with off-topic material not germane to Plaintiffs' factual presentation.

MR. GIBSON:          Were these letters, although unsigned, bearing your name?

A.:     I believe so.

Q.:     Were they on Millennium letterhead?

A.:     I don't recall.

Q.:     What did you say to Mr. Massi about those letters?

A.:     That it was eight or ten years ago and I don't recall if I sent them or not.

Q.:     … Do you recognize an entity or entities that go by the name Millennium?

A.:     I recognize, well[,] two entities—eight or ten years ago there probably was only one.

…

Q.:     What Millennium entity existed eight or ten years ago?

A.:     Millennium Properties and Development, Inc. … I was the president.

Q.:     And as the president, what were your duties?

A.:     To manage the affairs of the company.

Q.:     And did you routinely send out correspondence as the president of the company?

A.:     I didn't send out that much, just the normal course of business.

Q.:     … Was it your normal course that you would prepare letters that ultimately were intended to be sent out?

A.:     I prepared letters that sometimes got sent and sometimes didn't.

Q.:     Do you have any memory specifically that the two letters that Mr. Massi showed you did not get sent out?

A.:     I do not know if I did or did not send them out.

Q.:     … Under what circumstances would you draft letters and not send them out?

A.:     When I had a phone conversation or personal conversation that negated the need to send it out, when events caused the lack of needing to send it out.  Could have been lots of reasons.

February 2012 Chain Dep. at 20:2-22:13. Clearly from this testimony it appears that Mr. Chain would not have drafted the May 1 Chain Letter or the Van Aken/Massi Letter without a business purpose for doing so.  Further, to the extent Mr. Chain did not recall whether Mr. Chain actually effectuated the mailing of these two letters, Mr. Chain clearly testified that Mr. Chain would not have felt the need to mail either letter if Mr. Chain had already had the occasion to discuss the subject matter thereof with the intended recipient, and that the letters would only **not** have been sent if Mr. Chain had believed there was no need for same.

      With respect to the "assistance" Mr. Massi provided, and how that "assistance" warranted Mr. Massi's entitlement to preferred profit distribution, Mr. Chain testified:

> MR. GIBSON:     How did you distinguish between the so-called partners that you were going to share some personal [funds] with and the ones that you weren't going to share some personal [funds] with?
>
> A.:     Just their—it wasn't a specific formula.  Just their general involvement in the process throughout the period of time.
>
> Q.:     What kinds of things would they be involved with that you understood constituted their general involvement?
>
> A.:     ***Just helping discuss the projects, giving advice on direction, on engineering or zoning, or just being there and being a good corporate partner.***
>
> Q.:     ***What kinds of things would a member do to constitute being a good corporate partner?***
>
> A.:     ***Go to Phoenix, look at the properties, put in constructive input, disseminate information to fellow investors.***
>
> Q.:     ***Is that level of assistance consistent with the type of assistance you described in [the May 1 Chain Letter]?***
>
> A.:     ***That's one piece of it.***
>
> Q.:     What other pieces would constitute the kind of assistance that you were referring to in [the May 1 Chain Letter]?
>
> A.:     Taking an active interest in the overall success of the project and knowing what was going on.

February 2012 Chain Dep. at 128:18-129:18.  Thus, by Mr. Chain's admission, Mr. Massi must have participated in Investment Partnership activities at least to the extent described by Mr. Chain—and must have otherwise acted as, in Mr. Chain's words, "a good corporate partner."

### b. *The Massi Reimbursement Deal*

Mr. Chain wrote a subsequent letter to Mr. Kelly Van Aken dated June 15, 2004 (the "Van Aken/Massi Letter," attached hereto as Exhibit 4), also with respect to Messrs. Massi's and Van Aken's efforts in support of Cipriani:

> Dear Kelly,
>
> This letter will memorialize a verbal agreement made between Jeff Chain and various members of Cipriani LLC.
>
> Whereas Al Massi etal [*sic*] and Kelly Van Aken introduced to the investment various investors, who subsequently invested in one or more of the LLC's that comprise Cipriani.  [*Sic.*]
>
> Upon the ultimate sale of Cipriani LLC, Jeff Chain from his proceeds will reimburse the five percent (5%) paid by the above[-]referenced investors into the various LLC's in the ratio that they invested.
>
> This agreement is confidential between the parties and is not to be discussed or reproduced in any manner what so ever [*sic*].
>
> Respectfully,
> Jeff Chain

### c. *The "Massi Crew"*

Additional documents produced by Mr. Chain (and, as with the May 1 Chain Letter, not produced by the Massi-Represented Defendants notwithstanding the Massi-Represented Defendants' apparent access to same) demonstrate that a subset of investors in Investment Partnership properties (including without limitation Mr. John Esposito; Dana Corbo, Esq., and his mother Mrs. Betty Corbo; Allen Cap, Esq.; John Moehrle, D.C.; members of the Kring family; Mr. Logan Landers; members of the Van Aken family and the Van Aken family trust; Mr. Brett Bronson; Mr. Don Nobis; Mr. Ken Tracht; Mr. Tony Ciazzo; Mr. Art Cipolla; and Mr. Steven Garhardt) was known, at least by Mr. Chain, as the ***"Massi Crew."***  Exhibit 5 (proffered as Plaintiffs' Exhibit 54 during the deposition of Mr. Janga).  Another spreadsheet, entitled "Benessere potential investors" (Exhibit 6; proffered as Plaintiffs' Exhibit 61 during Dr. Moehrle's deposition; the "Potential Investors Spreadsheet"), identifies the "Blankenship" and "Younker" land parcels as having been purchased with investment money received from the "Massi Crew."

-8-

Mr. Chain testified that Mr. Massi held administrative responsibility for communicating information regarding the Investment Partnership's activities to the Massi Crew in a "telephone tree"-type arrangement.  February 2012 Chain Dep. at 198:23-200:1.

### d.   The "Massi Camp"

Another spreadsheet produced by Mr. Chain (and not by any of the Massi-Represented Defendants), which lists investors in the various limited-liability companies that were ultimately "rolled up" into Benessere LLC, has a number of investors' names highlighted, with the notation, "standard Massi camp guys are highlighted in yellow."  Exhibit 7.  The "Massi Camp" appears to comprise, at a minimum, Dr. Moehrle, the Tuscany Grill (with contacts identified as Mr. Louis Defilippis and Mr. Scott Canyo), Mr. Cipolla, Mr. Garhardt, Mr. Landers, Ms. Carol Marrandino, Mr. Nobis and Ms. Mary Ann Dillsio, Mr. David Stibor, Mr. Van Taylor, the Van Aken Family trust, Mr. W. Kelly Van Aken, Mr. Corbo, Mr. Massi himself, and a Massi family trust.  *Id.*

### e.   Mr. Massi's Loans To Buckeye Canamex 286 LLC And Buckeye 80 West LLC

Another spreadsheet produced by Mr. Chain (and not by any of the Massi-Represented Defendants) reflects that Mr. Massi loaned $257,280 to Buckeye West 80 LLC, one of the limited-liability companies eventually "rolled up" into Cipriani LLC, as well as $1,500,000 to Buckeye Canamex 286 LLC, one of the limited-liability companies eventually "rolled up" into Benessere LLC.  Exhibit 8 (proffered as Plaintiffs' Exhibit 62 during Dr. Moehrle's deposition).

### f.   Mr. Massi's Active Engagement Meetings

Mr. Gutzman testified that Mr. Massi received personal updates, in Mr. Massi's office, regarding the status of Investment Partnership real estate holdings and investments, directly from Mr. Gutzman, one of the architects of the Investment Partnership's investment scheme:

> MR. GIBSON:        Ever been to Al Massi's office?
>
> A.:     Sure.
>
> Q.:     On business?
>
> A.:     Yes.

Q.:     Okay.  On what occasions—what kind of business occasions would bring you to Al Massi's office?

A.:     Real estate.

Q.:     And any real estate within the Chain era real estate transactions?

A.:     Yes.  And before.

Q.:     And with respect to the Chain era real estate transactions… would you see Al Massi at his office?

A.:     Sure.

Q.:     And what was the purpose of the meeting?

A.:     Updates on what was going on, the potential of what we had going on specifically.  just what we've been doing and entitlement, update.  Any sharing of knowledge, etc.

Gutzman Dep. at 202:11-203:4.

### g.     *Mr. Gutzman's Conflicted Declaration*

Mr. Gutzman previously provided a declaration (the "Gutzman Declaration"; Doc. No. 386-3) to this Court in support of the Massi-Represented Defendants' Opposition to Plaintiffs' Motion for Leave to File First Amended Complaint (Doc. No. 386).  In the Gutzman Declaration, dated October 6, 2011, Mr. Gutzman stated under penalty of perjury:

17.     …[A]t no time did Al Massi act in any other capacity except as an investor in any of the substantial properties involved, including a 41[-]property "roll-up" into Cipriani Land Holdings, LLC.  Al Massi never acted in any capacity to promote, sell, engage in drafting any management documents, neither did he ever attend any city, county or State [council] or board meetings in any capacity in the efforts to procure property, promote the project to other investors, nor did he make any executive decisions in any management capacity, nor did he speak on behalf of the stability, risk, quality of the investments in my presence.

18.     Al Massi's sole and exclusive capacity was a substantial investor, he was a shareholder who may have attended Board Meetings [capitalization *sic*], he sought to be kept abreast of the projects and the progress in the management of the projects referenced within this declaration, but at no time did I ever observe or believe that he had exerted any pressure or conducted himself in any management functions whatsoever.

Doc. No. 386-3 at 5-6.  Upon being shown the May 1 Chain Letter in deposition on January 19, 2012, Mr. Gutzman testified (as more fully set forth in Exhibit 14) that Mr. Gutzman would have to "reflect more" on that declaration:

> MR. GIBSON:          … [I]f you were to draft your declaration today, knowing what you now … have seen on [the May 1 Chain Letter] … would you feel comfortable making the same declaration that you made now knowing and having learned about [the May 1 Chain Letter]?
>
> …
>
> A.:      It's possible I would have changed it.  I was not aware.
>
> Q.:      … [Y]ou would have to at least reflect more on [the May 1 Chain Letter].  Correct?
>
> A.:      I would reflect.
>
> Q.:      And isn't it fair that [the May 1 Chain Letter] appears to indicate that Mr. Massi was engaged in introductions to the investment of various investors.  Do you see that?
>
> A.:      Yes.
>
> …
>
> Q.:      And don't you see in your declaration he indicated that he never acted in any capacity to promote, sell, or do any other thing in the advancement other than merely as an investor.  Do you see that?
>
> A.:      Yes.
>
> …
>
> Q.:      Therefore, ***wouldn't you agree that [the May 1 Chain Letter] … contradicts your declaration?***
>
> A.:      ***I can see where it conflicts.***

Gutzman Dep. at 127:15-129:1 (emphasis supplied).

### *h.     Continued Administrative Responsibility For Cipriani*

Until as recently as November 15, 2012, the letterhead of Cipriani LLC provided, as the apparent contact e-mail address for Cipriani LLC, the e-mail address of Ms. Valerie Soto

-11-

(mamasoto@yahoo.com), Mr. Massi's legal assistant.[6]  Exhibits 9 (document KAB005268; proffered as Plaintiffs' Exhibit 52 during Mr. Janga's deposition), 10 (proffered as Plaintiffs' Exhibit 53 during Mr. Janga's deposition).  Mr. Massi thus apparently maintains some level of administrative communication responsibility for Cipriani, administered through Mr. Massi's legal assistant.  Indeed, as discussed *infra,* Mr. Janga identified Ms. Soto as an administrative assistant for Cipriani.  Deposition of Ram Janga (Exhibit 11) at 144:23-145:13.

Further, in 2008, Mr. Massi participated at some level in the solicitation of proxies from Cipriani members in advance of a members' meeting held on October 26, 2008.  Those proxies allowed Cipriani members to instruct Mr. Massi (by way of proxy to be delivered to Mr. Massi's law office at 3202 West Charleston Boulevard) to vote those members' membership interests in favor of propositions including, without limitation, replacement of Mr. Gutzman with Messrs. Corbo and Janga and Dr. Moehrle as managers of Cipriani.  Exhibit 12 (document KAB001420), proffered as Plaintiffs' Exhibit 56 during Mr. Janga's deposition).

### 2.     The Partnership Model

The partnership model is the course and custom of how the Investment Partnership partners (the "Investment Partners") conducted real estate investment activities both before the existence of the Investment Partnership and throughout the existence of the Investment Partnership.  Testimony by the Investment Partners demonstrates the extent to which the pre-existing model was carried over into the Investment Partnership, which was an overarching association of individuals working toward development of Arizona real estate through a variety of sham entities.

### a.     *The Gutzman Experience*

Mr. Gutzman testified in detail about the partnership model by reference to two general "eras":  the "Mitchell era," when Mr. Gutzman was part of an informal general partnership with an individual named Mitchell Oxman (the "Gutzman/Oxman General Partnership"), and the

---

[6] The most recent communication from Cipriani to investors, sent on or about February 14, 2012, reflects a new contact e-mail address for Cipriani:  ciprianimanagement@gmail.com. Exhibit 13.

"Chain era," when Mr. Gutzman was part of the Investment Partnership in addition to Mr. Chain and others, with the Chain era being subdivided further to include, at the end, a "Martinez era," reflecting the increasing management responsibility within the Investment Partnership of Gabriel Martinez, Esq.

i.      *Mr. Gutzman's* Modus Operandi

When Mr. Gutzman first "started to put investors together to buy land," *see* January 19, 2012 deposition of Edward Gutzman III ("Gutzman Dep.," attached hereto as Exhibit 14) at 29:1-6, Mr. Gutzman was working as a real estate agent through the Las Vegas Prudential Americana Group of agents ("Prudential"), selling parcels of vacant land through Prudential. Gutzman Dep. at 27:3-29:8.  Mr. Gutzman testified that Mr. Gutzman's assemblage of investors for land purchases was **separate from Mr. Gutzman's activities as an agent for Prudential**. Gutzman Dep. at 43:14-18.

ii.      *The "Mitchell Era"*

Mr. Gutzman joined in a partnership structure with respect to "put[ting] investors together to buy land" with an individual named Mitchell Oxman.  Mr. Oxman, while a real estate agent, did not work for the same agency as Mr. Gutzman.  Gutzman Dep. at 60:15-16.  ***The deals assembled by Messrs. Gutzman and Oxman were thus not undertaken on behalf of any entity other than the informal general partnership between Messrs. Gutzman and Oxman, and were independent of either Mr. Gutzman's or Mr. Oxman's relationships with any real estate agencies or other entities.***  Mr. Gutzman not only recognized Mr. Gutzman's partnership with Mr. Oxman, but provided testimony demonstrating that such an overarching general partnership structure to "put investors together to buy land," independent of any real estate agency relationship or any other entity, constituted a *modus operandi* with respect to conducting real estate deals.

(a)      <u>Mr. Gutzman Acknowledged Partnership With Mr. Oxman.</u>

Mr. Gutzman described the nature of Mr. Gutzman's relationship with Mr. Oxman:

> Q.:     Did you enter into any form of partnership arrangement in writing with Mitchell?
>
> …
>
> A.:     Other than the entities that we formed, no.
>
> Q.:     There was a general understanding that… during this period of time it was just an informal partnership arrangement. Right?  As far as you knew?  There was nothing formally in writing that said "we're going to do this together."  Right?
>
> A.:     That's correct.
>
> …
>
> Q.:     … [W]as there at least an informal understanding that… ***he would be your partner on these ventures and the guy that you would go to?***
>
> A.:     ***Yes.***

Gutzman Dep. at 55:3-56:2 (emphasis supplied).

(b)      <u>The Partners Agreed To Share Profits</u>

Mr. Gutzman testified further with respect to Mr. Gutzman's professional relationship with Mr. Oxman:

> Q.:     How did you make money off of the deals that you did with Mitchell as your partner?
>
> A.:     Sometimes there was a buyer's brokerage fee involved. Upon successful closings of the land as far as selling them, ***we would share in the profits***.
>
> …
>
> Q.:     Apart from the buyer's brokerage fee that was included and then upon closing, sharing profits, during the Mitchell partnership era was there any other way that you can remember you made money off of any of these deals?
>
> A.:     Not that I can recall.

Gutzman Dep. at 79:23-80:2 (emphasis supplied), 80:13-18.

-14-

1

iii.     *The Mitchell-Era Investment Process*

2   With this partnership basis as a foundation, Mr. Gutzman and Mr. Oxman utilized the

3   following investment process, incorporating the following elements, with respect to the

4   investments offered by the Gutzman/Oxman General Partnership:

5                                      (a)     The Gutzman/Oxman General Partnership

6                                              Identified Land

7   The first step in the Gutzman/Oxman General Partnership's investment process was to

8   identify vacant land for purchase:

9          Q.:     … Now, when you put these investors together to buy land,
           did you work with Mitchell to do that?

10
           A.:     Correct. … I would identify the land.  I would bring it to

11         Mitchell…

12         …

13         Q.:     … [S]o would you typically identify the property, then, at
           all times for each one of these?

14
           A.:     Not necessarily.

15
           Q.:     Mitchell might sometimes identify the property?

16
           A.:     Sure.

17

18   Gutzman Dep. at 49:16-24, 51:2-7.  Messrs. Gutzman and Oxman thus identified land to form

19   the potential basis of investment offerings on behalf of no entity other than the Gutzman/Oxman

20   General Partnership.

21                                     (b)     The Gutzman/Oxman General Partnership

22                                             Conducted Due Diligence

23   Following identification of land for potential purchase, "[a]fter a certain period of time

24   [Messrs. Gutzman and Oxman] did the due diligence and ascertained that we thought that this

25   would be a group deal, an investor deal that we would go out and do."  Gutzman Dep. at 61:16-

26   19.

27         Q.:     Okay.  So if I understand the process correct[ly], then, just
           building on the facts you've given me, you would start with the
28         identification that you or Mitchell would identify.  If Mitchell
           identified, he'd bring it to you and vice[-]versa.  Then you would

1  go out and do the due diligence.  Make sure everything is good and locked down from the due diligence standpoint.  At that point you would start interfacing with possible investors.  Correct?

2

3  A.:      Yes.

4  Gutzman Dep. at 65:9-18.  As with identification of land, Messrs. Gutzman and Oxman

5  performed this due diligence on behalf of no entity other than the Gutzman/Oxman General

6  Partnership.

7                                    (c)      The Gutzman/Oxman General Partnership Solicited

8                                    Investors

9        Messrs. Gutzman and Oxman—on behalf of no entity other than the Gutzman/Oxman

10  General Partnership—would next solicit investors in those properties:

11  MR. GIBSON.:      And you would go out to real estate agents, brokers, acquaintances, friends and family, and say this sounds like a good investment. … [W]hat would you say?

12

13  A.:      That I'm putting a deal together and I'm raising money for it, and here are the specifics about the land, some due diligence and the like, and then we would either sight the property with them or get knowledge to them about the deal, show them paperwork about the LLC, answer questions, and then we would then start to go on to the closing of the deal.  …  We would go to friends, etcetera [*sic*], and we would explain the deal that we're putting together, yes.  And if they wished to put in the money, then they may.

14

15

16

17

18  …

19  Q.:      …[A]t the time did you indicate to [potential investors] that… you along with Mitchell were putting together a deal?  Or did you just say it was your deal personally?

20

21  …

22  A.:      There might have been times I said myself and a friend. Myself and Mitchell.  But yes, there was a tandem putting the deal together.

23

24  …

25  Q.:      …[D]id you ever approach a potential investor together with Mitchell in the Mitchell partnership era?

26  A.:      Great possibility.

27  Q.:      …. And did you ever hear Mitchell while he was your partner say "Oh, this is a deal from my real estate company"?

28  A.:      Not that I recall.

-16-

Gutzman Dep. at 57:8-58:8, 61:24-62:1, 68:6-14, 74:8-14.  The Gutzman/Oxman General

Partnership's investment solicitations were thus emphatically made on behalf of **no extant entity**

**other than the Gutzman/Oxman General Partnership**.

(d)    The Gutzman/Oxman General Partnership Obtained

Verbal Commitments From Investors

     Mr. Gutzman testified further with respect to the investment-solicitation process

undertaken by the Gutzman/Oxman General Partnership:

> Q.:    … [Y]ou might get money, but you might get verbal commitments before you formed the entity.  Correct?
>
> A.:    Yes.
>
> Q.:    Did you ever want to get a level of comfort from the possible investors that there was some serious intent to put money in before you went through the effort and expense of forming the company?
>
> A.:    It's the same thing to me.  Their verbal commitment was that.
>
> Q.:    … [I]s it fair to say, then, … that you and Mitchell got a significant level of verbal commitment before you went ahead and formed the company?
>
> …
>
> A.:    … At times, yes.  At times, no.  We have a comfort level that we would be able to raise the money or had verbal commitments to go ahead and start getting more formal about the consequences of closing the deal.
>
> …
>
> Q.:    … [D]id you ever get written commitments before you formed any of the entities?
>
> A.:    I don't recall.  It's possible.

Gutzman Dep. at 65:24-67:9, 68:17-20. Messrs. Gutzman and Oxman thus received verbal

commitments from investors on behalf of no entity other than the Gutzman/Oxman General

Partnership, because no other entity that could have received those commitments was yet in

existence—the Gutzman/Oxman General Partnership's *modus operandi* involved waiting until a

-17-

certain level of investor commitments had been obtained before going to the expense of forming an entity.

    (e)    <u>Only After Investor Commitments, The Gutzman/Oxman General Partnership Formed An Entity To Be Funded With Investors' Already-Pledged Funds</u>

Only **after** having commenced the process of soliciting investor funds, and **after** having obtained at least some verbal commitments by investors, would Messrs. Gutzman and Oxman form an entity with respect to the potential investment:

> MR. GIBSON:    And at what point in time would you always, with respect to the Mitchell work, form the limited[-]liability company?
>
> A.:    Before the closing for sure, and around the time of contributions [by] investors.
>
> …
> Q.:    … [I]s it fair to say that you believe it is likely that there might be some occasions with respect to the Mitchell enterprise that you would receive money from investors prior to the formation of one of these limited[-]liability companies?
>
> A.:    I would venture to say that it would maybe be in the form of a verbal commitment that I'm 25 grand in.
>
> …
>
> Q.:    And then at that point you would start receiving money so that you could—well, it sounds like at that point you might form an entity so that you can start receiving money into that entity. Correct?
>
> A.:    Yes.

Gutzman Dep. at 63:24-64:21, 65:19-23.  Mr. Gutzman's testimony thus makes abundantly clear that ***the identification of land, due diligence, solicitation of investors, and initial receipt of verbal commitments from those investors was not undertaken on behalf of any entity other than the Gutzman/Oxman General Partnership.***

1                        (f)       **Mere Investors In Gutzman/Oxman General**

2                                **Partnership Deals Only Received *Pro Rata* Returns**

3                                **Based On Initial Investment Amounts.**

4       Mr. Gutzman testified with respect to the means by which investors other than Messrs.

5 Gutzman and Oxman received returns on their investments:

6              MR. GIBSON:      In the Mitchell era when he was your
partner, do you remember anyone else getting any fee or share

7              while you were working with Mitchell with respect to any of the
Mitchell[-]era deals?

8

9              A.:     Not that I'm aware of.

10              Q.:     Other than possibly an investor getting a return on their
investment by buying a membership interest.  Correct?

11              A.:     Upon the sale of that.

12              …

13              A.:     Like a pro rata share? … Correct.

14 Gutzman Dep. at 83:15-84:11.

15                        (g)       **Non-Partner Investors In Gutzman/Oxman General**

16                                **Partnership Deals Did Not Receive Any "Kickers."**

17       Mr. Gutzman also made clear that *pro rata* returns on investment were the *only* way

18 investors in Gutzman/Oxman General Partnership deals other than Messrs. Gutzman and Oxman

19 gained money as a result of participation in those deals:

20              MR. GIBSON:      So you would never structure a deal where
any member got any form of additional revenue… [o]f whatsoever

21              nature.  Correct?

22              A.:     Correct.

23              Q.:     No kicker.  Right?

24              A.:     No.

25              Q.:     You quickly answered my question about a kicker.  So you
seem to have a frame of reference as to what a kicker is.  Right?

26

27              A.:     Something far beyond than their investment.

28 Gutzman Dep. at 84:14-24.

1              *iv.*      **The "Mitchell Era" Ends And The "Chain Era" Begins**

2        Mr. Gutzman's professional relationship with Mr. Oxman came to a close later in the

3  mid-2000s:

4              Q.:     … At what point, if ever, did your doing business with
              Mitchell and the Mitchell-related properties end?

5
6              A.:     My recollection would be early 2000s.

7              …

8              Q.:     … The entities would still own the land during this period
              of time, but the formation period and the acquisition of the land
              and gaining investors would have ended.  Correct?

9
10             A.:     Correct.

11             Q.:     Okay.  You then, however, also in the early 2000s, started
              working with Jeff Chain. … Was there any crossover between your
              time with Mitchell and your time with Jeff in terms of putting
12             investors together?

13             A.:     I don't believe so.

14             …

15             Q.:     … And so to a certain extent, what you were doing with
              Mitchell became to be what you started doing with Jeff?
16
17             A.:     Yes.

18  Gutzman Dep. at 52:8-53:11, 54:2-5.

19             *v.*      **The "Chain Era," Incorporating The Same** Modus

20                      Operandi, *Begins*

21        Following the end of the "Mitchell era," Mr. Gutzman, with Mr. Chain and others acting

22  in a general partnership structure (the "Investment Partnership"), followed the same *modus*

23  *operandi* with respect to "put[ting] together investors to buy land" as the Gutzman/Oxman

24  General Partnership.

25

26

27

28

         (a)    <u>Mr. Gutzman Acknowledged Being In A</u>

<u>Partnership Structure Involving Mr. Chain And</u>

<u>Others.</u>

Mr. Gutzman testified as to the informal partnership Mr. Gutzman enjoyed with Mr. Chain:

> Q.:    Did you ever enter into a more formal written partnership with Jeff Chain—
>
> A.:    No.
>
> Q.:    —that  established the partnership?  *Like with Mitchell, you felt it was an informal partnership.  Right?*
>
> A.:    *Correct.*

Gutzman Dep. at 80:6-12 (emphasis supplied).  The Investment Partnership engaged in even more real estate deals than the Gutzman/Oxman General Partnership:

> MR. GIBSON:    … How many… real estate deals were part of the Jeff Chain era that you were involved with?
>
> A.:    Well, I believe there was 40 in the compass of Cipriani.  There were two escrows, one deal with 99th.  There was a deal with 83rd.  Capri, that's one.  I think Benessere was 10, 11 LLCs.  We did one on Power McDowell.  And each individual—maybe 65 sounds about right.
>
> Q.:    … Who came up with the idea of creating a separate limited[-]liability company for the respective real estate deals that were the subject of these limited[-]liability companies?
>
> …
>
> A.:    One or both.

Gutzman Dep. at 142:17-143:6.

         (b)    <u>The Investment Partnership Used The Same</u>

<u>Investment Process As The Gutzman/Oxman</u>

<u>General Partnership.</u>

Mr. Gutzman testified with respect to Mr. Chain:

> Q.:    We went through the process of—as you said, identifying and then talking to each other, your partner about the… possibility.  The next step you said was doing due diligence, and then you would approach potential investors, and at that point you more or

less would get verbal agreements, maybe you said written agreements at that point.  Then more likely than not you would form the LLC so that you could take in contributions into that entity.  **…[I]s that basic… process that I just described that you testified to… with respect to Mitchell as your partner the same thing that happened  more or less with Chain as your partner?**

A.:      **Yes.**

…

Q.:      … Did [the investment process] ever really change when you were partners with Jeff Chain?  They were basically the same?

A.:      They were basically the same.

Q.:      No real difference that you can remember?

A.:      Not really.

Gutzman Dep. at 73:14-74:2 (emphasis supplied), 79:17-21.  Importantly, the Investment Partnership, like the Gutzman/Oxman General Partnership, continued one of the key features of the Gutzman/Oxman General Partnership:  the identification of land, performance of due diligence, solicitation of investors, and obtaining of verbal commitments by investors prior to the time any LLC was formed.  In other words, **the Investment Partnership's land identification, due diligence, investor solicitation, and verbal investment commitment acquisition were all performed on behalf of no contemporaneously extant entity other than the Investment Partnership.**

(c)      Messrs. Gutzman And Chain Agreed To Share Profits.

Mr. Gutzman had previously testified, as described *supra,* that when Messrs. Gutzman and Oxman were partners, "Upon successful closings of the land as far as selling them, we would share in the profits."  Gutzman Dep. at 80:1-2.  Mr. Gutzman then testified:

Q.:      And was that the same format of making money when Jeff Chain was your partner?

A.:      Yes.

…

Q.:      While you were in the Jeff Chain partnership structure is there any way you remember making money other than getting a buyer's brokerage fee or sharing profits upon closing?

1   A.:    Not that I can recall.

2   Gutzman Dep. at 80:3-5, 19-23.

3                          (d)      The Investment Partnership Identified And

4                                   Purchased Land Prior To Entity Formation.

5   Mr. Gutzman testified with respect to the Investment Partnership's land purchases:

6       MR. GIBSON:         … Would there be occasions whereby—and
        let's start with the offer—that an offer would be made on property
7       that was the subject of a Chain partnership investment structure
        that was not made by the LLC because the LLC simply wasn't
8       formed yet?

9       …

10      A.:    Yes.  It was probably made on behalf of Millennium
        and[/]or assignees, and then the assignees were the ultimate buyers
11      of the property.

12      …

13      Q.:    … [G]enerally speaking, would it have been, the format
        you just described, be typically the format that the partnership
14      would use to buy property?

15      A.:    Enter into an agreement… and then assign it to the entity.

16      Q.:    Yes.  That would be the typical pattern?

17      A.:    Most typically.

18  Gutzman Dep. at 229:8-230:23.  Thus, while property may have been purchased on behalf of an

19  entity controlled by the overarching Investment Partnership (*i.e.,* one or more of the Millennium

20  entities), that entity would not be the ultimate titleholder of the property.  Rather, that property

21  would ultimately be the subject of an assignment of title by the Investment Partnership to an

22  entity that likely did not exist at the time of the Investment Partnership's purchase of the

23  property.

24                          (e)      The Investment Partnership Solicited Investors.

25  Mr. Gutzman testified regarding investor solicitations Mr. Gutzman undertook on behalf

26  of the Investment Partnership:

27      Q.:    During the Jeff Chain era, did you ever go with Jeff Chain
        to potential investors like you would sometimes do with Mitchell?
28      A.:    Yes.

                                    -23-

…

Q.:    I asked you whether or not you would represent [when you
went out to potential investors with Mr. Oxman] that it was a
Prudential deal.  You testified that it wasn't….

A.:    Yes.

Q.:    Then I asked you whether or not Mitchell would represent
to a potential investor that it was a deal from his real estate agency
company and you had no memory of that.  Correct?

A.:    Correct.

Q.:    … When you went out with Jeff Chain to talk to potential
investors during the Jeff Chain era, did you ever hear him make the
same statement?

…

A.:    I would say similar, yes.

Q.:    Similar what?  That he would not make that representation.
Correct?

A.:    Correct.

Gutzman Dep. at 75:14-17, 76:7-77:24.  As was the case with respect to the Gutzman/Oxman

General Partnership, then, Messrs. Gutzman's and Chain's investor solicitations were undertaken

on behalf of ***no contemporaneously extant entity other than the Investment Partnership.***

(f)    The Investment Partnership Offered Potential
       Investors A Range Of Investments.

As was the case with the Gutzman/Oxman General Partnership, the Investment

Partnership—and not particular entities—solicited investors.  The Investment Partnership would

solicit investors for a range of potential investments:

MR. GIBSON:    … [W]hen you went out and talked to
people… [i]s it fair to say that you wouldn't necessarily only focus
every single time on only one LLC.  Is that fair?

A.:    It would be general, and then if they seemed interested, it
would be specific.

Q.:    … When you say it's general, you would talk generally
about the kinds of projects that you and Jeff and others were
involved with?

1

A.:    Had been involved with and what we're trying to do, and
2    then if they were interested, then we would talk specifically.
Introduction, overview, interest-specific.

3
…

4    Q.:    … When you went out and talked to people in the Chain
era about this general overview that you were talking about, did
5    you ever say, "I'm here representing Cipriani, LLC" specifically?

6    A.:    Not that I can recall.

7    …
Q.:    If you went and talked to them for any of the potential
8    investors for any of the Chain-era properties, would you hand out a
business card?

9
A.:    It's possible.  NAI Horizon for sure.  NAI Horizon, that I
10    was a licensee.

Q.:    Okay.  But this work wasn't necessarily under NAI
11    Horizon that you were doing.  Correct?

12    A.:    No, but I was in the real estate field.

13    Gutzman Dep. at 144:12-146:24.  Mr. Gutzman testified further regarding the variety of potential

14    investments offered by the Investment Partnership:

15    MR. GIBSON:        … Isn't it also fair to say that before you got
into specifics, that with respect to the investment portfolio that you
16    and the partnership had, that there was at least the possibility of
being able to talk to a particular investor about more than one of
17    the investment companies which could have money come into it.
Is that fair?
18
A.:    It's possible.
19
Q.:    Because you had a lot of different investment companies
20    going at the same time.  Correct?

21    A.:    At times.

22    Q.:    Okay.  How did you decide which investment opportunity
specifically should be presented to a particular potential investor?
23
A.:    I don't know whether I decided, but it depends on what
24    area that I was doing at the particular time, what specific deal I was
there for, and maybe they had invested in the same area or what
25    was going to be merged, and discussed that part.

26    …

27    Q.:    Did you sit down with your partners and say, We really
need to get out and finish the gaining of investment capital for this
28    investment company before we move on to the next one?...

A.:      At times.

Gutzman Dep. at 217:4-218:17.  Mr. Gutzman's testimony supports that the Investment Partnership constituted an overarching association of individuals engaged in the solicitation of real estate investments in an array of single-asset real estate holding companies.  Those investment solicitations clearly could not have come from the single-asset real estate holding companies, which may not even have been formed at the time of investor solicitation.  Thus, ***the only entity that could have been engaged in investor solicitation was the overarching association of individuals making up the Investment Partnership.***

(g)      The Investment Partnership Obtained Investor Commitments.

Mr. Gutzman testified that, as was the case with the Gutzman/Oxman General Partnership, the Investment Partnership would obtain verbal commitments at a minimum from investors prior to forming investment entities:

MR. GIBSON:      … Was it your memory that potential investors might provide checks to the partnership with respect to an LLC prior to signing an operating agreement?

A.:      That's highly unlikely … because it usually accompanied both at the same time.

Q.:      That having been said, is it fair to say that verbal agreements with respect to commitments to make investments happened prior to executing the operating agreement?

A.:      Right.  Yes.

Gutzman Dep. at 205:20-206:7.

(h)      Only After Obtaining Investor Commitments, The Investment Partnership Formed Entities.

As was the case with respect to the Gutzman/Oxman General Partnership, only once sufficient investor commitments had been obtained to warrant formation of a limited-liability company, the Investment Partnership would cause a limited-liability company to be formed:

MR. GIBSON:      ***… I believe it's your testimony that it was not unusual to get verbal agreements from potential investors so that you guys knew in the partnership to say Okay.  We can set***

-26-

1   ***this LLC up.  We can run with it.  That's my understanding.
    Correct?***

2   A.:   ***Correct.***

3   Gutzman Dep. at 206:17-23 (emphasis supplied).

4                       (i)      The Investment Partnership Formed Sham Entities

5                                To Hold The Investment Partnership's Real Estate

6                                Investments.

7        Mr. Gutzman testified with respect to the attributes of those post-investor-commitment

8   limited-liability companies, which attributes are indicative of those limited-liability companies'

9   sham status:

10       Q.:   … For the 65 or so Jeff Chain[-]era deals that you did and
             the LLCs that were formed, did any of the LLCs that were formed
11           have employees other than the managers which would be you and
             others?
12
13           …

14           A.:   Employees?

15           Q.:   Yes.

16           A.:   We would hire third parties.  I don't know if that would be
                 called an employee.

17           Q.:   Assuming hiring a third party is not an employee, would
                 any of these real estate investment LLCs have employees?
18
19           …

20           A.:   Not that I'm aware of.

21           Q.:   Would that be true throughout your memory of the
                 existence of these Jeff Chain[-]era LLCs?
22           A.:   Correct.

23           …

24           Q.:   … Now, you would hire third parties.  Would they help
                 with accounting, for example?
25
26           A.:   Accounting, engineers, legal.

27           Q.:   … And would you hire a separate third-party accounting
                 [firm] for each and every LLC?
28           A.:   I believe so.

Q.:   …Would that accounting firm be different for each and every [one] of the LLCs?

A.:   Not that I'm aware of.

Q.:   Would it likely be the case that they were the same for all of them?

A.:   Most of them.  Correct.

Q.:   You might have done a change at one point?

A.:   There might have been, yeah.

Q.:   Apart from changing one third-party vendor from time to time, they would generally conduct the business for all of the LLCs.  Correct?

A.:   Most of the LLCs.

Q.:   Is that true for engineering as well?

A.:   We interviewed a lot of engineering firms and were very comfortable with one, so we would engage them.

Q.:   … [W]ould any of these LLCs in the Jeff Chain era, with respect to these 65 deals, have… a separate office?

…

A.:   I would venture to say Jeff Chain's office.

Gutzman Dep. at 158:23-160:22.  This testimony demonstrates that the limited-liability companies set up by the Investment Partnership were simply sham entities set up as instrumentalities of the Investment Partnership, lacking offices, employees, or separate third-party vendors.

(j)   Mere Investors In Investment Partnership Deals Only Received *Pro Rata* Returns Based On Initial Investment Amount.

As was the case with the Gutzman/Oxman General Partnership, investors in Investment Partnership deals who were not themselves Investment Partners received only *pro rata* shares of net profit based on those investors' initial investment amount:

Q.:   … It was your understanding during the Jeff Chain partnership structure with him [and], potentially others, such as Mr. Martinez, that you understood, at least informally with Jeff Chain and those others, that the same structure was applying; that

-28-

1   the only way people were going to get money was by way of either
2   participating in the buyer's brokerage commission upon closing
    and a share of profits, if they weren't merely an investor.  Correct?

3   …

4   A.:     Yes.

5   Gutzman Dep. at 104:14-25.  Mr. Gutzman's understanding of how investors would receive

6   returns on investments was based on the various Gutzman/Chain entities' operating agreements,

7   such as that of Cipriani LLC.  Mr. Gutzman acknowledged that section 4.7A of the Cipriani

8   operating agreement, and only section 4.7A, describes the provisions for cash distributions to

9   Cipriani investors:

10  Q.:     … Let's deal with [section] 4.7 generally.  Do you have
11  [knowledge] of any other provision in either the operating
    agreement or any other document that was associated in any way,
    shape, or form with Cipriani whereby a member, merely as a
12  member, got money other than through 4.7?

13  A.:     Not that I recall.

14  …

15  Q.:     Effectively, then, does this [section] 4.7 reinforce your
16  testimony this morning where you said that members basically got
    distributions on their pro rata investment interests.  Right?

17  A.:     Yes.

18  …

19  Q.:     Is there anything in 4.7 that you feel contradicts your
20  testimony this morning?

21  A.:     Not necessarily, no.

    Q.:     In fact, it mentions pro rata in accordance with their
22  ownership interest of shares?

23  A.:     Of the common As and Bs, yes.

24  Q.:     You would be surprised, therefore, if there was any other
25  distribution—right—provided to any other member other than
    through 4.7.  Correct?

26  …

27  A.:     I guess I would be surprised.

28  Gutzman Dep. at 108:8-14, 109:14-110:6.

(k)     Mere Investors Did Not Receive "Kickers."

Mr. Gutzman testified as well that, as was the case with the Gutzman/Oxman General

Partnership, mere investors *only* received *pro rata* shares of net profits, without any "kickers":

> Q.:     … When you entered into the partnership arrangement with
> Jeff Chain, was there anyone else in their role as an investor again
> that would have gotten a kicker out of any of the deals that you did
> when you partnered up with Jeff Chain?
>
> A.:     Not that I recall.
>
> Q.:     ***Is it fair to say, then, that none of the structures that you
> anticipated permitted anyone in their capacity as merely an
> investor to receive a kicker.  Correct?***
>
> A.:     ***Correct.***
>
> Q.:     Would you, sitting here today, be surprised if there is some
> indication out there that others received monies even though they
> were investors other than you and Jeff Chain in the real estate
> deals?
>
> …
>
> A.:     Would I be surprised? … I would venture to say yes.
>
> …
>
> Q.:     [In] the Jeff Chain partnership structure that you had[, d]o
> you ever remember anyone else when they were acting as an
> investor… receiving any money other than a return on their
> investment—on that pro rata basis of after a sale, making money
> off of their investment? … Would it be fair to say you would be
> surprised to learn if someone in their capacity as … an investor
> received any money while you were engaged in the Jeff Chain
> partnership structure?  Is that fair to say?
>
> A.:     Yes.

Gutzman Dep. at 85:7-86:1 (emphasis supplied), 87:9-88:17.

vi.     *The Investment Partnership Was Composed Of More Than*

*Mr. Chain And Mr. Gutzman.*

Mr. Gutzman later reaffirmed this testimony, making clear that others who were not mere

investors were part of the Investment Partnership:

> Q.:     … [Y]ou've testified earlier that the way that the economic
> arrangement was structured in both the Mitchell era and the Chain
> era was that the way that the money would flow would be that you
> and your partner… or partners would get a buyer's brokerage fee,

-30-

1   and then upon closing share the profits.  Do you remember that
    testimony?

2   A.:     Yes.

3   Q.:     And then you testified that the members would get a return
4   on their investment based upon their investment… percentage?

5   A.:     Correct.

6   Q.:     And that structure didn't change between the Mitchell
    partnership era and the Chain partnership… era, did it?

7   A.:     Correct.

8   Q.:     And that was, at a minimum, an informal understanding
9   between you and Mitchell.  Correct?

10  A.:     Correct.

11  Q.:     And at a minimum it was an informal understanding
    between you and Jeff Chain.  Correct?

12  A.:     Correct.

13  Q.:     And so you did have some knowledge that Jeff Chain
14  structured with you and perhaps others the revenue flow on a
    similar basis.  Right?

15  …

16  A.:     You said through others.  I'm not sure who are those.

17  Q.:     [Gabriel] Martinez, for example?

18  A.:     Martinez for an example, correct.

19  Q.:     It's more than Jeff Chain. Correct?

20  A.:     Yes.

21  Q.:     Martinez was participating in this kind of structure more
22  than merely as an investor by being able to gain commissions.
    Correct?

23  …

24  A.:     Rephrase that again.  I'm sorry.

25  Q.:     Well, by definition you said that Mr. Martinez was gaining
26  some level of a commission.  Correct?

    A.:     Correct.
27
    Q.:     And, therefore, he wasn't gaining that commission merely
28  by making his investment into the company.  Correct?

A.:      Correct.

Q.:      And so I'm just saying that Mr. Martinez, by way of example, was someone that gained money out of this structure other than merely a return on his investment.  Correct?

A.:      By way of commission. Correct.

Gutzman Dep. at 102:11-104:12.  Mr. Gutzman thus made clear that two varieties of individuals were investors in Investment Partnership deals:  (a) investors, whose returns on their investments would come in the form of *pro rata* net profit shares following property sales, and (b) individuals beyond merely Messrs. Chain and Gutzman who received additional funds—"kickers"—above and beyond *pro rata* net profits, *i.e.,* Investment Partners.

During the Chain Era, Mr. Gutzman also worked with Investment Partner Mr. Martinez[7] with respect to land deals:

MR. GIBSON:        Is it possible that you did a kind of mini[-Mitchell] or Jeff Chain structure with Gabe at one point?

…

A.:      With 99th and 83rd I did … .

…

Q.:      With respect to 99th and 83rd, *did you enter into that structure with the same type of general understanding and agreement between you, Jeff, and Gabe at a minimum that you had comparable to the [Mitchell] era understanding?*

…

A.:      *General[ly].*

…

Q.:      … In other words, that there would be *the same type of general agreement and understanding of sharing profits, how the commissions would go, etc.*  Correct?

…

---

[7] Mr. Martinez had apparently been acting as one of the Investment Partners since prior to the time Benessere, LLC was formed from the "roll-up" of various limited-liability companies.  *See* the Potential Investors Spreadsheet (Exhibit 6), identifying the "Perry" property's purchase as having been funded by the "Gabe Crew" of investors.  Mr. Martinez thus had administrative responsibilities with respect to the Gabe Crew akin to Mr. Massi's responsibilities with respect to the Massi Crew, including the responsibility for communicating news and information from the Investment Partnership to the members of the Gabe Crew.

1         A.:     ***General[ly].***

2         …

3         Q.:    In terms of the smaller Gabe era… [w]as it grounded upon
the same type of general structure that you had with Jeff and others

4         in the Chain era? … ***I'm talking about the general understanding***

5         ***of how the partners were going to make money.  Was that
effectively the same?***

6         …

7         A.:     ***Buyer broker fee and the profit sharing upon the sale.***

8         …

9         Q.:    [A]nd the commissions and the profit sharing, and the basic
economics of the deal were fundamentally the same.  Is that right?

10        …

11        A.:     ***They were [generally the same], yes.***

12

13 Gutzman Dep. at 148:5-152:9 (emphasis supplied).

14      Mr. Gutzman testified further as to the verbal partnership agreement between Messrs.

15 Gutzman, Chain, and Martinez establishing Mr. Martinez's right to a share of partnership

16 income:

17         MR. GIBSON:     … [D]id you have any understanding that
there was some written agreement that established Mr. Martinez's

18         ability to receive [a particular] payment [of $400,000,
characterized by Mr. Gutzman as "[s]haring commission and the

19         buyer's broker fee"]?

20         A.:    Verbal. … Once the formation started, the day-to-day
operations were going to be as such, but ***Gabe was going to be the***

21         ***main entity in the raising of funds, and for that we shared in the***

22         ***commissions.***

23 Gutzman Dep. at 167:8-24.  Mr. Gutzman's testimony demonstrates yet again the status of the

24 Investment Partnership as a general partnership.  The Investment Partnership's business included

25 acquisition of Arizona real estate and the commissions thereon, and Mr. Martinez was entitled to

26 a share of that income based on Mr. Martinez's status as "the main entity in the raising of funds."

27 At the time of Messrs. Chain, Gutzman, and Martinez entering into general partnership with one

28 another, no entity had been formed for which Mr. Martinez would be raising funds, and so that

to-be-formed entity cannot be held liable for Messrs. Chain's, Gutzman's, and/or Martinez's acts: only the general partnership comprising at a minimum Messrs. Chain, Gutzman, and Martinez could be so liable.

Mr. Gutzman testified generally regarding the manner in which the Investment Partnership went about raising capital for new investments:

> Q.:    Do you remember with respect to any of the Chain[-]era activities whether there was any formal entity created just for the purpose of raising capital?
>
> A.:    Correct.
>
> Q.:    That never existed.  Correct?
>
> A.:    Correct.
>
> Q.:    Therefore, **what existed was some folks getting together to raise money.**  Correct?
>
> A.:    **Correct**.
>
> Q.:    Okay.  And then ultimately if there was money raised—and at times money might be raised by some of these folks, and that money would be allocated more specifically, as you testified, to a specific LLC at any given point in time.  Correct?
>
> A.:    Correct.

Gutzman Dep. at 168:6-20 (emphasis supplied).  This testimony not only reinforces the Investment Partnership's overarching *modus operandi* of offering investments well prior to the time of entity formation, but also demonstrates that the Investment Partnership was not a closed group restricted to Messrs. Chain, Gutzman, and Martinez, but, rather, an overarching association of individuals (and entities) joined together for the purpose of engaging in the business of real estate acquisition and investment.  The Investment Partnership was willing to embrace efforts by any "folks getting together to raise money" for the Investment Partnership and to reward those individuals or entities with shares of, in the case of Mr. Martinez, Investment Partnership commission revenue, thereby making those individuals or entities *de facto* members of the Investment Partnership.

*b.*     ***The Martinez Experience***

i.     <u>Mr. Martinez Was A Partner With Respect To Prior Real</u>

<u>Estate Investments</u>

Mr. Martinez, like Mr. Gutzman, had prior experience as a partner with other real estate

investors prior to joining the Investment Partnership.  Mr. Martinez testified:

> MR. GIBSON:          … [W]hat would you say would be your
> earliest investment in these real estate investment companies, other
> than the ones that are the subject of this litigation?
>
> A.:     I started investing in land approximately in 1986.  They
> weren't necessarily investments in LLCs.  I would go and buy a
> piece of property.  It may be personally, or it may be with another
> person, or it could be with an entity.  And I continued to do that in
> 1986, approximately, until the present day.
>
> Q.:     When you would do those investments with another person,
> some of those occasions would not be through an entity, correct?
>
> A.:     Correct.
>
> Q.:     In a nonlegal way, ***did you consider that person a partner
> in that investment***?
>
> …
>
> A.:     ***In a nonlegal way, yes.***

Deposition of Gabriel Martinez ("Martinez Dep.," attached hereto as Exhibit 15) at 17:20-18:14.

ii.     <u>Mr. Martinez Recognized That The Investment Partnership,</u>

<u>Not Another Entity, Was Offering Investments.</u>

Mr. Martinez described the circumstances of Mr. Martinez's initial investment into one of

the Buckeye entities that ultimately comprised Cipriani, LLC, which circumstances further

reinforce the notion that ***the Investment Partnership was the entity offering real estate***

***investments*** to Mr. Martinez and other investors:

> MR. GIBSON:          So with respect to the first Cipriani-related
> master plan LLC, you did not identify that property?
>
> A.:     That's correct.
>
> Q.:     Do you know who did?
>
> A.:     I believe it was Jeff Chain and Eddie Gutzman.
>
> Q.:     What is the basis of that belief?

-35-

1    A.:    Prior to making any investment in Arizona, I was called

2 upon by Eddie Gutzman initially and then met Jeff Chain. I did not
know Jeff Chain prior to that time.  They essentially told me what

3 they were trying to do in Arizona. They showed me, I believe, that
first piece of property and what they intended to do in acquiring

4 approximately 2,000 acres of property and gave me a big picture of
what their plan was, and I actually went to Arizona to view the

5 property.  I'm not sure whether it was Jeff or whether it was Eddie
who picked it out first, but by the time I got involved, they were

6 together.

7    Q.:    What was this overarching plan that they related to you?

8    A.:    It was to acquire approximately 2,000 acres of property in
Buckeye, Arizona, zone it, entitle it, master[-]plan it and

9 eventually sell it.

10 …

11    Q.:    Do you have any memory of [your] first meeting with
Eddie Gutzman, with respect to Set A or that first discussion?

12    A.:    I think he came to my office to talk to me about it.

13    Q.:    Did he indicate that there was a real estate investment
opportunity for you?

14    A.:    Yes.

15    Q.:    Did he indicate at that point that he was representing a
specific company?

16

17    A.:    Not that I recall.

18 Martinez Dep. at 52:15-53:16, 56:24-57:9.  Mr. Martinez testified further regarding Mr.

19 Martinez's understanding that the Investment Partnership, not some other contemporaneously-

20 extant entity, was offering investments, and that the business conducted by the Investment

21 partnership was based on an overarching association of individuals and entities with Messrs.

22 Chain and Gutzman at the center:

23    MR. GIBSON:    When Mr. Gutzman first came to you and
started to talk about this plan of acquiring 2,000 acres in property,

24 did he indicate to you that there were already a number of limited[-
]liability companies already formed for the purposes of acquiring

25 any of the 2,000 acres of property?

26    A.:    Not to my knowledge.

27    Q.:    Did you have any understanding from Mr. Gutzman as to—
in what capacity he approached you; in other words, as a broker or

28 as a co-investor, as a manager?  Did he indicate to you in any
capacity as to how he was approaching you the first time?

-36-

A.:     To the best of my recollection, he was first the broker, that I knew he was a broker of real estate, and that he and Jeff would be overall managers, and that they would share in the profits after all of our investment was returned to us.

…

Q.:     So when he said to you that… he [and] Jeff would share in the profits after all of the investment was returned to you, did you understand that there was already an established single[-]entity limited[-]liability company formed that made clear that that was the case?

…

A.:     No.

…

Q.:     ***But it was your understanding that independent of these smaller LLCs along the way, Mr. Chain and Mr. Gutzman would be the <u>general managers of everything</u>, correct?***

…

A.:     ***Ultimately, yes.***

Q.:     And that's because they told you that, right? They said that they would be these managers, correct?

…

A.:     Yeah. I'm not sure if it was them individually or an entity that they were controlling that would be the management.

Martinez Dep. at 65:15-66:7, 67:1-10, 73:16-74:7 (emphasis supplied).  Mr. Martinez, an experienced attorney and investor, thus realized that: (a) at the time of Mr. Martinez's investments, no entity was yet formed to hold or manage those investments, and (b) there was an "everything" over which Messrs. Chain and Gutzman (or their entity or entities) would be the managers.

Mr. Martinez testified with respect to Mr. Martinez's understanding of Messrs. Chain's and Gutzman's communications with other potential investors, which communications are also consistent with the Investment Partnership, rather than any other entity, offering investments:

MR. GIBSON:     Is it your understanding that Jeff Chain, when he communicated to your knowledge with potential investors, would not announce himself with a business card or

1   whatever have you, and say, I'm only having this conversation as a
buyer's broker with respect to this parcel; is that fair?

2   A.:   That's fair.

3   Q.:   Is it also fair to say that he didn't announce himself and
say, I'm only acting as the manager with respect to this parcel; is
4   that fair?

5   A.:   I never heard him say that, correct.

6   Q.:   And you were in several of these solicitation
communications, is that fair, through the course of time?
7
8   A.:   Through the course of time, yes.

Q.:   Did you ever hear Jeff Chain, in any formal way,
9   distinguish himself in any formal way, distinguish himself in any
communication by status, that whether I'm buyer's broker, whether
10   I'm a member, or whether I'm a manager, with respect to a specific
entity?
11
12   A.:   There were occasions where he would say what his roles
were with the various entities.

13   Q.:   But did he ever articulate that, I'm here only having this
conversation in this capacity today?
14
15   A.:   I don't recall that.

16   Q.:   How about Mr. Gutzman, the same question with respect to
Mr. Gutzman.

17   A.:   Same answer.

18   Martinez Dep. at 189:20-190:23.

19           iii.        *Mr. Martinez Knowingly Solicited Investors Prior To Entity*

20                        *Formation.*

21        Mr. Martinez testified that, beginning with the project that would ultimately involve

22   formation of 99th & Indian School LLC ("99th & Indian School"), Mr. Martinez solicited

23   investments prior to such entity formation in that project, "in the sense that I may have called

24   some people and said, Hey, we got a great investment; are you interested."  Martinez Dep. at

25   39:18-20.  Mr. Martinez testified further with respect to 99th & Indian School:

26        MR. GIBSON:        Before the LLC was necessarily formed for
that, correct?
27
28        A.:   I think the LLC—it's possible that some of those
communications took place before it was formed, but it's also

-38-

1   possible that it was, like, formed and then, boom, we went out and
    started talking to people.

2   …

3   *Q.:   …[I]t wasn't critical, in your mind, that 99th & Indian*
4   *School, the formal LLC, was formed before you started talking*
    *with folks about possibly acquiring the property that ultimately*
5   *would be held by the LLC, correct?*

6   *A.:   Yes.*

7   Martinez Dep. at 39:21-40:17 (emphasis supplied).  Mr. Martinez's testimony thus reinforces the

8   fact that the Investment Partnership's investment offerings were made on behalf of ***no entity***

9   ***other than the Investment Partnership.***

10      Mr. Martinez testified further regarding Mr. Martinez's practices in soliciting investors in

11  the various Investment Partnership offerings, reinforcing yet again that the Investment

12  Partnership—which included, at a minimum, Messrs. Martinez, Chain, and Gutzman—was not

13  soliciting investments on behalf of any contemporaneously-extant entity other than the

14  Investment Partnership.

15      MR. GIBSON:        … Is it significantly far more likely than not
16      that before you commenced any solicitation efforts at all with
        respect to 99th & Indian School, that the final form of all of the
17      offering documents, including, without limitation, the operating
        agreement, were in place.

18  …

19  A.:   Not exactly. … ***[I]t's very probable that they were not in***
20  ***final form the very first time I talked to anybody about potentially***
    ***looking at [99th & Indian School].***

21  Q.:   Do you remember approximately how many people you
22      would have talked to in that initial phase before… the
        documentation was in final form?

23  A.:   It would probably be limited, and it would most likely be to
24      someone who was talking to me about investing in a property that I
        was going to be involved in.  And at that time, ***we may not have***
25      ***actually had the deal ironed out on [99th & Indian School].***

26  *Q.:   When you say "we," you are talking about you, Mr.*
    *Chain and Mr. Gutzman?*

27  *A.:   That's correct.*

28  …

-39-

Q.:      … When you would hand out, in those limited occasions that you did, business cards for people to contact you, ***that would have been your law practice business card that you would have handed out***; is that correct?

…

A.:      ***Yes.***

Martinez Dep. at 194:6-195:18, 207:6-16 (emphasis supplied).  No real estate holding entities were yet formed, and the Investment Partners themselves were not apparently acting on behalf of any entity that could have been offering real estate investments.  Mr. Martinez, an experienced attorney who had engaged in real estate investments in which Mr. Martinez had formed an entity prior to property acquisition, was well aware that the investments Mr. Martinez was offering were, at best, in to-be-formed entities, and proceeded to solicit investors in those investment opportunities nonetheless.

iv.      <u>Mr. Martinez Received Partnership Proceeds.</u>

Mr. Martinez testified with respect to a payment for $431,666.66 that Mr. Martinez received in May 2006 (the "May 2006 Martinez Payment"):

MR. GIBSON:      You can see again on the first page, 4177, there is a reference on number 104, at 5/23/06, of Gabriel Martinez and $431,000.  Do you have any understanding of what that amount would have been for?

A.:      ***This was probably part of commission that Jeff Chain and Eddie Gutzman earned, and I got part of it, when we purchased the property of 99th & Indian School.***

Q.:      Were you acting as a broker?

A.:      No.

Q.:      Were you acting as a real estate agent?

A.:      No.

…

Q.:      … [D]id you consider yourself, in a nonlegalistic way, … to be engaged in the activities that are associated with the activities of a buyer's broker with respect to any of the… acquisition of the real estate properties that were the subject of the Set A investment companies?

…

A.:      Not really.

-40-

Q.:     Is that a no, or is that a no, with a caveat[?]…

A.:     I was in the process of helping acquire a property. I knew that Jeff Chain and Eddie Gutzman were going to get a commission. Jeff Chain and Eddie Gutzman had told me, Hey, when we get a commission, we will share it with you.  I said fine.

…

Q.:     Did you feel at any time that your status as an attorney at law permitted you to act as a qualified and/or licensed buyer's broker with respect to the acquisition of real estate properties?

A.:     Well, as an attorney at law, … my understanding is I could do that if I chose to do it. For example, if I wanted to put together a deal in the state of Nevada as a licensed attorney in the state of Nevada, I can charge a commission.

Q.:     Are you licensed in the state of Arizona?

A.:     To practice law? … No.

Q.:     Are you licensed in the state of Arizona as a real estate agent?

A.:     No.

Martinez Dep. at 235:2-14, 238:4-240:5 (emphasis supplied).  Despite being neither an Arizona-licensed attorney or an Arizona-licensed real estate agent, then, Mr. Martinez received brokerage commissions on the purchase of the various Investment Partnership properties in Arizona, a violation of Arizona real estate law (ARS 32-2122, which enjoins activity as a real estate agent or broker in Arizona absent a license granted by the state of Arizona).  Mr. Martinez's testimony demonstrated that Mr. Martinez was apparently aware of the inappropriate nature of Mr. Martinez's receipt of Arizona real estate commissions, but that Mr. Martinez had been promised payment by Messrs. Chain and Gutzman out of Investment Partnership revenue as consideration for Mr. Martinez's activities on behalf of the Investment Partnership.

Mr. Martinez testified further with respect to the activity that warranted Mr. Martinez's receipt of the May 2006 Martinez Payment from the Investment Partnership:

MR. GIBSON:        I think you began to intimate, in regards to one of your answers with respect to payment of his commission, that you felt… that the $431,000 commission check that you received was, in part, payable to you for procuring investors; is that correct?

A.:     Not specifically for that.

Q.:     What about generally?

A.:     In general, ***I was part of the team that put together the capital and the members to come to a successful purchase of the land.*** ...  [T]here was no formal contract about anything about that. … The reason I received it is because, when we were involved in raising capital and acquiring the property, both Jeff and Eddie said, Hey, listen, if we successfully purchase the property, we will share our commissions with you.

Q.:     Did they tell this to you before you became an investor?

A.:     I think so.

Q.:     But this wasn't written down anywhere, right?

A.:     No.

Martinez Dep. at 257:23-259:25 (emphasis supplied).  This testimony by Mr. Martinez reinforces yet again that the Investment Partnership constituted an overarching association of individuals and entities, described by Mr. Martinez as "the team that put together the capital and the members to come to a successful purchase of the land."  Mr. Martinez already testified that the entity ultimately holding the successfully purchased land, 99th & Indian School, had not yet been formed, so "the team" could not have been 99th & Indian School.  Mr. Martinez's testimony demonstrates once again that some overarching association was responsible for all of the business conducted with respect to the Phoenix-area land deals orchestrated by Messrs. Chain and Gutzman and a variety of other members of "the team"—*i.e.,* the Investment Partnership.

Mr. Martinez testified further regarding Mr. Martinez's receipt of the May 2006 Martinez Payment:

MR. GIBSON:  … Do you remember, apart from the $431,666.66 payment to you, any other payments from the company to you?

A.:     The only monies that would have been made from payments, the way that I'm interpreting your understanding of payments, is money that I would have either paid out of my pocket directly or loans that I had given to [a] LLC that were being repaid.

…

Q.:     But you didn't loan the company the $431,666.66, did you?

A.:     No, and… I don't think that came from the company.

-42-

Q.:      Where did it come from?

A.:      From Jeff and Eddie. That did not come from 99th &
Indian School, to my understanding.

…

Q.:      Did you believe that Mr. Gutzman and Mr. Chain were
under a legal obligation to pay you the $431,000?

…

A.:      I don't know if I would have called it a legal obligation.  I
wouldn't have sued them to enforce it, but they told me that's what
they were going to do.

Martinez Dep. at 281:1-282:7, 290:17-25.  As discussed *infra* in Plaintiffs' Argument, there are a

variety of explanations for Mr. Martinez's theory that the May 2006 Martinez Payment came

"[f]rom Jeff and Eddie," all of which are consistent with the May 2006 Martinez Payment

ultimately emanating from the Investment Partnership.

*v.*      <u>Mr. Martinez Delegated Managerial Duties To Other</u>

<u>Investment Partners.</u>

Mr. Martinez testified as to Mr. Martinez' willingness to delegate management duties

with respect to 99th & Indian School Management to Messrs. Chain and Gutzman:

MR. GIBSON:          … Were you in some way an inferior
manager to Jeff Chain, with respect to any of the entities that you
were a manager of at the same time that he was a manager?

A.:      I wouldn't classify it as inferior.

…

Q.:      You had an oral understanding with Jeff Chain as to you
having certain management duties and him having certain
management duties with respect to any of the entities that you were
managers of at the same time?

A.:      Yes, and Eddie Gutzman.

…

Q.:      What was the division of labor?

A.:      Essentially, when they asked me to become part of the
management, both Mr. Chain and Mr. Gutzman, my comments to
them were, Look, I have a law practice to run; that's my primary
business; that's what I do; ***I cannot be involved in the day-to-day
operations of the management of these LLCs*** because there was

-43-

extensive meetings that took place in Phoenix, Arizona, for zoning, for engineering, entitlement work, et cetera.  At that time, Mr. Chain and Mr. Gutzman were probably, to my knowledge, spending three to four days a week in Phoenix, Arizona, and it was very clear that I was not going to be able to do that. I would not be participating in those meetings. ***They were to be dealing with the day-to-day operations, and I would be available for major decisions, guidance, raising capital.*** That was my primary role.

Q.:     Did you effectively give them your proxy for minor decisions, so they didn't have to come and bother you with respect to minor decisions?

A.:     Yes.

Q.:     Did you give both of them your proxy or one of the two of them?

A.:     Both. They were together in virtually every—these things. They lived together in Phoenix. They had a condominium together. That doesn't mean they didn't divide some of the duties.

Q.:     Did you have anything even informally in writing that captured what—the difference between a major decision and a minor decision?

A.:     No.

Q.:     Did you allow them to use their discretion as to what a minor decision was, as compared to a major decision?

A.:     Yes.

Q.:     So it's fair to say that they could have decided that something was a major decision and move forward—there was a minor decision that you could have considered to be a major decision, correct?

…

A.:     I guess anything is possible.

Q.:     Did you have an understanding that they had to give you a written report of every minor decision that they made?

A.:     No.

Martinez Dep. at 214:16-215:13, 216:11-218:14.  Mr. Martinez thus admitted that Mr. Martinez was willing to abdicate Mr. Martinez's managerial duties with respect to 99th & Indian School Management to Messrs. Chain and Gutzman.  As discussed further *infra* with respect to the testimony of Mr. Povalaitis, at least some of the managers of Investment Partnership entities who were not Mr. Chain, Mr. Gutzman, or an entity under Mr. Chain's and/or Mr. Gutzman's control

-44-

were willing to abdicate those individuals' managerial duties to Mr. Chain, Mr. Gutzman, and/or Mr. Chain's and Mr. Gutzman's respective entities.  This inappropriate abdication of managerial duties is among the recurrent features of the sham entities set up by the Investment Partnership, in which the distinctions between different entities were so thoroughly blurred and disregarded as to become meaningless.

<em>vi.     <u>Mr. Massi Took Issue With The "Roll-Ups" Of Benessere And Cipriani.</u></em>

Mr. Martinez testified with respect to the content of Mr. Martinez's conversations with Mr. Massi regarding the Investment Partnership's properties:

> MR. GIBSON:     As far as you can recall, every single time you had a communication with Al Massi about anything to do with [Investment Partnership properties], the only subject matter of those communications was exclusively about the Jeff Chain[-]related issues; is that correct?
>
> A.:     To the best of my recollection. … He was very upset that Jeff had borrowed money from the LLCs. There was another issue that dealt with the blending of the LLCs. Didn't have much discussion about that.  I know that that he mentioned that in a meeting or so, about the roll-up. He was upset about something that happened in the roll-up. I didn't get involved in that controversy. So that, and he wanted to change the managements of Cipriani and Benessere.
>
> …
>
> Q.:     … [D]o you have any understanding of what the problem was with the blending of the LLCs?
>
> …
>
> A.:     I believe the issue was that prior to the roll-up, there was one acquisition that happened just shortly prior to the roll-up. ***I think Al was upset that those people that had just put their money in were going to get rolled up at the same level that the others, like myself being one of the original investors, when I had my money in there for maybe now two years, they were going to get treated the same way. I think he had a problem with that.***
>
> Q.:     Did you?
>
> A.:     No. … I knew that going in.

Martinez Dep. at 170:14-171:5, 172:15-173:7 (emphasis supplied).  Mr. Massi's objection to the "roll-up" process by which the various Buckeye entities were combined to form Benessere and

1   Cipriani reflects the illogic of that process, which involved the merging of dozens of separate

2   limited-liability companies into single entities.  Such merging demonstrates the disregard

3   exhibited by the architects of the Investment Partnership for the separateness of the Buckeye

4   entities:  if the entities were subject ultimately to a "roll-up," it is not clear why separate entities

5   were formed in the first instance.

6                       *vii.*     *Mr. Massi Engaged With Mr. Martinez Regarding Cipriani*

7                              *And Benessere Management And Operations.*

8           Further, Mr. Martinez's above-cited testimony demonstrates that Mr. Massi appeared at

9   some level to Mr. Martinez to be taking such an active role with respect to Benessere and

10  Cipriani that Mr. Martinez took seriously, to some extent, the apparent fact that Mr. Massi

11  "wanted to change the management" of those entities. Mr. Massi instead appears to have worked

12  with Mr. Martinez to institute "advisory boards" for the various Investment Partnership entities:

13              MR. GIBSON:          Do you know who desired there to be an
14              advisory board?

15              A.:     I think, again, part of that came about as a result of, number
        one, Mr. Massi being upset with the roll-up, and then the
16      significant entities that were involved wanted—you know, various
        people wanted updates on a number of occasions. And I think from
17      their standpoint, they wanted to be able to have a select number of
        people that they could communicate with, rather than all of the
18      various members.  And so they, to my recollection, asked specific
        people to be part of the advisory board. And hopefully, then, that
19      would be communicated out to, perhaps, other members.

20  Martinez Dep. at 224:1-15.  Mr. Massi thus appears consistently to have taken an active

21  administrative role with respect to, at a minimum, Benessere and Cipriani.

22                      *viii.*    *Mr. Martinez Acted With Respect To Gila Bend In A*

23                              *Manner Consistent With Partnership*

24          Mr. Martinez testified regarding some of the steps taken by Messrs. Martinez and

25  Gutzman following the discovery that Mr. Chain had "borrowed" money from various

26  Investment Partnership entities, which involved Mr. Martinez acting with respect to Gila Bend in

27  a managerial fashion consistent with the Investment Partnership's overarching structure:

28              MR. GIBSON:          I'm going to ask you to turn to Page 2042.
            And you will see about a third down an [I]nnovative [A]ssets

1   check, and it says… wire came from Gabe Martinez, and then it's
2   cut off a little bit, interest through 5/12/08. … It looks like… there
    is a lot of entry space with respect to this discussion of Gabe
3   Martinez.  Does this amount in this entry refresh your memory as
    to some kind of payment associated with interest happening with
    respect to you?

4   A.:     Yes.

5   Q.:     What is this?

6   A.:     What I think it is, is this was about the time that we became
7   aware of Jeff Chain's borrowing of funds, not just from the entities
    that I was a manager of, and some of the entities that I was an
8   investor of, but other entities that I had nothing to do with, like
    Gila Bend.  I didn't have anything to do with Gila Bend, but I
9   believe Eddie Gutzman did.   So when we found out that Jeff had
    borrowed from these various entities, we instructed Jeff to get us
10  back all the money, not just to 99th & Indian School, Capri,
    Cipriani, Benessere, but also Gila Bend—and there might have
11  been a couple of others that I don't know off the top of my head—
    all monies returned, plus interest.  So … at that time, Mr. Gutzman
12  was very upset with Mr. Chain. Mr. Chain did not want to wire the
    money to … any of Mr. Gutzman's control. He wanted to wire the
13  money to a place where I would make sure and facilitate that it
    would be distributed in accordance with the pay-back schedule we
14  set up. And I believe that was one of those payments.

15  Q.:     So you are telling me that this was money paid to you by
16  Jeff Chain in association with interest that you then paid to Gila
    Bend, to Gila Bend's account; is that correct?

17  A.:     It wasn't money paid to me. ***It was money wired to an***
    ***account that I controlled, that then we forwarded to Gila Bend's***
18  ***account.***

19  Q.:     It was paid to your account, right?

20  A.:     It was wired to my account.

21  …

22  Q.:     ***Even  though you had nothing to do with Gila Bend,***
    ***correct?***

23  A.:     ***Correct.***

24  Q.:     So you were acting merely as a member in this
25  circumstance, correct, with respect to Gila Bend?

26  A.:     I wasn't a member of Gila Bend.

27  Q.:     You weren't even a member of Gila Bend, correct?

28  A.:     Correct.

    Q.:     Were you an officer of Gila Bend?

-47-

1  A.: No.

2  Q.: Were you an employee of Gila Bend?

3  A.: No.

4  Q.: Were you holding the  monies momentarily in trust through
your account for the benefit of Gila Bend?

5

6  A.: Yes.

7 Martinez Dep. at 224:22-227:18.  The fact that the Investment Partnership placed Mr. Martinez,

8 who was not only not a manager or other officer of Gila Bend, but not even a Gila Bend investor,

9 in charge of "holding… monies momentarily in trust through [Mr. Martinez's] account for the

10 benefit of Gila Bend" further exemplifies the looseness of divisions between the various entities

11 created by the Investment Partnership.  Moreover, the fact that Mr. Martinez was the vehicle—

12 apparently agreed upon by both Messrs. Chain and Gutzman—by which Mr. Chain paid money

13 back to the Investment Partnership entities strongly demonstrates that Mr. Martinez was himself

14 an Investment Partner.

15    *c.*  ***The Moehrle Experience***

16     i.  <u>Dr. Moehrle Previously Invested In Real Estate Through A</u>

17      <u>General Partnership Including Mr. Massi.</u>

18   John Moehrle, D.C., who currently acts as the manager of Benessere LLC, began

19 investing in real estate as a partner with, *inter alia,* Messrs. Gutzman and Massi some time

20 before Dr. Moehrle became an investor in any of the Investment Partnership deals.  Dr. Moehrle

21 testified:

22   MR. GIBSON:  Prior to the time that… Mr. Gutzman called
you with regard to the Cipriani opportunity, did you ever… engage

23   in a business transaction with Mr. Massi?

24   A.: Yes. … On several occasions.  Land investments.

25 Deposition of John Moehrle, D.C. ("Moehrle Dep.," attached hereto as Exhibit 16) at 66:15-67:2.

26 Other individuals involved in those investments were Mr. Gutzman and non-Defendant Gerald

27 Kring.  Moehrle Dep. at 70:10-16.  With respect to Messrs. Gutzman, Kring, and Massi, Dr.

28 Moehrle testified:

MR. GIBSON:      Is it fair to say that the guys you were investing together with, you gained a level of comfort in doing real estate business transactions with this group of gentlemen?

…

A.:      Yes, I would agree that there was a comfort—a degree of comfort.

Moehrle Dep. at 73:7-18.

Dr. Moehrle testified regarding the partnership structures of those prior land investments:

MR. GIBSON:      With respect to these partnership investments that we have been talking about, was there any written partnership agreement that you remember being put in place for any of the transactions?

A.:      I don't recall any partnership agreement, that I recall.

…

Q.:      … [T]here was an **agreement to share the cost**, as we talked about, correct?

A.:      **Correct.**

Q.:      There was an **agreement that the partners would get paid based upon their percentage share**, correct?

A.:      **Correct.**

Q.:      But that was an oral agreement, done on a handshake, effectively?

A.:      … [I]f I recall … we had a document that stated the investment and percentage ownership of that investment.

Moehrle Dep. at 102:23-103:20.  Dr. Moehrle further testified regarding the economics of those partnerships:

MR. GIBSON:        …[Y]ou didn't form an entity for any of these five transactions, so I'm trying to understand how, amongst the partners that made these purchases, how the investment costs were handled; who paid them; was it divided in some way [?] …

A.:      My recollection is that costs were shared **amongst the partners, the investment partners.**

Q.:      Were the costs shared amongst the investment partners based upon the percentage of their partnership interest?

A.:      Yes, to my recollection.

> Q.:     Was it part of the partnership arrangement that the return
> on your partnership investment would be based upon the
> partnership percentages as well?
>
> …
>
> A.:     Yes, that's what I recall.

Moehrle Dep. at 74:7-23.  Prior to making any investments in any of the Investment Partnership

properties, then, Dr. Moehrle had experience investing—***along with Messrs. Gutzman and***

***Massi***—in ***real estate investment partnerships***, with the partners' returns on investment to come

in the form of *pro rata* distributions of net profits.

*ii.*     <u>*Dr. Moehrle Obtained Information Regarding Cipriani*</u>

<u>*From Messrs. Gutzman And Massi.*</u>

Dr. Moehrle testified that Mr. Gutzman introduced Dr. Moehrle to the Cipriani deal:

> MR. GIBSON:          …[W]hat were the circumstances of you
> becoming aware of the opportunity to make investments in
> Cipriani?
>
> A.:     What I recall is Eddie called me, Eddie Gutzman, and told
> me of this opportunity and, you know, invited me to a meeting,
> initial meeting.

Moehrle Dep. at 50:24-51:4.  Dr. Moehrle inquired among Dr. Moehrle's prior real estate

investment partners for further information about Cipriani:

> MR. GIBSON:          … Did you discuss—prior to making the
> investment, did you have a conversation with any other human
> being, through the due diligence phase and otherwise, in any way,
> shape or form, about acquiring the Cipriani interest?
>
> A.:     I have talked to … several other potential investors in the
> project.
>
> Q.:     Can you remember a name?
>
> A.:     John Babcock; Gerald Kring…  Albert Massi.  I don't recall
> … anybody else.
>
> …
>
> Q.:     How about Gerald Kring, on how many occasions did you
> communicate with him through all of those means that I just
> described … concerning the Cipriani investment?
>
> A.:     Several times.
>
> Q.:     ***How about Mr. Massi?***

-50-

A.:     *Several times.*

…

Q.:     And so isn't it fair to say, then, that you did, in fact, have knowledge that these other investment partners were involved as potential investors in the Cipriani project prior to you making the investment?

A.:     … [I] had knowledge that they were potentially going to invest? Yes.

Moehrle Dep. at 62:6-19, 65:16-22 (emphasis supplied), 79:21-80:2.

### iii.     Mr. Gutzman Solicited Dr. Moehrle Prior To Entity Formation.

Dr. Moehrle testified further regarding Dr. Moehrle's initial investment with the Investment Partnership:

MR. GIBSON:       Did  you have any information that there was actual formation of a particular LLC at the time that Mr. Gutzman first approached you with respect to making an investment opportunity?  … In the Cipriani context[.]… Whether or not he knew for certain that a limited liability company was already formed that would be the vehicle through which Dr. Moehrle could make the investment.

…

A.:     I don't know that for a fact.

Q.:     When you were talking with Mr. Massi about the Cipriani investments, did you know at that point whether or not any… actual limited[-]liability company was formed for which you could be making your 1031 exchange?

…

A.:     Did not know that for a fact.

…

Q.:     *When you were making the investment into Cipriani initially, when did you learn the name of the actual limited[-] liability company that you were making the investment into?  At the time you saw the operating agreement?*

A.:     *That's my recollection.*

…

Q.:     *When Mr. Gutzman approached you with respect to investment opportunity, did he indicate to you that there would*

-51-

*only be one limited[-]liability company that you could … acquire a membership interest into?*

A.:  *No.*

…

Q.:  Did Mr. Gutzman indicate to you that there was a range of opportunities, in terms of the work that he was doing with Jeff Chain and others, at any time?

A.:  I don't recall any—I don't recall that.

Q.:  He didn't speak of only one specific investment LLC opportunity; is that fair?

A.:  *I don't recall if there was a discussion of one particular LLC. We were just talking about an investment in general and was I interested in investing in this project. And it was my understanding that there was [sic] multiple LLCs. Initially, there were multiple LLCs that people invested in individually, initially, and that was rolled up into a master LLC.*

Moehrle Dep. at 206:13-209:16 (emphasis supplied).  Dr. Moehrle's testimony thus reaffirms that the Investment Partnership's investor solicitations were undertaken on behalf of *no contemporaneously extant entity other than the Investment Partnership.*

*iv.*     <u>Dr. Moehrle Recognized That The Investment Partnership's Investments Were "All Part Of A Holistic Project."</u>

Immediately following the above-quoted exchange, Dr. Moehrle testified that the "multiple LLCs that people invested in individually, initially… rolled up into a master LLC" were:

Q.:  *All part of a holistic project, right?*

A.:  *Yes.*

Moehrle Dep. at 209:17-18.  Dr. Moehrle thus recognized that the web of entities created by the Investment Partnership constituted one unified whole of the Investment Partnership's business.

*v.*     <u>Dr. Moehrle Expected To Be Part Of The "Massi Crew" Or "Massi Camp."</u>

Dr. Moehrle testified, with respect to Dr. Moehrle's designation as part of the "Massi crew" or "Massi camp":

-52-

MR. GIBSON:        Now, you had a history of engaging in real estate investment partnerships with Mr. Massi prior to… engaging in the Cipriani investment, correct?

A.:      Yes.

…

Q.:      Did Mr. Gutzman ever indicate to you that, as part of the transactions associated with any of the projects associated with Cipriani or Benessere, that you were part of the Massi crew?

A.:      … That's a possibility. …

…

Q.:      … [W]ould it surprise you that within the administrative structure, the relationships that apparently Mr. Gutzman and Mr. Massi and Mr. Chain had, that there was a[n] administrative file structure electronically that classified you within the Massi camp?

**A.:      *Nothing surprises me. That may be possible, based on my history with individuals, that they classify me in a certain way. That's possible.***

Moehrle Dep. at 211:10-14, 213:16-21, 219:7-15 (emphasis supplied).  Dr. Moehrle was thus unsurprised to learn that Dr. Moehrle had been classified, within the Investment Partnership's administrative structure, as part of Mr. Massi's "crew," based on Dr. Moehrle's "history" with Mr. Massi as a co-investor.

                    *vi.*        *Dr. Moehrle Agreed That Cipriani LLC Members Are Not Entitled To Preferred Distributions Under The Operating Agreement.*

        Dr. Moehrle testified further regarding Dr. Moehrle's understanding of how Cipriani *investors* would receive returns on their investments:

MR. GIBSON:        Did you have an understanding that all members of Cipriani were going to be treated equally, economically, based upon their percentage share interest purchases in Cipriani limited[-]liability companies?

A.:      That was my understanding.

Q.:      Did you have any understanding that if … certain members made introductions to other members, that they were going to be paid more money?

A.:      No.

Q.:      Would that surprise you?

-53-

1      A.:      Yes.

2      Q.:      Would you find that to be contrary to your understanding of
       how the operating agreement should work?
3

4      A.:      Yes.

5      Q.:      Would that upset you, like Mr. Chain's misappropriations
       might upset you?

6      A.:      I wouldn't be happy about that.

7      …

8      Q.:      *[After showing Mr. Moehrle the document attached hereto
       as Exhibit 17, proffered as Plaintiffs' Deposition Exhibit 48]* Is this
9      the very kind of indication of preferred payoffs that you would find
       to be inappropriate, in view of the operating agreement … as you
10     testified earlier?

11     …

12     A.:      Yes.

13     …

14     Q.:      To the extent that this arrangement was, in fact, entered
       into and undisclosed, would it be comparable to the kind of
15     inappropriate, exceptional arrangement outside of the scope of the
       operating agreement that you would find inappropriate?
16
       …
17

18     A.:      I don't think that would be appropriate, from my
       understanding of the operating agreement. I don't see anything in
19     there that allows this type of arrangement.

20     Moehrle Dep. at 244:25-245:19, 252:6-253:7, 257:4-21.  Dr. Moehrle's testimony in this regard

21     thus supports the notion, discussed as well by Mr. Gutzman as cited *supra,* that given that the

22     Cipriani operating agreement does not provide for, *e.g.,* preferred profit distributions such as

23     those described in the May 1 Chain Letter and the Van Aken/Massi Letter, the individuals

24     receiving those preferred profit distributions must have received said distributions not as

25     investors, but for some other reason:  *i.e.,* that those individuals are Investment Partners,

26     receiving payment from the Investment Partnership's business proceeds.

27

28

vii.      *Mr. Massi Apparently Set Up A Cost-Sharing Arrangement For This Litigation Between The Three Massi-Represented Entities.*

Dr. Moehrle testified regarding the manner in which the costs of this litigation are being borne by Investment Partnership entities, drawing telling objections and instructions not to answer from counsel for the Massi-Represented Entities:

> MR. GIBSON:          …[D]id Mr. Massi make the arrangements, or was he basically the person who was the architect of the cost-sharing arrangement between the three entities that are involved in the cost[-]sharing?
>
> MR. BOWERS:      That question I'm going to instruct him not to answer… [b]ased on the grounds of privilege.  There is no way that doesn't involve privileged communications if he answers that question.
>
> A.:      I would agree.

Moehrle Dep. at 236:25-237:12.  Thus, while Plaintiffs have not yet had the opportunity to file a motion to compel with respect to the question of whether Mr. Massi acted as the "architect of the cost-sharing arrangement" between the Massi-Represented Entities, Dr. Moehrle's testimony strongly suggests that this was, in fact, the case:  that Mr. Massi put into place a cost-sharing structure between the three entities—and *only* the three entities—in which Mr. Massi holds direct or beneficial ownership interests.

d.     **The Corbo Experience**

i.      *Mr. Corbo Has A History Of Real Estate Investment With Messrs. Gutzman And Massi.*

Dana Corbo, Esq., who currently acts in a management capacity with respect to Cipriani LLC, testified that, prior to Mr. Corbo's initial investment in any of the Investment Partnership's deals, Mr. Corbo may have been involved in "some other land investment… where [Mr. Gutzman] was involved."  Deposition of Dana Corbo, Esq. ("Corbo Dep.," attached hereto as Exhibit 18) at 267:9-15.  Mr. Corbo testified as well that Mr. Corbo may have been introduced to Mr. Chain, and/or to the Cipriani deal, through one of Mr. Corbo's real-estate-investment-savvy

friends, including "John Esposito, Jerry Kring, John [Moehrle], Al Massi, John Babcock."
Corbo Dep. at 268:21-270:11.

        *ii.*      ***Mr. Corbo Was Initially Solicited By Mr. Chain On Behalf Of The Investment Partnership.***

        Mr. Corbo's initial experience with the Investment Partnership exemplifies the Investment Partnership's *modus operandi* of offering a range of potential investments in potentially-to-be-formed entities.  Mr. Corbo testified regarding Mr. Corbo's introduction to Mr. Chain:

        MR. GIBSON:     Okay.  When you met with Jeff Chain…did you know who he was representing at the time?

        A.:   Well, I don't believe Cipriani existed at the time.  I mean, it was whatever entity, you know, Buckeye 1, 450, whatever, LLC, was the—

        Q.:   … Did he ever tell you, I represent this entity?

        A.:   Not really.  I mean, I saw him as the guy putting together the deal.  So… I assumed he was the representative of that entity.

        …

        MR. GIBSON:     And I'm asking from the beginning of your relationship with Jeff Chain investment companies to today. … [D]idn't you gain by definition an awareness along the way that Jeff Chain was involved with a range of real estate investment companies?

        A.:   ***A range of investment opportunities that each one was a separate company, yes.***

        …

        MR. GIBSON:     …[Y]ou had an awareness that there were independent limited[-]liability companies associated with whatever properties that those limited[-]liability companies might hold title to, that—that you could make investments into, and those were all at some level one or the other involved with Jeff Chain, right?

        A.:   Right.

        …

        Q.:   And so Jeff never handed you his business card for Buckeye 3 … and said, I am only representing as a manager of this particular investment company, and I can't talk to you about anything else, right?

A.:    He never said anything like that or presented a business card with the name of one of these entities on it. … In fact, his business card, I think, said Millennium Properties maybe, or something like that.

Corbo Dep. at 288:13-23, 291:25-292:22, 295:10-20 (emphasis supplied).  Mr. Corbo's testimony demonstrates yet again that the only entity that could have been offering investment securities for sale at the time of solicitation was the Investment Partnership, because no other entity yet existed to offer those securities or solicit those investments.  While Mr. Chain may have given Mr. Corbo a business card bearing the name of one of the Millennium entities that the Investment Partnership used as instrumentalities of the Investment Partnership's business, Mr. Corbo recognized that Mr. Chain was actually offering "[a] range of investment opportunities that each one was a separate company," all "involved with" Mr. Chain.

iii.    *Mr. Corbo Was Solicited For Multiple Investments Prior To Entity Formation.*

Mr. Corbo made multiple investments in Investment Partnership properties.  Mr. Corbo described the ongoing conversations between Mr. Corbo and Mr. Chain regarding these further investments, which further evidenced that that **the Investment Partnership,** not any particular entity, was offering investments in the Investment Partnership's real estate deals:

MR. GIBSON:        …[H]ow did these conversations go with you and Jeff Chain with respect to these additional properties? … He either needed to tell you that I've got a new entity, or you had to tell him that, you know, I'm interested in one of your other scope of entities, and did you say, choose one for me?

A.:    Yeah, I mean, I guess the conversation was either Jeff coming and saying, I've got some more land that we're buying and we need more money for this purchase, or I would go to him and say, I have some more money, do you have any purchases in the works that I can invest in.

Q.:    …[E]ach time, then, that you made an investment, was it your understanding that there was only one investment company that needed additional investors? And that Jeff said, you know what, … I'm only here able to say to you that only this particular company may take any additional investment? …[D]id he ever say anything to that effect?

A.:    I don't recall anything like that.

Q.:    Did you ever get the impression that Jeff said, you know what, it seems like you're up for more investment, I can only talk

1     to you about one investment company. Anything to that effect
      ever?

2         A.:    No.

3   Corbo Dep. at 293:22-294:23.

4                    *iv.        Mr. Corbo Became Part Of The Massi-Instigated Members'*

5                                *Advisory Committee.*

6         As Mr. Corbo invested increasing sums into the Investment Partnership's properties, Mr.

7   Corbo became more involved in the Investment Partnership's administrative hierarchy.  Mr.

8   Corbo was appointed to "an advisory committee formed by [Mr. Chain] and [Mr. Gutzman] of

9   members to kind of be a liaison between them and the members," which committee also included

10  Mr. Martinez.  Corbo Dep. at 300:1-5.  As discussed by Mr. Martinez, *see supra,* this advisory

11  committee was apparently formed at the behest of Mr. Massi.

12                   *v.         Mr. Corbo Admitted Mr. Massi Was In A "Very Unique*

13                               *Position to Influence Management" Of The Massi-*

14                               *Represented Entities.*

15        Mr. Corbo testified with respect to Mr. Massi's role as counsel for the Massi-Represented

16  Entities:

17            MR. GIBSON:        … [M]r. Massi has the opportunity to
              influence you on the management of the company and the defense
18            of the litigation more so than any other member, doesn't he?

19            …

20            A.:    This isn't a privilege problem? … Yes.

21            Q.:    … [I]f, hypothetically, Mr. Massi felt that as a member it
              was in the best interests of the company to pursue the litigation in a
22            particular way, … he would be in a very unique position to
              influence management in [e]ffecting that mission, wouldn't he?
23
              …
24
              A.:    Yes.
25
    Corbo Dep. at 342:17-343:16.  Mr. Corbo's testimony in this regard is powerful evidence of the
26
    conflict of interest posed by Mr. Massi's representation of the Massi-Represented Entities in this
27
    matter.
28

1           *e.*     ***The Bergman Experience***

2               *i.*       *Mr. Chain Described Mr. Gutzman To Mr. Bergman As A*

3                         *"Partner."*

4       Defendant Todd Bergman holds a Nevada real estate license that Mr. Bergman "hung"

5 with KB Morris Real Estate from around 2000 until around 2010. August 25, 2011 deposition of

6 Todd Bergman ("Bergman Dep.," attached hereto as Exhibit 19) at 27:11-22. Mr. Bergman was

7 introduced to Mr. Chain by Karyne Morris, the principal of KB Morris Real Estate. Bergman

8 Dep. at 77:22-24. Mr. Bergman testified that Mr. Bergman believed that Mr. Gutzman "was

9 partners with Jeff Chain." Bergman Dep. at 96:15-16. The basis for this belief, Mr. Bergman

10 stated, was that "Jeff Chain told me his partner was Eddie Gutzman… [o]n the time that I met

11 [Mr. Chain]." *Id.* at 97:19-23.

12              *ii.*      *Mr. Bergman Received Referral Fees From, And*

13                  *Introduced Investors To, The Investment Partnership.*

14       Mr. Bergman testified with respect to the referral fees Mr. Bergman received from the

15 Investment Partnership:

16          MR. GIBSON.:      Do you remember how much [Mr. Chain]
paid you?

17

18          A.:     Not exactly.

19          …

20          Q.:     … When you make a real estate sale to a client, would you
characterize that as a "referral"?

21

22          A.:     No.

23          Q.:     … [W]hen you are involved in a paid referral
relationship[,] what is it that you do to make the referral?

24          A.:     Introduce.

25          Q.:     You introduce the person that is potentially going to buy
real estate to somebody?

26

27          A.:     Introduce opportunity for investments, like real estate
investments.

28          …

1
2

      Q.:     When you made these referrals to Jeff Chain, how would you do that? Would you send the referred person to Jeff Chain and communicate to that person that they should see Jeff Chain, or through another means?

3

      A.:     Introduce them personally.

4

      Q.:     To Jeff Chain?

5

      A.:     Yes.

6  Bergman Dep. at 55:10-25, 67:16-70:3.  Mr. Bergman testified further regarding Mr. Bergman's

7  communications with potential investors to be referred to Mr. Chain:

8
9

      MR. GIBSON:     What would you say to the people that you were referring to Jeff Chain in order to get the meeting with Jeff Chain?

10
11

      A.:     I would talk about a real estate opportunity investment that they may be interested in, maybe what it entailed, and if they were interested.

12

      …

13
14

      Q.:     So you were merely trying to bring candidates to Jeff Chain; is that correct?

15

      A.:     That were interested.

16

      Q.:     … Did you do anything to try and get them interested?

17

      A.:     Talk about the investment, best of my knowledge.

18
19

      Q.:     So it was the object of your communications with these Jeff Chain referral candidates to motivate them to talk to Jeff Chain, correct?

20

      A.:     Somewhat, yes.

21

      Q.:     Was it in … your personal interest for them to start talking with Jeff Chain about buying commercial real estate?

22
23

      A.:     Yes. … My personal interest was ***I would make a percentage of profit*** on some of these deals that I thought were good, and if they thought were good they'd invest.

24

      …

25

      Q.:     So what else had to happen in order for you to get paid?

26

      A.:     They would have to invest.

27

      Q.:     Did Jeff Chain personally make payments to you with respect to these referrals that you characterized?

28

      A.:     Yes.

-60-

Bergman Dep. at 71:18-72:24 (emphasis supplied).  Mr. Bergman thus fully anticipated sharing profits with the Investment Partnership as a result of Mr. Bergman's referral activity, making clear that Mr. Bergman is himself an additional Investment Partner.

iii.    *Mr. Bergman Referred Potential Investors To Mr. Massi*
*For Further Information.*

Mr. Bergman testified with respect to the ongoing process of communicating with investors recruited by Mr. Bergman:

> MR. GIBSON:        Did any of the… Jeff Chain referrals ask you whether or not you felt that the investments were good investments?
>
> A.:    Yes. … I said that "they look like good investments."
>
> Q.:    Did they ask you why you felt that way?
>
> A.:    *I said that some of their friends or counterparts were invested in the same properties and they should also talk to them.*
>
> …
>
> Q.:    *Do you now, sitting here today, remember any of these other individuals… that constitute the friends and counterparts?*
>
> …
>
> A.:    *Gabe Martinez. … Al Massi.*

Bergman Dep. at 124:4-125:24 (emphasis supplied).  Part of Mr. Bergman's sales pitch for Investment Partnership investments, then, consisted of instructions to potential investors to contact either Mr. Martinez—clearly an Investment Partner—or Mr. Massi if those potential investors had any questions.  Mr. Bergman's testimony in this regard also undermines, as discussed more fully *infra,* Mr. Massi's contention in Mr. Massi's October 7, 2011 declaration that Mr. Massi "never had anything to do with any aspect of the *promotion*, assemblage, *development*, engineering, improvements, *sales*, *marketing* and/or *operations* of the LLC Defendants or any other companies and/or investments relating to this Action."  Doc. No. 386-2 at ¶11 (emphasis supplied).

                 iv.            *__Mr. Bergman's Referral Fees Constituted Profit-Sharing.__*

Mr. Bergman testified further with respect to the referral fees Mr. Bergman received from Mr. Chain:

> MR. GIBSON:       … Did you have a written agreement with Mr. Chain that made clear the circumstances of how and when you would get paid for the Jeff Chain referrals that you made?
>
> A.:     No.
>
> …
>
> Q.:     What was the understanding between you and Mr. Chain with respect to these payments?
>
> A.:     I would get a percentage of profit on the back end if people invested into his—into the projects.
>
> Q.:     What do you mean by the "back end"?
>
> A.:     Like after—after maybe a sale of a property, I would get a percentage of the profits that went to the company… that they would pay me.
>
> …
>
> Q.:     Do you have any idea how much, in total, you got paid from Jeff Chain?
>
> A.:     Approximately a couple hundred thousand.

Bergman Dep. at 74:5-25, 77:4-6.  Mr. Bergman was thus admittedly sharing profits with the Investment Partnership, further supporting that Mr. Bergman was another *de facto* Investment Partner.  Mr. Bergman testified further regarding the payments Mr. Bergman received from the Investment Partnership:

> MR. GIBSON:       What profits are we talking about, profits out of what?
>
> A.:     … A percentage of profits from conclusion of sales of the properties, that I would get commission on from Jeff Chain.
>
> …
>
> Q.:     … What percentage did you get?
>
> A.:     I got 7 percent on the back end… Percentage of profit.
>
> …

1

Q.:     You keep on saying "back end."  Do you mean—"back end" meaning after the property is sold?

2

A.:     Yes.

3

…

4

Q.:     … [D]id you volunteer this information to the referral sources, or did you only give this information to them if they asked you?

5

6

A.:     Both.  They asked me or I would volunteer.

7

Bergman Dep. at 139:8-12, 143:7-16, 144:21-25.  Mr. Bergman testified further with respect to

8

Mr. Bergman's profit-sharing agreement:

9

MR. GIBSON:        Did Mr. Chain offer you 7 percent right off the bat; in other words, did he come up with that number, 7?

10

11

A.:     Yeah.

12

…

13

Q.:     What number did you have in mind?

A.:     None. … I didn't have a number in mind.

14

…

15

Q.:     You didn't think you deserved anything… for your efforts, and he came up with 7 percent?

16

17

A.:     As I can recall, *he … told me he would give me a percentage of the profits, and later on down the line he told me what that was.*  It wasn't actually discussed from the get-go on what exact percentage I would get.  So he said, *"I will give you a percentage of the profits and we will talk about that later,"* and I was like "fine."

18

19

20

21

Bergman Dep. at 183:1-184:6 (emphasis supplied).  Mr. Chain thus knowingly offered to share

22

Investment Partnership profits with Mr. Bergman.

23

*v.*     *Mr. Bergman Engaged In Investment Solicitation On*

24

*Behalf Of No Entity Other Than The Investment*

25

*Partnership.*

26

Mr. Bergman testified further regarding Mr. Bergman's solicitation of investments from

27

Plaintiffs:

28

MR. GIBSON:        When did you decide that Dr. Kabins might be an appropriate investor?

A.:     During the time working with him, I asked him if he would be interested in some investment opportunities, in land, if I could bring them to him.

Q.:     *And at that time, did you know whether there was a particular investment opportunity available within the scope of the* Chain partnership portfolio*?*

A.:     *Not specifically.*

…

Q.:     *You approached Dr. Kabins with respect to, later on, a range of investment companies, correct?*

A.:     *Yeah.*

…

Q.:     Did you go back to Dr. Kabins, after the first investment, with other possible investment opportunities… associated with the Chain partnership?

…

A.:     Yeah.

…

Q.:     Did Jeff Chain ever say to you, you know, "we might—you might want to talk to Dr. Kabins about this particular investment company or property"?

A.:     Not specifically. … Not generally.

Q.:     At all? … Is it that he did it or he didn't do it, even at some level?

A.:     Maybe referenced Dr. Kabins a couple times during the whole, you know, investment period, where we had opportunity to invest in.  It was more, "Todd, I have got this much with this property, do you know of anybody, you know, be great to, you know, meet with them and show them what we are doing." So it wasn't specifically Dr. Kabins.

Q.:     So he would indicate to you where the needs were and you would go out and talk with possible investors… with respect to those needs, correct?

A.:     Correct.

Bergman Dep. at 209:8-210:12, 231:16-233:15, 243:7-16 (emphasis supplied).  Mr. Bergman's

testimony thus reinforces yet again that Mr. Bergman was not soliciting investments on behalf of

-64-

any particular entity other than the Investment Partnership.  Mr. Bergman's testimony also reinforces the overarching nature of the Investment Partnership—Mr. Bergman recognized that the Investment Partnership's properties all fell into a "partnership portfolio" subject to common control by, at a minimum, Mr. Chain.

### f.    *The Povalaitis Experience*

#### i.    *Mr. Povalaitis Was Set Up By The Investment Partnership As President Of Modern Management, Inc.*

Allyn Povalaitis went to work for Defendant Millennium Properties and Development, Inc. ("MPD") on or about November 1, 2000 as a real estate analyst.  Deposition of Allyn Povalaitis ("Povalaitis Dep."; attached hereto as Exhibit 20) at 13:17-14:3.  Mr. Povalaitis' initial duties at MPD included preparation of "financial pro formas for potential projects."  Povalaitis Dep. at 20:9-10.  In 2005, Mr. Chain made Mr. Povalaitis president of Defendant Modern Management, Inc. ("Modern Management"), a position Mr. Povalaitis held until January 2008.  Povalaitis Dep. at 41:8-24.  Mr. Povalaitis testified with respect to Modern Management, amply demonstrating the sham nature of Modern Management:

> MR. GIBSON:        Starting in 2005, how many employees did Modern Management, Inc. have?
>
> A.:    Zero.
>
> Q.:    Did the number of employees for Modern Management, Inc. ever change up through the time that you left Modern Management, Inc. as president?
>
> A.:    No.
>
> …
>
> Q.:    … [D]id you ever receive any value of whatsoever nature while acting as president of Modern Management, Inc.? … You weren't paid by Modern Management, Inc., so I want to expand the scope of that inquiry to say even if you didn't receive any compensation per se, did you receive any value whatsoever? Did you get… a watch? Did you get a car or something?
>
> A.:    No.
>
> Q.:    Who owned Modern Management, Inc.?
>
> A.:    I don't know.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Q.:   [W]ho was on the board of directors of Modern Management, Inc.?

A.:   I don't know.

Q.:   Did Modern Management, Inc. have a… business purpose?

A.:   Not that I know of.

Q.:   What were you president of?

A.:   It was a structure that the lawyers and accountants came up with in 2005 that the real estate entities would be managed by Modern Management. So the LLCs were manager-managed LLCs, and the manager would be Modern Management. And initially, it was Jeff Chain as the president of Modern Management, and it was changed later in 2005 to me so that I could deal with the lenders. That was my only role.

Povalaitis Dep. at 41:25-43:17.  Modern Management's sham status is discussed in more detail in subsection iii, *infra*.

ii.      *The Investment Partnership Had A Routine Structure For*

*Setting Up Real Estate Holding Companies.*

Mr. Povalaitis testified as to a standard pattern and practice, or "structure," utilized by the Investment Partnership in setting up real estate holding companies to be "managed" by Modern Management:

Q.:   When you say that they came up with Modern Management, Inc. to manage the LLCs, … to what LLCs are you referring? …

A.:   … I don't have a list of them, but that was kind of the structure, that [any time] there was a new entity started, that was the structure.

Q.:   That Modern Management, Inc. would always be the manager of those entities?

A.:   Would always be the manager of those entities.

Q.:   Were, to your knowledge, there any other officers of Modern Management, Inc. other than yourself?

A.:   Jeff Chain.  He was vice[-]president.

Q.:   And did Jeff Chain report to you while you were president?

A.:   No.

-66-

Q.:     Did you ever instruct Jeff Chain to do something while he was vice[-]president?

A.:     No.

Q.:     Did you ever take instructions from Jeff Chain while he was vice[-]president?

A.:     No.

Q.:     How did you arrive at decisions to be made for the company?  You had to conduct day-to-day business; correct?

A.:     Well, there was really no day-to-day business to be done. … [M]y only role as president of Modern Management was to allow me to communicate with lenders if need be.

Povalaitis Dep. at 43:21-45:18.  Mr. Povalaitis was thus the president of an Investment

Partnership entity with respect to which Mr. Povalaitis neither gave other officers direction nor

received direction from other officers, and which apparently did no actual day-to-day business.

Later, Mr. Povalaitis revisited this testimony and discussed "the process that was set up for every

LLC" by the Investment Partnership:

MR. GIBSON:          … [Y]ou testified [this morning] that … 99th & Indian School, Benessere, Cipriani, and Cottonwood—that Modern [M]anagement was a manager of those. … Do you have any reason to believe that your testimony this morning with respect to same is now inaccurate?

A.:     I'm saying I don't know for sure that Modern Management is the manager or was ever a manager of those entities except for Cottonwood. … The only reason I said yes at that time earlier on is because I assumed that *all of these entities more than likely have Modern Management, Inc. as their manager, because that was the process that was set up for every LLC*.

Q.:     Okay. … [A]nd so you have a reason to believe that for entities like Capri, Gila Bend, and Michael's Plaza, because that's the template that Jeff Chain used, that it makes sense that there's no reason to exclude those from the template; is that right?

A.:     Correct.

…

Q.:     And it's confusing because *if Modern Management, Inc. was the manager of 99th & Indian School, why would there be a creation of 99th & Indian School Management, LLC; right?*

A.:     *In my eyes, yes.*

…

-67-

Q.:    Was part of this template that Jeff Chain's, in coordination with the attorneys and accountants, construction of this … template of … having all of these LLCs tied to specific parcels and then have … this Modern Management structure's [*sic*] tied to those parcels?

A.:    Yes. … It was more of a structural way, because as you can see, there's a lot of LLCs starting, and in 2004, there's—started to get bigger. [*Sic.*] And so ***they needed a way to control that*** and organize that is my impression. I don't know that for a fact, but that was my impression.

Povalaitis Dep. at 111:1-113:23 (emphasis supplied).  This testimony demonstrates that the Investment Partnership's creation of limited-liability holding companies for single parcels of real estate was a templated process undertaken without any actual intent to create independent entities.  Further, such entity creation was undertaken by some "they" who "needed a way to control" Investment Partnership business—*i.e.,* the overarching association of individuals and their entity instrumentalities that constituted the Investment Partnership.  Those limited-liability companies appear to have been created without any particular logic, as exemplified by Mr. Povalaitis' own confusion regarding the necessity of forming 99th & Indian School Management when Modern Management was already acting as 99th & Indian School's manager.

Mr. Povalaitis testified that the Investment Partnership made Modern Management the manager of each of the Investment Partnership's single-asset real estate holding entities:

MR. GIBSON:    So [99th & Indian School, LLC, Benessere, LLC, Cipriani, LLC, Cottonwood Retail, LLC, Michael's Plaza, LLC, and 3900, LLC] can be categorized … as … LLCs that you referred to before that were set up as single entities with respect to these real estate ventures; correct?

A.:    I believe so, yes.

Q.:    … [Y]ou have no reason to believe that Modern Management, Inc. was not the manager of each and every one of these entities; correct?

A.:    That is true.

Povalaitis Dep. at 51:5-19.  With respect to the structure of the various investment entities, Mr. Povalaitis testified:

MR. GIBSON:        … [T]his is a [S]ecretary of [S]tate printout … Do you see you being listed as a registered agent of Capri II?

-68-

A.:    Yes.

Q.:    Does that refresh your memory that you had some responsibilities for Capri II?

A.:    No.

Q.:    Do you have any reason to believe that this document is wrong in any way?

A.:    Yeah, I think it is wrong. I didn't know I was a resident agent. … [W]hat year is this? What time?

Q.:    Well, the file date is shown there.

A.:    Oh, 2005, yeah. Usually those were Christine Thornton. … Christine Thornton is usually the registered agent.

Q.:    For all of these entities?

A.:    Everything, yeah. … *'Cause that's part of that template. … Of how we created an LLC.*

Q.:    And basically everything *was managed under the same umbrella; right? Under the guise of Millennium Properties; right? I think you used the word "guise" earlier today.*

A.:    *Well, I don't want to say guise, but I mean, Millennium Properties was the—I don't know how to explain what they did but—yeah.*

Q.:    It wasn't direct. It was just generally *Jeff Chain with some folks;* right?

A.:    Yeah. And the management process was managed through Millennium Properties and Development, Inc. … But Millennium Properties and Development, Inc. did other things as well, not just this.

Povalaitis Dep. at 207:9-209:7 (emphasis supplied).  This testimony by Mr. Povalaitis reinforces a number of facts regarding the Investment Partnership.  First, while the Investment Partnership may have caused "the management process" to be "managed through [MPD]," the actual source of management authority for the Investment Partnership was "Jeff Chain with some folks"—the overarching association constituting and administering the Investment Partnership.  Second, Mr. Povalaitis' testimony reinforces the apparent cookie-cutter approach by which the Investment Partnership set up shell entities, naming the same administrative assistant, Ms. Thornton (whose role in Investment Partnership business was discussed more thoroughly by Mr. Janga, *infra*) as registered agent with such regularity that Mr. Povalaitis immediately recognized that Mr.

Povalaitis' naming as a registered agent for an Investment Partnership entity must have been a mistake.  Both of these recurring themes in all deponents' testimony make clear that the Investment Partnership existed as a *de facto* entity responsible for the creation and control of all of the sham entities set up as instrumentalities of the Investment Partnership's business of Phoenix-area real estate development and investment procural.

> iii.     *Modern Management Was A Sham Entity Set Up As Manager Of The Various Investment Partnership LLCs.*

Mr. Povalaitis testified further with respect to Modern Management:

> MR. GIBSON:     … Did you ever see what's called an operating agreement with respect to Modern Management, Inc.?
>
> A.:     I believe I did. … Do I remember reading it? No.
>
> Q.:     Did you ever have any formal operating agreement level meeting with… Jeff Chain with respect to Modern Management, Inc.?
>
> A.:     Not that I recall.
>
> Q.:     And it's fair to say, since you don't know who any of the board of directors were of Modern Management, Inc., that you've never participated in any meeting with the board of directors of Modern Management, Inc.; correct?
>
> A.:     Correct.
>
> Q.:     Did you ever receive a business card depicting your status as president of Modern Management, Inc.?
>
> A.:     No.
>
> Q.:     Did you ever have a meeting where you introduced yourself as president of Modern Management, Inc. to somebody else?
>
> A.:     No.
>
> Q.:     Did Modern Management, Inc. have any offices?
>
> A.:     No.
>
> Q.:     Do you remember if Modern Management, Inc. had its own bank account?
>
> A.:     No. … It did not have its own bank account.
>
> …

1      Q.:      Do you know if Modern Management, Inc. had a post
        office box?

2      A.:      Not to my knowledge.

3      Q.:      Did Modern Management, Inc. have a phone number
        owned by Modern Management, Inc.

4
5      A.:      Not that I know of.

       Q.:      Did Modern Management, Inc. possess any assets ever?
6
7      A.:      Not to my knowledge.

8    Povalaitis Dep. at 51:22-53:16.  Modern Management itself was thus a sham, undercapitalized

9    shell entity, acting as manager of other sham entities.  This is consistent with the Investment

10   Partnership's business model of creating a plethora of sham entities all ultimately to be treated as

11   instrumentalities of the overarching association headed by, at a minimum, Messrs. Chain and

12   Gutzman.

13          Notwithstanding Modern Management's role as manager of all of the Investment

14   Partnership's real estate holding companies, Mr. Povalaitis never participated in management

15   meetings of those companies:

16          MR. GIBSON.:        … Did you ever participate in a
        management meeting of 99th & Indian School, LLC?
17
18      A.:      No.

       Q.:      Whereby you were representing, as president of Modern
19      Management, Inc., as the manager of 99th & Indian School, LLC?

20      A.:      No.

21      Q.:      Same question with respect to Benessere, LLC.

22      A.:      No.

23      Q.:      Same question with respect to Cipriani.

24      A.:      No.

25      Q.:      Same question with respect to Cottonwood.

26      A.:      Yes.

27      Q.:      As far as you knew, Modern Management, Inc. was as
        much a manager of Benessere as it was Cottonwood; correct?
28
        A.:      In the beginning, yes. … It changed.

-71-

1

2

      Q.:     While you were president of Modern Management, Inc.; right?

3

4

      A.:     No. … Modern Management, Inc. was the manager for Cottonwood for three months, and then it changed. I became personally manager of Cottonwood.

5

6

      Q.:     Okay. Well, my question was while president of Modern Management, Inc. So did you attend a management meeting … with respect to Cottonwood Retail, LLC while acting as president of Modern Management, Inc.?

7

      A.:     No.

8 Povalaitis Dep. at 53:19-55:1.  Mr. Povalaitis' testimony thus makes clear that Modern

9 Management, Inc. was no more than a sham entity formed to be named as the manager of the

10 Investment Partnership's various investment entities, but otherwise to do no discernible business.

11 Further supporting Modern Management, Inc.'s sham status is Mr. Povalaitis' description of Mr.

12 Chain's participation, or lack thereof, in Modern Management affairs:

13

14

15

      MR. GIBSON:     … [I]s it fair to say that with respect to any of the real estate venture LLCs that you described, that while you were president of Modern Management, Inc., you never participated in a management meeting with respect to any of those entities. Is that fair?

16

      A.:     That is fair.

17

18

      Q.:     Did you ever ask Mr. Chain to participate in a management meeting with respect to any of those entities as your vice[-]president?

19

      A.:     No.

20

21

22

      Q.:     Do you have any reason to believe that Mr. Chain engaged in any management meeting for the benefit of Modern Management, Inc. as vice[-]president with respect to any of these real estate venture LLCs that we've identified?

23

      A.:     I have no idea.

24

25

      Q.:     Did Mr. Chain ever inform you, in his capacity as vice president of Modern Management, Inc., of what he was doing on behalf of Modern Management, Inc., in your capacity as president?

      A.:     Never.

26 Povalaitis Dep. at 55:9-56:6.  Mr. Povalaitis' testimony thus reinforces that the Investment

27 Partnership had a complex overarching bureaucratic structure involving the creation, not

28 necessarily for any discernible business purpose, of a wide array of limited-liability companies,

but in fact leaving administrative power in the hands of the overarching association of individuals constituting the Investment Partnership.

                *iv.*        *Cottonwood Retail Gained Investors Prior To Entity Formation.*

      With respect to the time frame in which Cottonwood Retail gained investors, Mr. Povalaitis testified:

> MR. GIBSON:      [Cottonwood Retail] didn't start to gain investors until August 2007; correct?
>
> A.:    Correct. … There would be no reason to at that point.
>
> …
>
> Q.:    Why not?
>
> A.:    Just 'cause you don't need the money until we know that we have a deal that's going to work and that's going to, you know, get financed. The development process starts way before you ever close on a project.

Povalaitis Dep. at 152:7-23.  Mr. Povalaitis thus reinforced yet again that **no entity solicited investments in Cottonwood Retail other than the Investment Partnership,** because the Investment Partnership did not plan to take any steps in furtherance of Cottonwood Retail investment or operations until "we know that we have a deal that's going to work and that's going to… get financed."  In this regard, Mr. Povalaitis testified as well:

> MR. GIBSON:      Okay. And do you have any understanding of what would drive that dynamic as to when an LLC was formed… ?
>
> A.:    In some cases in the process of lending, getting lending information, lenders would like to know what they're lending to, so they may require you to have an entity before. That's why I'm saying there are a lot of entities that were created that were never used or—you know, just because the project did not go forward. So, you know, it just depended on the situation of when a particular LLC was going to be created. ***But generally speaking, you didn't have to create an LLC to do a development deal until you actually knew that it was something that you were going to pursue.***
>
> Q.:    Well, then let me understand that in terms of a development timeline, because for Cottonwood, as an example, you knew about Cottonwood no later than December 2006 as a project that you guys wanted to pursue; correct?

A.:     That was the first one, yes. … First time that we had looked at it.

…

Q.:     Do you have any reason to believe at that point in time that Cottonwood Retail, LLC was already formed?

A.:     It would not have been.

…

Q.:     … [Y]ou appear certain that it would not have been. … **What makes you so confident that Cottonwood Retail, LLC would not have been formed in December 2006?**

A.:     **Because we had just started the process of doing our due diligence in terms of finding out whether it was viable or not viable and whether we were going to pursue it.**

Povalaitis Dep. at 157:15-159:11 (emphasis supplied). Yet again, Mr. Povalaitis' testimony reinforces that the Investment Partnership, and not any particular entity, offered investments in the Investment Partnership's scheme.  Mr. Povalaitis' testimony further reinforces the notion of the overarching association constituting the Investment Partnership—by testifying that "**we** had just started the process of doing our due diligence," Povalaitis Dep. at 159:8-9 (emphasis supplied), Mr. Povalaitis' testimony begs the question of who "we" was, if not the Investment Partnership.

> *v.*     *Millennium Properties & Development, Inc. Did Not Own*
> *The Investment Partnership's Properties.*

Mr. Povalaitis testified with respect to Defendant Millennium Properties & Development, Inc. ("MPD"):

MR. GIBSON:     … [L]et's talk about Millennium Properties and Development a second. Was that entity effectively run by Jeff Chain?

A.:     Yes.

Q.:     Was there any other individuals that you knew that participated in these projects from time to time in talking with Jeff Chain as … a possible development project?

A.:     From the standpoint of someone involved in Millennium Properties and Development?

-74-

Q.:   Or … just with Jeff Chain, whether or not they're an employee of Millennium Properties and Development?

A.:   Yeah, there was several—hundreds of people probably, as partners or potential to develop—joint developments, all sorts of people.

Q.:   Okay?

A.:   But not under the guise of Millennium Properties and Development.

Q.:   Right.

A.:   That was his company.

Q.:   Right. So under that guise… do you have memory of anybody that would fall—and I know you know hundreds, so just give me—you know, does Eddie Gutzman come into that?

A.:   Eddie Gutzman would come into that.

…

Q.:   … [D]o you have any reason to believe, for example, that it was always that Millennium Properties and Development, Inc. was the exclusive owner originally of all these properties?

…

A.:   No, no.

Q.:   You sound fairly confident about that.

A.:   Absolutely.

Q.:   Okay. What makes you so confident about that?

A.:   Because they were never a member of an LLC.

Povalaitis Dep. at 157:19-162:3.  Mr. Povalaitis' testimony in this regard thus demonstrates that Defendant MPD, while used by Mr. Chain as an instrumentality of the Investment Partnership, was in no way synonymous with the Investment Partnership.  MPD owned none of the Investment Partnership's properties, and Mr. Povalaitis identified MPD as being "his company," *i.e.,* only Mr. Chain's, with Mr. Chain's projects involving Mr. Gutzman ***not*** being undertaken under MPD's umbrella.

vi.     *Cottonwood Retail's Day-to-Day Operations Illustrate The Sham Nature of Investment Partnership Entities.*

1         Mr. Povalaitis additionally testified as follows with respect to the overarching

2  bureaucratic structure of the Investment Partnership:

3         MR. GIBSON:     How about Cottonwood Retail, LLC [?  D]id
       that entity, to your knowledge, ever have a separate office?

4

5         A.:    No.

6         Q.:    And when you conducted your management activities for
       Cottonwood Retail, LLC[,] from what office would you… perform
       those duties?

7

8         A.:    3900 South Hualapai Way.

9         Q.:    Is that the same office that Millennium Construction was
       officed through?

10        A.:    No, it would have been a different office. My own office. I
       had my own office when I worked for Jeff.  … It's a 20,000-

11        square-foot building. … Millennium Properties probably takes up
       500 square feet. Another entity takes up another 1,000.  Another

12        entity takes up 3,000.  I mean, it's all over the place.  There's not
       just one entity there.

13

14        …

15        Q.:    In this facility, were there a number of, for lack of a better
       word, Jeff Chain-related entities that … had offices in this 20,000-

16        foot structure?

17        A.:    Yes.

18        Q.:    … What entities do you remember had offices in this
       structure?

19        A.:    It would be Benchmark Realty, Millennium Commercial

20        Realty….

21        Q.:    … When you were acting as manager, either through KAN
       Investments or otherwise for any of these real estate venture LLCs

22        that we've been talking about all day long … or any related entity,
       would you ever engage in management activities from an office

23        other than an office located in this 20,000-foot center at 3900
       South Hualapai Way.

24        A.:    No.

25        Q.:    And when you did, therefore, you would only do it either
       through the Millennium Construction office or the Millennium

26        Properties office; correct?

27        A.:    Correct.

28

1

2

> Q.:     And in fact, you would, from time to time, … depending upon the time, engage in management activities from Millennium Properties' [and/or] the Millennium Construction office; correct?

3

> A.:     Correct.

4

5

> Q.:     And did you engage in these management activities from the Millennium Construction office after January of 2008, thereby abandoning your office activities from the Millennium Properties office?

6

> A.:     Correct, yes.

7

8

Povalaitis Dep. at 134:24-140:13.  Mr. Povalaitis' testimony in this regard demonstrates the

9

sham nature of the various Investment Partnership entities by exemplifying the porousness of the

10

boundaries between the Investment Partnership entities at even the level of assignment of office

11

space.  Further, Mr. Povalaitis' testimony demonstrates that the Investment Partnership entities

12

were all under the common control of Mr. Chain and the rest of the overarching association of

13

Investment Partners, headquartered in the same building with officers of one entity working out

14

of the office space of another entity.

15

> vii.     _Cottonwood Retail Paid Various Entities For Acting As "Consultant[s]," For "Development," And For Unknown Reasons._

16

17

Mr. Povalaitis provided significant testimony regarding unexplained payments among the

18

various Investment Partnership entities, demonstrating the fluidity with respect to which the

19

Investment Partners treated those entities:

20

21

> MR. GIBSON:     The 9-26-2007 payment … to Millennium Commercial for $161,000, it's your current understanding that your best memory is that that, again, is reimbursement for escrow?

22

23

> A.:     No. That might have been a development fee at that time.

24

> …

25

> Q.:     [A]t that time, do you have any memory of any development work that Millennium Commercial was doing?

26

> …

27

> A.:     I'd say no.

28

Q.:     So sitting here today, you have no real reason to believe that Millennium Commercial was to be compensated for any development work; correct?

A.:     Not that I know of, no.

Q.:     So apart from development work, do you have any memory of any other bases upon which Millennium Commercial would be paid $161,000?

A.:     As of right now looking at it, three years ago, I don't know, but I could.

…

Q.:     … [C]an you come up with any possible rational bases for why Millennium Commercial would be paid $161,000 on that date?

A.:     No, I cannot.

Q.:     … Did Cottonwood Retail, LLC have a business relationship with Millennium Commercial at this time of any dimension whatsoever?

A.:     Not that I recall, no.

Q.:     …When is the first time that you have any memory of Cottonwood Retail, LLC ever having a business relationship that would require some type of payment to Millennium Commercial during all of the time that you had any involvement whatsoever with … Cottonwood Retail, LLC?

A.:     I cannot think of any reason.

Q.:     Going to the 10-11-2007 entry associated with Innovative Assets, can you come up with any rational bases whatsoever for why that payment of $85,000 was made to Innovative Assets?

A.:     I cannot at this time.

Q.:     Did Cottonwood Retail, LLC have any business relationship with Innovative Assets that you can… recall at any level?

A.:     Only that Innovative Assets was a member B.

Q.:     And do you have any belief that status as a member allowed membership distributions to occur ahead of other members?

A.:     No.

Povalaitis Dep. at 222:21-224:19, 231:24-233:4.  Mr. Povalaitis' inability to explain payments made and received by Cottonwood Retail continued:

1          MR. GIBSON:      On 10-24, another payment was made to

2 Innovative Assets. Do you have … any understanding of why that payment would have been made of $78,782.31?

3          A.:     I do not.

4 Povalaitis Dep. at 236:15-19.  Thus, even though Mr. Povalaitis (and Mr. Povalaitis' own sham

5 entity, KAN Investments) acted as the manager of Cottonwood Retail, Mr. Povalaitis could not

6 explain the transfer of significant amounts of money between Cottonwood Retail and

7 Millennium Commercial Properties, Inc. or Innovative Assets, LLC.

8      Mr. Povalaitis also testified, with respect to money apparently reimbursed to Mr. Chain

9 from various Investment Partnership entities:

10          MR. GIBSON:     [C]an you explain to me what your thoughts

11 were as to the circumstances under which Jeff Chain, by way of Millennium Commercial, would be reimbursed escrow funds. I don't understand the concept.

12

13          A.:     A lot of times with development, the developer will front funds in the beginning before the cash comes in for whatever reason, for putting it into escrow, putting land into escrow, and then when the development closes, they get reimbursed. So he may have paid money out of Millennium Commercial to put down money that needed to be put in in early 2007, April of 2007, 'cause I think we put it in escrow in April of 2007 or April or May. I don't remember. So those would have been moneys that would have been Jeff's sitting there, and then eventually, when the property closed in September or  October, November—excuse me, August, September, those would have been paid back to him, refunded back to him, I'm assuming. I don't know. I'd have to look at my records …

14

15

16

17

18

19

20          …

21          Q.:     And that would not have been an unusual event associated with the template we've been talking about; correct?

22          A.:     No.

23          Q.:     So effectively—because as you said before, Cottonwood

24 Retail, LLC may not have been in existence at the time of putting down the down payment on the property; correct?

25          A.:     Correct.

26          Q.:    … [W]ouldn't it have made more sense to have Millennium

27 Properties and Development, Inc. make the down payment as opposed to Millennium Commercial under these circumstances?

28          A.:     ***I don't think it matters. …***

…

Q.:    *For these purposes, they are interchangeable?*

A.:    *Could have been me, could have been you. Just in a sense lending money until it gets going.*

Povalaitis Dep. at 215:6-216:24 (emphasis supplied).  The fronting of those escrow funds by Mr. Chain, MCP, or some other entity is inconsistent with any other business model other than an overarching general partnership, because no rational business purpose would otherwise exist for Mr. Chain (whom Mr. Povalaitis tellingly treated, in the above-cited testimony, as effectively interchangeable with MCP) to engage in fronting of escrow money for an entity that, on paper, would appear to be completely unrelated.  Mr. Chain appears to have treated MCP and MPD effectively interchangeably, further demonstrating the lack of regard of corporate boundaries by Mr. Chain and the rest of the Investment Partnership.  Also informative is that, despite Mr. Povalaitis being the president of Modern Management—the manager of, apparently, all of the single-asset real estate holding LLCs operated by the Investment Partnership—Mr. Povalaitis had no coherent explanation for the process by which Mr. Chain allegedly received repayment of escrow funds fronted by Mr. Chain and/or MCP.

> *viii.*    *Mr. Povalaitis Could Not Explain Innovative Assets' Role Or Why Innovative Assets Received Payments.*

Mr. Povalaitis further testified regarding the role of Innovative Assets, Inc. in the Investment Partnership's bureaucratic structure:

> MR. GIBSON:        … [D]o you remember Modern Management, Inc. being a manager for Innovative Assets?
>
> A.:    I don't really recall. … [Innovative Assets is] *Jeff Chain's personal holding company or I should say asset holding company* or whatever you want to call it. I don't know what the technical term is.

Povalaitis Dep. at 97:18-98:2 (emphasis supplied).  With respect to payments made by Cottonwood Retail to Innovative Assets, Mr. Povalaitis testified:

> MR. GIBSON:        … The January 1, New Year's 2008 payment to Innovative Assets on page 4961 for [$]8,125, do you have any memory of why—or any rational basis for why Innovative Assets would have been paid [$]8,125 on New Year's Day?

1    A.:     That would have been a development fee paid to Innovative
     Assets.

2
     Q.:     Was Innovative Assets contracted with by Cottonwood
3    Retail to do development work?

4    A.:     I believe through the development agreement… The
     development agreement between Cottonwood and Innovative
5    Assets and KAN Investments.

6    …

7    Q.:     Did Innovative Assets do development work that was the
     same as what KAN Investments was doing?

8    A.:     No.

9    Q.:     So Innovative Assets, by exclusion, was doing other
     development work; correct?

10
     A.:     No. It was the same. Divvied up in different ways. I'd have
11   to look at the development agreement to tell you how the
     responsibilities were divided.

12
Povalaitis Dep. at 245:25-247:5.  Innovative Assets' business thus appears to have constituted

13
some sort of vague and redundant "development work" in conjunction with other Investment

14
Partnership entities.  The fact that Innovative Assets entered into a "development agreement"

15
with Cottonwood and KAN Investments further demonstrates that Innovative Assets,

16
Cottonwood, and KAN Investments were all ultimately entities that were instrumentalities of the

17
overarching association of individuals constituting the Investment Partnership.

18

19

20

21

22

23

24

25

26

27

28

ix.      *Mr. Povalaitis Received "Management" And/Or*
         *"Consulting" Payments Through KAN Investments.*

The check registers for Cottonwood Retail, LLC indicate that Cottonwood Retail made payments to KAN Investments, an entity owned by Mr. Povalaitis.  Mr. Povalaitis testified regarding these payments:

> MR. GIBSON:        … What would be… the earliest time that KAN Investments would be paid any moneys for any purpose by another entity or person?
>
> A.:      September of 2007, there [were] payments made… from Cottonwood to KAN.
>
> Q.:      Okay. For what purpose? Do you know?
>
> A.:      A management fee.  And before you say that, consultant fee, because now you're going to say it wasn't a manager. But it was a consulting fee so—
>
> Q.:      … Was it a management fee?
>
> A.:      No, it wasn't a management fee. It was a consultant fee.
>
> Q.:      Was it ever, to your knowledge, described as a management fee?
>
> A.:      I don't know how to answer that, Steve. …  I look at it as a management fee. … But KAN Investments was not a manager, so it was not technically a management fee, but I look on it as a management fee 'cause it was just being paid to my company versus me. That's all.
>
> …
>
> Q.:      But irrespective of who was the manager, KAN [I]nvestments got paid effectively a management fee; correct?
>
> A.:      Correct.

Povalaitis Dep. at 68:23-70:11, 71:17-20.  Mr. Povalaitis testified further regarding those "management fees":

> MR. GIBSON:        Between September 2007 and January 2008, were you ever compensated directly or indirectly in your role as effective comanager of Cottonwood?
>
> A.:      Yes.
>
> Q.:      And were those management fees paid to KAN Investments?

A.:     Yes.

Q.:     About how much money between September 2007 and January 2008 was paid by Cottonwood to… KAN Investments for these management fees?

A.:     [$]12,000 a month.

…

Q.:     How many employees, between September 2007 to January of 2008, did KAN Investments have?

A.:     None.

…

Q.:     So technically, KAN Investments wasn't doing anything as a business; correct?

A.:     Correct.

Povalaitis Dep. at 74:7-75:1, 76:9-11.  Clearly KAN Investments, like Modern Management, was another undercapitalized sham entity created to allow members of the Investment Partnership to attempt to avoid personal liability.  KAN Investments was also another instrumentality of the overarching association of individuals constituting the Investment Partnership, acting in this case as the putative manager of Cottonwood Retail.

x.       <em>Modern Management And Innovative Assets Engaged In Business Unknown To Mr. Povalaitis.</em>

Notwithstanding Mr. Povalaitis' (and/or KAN Investments') nominal role as the president of Innovative Assets' manager Modern Management, Mr. Povalaitis displayed a remarkable lack of knowledge and/or candor regarding Mr. Povalaitis' duties in this regard.  Mr. Povalaitis testified, for example, regarding the balance sheet of Defendant entity 3900, LLC:

MR. GIBSON:      Would this be an unusual document as a balance sheet for 3900, LLC, as far as you can tell?

A.:     As far as I can tell. … [i]t would not be unusual.

Q.:     Under liabilities and equities, the second line from the bottom says "Due to/from Innovative, $202,945.79." Do you have any understanding of why Innovative would be due that money?

A.:     I have no idea.

Q.:     Would you have been the manager of Innovative Assets by way of the president of Modern Management, Inc. at this time?

A.:     Yes.

Q.:     And in fact, based upon the prior exhibit that I showed you, you did more than merely act as someone who communicated for lending purposes. You, in fact, signed documents of transfer authority, didn't you?

A.:     Yes.

Q.:     So your prior testimony today that the only thing that you did for Modern Management, Inc. was to effect lending communications was inaccurate, wasn't it?

A.:     Not at the time that I gave that, no. I think it's accurate. … At the time that you asked me that earlier today, that's what I still believe—even to this moment I believe. Since I—you know, if I signed something transferring that, the only reason I did that is because I was the president of Modern Management and was the manager at that particular entity. So I'm saying to me, that's not a duty or a responsibility. That's just—it is what it is.

Q.:     All right. So executing material documents on behalf of the company is not something that you consider to be part of your duties, then.

A.:     No, I did not.

Q.:     Okay. But you understand that that's something that you did now; correct?

A.:     I do now, yes.

Povalaitis Dep. at 256:13-258:8.

Additionally notwithstanding Mr. Povalaitis' (and/or KAN Investments') role as the president of Modern Management, the entity designated as manager of Innovative Assets, Mr. Povalaitis' examination during Mr. Povalaitis' deposition of Benessere's check registers indicated that payments had been disbursed to Innovative Assets of which Mr. Povalaitis apparently had no knowledge, as demonstrated below:

MR. GIBSON:        There's a payment to Innovative Assets  of $100,000, and then a few lines down on 12-13-2006, there's another line item of $170,000 associated with Innovative Assets, and then on 2-14, there's another $100,000 reference to Innovative Assets. Do you have any understanding or knowledge of why these amounts were reflected on this account quick report?

A.:     I don't.

Q.:      And so as president of Modern Management, Inc. that managed Innovative Assets, LLC, you would have no knowledge of what was happening here; correct?

A.:      Correct. …

Povalaitis Dep. at 206:12-207:1.  Mr. Povalaitis' lack of knowledge of Modern Management and Innovative Assets affairs became even clearer upon the following testimony:

MR. GIBSON:          … [C]an you explain to me the amount on page 2395. In relationship to the $19 and $81, you decided that it's good to be a class B member for $81 and a class B member for $19 and a class A member for $4,075,000 through Innovative Assets?

A.:      Did I think so?

Q.:      Yeah.

A.:      ***I have no idea. I didn't make those decisions for Innovative Assets.***

Q.:      Well, you're … the listed name of contact here in the manager; right?

A.:      Manager through Modern Management.

Q.:      Right. And you were the president of Modern Management; right?

A.:      Correct.

Q.:      And you're the only listed name on these sheets; correct?

A.:      Correct.

Q.:      But you had nothing to do with this; correct?

A.:      Nothing. … I don't own Innovative Assets at all.

Q.:      But you signed on behalf of them.

A.:      … As president of Modern Management.

Q.:      So do you have any memory of being directed … to execute these documents?

A.:      Oh, I'm sure I was.

Q.:      Okay. By who?

A.:      Jeff Chain.

Q.:      Okay. As president.

A.:      Of Modern Management?

-85-

Q.:   Right.

A.:   Yes.

Q.:   So once again, as president of Modern Management, you did much, much more than merely speak to lenders; correct? We see evidence now of you executing a myriad of documents; correct?

A.:   True.

Q.:   To bind the company; correct?

A.:   Correct.

Povalaitis Dep. at 259:14-262:12.  Mr. Povalaitis finally admitted to Mr. Chain's effective control of Modern Management upon further questioning regarding documents signed by Mr. Povalaitis:

MR. GIBSON:      Okay. Was this another document that you signed at the direction of Jeff Chain?

A.:   Yes.

Q.:   And when he told you to sign something, you didn't really question it; correct?

A.:   Not really, no.

Q.:   You were almost a rubber stamp puppet for him on these— this kind of circumstance effectively?

A.:   In a sense, yes.

Povalaitis Dep. at 265:13-22.  This testimony by Mr. Povalaitis lays bare the artifice created by the Investment Partnership of a management structure for the real-estate-holding limited-liability companies involving Modern Management and Innovative Assets.  Mr. Povalaitis, despite nominally having authority over both of those entities, actually knew nothing about elements of those entities' business and agreed that Mr. Povalaitis acted merely as "a rubber stamp puppet" for Mr. Chain in controlling those entities.  This testimony demonstrates clearly that ***the Investment Partnership constituted an overarching bureaucratic structure controlled by an overarching association of individuals acting for a common business purpose***:  *i.e.,* a *de facto*

general partnership including, at a minimum, all of the individuals and entities described in Mr.

Povalaitis' above-excerpted testimony.

xi.    *The Investment Partnership Solicited Investments From*

*Mr. Povalaitis.*

Mr. Povalaitis testified with respect to Mr. Chain's solicitation of Mr. Povalaitis (and

KAN Investments) as an investor in Cipriani and Cottonwood Retail:

> MR. GIBSON:     … [W]hen you made the investment in [one
> of the Cipriani Buckeyes], did you understand that you were
> speaking with Mr. Chain as a representative of that particular
> entity and only that entity or generally Jeff Chain with respect to
> his general construction of a bunch of LLCs?
>
> A.:    I don't think I have—I don't think I distinguished between
> either one of those.
>
> Q.:    …You just understood that Jeff Chain was organizing the
> investments in an array of entities; correct?
>
> A.:    Correct.
>
> Q.:    … [D]id you ever hear Jeff Chain represent to anybody that
> he is exclusively the representative of one of these particular LLCs
> when he discussed investments?
>
> A.:    No.
>
> …
>
> Q.:    **When did you first learn which parcel was owned by the
> entity that you invested in?**
>
> A.:    I don't recall. … **I think it was 2005 when I knew which
> one it was.**

Povalaitis Dep. at 123:23-124:14, 179:15-184:18 (emphasis supplied).  Mr. Povalaitis' testimony

in this regard is thus entirely consistent with that of all the other witnesses deposed by Plaintiffs

to date:  **investments were not offered in the name of any particular LLC, but, rather, were

apparently only offered by the Investment Partnership itself.**

-87-

g.   ***The Janga Experience***

i.   <u>*Mr. Janga Could Not Explain The Convoluted Investment*</u>

<u>*Partnership Hierarchy Of Sham Entities.*</u>

Mr. Janga is apparently the manager of one or more of the Investment Partnership's

multitude of sham Cipriani-denominated entities, including Cipriani Investments, LLC.  Which

entity or entities Mr. Janga manages, and whether such management is direct or indirect, is by no

means clear, even to Mr. Janga, as demonstrated by the following testimony:

> MR. GIBSON:       So is it fair to say that the only other entity
> that you believe that you are currently the manager of is Cipriani
> Investments, LLC personally and directly.  Correct? Other than the
> other four entities we talked about, being Water Resources, CRCG,
> Lot 130, LLC; and Gila Bend 70, LLC. Correct? You have no
> knowledge of any other entity or by any number that you might be
> a manager of today, correct?
>
> A.:       Correct. And I want to go back and clarify one of the
> things. I'm not 100 percent sure if I am the manager of Gila Bend
> 70, LLC. It could be that Cipriani Investments is the manager of
> Gila Bend. Just a correction.
>
> …
>
> Q.:       I don't want you to guess. I'm asking you in your view—
> you've already testified that you have done everything that you felt
> reasonably appropriate to discharge your job as a manager.
> Correct?
>
> A.:       Yes.
>
> Q.:       And I'm asking you whether or not you feel in discharging
> your job as a manager, at a minimum, that you should know the
> entities that you're a manager of?
>
> A.:       Yes.

Janga Dep. at 22:20-23:7, 25:14-22.  Despite this testimony by Mr. Janga that part of Mr. Janga's

managerial duties include knowing the entities of which Mr. Janga is a manager, Mr. Janga

experienced considerable difficulty in articulating the relationships between the various Cipriani-

denominated entities:

> MR. GIBSON:       … [Y]ou've indicated that Cipriani
> Investments, LLC is a manager of Cipriani Management, LLC.
> Correct?
>
> A.:       Yes. As I can remember. It's been a while since I looked
> into it or—but I think I'm recollecting correctly that Cipriani

1    Investments is the manager of Cipriani Management, LLC. It's
been a while since these were formed.

2    Q.:    You understand as of today you are the manager.  Correct?

3    A.:    Of?

4    Q.:    Cipriani Investments, LLC.

5    A.:    Yes.

6    Q.:    So regardless of when they're formed… is it your
testimony that you are in your mind adequately discharging the
7    duties and job of being a manager of Cipriani Investments, LLC
today?

8

9    A.:    Yes.

10   …

11   Q.:    Yet, sitting here today you cannot tell me whether or not
Cipriani Investments, LLC is the manager of another entity.
12   Correct?

13   …

14   A.:    I didn't say that. … I said as far as I can remember,
Cipriani Investments is the manager of Cipriani Management,
15   LLC.

16   …

17   Q.:    Fantastic. So sitting here today, then, Cipriani Investments,
LLC is the manager of Cipriani Management, LLC. Correct?

18   A.:    Correct.

19   …

20   Q.:    Are you currently the manager of Cipriani Management
Consultants, LLC?
21

22   A.:    Not sure.

23   Janga Dep. at 26:4-27:15, 28:17-20, 60:16-18.  Mr. Janga further expressed a lack of knowledge

24   of any practical difference between the various Cipriani entities:

25   MR. GIBSON:        When you talked with Dana Corbo on the
phone, was the topic of that telephone conversation in all or in part
26   Cipriani Management, LLC?

27   A.:    The conversation I had with Dana Corbo was about
Cipriani project.  [*Sic.*]
28

…

-89-

1    Q.:    … I'm asking you whether or not in the scope of your
2    management, whether or not you talked about the management of
Cipriani Management, LLC?

3    A.:    I don't pick up the phone and talk to him about Cipriani
4    Management or Cipriani. It's about Cipriani project.  [*Sic.*]

5    Janga Dep. at 31:18-32:9.  Overall, despite Mr. Janga's management role within some Cipriani

6    entity or entities, Mr. Janga demonstrated little more than sheer ignorance of the apparently-

7    convoluted Cipriani corporate hierarchy, as evidenced by this somewhat lengthy line of

8    questioning:

9    MR. GIBSON:    What's the business of Cipriani
10    Management, LLC?

11    A.:    It is part of Cipriani project, which is Cipriani, LLC.

12    Q.:    So the business of Cipriani Management, LLC is to be part
of Cipriani, LLC? …

13    A.:    I think I understand the question. … Cipriani, LLC;
14    Cipriani Management, LLC are all formed for the operation of
Cipriani project. Again, I'm not an expert in the corporate
15    structure. It was formed, and my understanding is Cipriani
Management is part of the Cipriani project.

16    Q.:    Well, okay. That's not my question. You effectively,
17    through Cipriani Investments, LLC, are the manager of Cipriani
Management, LLC. Correct?

18    A.:    Correct.

19    Q.:    And you understand that Cipriani Management, LLC has a
20    purpose. Correct?

21    A.:    Yes.

22    …

23    Q.:    Okay. And as you're testifying that Cipriani Management,
LLC is not merely an irrelevant entity that you can sweep under
24    the rug with any other entity, it has an independent business
purpose. Correct?

25    A.:    I think so.

26    Q.:    Well, you're the manager. Right?

27    A.:    Yes.

28    Q.:    So if you don't know, not a whole lot of people in this
world are going to know. Right?

…

A.:     As I said, Cipriani project has different LLCs formed for that project.

…

Q.:     … You understand that by way of Cipriani Investments, LLC, that you're the current manager of Cipriani Management, LLC, right?

A.:     Yes.

Q.:     As manager you probably understand that you should understand the business purpose of the company you manage. Correct?

A.:     Yes.

Q.:     So I'm asking you very straightforwardly, sir, what is your understanding of the independent business purpose of Cipriani Management, LLC? Since you've already testified that you must know it.

A.:     As I said, I have to guess. I'm not 100 percent sure how the corporate structure is.

…

Q.:     … Do you have to guess in order to give me what your understanding of the independent business purpose is of Cipriani Management, LLC? Is that fair?

A.:     Yes.

Janga Dep. at 62:12-64:15, 65:9-22, 66:8-18.  The utter befuddlement of Mr. Janga—a ***manager*** of some entity or combination thereof in the Cipriani daisy chain—at the structure of the various Cipriani entities and the business purposes therefor demonstrates amply that the various Cipriani entities are no more than shams.

Another example of Mr. Janga's confusion is Mr. Janga's lack of knowledge of whether or not Mr. Janga played any management role with respect to yet another Cipriani-denominated entity, Cipriani Land Holdings, LLC:

MR. GIBSON:      Were you ever a manager of Cipriani Land Holdings, LLC, directly or indirectly?

A.:     I don't know.

Q.:     Okay. You don't know. Is it possible?

A.:    Directly, I know for sure I'm not.

Q.:    What about indirectly? … You are a manager of Cipriani Investments, LLC, that is a manager of Cipriani Management, LLC.  I'm going to take that as [an] indirect level of management. Do you understand that example?

A.:    Yes.

Q.:    So I'm asking you, do you have any knowledge here sitting today that you are indirectly a manager of Cipriani Land Holdings, LLC or ever have been indirectly a manager of Cipriani Land Holdings, LLC?

A.:    I don't know.

Q.:    So you don't know[. … L]et me ask the question a different way. Do you have any reason to believe sitting here today that you may have at any time been indirectly a manager of Cipriani Land Holdings, LLC?

A.:    Could be.

Q.:    It's possible?

A.:    It's possible.

…

Q.:    … Do you have any knowledge that you can provide me, not hypothetically, as to which entity you believe would be the possible entity that would have been the manager of Cipriani Land Holdings, LLC that you would have thereupon have been the indirect manager through? Do you understand that question?

A.:    I don't know. I understand the question. I don't know the answer.

Janga Dep. at 68:22-69:22, 71:2-12.  Thus, despite being *a manager* of some Cipriani entity or entities, Mr. Janga could not explain the management structure of those entities.

Ultimately Mr. Janga attempted to explain Mr. Janga's general references to "the Cipriani project," which apparently is Mr. Janga's only frame of reference for Cipriani structure

MR. GIBSON:    What's the Cipriani project? I don't understand what you're referring to. Can you help me out there? You testified to it a couple times.

A.:    Sure. As it stands today, it's—I'm not 100 percent sure, it's 22- or 2300 acres of land in Buckeye.  Part of it is agricultural and part is raw land.

Q.:    So the Cipriani project in your view is about 2300 acres of land. Correct?

1    A.:    Correct.

2    Q.:    Okay. Do you have an understanding of which entity owns
3    that 2300 acres of land? Go ahead. You can answer that question.

4    A.:    I don't know. … I don't know the corporate structure of
     how the 2300 are held in either Cipriani, LLC or Cipriani Land
5    Holding, LLC.

6    …

7    Q.:    You have no doubt that you are at least indirectly a
     manager of Cipriani, LLC. Correct?

8    A.:    Correct.

9    Q.:    So is it fair to say, then, that in your position as manager of
     Cipriani, LLC, you don't know whether or not you are managing
10   those 2300 acres on behalf of Cipriani, LLC?

11   …

12   A.:    The 2300 acres are either in Cipriani, LLC or Cipriani Land
     Holdings, LLC, and I'm the manager of Cipriani, LLC, indirectly
13   managing that project.

14   Q.:    Okay. But I—let me understand then. Even if Cipriani,
     LLC doesn't own those acres, Cipriani, LLC is somehow
15   managing those acres irrespective of whether they own it?

16   …

17   A.:    I don't know.

18   …

19   Q.:    … And you don't know if Cipriani Land Holdings owns
     that land. Correct?

20
21   A.:    Correct.

22   …

23   Q.:    … [I]rrespective of whether or not Cipriani, LLC owns the
     land, which you're just not sure of, is it your understanding that
24   Cipriani, LLC nevertheless manages that land?

25   A.:    Yes.

26   Q.:    … Does Cipriani Land Holdings join, in your
     understanding, Cipriani, LLC in the management of that 2300
27   acres?

28   A.:    I guess.

1      Q.:    I'm not asking you to guess. If you have to guess, then
       please tell me you don't know.

2      A.:    I don't know.

3      Janga Dep. at 73:21-75:12, 76:5-77:6.  Mr. Janga's testimony clearly demonstrates that the daisy

4      chain of sham companies constructed by the Investment Partnership was so convoluted,

5      extensive, and gratuitous that even the people charged with the administration of that web of

6      entities could not explain it.

7              ii.       *Mr. Janga Acknowledged Conflicts Between Cipriani*

8                        *Members.*

9          Mr. Janga testified that Cipriani members might not always be in agreement with respect

10     to every decision those members voted on:

11     MR. GIBSON:        My question is whether you have any
       memory at any time whether or not there was uniform consensus

12     amongst all the members with respect to any given vote.

13     A.:    No.

14     …

15     Q.:    There's two alternatives here. A memory of … completely
       uniform voting on the one hand, as opposed to occasions where

16     there were not uniform voting on the other hand; i.e., … at least
       one member didn't vote with the remainder?

17     A.:    Yes.

18     Q.:    As I understand… it could have happened, but you have no

19     memory of there being an occasion with Cipriani where there was
       absolutely uniform voting. Is that right?

20     A.:    Yes.

21     …

22     Q.:    Do you have any reason to believe that whenever you

23     interfaced with another member at Cipriani and talked to them
       about their opinions about what's a good or bad decision for the

24     company, that anyone was ever of the opinion that their view was
       other than what was in the best interests of the company?

25     A.:    No.

26     Q.:    While there was differences of opinion about what in their

27     view would be in the best interests of the company, you have no
       reason to believe anyone ever held an agenda other than what they

28     felt was in the best interest of the company. Correct?

A.:     Correct.

Q.:     But it's clear that there were from time to time differences of opinion about what was in the best interest of the company, based on your interface with members. Right?

A.:     I guess.

Janga Dep. at 93:8-94:15, 95:24-96:16.

iii.     *Mr. Janga Recognized That Mr. Massi's Interests Might Conflict With Other Cipriani Members' Interests.*

Mr. Janga testified regarding Mr. Janga's interactions with Mr. Massi, whom Mr. Janga understood to be one of Cipriani's attorneys in this litigation:

MR. GIBSON:     Do you know Al Massi?

A.:     Yes. … Before I was the manager, he was—I met him at one of the member meetings.

…

Q.:     On how many occasions have you interfaced with Mr. Massi? … No time frame.

A.:     …Probably four or five times.

Q.:     Okay.  And in those times you never understood that you ever were speaking with Mr. Massi as Cipriani's attorney. Correct?

A.:     He was not the Cipriani attorney until—I have to guess 2009.

Q.:     … In the times that you spoke with him… was it your understanding that he was speaking with you as the Cipriani attorney?  In the capacity as the Cipriani attorney as opposed to a member, just merely being a member?

A.:     Correct. Just being a member.

Q.:     …But is it also your testimony that it's possible that you just don't know that he was also acting as an attorney for Cipriani at the time?

A.:     No, I knew. ***I knew that he was the Cipriani attorney when he was defending the lawsuit or when we—of those four or five occasions, maybe once I met him at the members meeting when he was the Cipriani attorney.***

Janga Dep. at 97:15-98:24.  Mr. Janga testified regarding the Cipriani voting procedure and Mr. Massi's participation therein:

-95-

1    MR. GIBSON:        And you do remember that Mr. Massi would vote on issues from time to time?

2    A.:    When the vote goes out to the members, we get the ballots

3    back and we have the administrative staff who get those votes either by fax or by mail. I'm not sure about the Email [*sic*]. If it is,

4    they might have got it.  They tally up the votes, and they tell us where we stand on a specific item that we want them to vote for.

5    ...

6    Q.:    And I'm not asking you whether he voted in the majority or the minority.

7

8    A.:    Correct.

9    Q.:    But I understand your testimony that you're sure he's voted at some point.

10   A.:    Yes.

11   Q.:    And since you have no memory of there being a completely

12   uniform vote, he was either in the minority or the majority on those votes?

13   A.:    Correct.

14   Q.:    That's all my question was. Do you have any memory of ...

15   any member vote taking place while Mr. Massi was also counsel for the company? Whether he voted or not, I'm not asking. ***Do you***

16   ***have any memory of a member vote taking place while Mr. Massi was also acting as attorney for the company?***

17   A.:    Acting as an attorney for this lawsuit?

18   Q.:    No. Acting as an attorney for the company.

19   A.:    ***Yes.***

20   Q.:    Okay. Do you have memory that Mr. Massi was acting as

21   the attorney for the company independent of the representation of the company with respect to this lawsuit?

22   A.:    No.

23   Q.:    Okay. Do you have any memory of Mr. Massi participating

24   in a discussion or vote as a member while he was also an attorney for the company, Cipriani?

25   A.:    As I said, he might have voted, because I don't see—I'm

26   sure he voted.

27   Janga Dep. at 104:6-106:4 (emphasis supplied).  Mr. Janga thus admitted the obvious facts that:

28   (a) Cipriani members may not always have the same opinion regarding the best course of action

for the company, (b) Mr. Massi is a voting Cipriani member, and (c) *since no Cipriani member vote has ever been unanimous, Mr. Massi must have a difference of opinion with at least some Cipriani member with respect to every matter that has come up for a Cipriani members' vote.*

Mr. Janga testified that, irrespective of what Mr. Janga's views might have been of Mr. Massi's potential conflict of interest, Mr. Corbo effectively made the decision on behalf of Cipriani to retain Mr. Massi as litigation counsel:

> MR. GIBSON:        I'm asking you personally whether you feel as a manager, in managing the company against possible conflicts of interest at any level, whether Mr. Massi may have a view as a member, in his own interest preservation as a member, that may differ from what he believes is strategically appropriate in the provision of legal services to the company?
>
> …
>
> A.:    I don't know.
>
> Q.:    Do you understand that Mr. Massi's firm is, in fact, getting paid for his work?
>
> A.:    Yes.
>
> …
>
> Q.:    And therefore you understand that … Mr. Massi has an interest in getting paid for his legal services. Correct?
>
> A.:    I suppose.
>
> Q.:    Okay. Was it your decision to have narrowly limited discovery to save costs on the Kabins litigation?
>
> A.:    I don't know.
>
> Q.:    You don't know? You don't know if it was your decision?
>
> A.:    It was not my decision.
>
> …
>
> Q.:    Did you agree with the decision?
>
> A.:    I left it up to Dana Corbo. Since he's a legal attorney, he understands more about the lawsuit than I do.
>
> Q.:    So … are you testifying that you delegated your job as manager to Mr. Corbo with respect to the determinations as to how best for the company to manage litigation? Is that right?

-97-

1   A.:     I relied upon his advice as to what's the best for the company because of his legal expertise.

2   Q.:     So … whatever Mr. Corbo decided with respect to the litigation, you automatically voted in favor as a manager of whatever Mr. Corbo decided with respect to litigation. Is that right?

3

4

5   …

6   A.:     I got his advice as to what's the best for the company with relations to … the legal work.

7   Q.:     … You understand as a manager you have to make a decision along with Mr. Corbo. Correct?

8

9   A.:     Correct.

10  Q.:     Okay. And as a manager you have a vote as to what happens at a managerial level. Correct?

11  A.:     Correct.

12  Q.:     I'm asking you whether or not … even though you got advice from Mr. Corbo, whether or not you abdicated your role as manager and did not make a decision based upon that advice one way or the other with respect to the conduct of the litigation?

13

14

15  A.:     I relied upon his advice and agreed with him as to the best course based on his advice.

16  Janga Dep. at 114:16-117:7.  Mr. Janga testified further:

17  MR. GIBSON:         You've testified this afternoon that Mr. Massi -- you don't know how much he's getting paid, you have no idea how much he's getting paid, but that Mr. Massi was not merely contributing his legal services for the sake of the company, that he was, in fact, doing it as a business person, getting compensated as any other lawyer gets compensated for legal services, but at a rate you don't know. … The other thing you have testified to is that Mr. Massi, during all this period of time, was also a member with his own ability to vote on company issues and had the right to do so, which I understand. You also indicated during this line of testimony that you have no knowledge that Mr. Massi ever recused himself from a vote, which means that he indicated that he could not vote because there would be a conflict of interest. You have no memory whatsoever that Mr. Massi ever … sought a waiver of any conflict of interest from anybody, to your knowledge, whereby he said that, to the extent that I have membership interests that would conflict with the best interests of the company from the majority vote, that people respect that I'm still going to be acting as counsel. You have no memory of that?

18

19

20

21

22

23

24

25

26

…

27

28  A.:     … I didn't ask for a waiver.

1    Janga Dep. at 118:16-121:15.  Later, Mr. Janga testified regarding issues concerning this

2    litigation:

3                    MR. GIBSON:           Do you have an understanding that this
                  litigation exposes the company, at least by way of legal fees, to
4                 potentially significant financial circumstances?

5                    A.:    Yes.

6                    Q.:    So is it fair to say then that this would be part of that type
                  of subject matter, even if it wasn't a vote, that you felt it would be
7                 appropriate as a manager to receive some level of membership
                  input on?
8
                     A.:    Sure.
9
                     …
10
                     Q.:    … [I]ndependent of sending it out for a vote, there would
11                be certain occasions where you would seek the informal input of
                  members. Correct?
12
                     A.:    I want their opinion about things that are going on in the
13                company, yes.

14                   …

15                   Q.:    … And we added Al Massi to the list of people that you
                  had these informal conversations with. Correct?
16
                     A.:    Sure.
17
                     …
18
                     Q.:    … [I]t's your understanding that it's the role of Mr. Massi,
19                very simply, to provide the company with guidance as to how to
                  conduct the legal aspects of a litigation?
20
                     A.:    Sure.
21
                     Q.:    Is it your understanding that Mr. Massi has an ability to
22                vote as a member on any issues that arise with respect to the
                  litigation that's different from whatever guidance he might give
23                you as counsel?

24                   …

25                   A.:    As a member, he has the right to vote.

26                   Q.:    So the answer is yes?

27                   A.:    Yes.

28

Janga Dep. at 206:8-16, 216:15-217:1, 220:15-221:14, 224:8-225:5.  Mr. Janga's testimony thus exemplifies Mr. Massi's inherent conflict of interest in representing the Massi-Represented Entities:  Mr. Massi's opinion as a member regarding the best course for the companies in this litigation, and indeed whether or not to continue to employ Mr. Massi as counsel, may differ from the opinions of other members, but as litigation counsel for the Massi-Represented Entities, Mr. Massi apparently has unfettered discretionary authority, with limited oversight from managers (or effective managers) Dr. Moehrle, Mr. Corbo, and Mr. Janga, for determining the course of this litigation.

> *iv.*     *Cipriani's Day-To-Day Operations Demonstrate The Sham Nature of The Various Investment Partnership Entities.*

Mr. Janga's testimony regarding Cipriani's day-to-day operations makes clear that the various Cipriani entities are, like other entities set up to be instrumentalities of the Investment Partnership, undercapitalized, employee-less, office-less shams.  Mr. Janga testified with respect to Cipriani's day-to-day operations:

MR. GIBSON:        … Does Cipriani have an office?  The LLC?

A.:      The LLC office is—where the books are kept? Is that what you're referring to as an office?

Q.:      You tell me.  Does it have an office?

A.:      The office where our bookkeeper and our administrative person sits is—I think that's the office.

Q.:      So the answer in your view is yes. Right?

A.:      Yes.

Q.:      … Where is that office?

A.:      I don't know the address but it's on Hualapai and 215.

Q.:      Does Cipriani have any employees?

A.:      No.

…

Q.:      Do you keep an office there, at least a visiting office?

A.:      No.

Q.:     Does Mr. Corbo?

A.:     No. … There is just one room where the bookkeeper and the administrative person sits, and … they receive the mail for Cipriani.

…

Q.:     … How big is this office space that Cipriani, LLC maintains at Hualapai and 215?

A.:     20 by 10. 200 square feet.

Q.:     Does Cipriani own this office space?

A.:     No.

Q.:     Does Cipriani lease this office space?

A.:     I don't think Cipriani leases the space.

Q.:     Does Cipriani make any payments to anyone for this office space?

A.:     We pay the administrative person or the bookkeeper there, and she is—she receives the mail there.

…

Q.:     Does Cipriani share this bookkeeper with other companies for the bookkeeping services?

A.:     I don't know.

Q.:     Does Cipriani keep this bookkeeper engaged full-time for bookkeeping services?

A.:     She charges the amount of time she spends on Cipriani. … She's a consultant to Cipriani and she charges the amount of time she spends keeping the books, and we pay for that.

…

Q.:     … Do you know any other company that this bookkeeper provides services to?

A.:     Yes. … Benessere and Lot 130 until last year.

Q.:     Okay. What's this bookkeeper's name?

A.:     Susan Licata… .

Q.:     How about the administrative assistant? Is it the same situation with the administrative assistant, that the administrative assistant provides part-time services to Cipriani as well as other companies?

A.:     Part-time for Cipriani. I don't know what other companies she provides services to. … There are two of them.

Janga Dep. at 135:23-145:5.  Mr. Janga's testimony is thus consistent with that of Mr. Povalaitis regarding the Investment Partnership's apparent lack of any effort at all to maintain the separateness of identities between any of the entities falling under the Investment Partnership's administrative structure.  The various Cipriani entities are merely sham entities, among a plethora of sham entities, that share the same office space and personnel without any practical distinction between any of the involved entities.

v.      *Mr. Massi's Legal Assistant Is A Cipriani Administrative Assistant As Well.*

Immediately following the testimony quoted above, Mr. Janga testified:

Q.:     Two administrative assistants?

A.:     Well, at one point Christine Thornton was the administrative assistant, and she does some of it, and the other person is Valerie. … Valerie Soto.

…

Q.:     You indicated in prior testimony that staff would conduct the processes with respect to bringing votes in and calculating those votes. Do you remember that testimony?

A.:     Yes.

Q.:     Okay. Who is that staff?

A.:     Christine Thornton and Susan Licata. Mostly Christine Thornton.

Q.:     Has Valerie Soto ever been involved in the processes that you've just described as well?

A.:     Yes.

Janga Dep. at 145:6-13, 248:2-12. Upon Mr. Janga's testimony that Valerie Soto, Mr. Massi's legal assistant, is an "administrative assistant" for Cipriani, Mr. Janga testified further:

MR. GIBSON:         … [D]o you have any reason to believe that the [e-mail] address that is … indicated as of November 15, 2011, mamasoto@yahoo.com, is not the proper address for Cipriani, LLC?

…

A.:     Oh, this is, mamasoto@yahoo.com, if it is Valerie's, then that's where she's doing some administrative work.

Q.:     … Do you have any reason to believe that that is an inaccurate depiction on the company letterhead of the company's [e-mail] address?

A.:     No.

…

Q.:     Do you have any idea why the company's [e-mail] address is the same [e-mail] address as your legal counsel's address?

…

A.:     I don't know.

Q.:     Would it surprise you to learn that it's identical?

…

A.:     I don't know. … I haven't seen the [e-mail] address you're referring to.

Q.:     Assuming that it's the same, would it surprise you if it's the same?

…

A.:     No.

Janga Dep. at 150:14-24, 155:4-22.  Mr. Janga was thus unsurprised to learn that the very e-mail address provided for Cipriani investors was that of Mr. Massi's legal assistant, whose services Mr. Massi appears to be sharing in some manner with Cipriani.  It is apparent from this testimony that **_Mr. Massi is thus also part of the overarching association in control of Investment Partnership business_**—Mr. Massi takes administrative responsibility for Cipriani to the extent of actually providing Cipriani with the services of Mr. Massi's administrative assistant.

                    *vi.*          <u>The Investment Partnership Solicited Mr. Janga's Investment.</u>

Mr. Janga testified regarding the circumstances by which Mr. Janga became an Investment Partnership investor:

MR. GIBSON:          … At the time that you met with Jeff Chain first … [d]id Mr. Chain indicate that there was a specific….

1    limited[-]liability company by name that you could make an
     investment in?

2    A.:    Yes.

3    Q.:    … Which one?

4    A.:    I don't remember.

5    Q.:    Did he indicate that there was only one possible limited
6    liability company that you could acquire a membership interest in
     at that time?

7    A.:    No.

8    Q.:    Was it your understanding that along that six-month period
9    of time that there might be a couple choices for you to make
     investment acquisitions in?

10   A.:    Correct.

11   Q.:    … [I]s it fair to say that Mr. Chain was never indicating to
12   you that he was merely representing one LLC with respect to you
     being able to acquire a membership interest in?

13   A.:    Correct.

14   …

15   Q.:    Do you remember him taking the time to specify in any
16   particularity whatsoever a formal affiliation with an entity at the
     time of this meeting?

17   A.:    Not really.

18   …

19   Q.:    … [W]hen was the first time that you learned the name of
20   the limited liability company that you acquired your first
     membership interest in with respect to any investment company
     related to Jeff Chain?

21
22   A.:    When I decided to invest, he told me which company I
     need to write the check to. It was Buckeye something. …

23   Q.:    So this was at the end of the six-month process that you
     talked about?

24
25   A.:    Again, six months, seven months. Somewhere in that
     ballpark.

26   Q.:    I'm asking you, you said when you decided to invest. It
27   was effectively the time that you decided to actually cut the check.
     Right?

28   A.:    Correct.

Janga Dep. at 168:6-172:14, 188:19-189:8.  Mr. Janga testified with respect to Mr. Gutzman:

> MR. GIBSON:        Did Eddie Gutzman at any time indicate to
> you that he was representing any particular company or entity
> when having a conversation with you about the investment
> opportunity with Cipriani?
>
> A.:     No.
>
> …
>
> Q.:     Did Eddie Gutzman ever introduce Jeff Chain to you as his
> partner—or…  refer to him as his partner?
>
> A.:     As I said, when we toured the site, Cipriani site, Eddie and
> Jeff were both showing as comanagers of this project, so I assumed
> they were partners.

Janga Dep. at 187:12-16, 253:11-16.  Once again, Mr. Janga's testimony demonstrates that ***no entity was offering investments on behalf of the Investment Partnership other than the Investment Partnership itself.***  In Mr. Janga's case, it was a full six months after Mr. Janga had been recruited as an investor before Mr. Janga learned what company Mr. Janga was investing in—and only learned that information because Mr. Chain had to tell Mr. Janga to whom to make Mr. Janga's check payable.  Mr. Janga was thus recruited by ***the Investment Partnership,*** not the entity in which Mr. Janga invested, like all the other investor-deponents quoted in this Supplement.

**B.    Procedural Facts**

On May 14, 2010, Mr. Massi opposed Plaintiffs' Motion to Disqualify (Doc. No. 290).  Mr. Massi supported his Opposition with a declaration (the "2010 Massi Declaration") in which Mr. Massi made the following assertion under the penalty of perjury:

> 20.    Other than the ownership interests I have itemized, which
> pre-date the filing of this Action, ***I have not personally engaged in
> any business transactions or financial dealings with the LLC
> Defendants.***  I am only a Member of the LLC Defendants and
> counsel for the LLC Defendants.

May 13, 2010 Declaration of Albert Massi (Doc. No. 290 at 13-17) at ¶20 (emphasis supplied).

Mr. Massi filed a Motion for Protective Order on September 22, 2011, supported by another declaration (the "September 2011 Massi Declaration," Doc. No. 382 at 12-13), in which

Mr. Massi claimed under the penalty of perjury, "I am merely an investor in the LLC Defendants, amongst numerous other investors."  September 2011 Massi Declaration at ¶3.

On October 7, 2011, Mr. Massi filed a Response to Plaintiffs' Motion, supported by a third declaration (the "October 2011 Massi Declaration," Doc. No. 386-2) in which Mr. Massi made the following claims under the penalty of perjury:

> 6.     I have never been a partner, either real or imagined, with either Defendant, JEFF CHAIN ("Mr. Chain") or Defendant, EDWARD GUTZMAN III ("Mr. Gutzman"), or any of the other party-Defendants in this Action relating to any matter involving the LLC Defendants and/or this Action.
>
> 7.     I have never profited in any manner (i.e. commissions or otherwise) from my investment or involvement in these LLC Defendants or any of the companies owning any real properties relating to this Action.
>
> 8.     I and my family members have acted only as investors in the LLC Defendants, just as hundreds of other person(s) and/or entity(ies).
>
> …
>
> 11.    I have never had anything to do with any aspect of the promotion, assemblage, development, engineering, improvements, sales, marketing and/or operations of the LLC Defendants or any other companies and/or investments relating to this Action.
>
> …
>
> 18.    Unlike Dr. Kabins, I never had any secret deals with Mr. Chain.

October 7, 2011 Declaration of Albert Massi (Doc. No. 386-2).

## III.    ARGUMENT

### A.    Plaintiffs Have Standing To Sue Mr. Massi For Negligence.

Mr. Massi's actions in conducting the defense of the Massi-Represented Entities causes sufficient injury to each of the members of, *inter alia,* each of the Massi-Represented Entities, including Plaintiffs, to confer standing on Plaintiffs.  The essential question for standing purposes is whether Plaintiffs have a "personal stake" in this action sufficient to confer standing on Plaintiffs.  In denying Plaintiffs' original Motion to Disqualify Mr. Massi (Doc. No. 280), one rationale advanced by Magistrate Judge Johnston for such denial was that Plaintiffs had not

suffered an injury-in-fact.  Magistrate Judge Johnston held at that time that "a nonclient party

may have standing to bring a motion to disqualify 'where an ethical breach so infects the

litigation… that it impacts the moving party's interest in a just and lawful determination of [the

moving party's] claims.'"  Doc. No. 334, 3:18-21, *quoting FMC Technologies, Inc.,* 420

F.Supp.2d 1153, 1156 (W.D. Wash. 2006) ("*FMC*"), *citing Colyer v. Smith,* 50 F.Supp.2d 966,

968 (C.D. Cal. 1999).  Magistrate Judge Johnston found that no such ethical breach existed,

giving Plaintiffs no standing.  Whether or not Mr. Massi committed an ethical breach *vis-à-vis*

Plaintiffs is ***immaterial to the question of Plaintiffs' standing***, however.  A close examination of

*FMC* demonstrates that the language Magistrate Judge Johnston quoted from *FMC* and *Colyer*

was presented by the *FMC* court as an example, not a statement of a general standard.  The

paragraph from which Magistrate Judge Johnston's quotation was taken more fully states:

> In addressing the standing question, the *Colyer* court held that a
> nonclient litigant "must establish a personal stake in the motion to
> disqualify sufficient to satisfy the irreducible constitutional
> minimum of Article III."  50 F.Supp.2d at 971 (internal citation
> omitted).  ***Further***, where an

>> ethical breach so infects the litigation in which
>> disqualification is sought that it impacts the moving party's
>> interest in a just and lawful determination of her claims, she
>> may have the constitutional standing needed to bring a
>> motion to disqualify based on a third-party conflict of
>> interest or other ethical violation.  In such a case, moreover,
>> the prudential barrier to litigating the rights and claims of
>> third parties should not stop a district court from
>> determining the motion, because such a limitation would be
>> overcome by the court's inherent obligation to manage the
>> conduct of attorneys who appear before it and to ensure the
>> fair administration of justice.

> *Id.* at 971-72.  ***Further***, several district courts in the Ninth Circuit,
> including this one, have held that district courts have the inherent
> power to "protect the integrity of their processes" in the context of
> ethical disqualification motions…

*FMC,* 420 F.Supp.2d at 1156 (emphasis supplied).  The *FMC* court thus did *not* rule that the *only*

way a nonclient litigant may "establish a personal stake in the motion to disqualify sufficient to

satisfy the irreducible constitutional minimum of Article III" is to demonstrate the existence of

an "ethical breach… that… impacts the moving party's interest in a just and lawful

determination of her claims"—merely that such a circumstance constituted an example of the type of injury that would confer Article III standing.

A more definitive statement of a standard for a determination of Article III standing does appear in *Colyer*.  The *Colyer* court held that "[t]he requirements for Article III standing, necessary for any party to seek relief from a federal court, are that the party have personally suffered an *'injury in fact,'* which is *causally related* to the conduct in issue and *redressable* by a favorable decision of the court."  *Colyer v. Smith,* 50 F.Supp.2d 966, 968 (C.D. Cal. 1999) (emphasis supplied).  The Supreme Court of the United States defined an "injury in fact" as "an invasion of a legally protected interest which is (a) concrete and particularized… and 'actual or imminent, not "conjectural" or "hypothetical"'"… *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560 (1992), *quoting Whitmore v. Arkansas,* 495 U.S. 149, 155 (1990) (additional citations omitted). Additionally, that injury-in-fact must be "'fairly traceable' to the actions of the defendant, and … will likely be redressed by a favorable decision." *Bennett v. Spear,* 520 U.S. 154, 162 (1997).  In this case, Plaintiffs can demonstrate that Plaintiffs have suffered a *"concrete and particularized," "actual" injury* that is *"fairly traceable" to Mr. Massi's actions* and is *redressable by disqualification* of Mr. Massi from further representation of the Massi-Represented Defendants.

          **1.**      **Plaintiffs Continue To Suffer A "Concrete And Particularized,"**
                          **"Actual" Injury As A Result Of Mr. Massi's Conflicted Activity.**

Plaintiffs' "concrete and particularized," "actual" injury is entirely unrelated to the issue of whether Plaintiffs are former clients of Mr. Massi or are personally owed a specific duty by Mr. Massi, because Plaintiffs' *standing for Article III purposes* is not dependent on the existence of a conflict of interest between Plaintiffs and Mr. Massi.  Plaintiffs' standing arises from the injury Plaintiffs have sustained *as members of the Massi-Represented Entities* whose legal bills have been escalated, and whose investments may have suffered a diminution in value, because the Massi-Represented Entities' attorney is acting from a position of a conflict of interest.  Even if Mr. Massi's *conflict* with the Massi-Represented Entities did not involve Plaintiffs at all, Plaintiffs would still suffer *injury* sufficient to confer Article III standing as a

result of that conflict.  Whether or not Mr. Massi specifically owed Plaintiffs a **duty** arising from a direct attorney-client relationship is irrelevant to the issue of Plaintiffs' standing-conferring **injury**.

Discovery has reinforced compellingly that Plaintiffs can satisfy Article III's test for standing.  As set forth in Plaintiffs' Motion, and as also made clear in testimony by current Benessere manager Dr. Moehrle, Plaintiffs have unquestionably suffered actual injury as a result of Mr. Massi's conflicted representation. Deposition testimony from Benessere manager Dr. Moehrle reaffirms that Plaintiffs are suffering a "concrete and particularized," "actual" injury as a result of Mr. Massi's conflicted activity, because Plaintiffs are apparently subsidizing Mr. Massi's own separate defense in addition to the defenses of the Massi-Represented Entities.  Dr. Moehrle testified that each member of the Massi-Represented Entities has an interest in how the costs associated with Mr. Massi's representation are allocated between the members of the various entities.  Moehrle Dep. at 272:22-273:7.  Dr. Moehrle testified as well that each member of the Massi-Represented Entities has an interest in how entity funds are used to pay Mr. Massi for his services and how Mr. Massi chooses to provide those services.  *Ibid.*  Notwithstanding these interests on the parts of each member of the Massi-Represented Entities, Dr. Moehrle does not review Mr. Massi's legal bills to ascertain what work Mr. Massi has done for which Massi-Represented Entity or whether the time charged for that work is reasonable—indeed, Dr. Moehrle could not even state Mr. Massi's hourly billing rate. Moehrle Dep. at 261:7-262:16.  Dr. Moehrle does not even know whether Mr. Massi is billing Benessere (or Cipriani, or Gila Bend) for work performed by Mr. Massi in Mr. Massi's own defense rather than defense of the Massi-Represented Entities.  Moehrle Dep. at 273:21-275:2.  Dr. Moehrle does not review Mr. Massi's legal bills to ascertain the extent to which Mr. Massi's work may have been performed in the interest of one or more of the Massi-Represented Entities or in the interest solely of Mr. Massi himself. *Ibid*.

Dr. Moehrle's testimony thus reinforces the "concrete and particularized," "actual" nature of the injury to Plaintiffs.  As members of the Massi-Represented Entities, Plaintiffs are paying legal fees that may not have been appropriately allocated between the Massi-Represented

Entities (or, for that matter, among a larger subset of the Defendant entities) and may actually have been incurred in Mr. Massi's own defense, not that of any of the Massi-Represented Entities.  Previously, when Magistrate Judge Johnston denied Plaintiffs' Motion to Disqualify, among one of Magistrate Judge Johnston's rationales was:

> … Kabins entities use Massi's investor status to claim he will unnecessarily increase legal fees.  However, Kabins entities use their own investor status to claim they will have to pay Defendants' attorney fees.  Under this logic, Massi has an incentive to keep his attorney fees low, because he, at least in part, will be paying the fees.

Doc. No. 334 at 6:25-28.  At this time, however, it has become clear that the converse of Magistrate Judge Johnston's rationale is more likely the case:  Mr. Massi has an incentive *not* to keep Mr. Massi's attorney fees low, because Mr. Massi will apparently only be paying a portion of those fees, and Mr. Massi's fellow investors in Benessere, Cipriani, and Gila Bend will be paying the lion's share.  As investors in closely-held entities whose economic interests are adversely affected by being forced inappropriately to pay for the defense of the entities' conflicted attorney, Plaintiffs continue to sustain "concrete and particularized," "actual" injury.

### 2.    Plaintiffs' Injury Is Eminently Traceable To Mr. Massi's Actions.

Plaintiffs' injury-in-fact is eminently and axiomatically traceable to Mr. Massi's actions, because Plaintiffs' injury-in-fact stems entirely from Mr. Massi's continued paid service as counsel for the Massi-Represented Entities notwithstanding Mr. Massi's conflict in that regard. If the Massi-Represented Entities were represented by an attorney who had no possibility of liability in this matter, there would be no issue as to whether that attorney was billing that attorney's own defense to the Massi-Represented Entities.

### 3.    Plaintiffs' Injury Is Redressable By Disqualification Of Mr. Massi.

Plaintiffs' injury-in-fact is redressable by disqualification of Mr. Massi, because if Mr. Massi is disqualified, Mr. Massi will no longer be charging legal fees to the Massi-Represented Entities.

**B.**     **The Investment Partnership Is A General Partnership.**

Testimony by all of the above-referenced deponents—Mr. Bergman, Mr. Corbo, Mr. Gutzman, Mr. Janga, Mr. Martinez, Dr. Moehrle, and Mr. Povalaitis—amply demonstrates that the individuals and entities comprising the Investment Partnership constituted "an association… to carry on as co-owners a business for profit," making the Investment Partnership a general partnership as a matter of fact and law. Nevada Revised Statute 87.060(1) defines a partnership as "an association of two or more persons to carry on as co-owners a business for profit." Nevada Revised Statute 87.070(4) further provides that "[t]he receipt by a person of a share of the profits of a business is prima facie evidence that the person is a partner in the business" unless that profit share is received in payment of a debt, wages of an employee, an annuity to the survivor of a dead partner, interest on a loan, or consideration for the sale of goodwill. Assessment of Mr. Gutzman's and others' testimony in light of these statutory tests makes clear the existence of a general partnership and the identity of a number of the general partners therein, including, without limitation, Mr. Bergman, Mr. Chain, Mr. Gutzman, Mr. Martinez, Mr. Massi, and Mr. Povalaitis.

    **1.**     **Mr. Gutzman Established The Model For The Investment Partnership During The Mitchell Era**

Mr. Gutzman's testimony regarding the attributes of the Gutzman/Oxman General Partnership establishes the existence of a general partnership comprising Mr. Gutzman and Mr. Oxman, because Mr. Gutzman and Mr. Oxman were "carry[ing] on as co-owners a business for profit."

        *a.*     ***Mr. Gutzman Acknowledged Partnership With Mr. Oxman.***

Mr. Gutzman acknowledged "at least an informal understanding" that Mr. Oxman was acting as Mr. Gutzman's partner for purposes of the real estate investment activities Messrs. Gutzman and Oxman undertook together. Gutzman Dep. at 55-57. While the law does not require individuals to expressly agree to act as partners before a general partnership including those individuals may be found to exist, Messrs. Gutzman and Oxman's intent is obviously relevant.

1            *b.*        **Mr. Gutzman And Mr. Oxman Shared Profits.**

2        Mr. Gutzman expressly acknowledged that Messrs. Gutzman and Oxman "would share in

3   the profits" upon sale of investment properties.  Gutzman Dep. at 79.  Under Nev. Rev. Stat.

4   87.070(4), such profit-sharing is *prima facie* evidence of the existence of a general partnership.

5            *c.*        **The Gutzman/Oxman General Partnership Operated**

6                         **Independently.**

7        Mr. Gutzman's testimony establishes that Messrs. Gutzman and Oxman's activities in

8   "put[ting] investors together to buy land" were independent of either Mr. Gutzman's or Mr.

9   Oxman's activities as an employee or agent of any other entity.  *See* Gutzman Dep. at 43:14-18,

10  in which Mr. Gutzman agreed that Mr. Gutzman's activities related to "put[ting] investors

11  together to buy land" were independent of Mr. Gutzman's activities as a real estate agent

12  associated with Prudential.  Since the Gutzman/Oxman General Partnership was independent of

13  any other entity, the Gutzman/Oxman General Partnership itself must independently constitute a

14  "business for profit."

15           *d.*        **The Gutzman/Oxman General Partnership Utilized A Consistent**

16                        **Investment Process.**

17       Further supporting that the Gutzman/Oxman General Partnership constituted a separate

18  and independent "business for profit" is the fact that the Gutzman/Oxman General Partnership

19  followed a consistent process in "put[ting] investors together to buy land."  This investment

20  process included: (i) identification of land (Gutzman Dep. at 49-51); (ii) due diligence with

21  respect to same (Gutzman Dep. at 65:9-18); (iii) solicitation of investors (Gutzman Dep. at 57:2-

22  58:8, 61:24-62:19, 68:6-14, 74:8-14); (iv) obtaining verbal commitments from investors

23  (Gutzman Dep. at 65:24-67:9, 68:17-69:6); (v) potentially purchasing land (*see generally*

24  Gutzman Dep. at 49-85); (vi) formation of an entity to be funded with investors' pledged funds

25  (*ibid.*); (vii) receipt of funds from investors (*ibid.*); (viii) purchase of land, if not already

26  purchased prior to entity formation (*ibid.*); and ultimately (ix) sale of properties and distribution

27  of revenue to the general partners and investors (Gutzman Dep. at 83:15-85:6).

28

2. **Mr. Gutzman And Others Adopted The Partnership Model From The Mitchell Era For The Investment Partnership.**

　　a. ***Mr. Gutzman And Others Adopted The Gutzman/Oxman General Partnership Profit- and Commission-Sharing Model For The Investment Partnership.***

　　　　i. <u>*Mr. Gutzman Acknowledged Partnership With, At A Minimum, Messrs. Chain And Martinez.*</u>

As was the case *vis-à-vis* Mr. Oxman, Mr. Gutzman acknowledged that Mr. Gutzman believed himself to be in, at a minimum, an informal partnership arrangement with, at a minimum, Mr. Chain.  Gutzman Dep. at 80:6-12.

　　　　ii. <u>*Mr. Gutzman And Mr. Chain Agreed To Share Profits.*</u>

Mr. Gutzman acknowledged as well that, between Messrs. Gutzman and Chain, the same "format of making money" existed as had been the case for the Gutzman/Oxman General Partnership:  obtaining a buyer's brokerage fee and/or sharing profits on closing.  Gutzman Dep. at 80:3-5, 19-23.  The relationship between Mr. Gutzman and Mr. Chain thus shared this critical attribute of the general partnership between Mr. Gutzman and Mr. Oxman.

　　　　iii. <u>*Mr. Bergman Expected To Share Profits With The Investment Partnership.*</u>

Mr. Bergman's understanding that Mr. Bergman would receive 7 percent of the profits associated with Mr. Bergman's investor solicitations following sale of relevant Investment Partnership properties demonstrates that Mr. Bergman was an Investment Partner.  Bergman Dep. at 71:18-72:24.

　　　　iv. <u>*Mr. Martinez Shared Profits With The Investment Partnership.*</u>

The model by which Mr. Martinez received compensation from the Investment Partnership demonstrates that Mr. Martinez was an Investment Partner.  In May 2006 Mr. Martinez received the May 2006 Martinez Payment, representing a share of commission earned on the Investment Partnership's purchase of the land ultimately held by 99th & Indian School.

In deposition, Mr. Martinez testified that he believed the May 2006 Martinez Payment came "from Jeff and Eddie," not from 99th & Indian School, notwithstanding the fact that the May 2006 Martinez Payment was made by 99th & Indian School.  Martinez Dep. at 281:1-282:7.  The fact that Messrs. Chain and Gutzman inappropriately directed payment of a share of an Arizona real estate commission to Mr. Martinez does not vitiate the fact that the Investment Partnership, not Messrs. Chain and Gutzman in their individual rights, ultimately made the May 2006 Martinez Payment.  Logic dictates that the fact that the May 2006 Martinez Payment was made *by 99th & Indian School* estops either Mr. Chain or Mr. Gutzman from claiming to have made the May 2006 Martinez Payment in either of their own rights.  Even setting aside the fact that *99th & Indian School made the May 2006 Martinez Payment,* there are still only four cognizable explanations for the May 2006 Martinez Payment, :

a.  The Investment Partnership made the May 2006 Martinez Payment from Investment Partnership income obtained in the course of the Investment Partnership's business.  Axiomatically, in this case, the May 2006 Martinez Payment was made by the Investment Partnership.

b.  Mr. Chain made the May 2006 Martinez Payment from Investment Partnership income obtained in the course of the Investment Partnership's business—*i.e.,* Mr. Chain received payment (or a right to payment) from the Investment Partnership, and paid other Investment Partners from those funds.  In this instance, Mr. Chain would have been acting as an agent of the Investment Partnership, distributing partnership income among partners.

c.  99th & Indian School made the May 2006 Martinez Payment based on commissions due and owing Mr. Martinez by 99th & Indian School.  As 99th & Indian School is an instrumentality of the Investment Partnership under the Investment Partnership's control, such a payment must ultimately have emanated from the Investment Partnership.

d.  Mr. Chain made the May 2006 Martinez Payment gratuitously to Mr. Martinez from payments owed Mr. Chain by 99th & Indian School.  Mr. Martinez testified,

however, that **Mr. Martinez understood himself to have earned the May 2006 Martinez Payment as compensation for being "part of the team that put together the capital and the members to come to a successful purchase of the land."** Martinez Dep. at 258:6-8. That "team," which must be separate from 99th & Indian School because 99th & Indian School did not exist at the time of the land purchase, can only be the Investment Partnership (or a subset thereof).

Mr. Gutzman as well testified that Mr. Martinez gained compensation from the Investment Partnership independent of Mr. Martinez's investments into Investment Partnership offerings, and that such additional compensation elevated Mr. Martinez beyond the level of a mere investor in those offerings. Gutzman Dep. at 102:11-104:11.

> *b.*     ***The Investment Partnership Used The Same Investment Process As The Gutzman/Oxman General Partnership.***

> > *i.*     <u>Mr. Gutzman Acknowledged That The Investment Partnership Used The Gutzman/Oxman General Partnership's Investment Process.</u>

Mr. Gutzman candidly admitted that the Investment Partnership's investment process was "basically the same" as that used by the Gutzman/Oxman General Partnership. Gutzman Dep. at 71:8-25, 73:5-74:2, 79:17-21. Given that the Gutzman/Oxman General Partnership's investment process demonstrates the existence of a general partnership between Messrs. Gutzman and Oxman, as described *supra,* the Investment Partnership's use of the same investment process demonstrates the existence of a general partnership between, at a minimum, Messrs. Chain and Gutzman.

> > *ii.*     <u>The Investment Partnership Identified Land, Conducted Due Diligence, Solicited Investors, Obtained Investor Commitments, And Potentially Purchased Land Prior To Entity Formation.</u>

As was the case with the Gutzman/Oxman General Partnership, the Investment Partnership solicited investors and verbal investment commitments in potentially-to-be-formed

entities, and additionally identified land, conducted due diligence, and purchased that land. Gutzman Dep. at 75:14-17, 76:7-77:24, 144:2-146:12, 205:20-208:12, 217:4-218:17, 229:8-230:23.  The entities themselves, which had not yet been formed and would not necessarily have been formed if investor interest had not warranted such entity formation, did not make and could not have made those solicitations or land purchases.  Had a potential investor reneged on such a verbal commitment, the only natural person or entity with a cause of action for promissory estoppel against that investor would have been the Investment Partnership, because no other entity yet existed that could assert that cause of action.

> iii.    *The Investment Partnership Waited Until Investors Had Committed Prior To Forming Entities.*

Reinforcing the fact that only the Investment Partnership can be deemed to have solicited investors in the Investment Partnership's various projects is the Investment Partnership's practice of not forming entities until sufficient investor commitments had been obtained to justify entity formation.  Gutzman Dep. at 205:20-208:12.  This practice demonstrates that the solicitations were made ***by the Investment Partnership***, because not only was ***no other entity extant that could have made the solicitations***, the Investment Partnership intentionally refrained from undertaking the expense of forming such entities until a certain level of investor commitments had been obtained, making even the ultimate existence of any other entity that might have been responsible for the solicitations speculative at best.

> **3.    No Entity Other Than The Investment Partnership Could Have Identified Land, Conducted Due Diligence, Solicited Investors, Obtained Investor Commitments, Or Purchased Land Prior To Formation Of Entities.**

> a.    ***The Members Of The Investment Partnership Did Not Claim Or Appear To Act On Behalf Of A Specific Entity.***

The testimony of virtually every deponent to date establishes that the members of the Investment Partnership were acting on behalf of no recognizable entity other than themselves, *i.e.,* the Investment Partnership.  Mr. Bergman testified that, while Mr. Chain appeared to be

acting on behalf of an entity whose name Mr. Bergman recalled as "Millennium Properties," Mr. Bergman viewed "Millennium Properties" as effectively synonymous with the investment opportunities Mr. Bergman and others offered to potential investors.  Bergman Dep. at 85:17-88:25, 90:19-91:17.  Mr. Corbo, Mr. Janga, Mr. Martinez, Dr. Moehrle, and Mr. Povalaitis all testified that neither Mr. Chain, Mr. Gutzman, nor anyone else apparently affiliated with Messrs. Chain or Gutzman ever identified themselves as representing a specific entity, *e.g.,* Benessere LLC or Cipriani LLC.  Indeed, as discussed *supra,* Mr. Gutzman testified that Mr. Gutzman used Mr. Gutzman's NAI Horizon business cards when engaged in Investment Partnership business, even though Mr. Gutzman readily admitted that at no time did Mr. Gutzman identify any Investment Partnership investment opportunity as being offered by Mr. Gutzman through NAI Horizon.  Mr. Martinez handed out Mr. Martinez's business cards from Mr. Martinez's law practice, also as discussed *supra,* even though the Investment Partnership investment opportunities were axiomatically not being offered "through" Greenman Goldberg Raby & Martinez or any other law firm.  The only conclusion that can be drawn from this testimony is that the Investment Partners were acting solely on behalf of the Investment Partnership when the Investment Partners engaged in solicitation, administrative activity, or any other activity with respect to the management of the entities at issue in this matter.

*b.*     **The Investment Partnership Offered Prospective Investors A**
**Range Of Potential Investments In To-Be-Formed Entities.**

Not only did the Investment Partnership members *not* represent themselves as acting on behalf of a particular entity, the Investment Partnership offered investors the opportunity to invest *not* in going concerns, but in to-be-formed entities that themselves might not ever be formed absent a certain level of investor commitments.  Gutzman Dep. at 144:2-146:12, 205:20-208:12; Povalaitis Dep. at 152:7-23, 157:19-162:3.

**4.     The Investment Partnership Has An Overarching Bureaucratic**
**Structure.**

Mr. Gutzman's, Mr. Chain's, Mr. Martinez's, and Mr. Povalaitis' testimony all demonstrate that the Investment Partnership had an overarching bureaucratic structure, supporting the Investment Partnership's cognizability as an entity.  Investors were grouped into "teams" or "camps" for which individual Investment Partners held communication responsibilities.  February 2012 Chain Dep. at 198:23-200:1.  This lower-level bureaucratic structure does not appear to have been put into place under the auspices of any identifiable entity other than the Investment Partnership.

With respect to the Investment Partnership's high-level administrative bureaucracy, entities controlled by Mr. Chain, including without limitation Millennium Properties and Development, Inc., Millennium Construction, Inc., and Innovative Assets, Inc., were apparently implicated in most management activities, although no investor to date has claimed to have received any solicitations from those entities or any natural person affiliated therewith.  Modern Management, Inc., nominally acted as "manager" of the Investment Partnership's single-asset real estate holding companies, as well as of Innovative Assets, despite having no office space of Modern Management's own and otherwise demonstrating a variety of indicia of an undercapitalized shell corporation, including an absence of a separate telephone number, bank account, or business cards for Modern Management, as Mr. Povalaitis testified. No investor-deponent testified that such investor believed the Investment Partnership's solicitations to have emanated from Millennium Properties and Development, Millennium Construction, Innovative

-118-

Assets, or Modern Management.  Neither Mr. Gutzman nor Mr. Martinez claimed any affiliation with Millennium Properties and Development, Millennium Construction, Innovative Assets, and Modern Management.  Given, then, that Messrs. Gutzman and Martinez appear unquestionably to be partners in the Investment Partnership, it would be illogical to conclude that the Investment Partnership's investments were somehow offered by Millennium Properties and Development, Millennium Construction, Innovative Assets, Modern Management, or any other entity besides the Investment Partnership itself.

### 5.    The Investment Partnership's Multiplicity Of Shell Entities Is Consistent With General Partnership.

The Investment Partnership's implementation of a daisy chain of shell entities, purportedly to engage in management of the Investment Partnership's real estate holding companies, is consistent with the Investment Partnership's status as a *de facto* general partnership.  Based on Mr. Povalaitis' deposition testimony, it appears that at least some Investment Partnership assets and payments flowed through at least two shell entities— Innovative Assets and Modern Management.  Moreover, in Mr. Povalaitis' case, Mr. Povalaitis received payments from the Investment Partnership through another shell entity controlled by Mr. Povalaitis:  KAN Investments, Inc.  Mr. Povalaitis testified as to the lack of actual business done by Modern Management, as discussed *supra*.  Courts have held that similar structures involving shell entities that do not themselves perform any "legitimate services" are indiciae of a general partnership actually exercising control over the business operations that include those shell entities.  *See U.S. Small Business Admin. v. Smith Stratton, Wise, Heher & Brennan, LLP,* civil action no. 05-190, 2009 U.S. Dist. LEXIS 9411, *17 (E.D. Pa., February 9, 2009) ("*Smith Stratton*").  In *Smith Stratton,* the Eastern District of Pennsylvania found that purported limited partners acted as general partners by engaging in "consulting" activities through a shell entity.  While, in this case, the entities at issue are limited-liability companies and corporations, the undercapitalized and apparently purposeless nature of a number of those entities indicates that a subset of the people behind those entities—Mr. Chain, Mr. Gutzman, and Mr. Martinez, at a minimum—are the actors actually undertaking control of the enterprise's affairs.  In other words,

1  notwithstanding the existence of, *e.g.,* Modern Management and Innovative Assets, the activities

2  of the Investment Partnership have actually been undertaken by the overarching association of

3  Investment Partners and the general partnership comprising same, rather than the shell entities

4  set up by various Investment Partners.

5         Another example of the Investment Partnership's use of undercapitalized, apparently

6  purposeless shell entities in order to effectuate the Investment Partnership's scheme is with

7  respect to Cipriani.  Mr. Janga, a manager of Cipriani Investments, LLC, testified that Cipriani

8  Investments is the manager of Cipriani Management, LLC, which in turn is the manager of

9  Cipriani LLC.  Other limited-liability companies affiliated with what Mr. Janga would only refer

10 to generally as the "Cipriani project" are Cipriani Management Consultants, LLC and Cipriani

11 Land Holdings, LLC.  However, Mr. Janga was not able to identify any separate, distinct

12 business purposes for either Cipriani Investments or Cipriani Management.  Mr. Janga testified

13 that, notwithstanding Mr. Janga's status as manager of the manager of Cipriani Management,

14 Mr. Janga would have to guess in order to state the independent business purpose of Cipriani

15 Management.  Janga Dep. at 66:8-18.  Mr. Janga did not know whether the 2300 acres

16 comprising the "Cipriani project" were owned by Cipriani Land Holdings, Cipriani LLC itself,

17 or some other entity, nor did Mr. Janga know which entity or entities were responsible for

18 managing those 2300 acres.  Janga Dep. at 76:15-77:6.  Thus, while the Investment Partnership

19 may well utilize the various Cipriani entities for some administrative purpose, even the manager

20 of at least one of those entities is unaware of any such purpose.  This state of affairs is consistent

21 with the overarching association of Investment Partners, rather than any particular entity,

22 exercising control over the Investment Partnership's business.

23       **C.**    **Mr. Massi Is An Investment Partner.**

24            **1.**    **Mr. Massi Was Clearly Not A Mere "Passive Investor" In The Massi-**

25                 **Represented Entities, As Mr. Massi Led This Court To Believe.**

26                    *a.*    ***Mr. Massi Was Entitled To Preferred Reimbursement of Mr.***

27                       ***Massi's Investments.***

28

Mr. Massi was entitled to preferred reimbursement of Mr. Massi's investments in Cipriani, as demonstrated by the Van Aken/Massi Letter.  Exhibit 4.  Given Mr. Gutzman's testimony that Cipriani investors were not entitled to payment or distributions beyond those described in Section 4.7A of the Cipriani operating agreement, the Investment Partnership's commitment to make such preferred reimbursement to Mr. Massi demonstrates that Mr. Massi was more than a "mere investor"—Mr. Massi was, apparently, an Investment Partner.

### b.    *Mr. Massi Was Entitled To A Preferred Distribution Of Cipriani Profits.*

The May 1 Chain Letter makes clear that Mr. Massi provided sufficient "assistance" to the Investment Partnership with respect to Cipriani investor recruitment to warrant a side deal with Mr. Chain by which Mr. Chain committed to a preferred distribution of $400,000 to Mr. Massi upon the profitable sale of Cipriani. Although it is not yet clear what the nature and/or dimension of that assistance were, the May 1 Chain letter demonstrates that: (a) some "assistance" was provided by Mr. Massi; (b) Mr. Massi introduced a number of investors to Cipriani; and (c) there was apparently some level of euphemistically-labeled "confusion" that appears to have reflected a dispute between Mr. Massi and Mr. Chain regarding Mr. Massi's compensation for such "assistance" and investor recruitment.

This planned preferred distribution of Cipriani profits demonstrates that from an early date, Mr. Massi was a member of the Investment Partnership. *See* NRS 87.070(4), which provides that "the receipt by a person of a share of the profits of a business is prima facie evidence that the person is a partner in the business," unless such profit share represented payment of a debt, wages of an employee, interest on a loan, or other circumstances that do not appear applicable here[8].  In this case, the May 1 Chain Letter makes no reference to the profit distribution constituting debt payment, wages, or loan interest (although, if the May 1 Chain Letter did make such reference, other serious conflict issues would be implicated with respect to

---

[8] There is no evidence that this preferred distribution of profits represented "an annuity to a surviving spouse or representative of a deceased partner" (NRS 87.070(4)(c)) or "consideration for the sale of a goodwill [*sic*] of a business or other property" (NRS 87.040(4)(e)).

Mr. Massi).  The most charitable characterization of Mr. Chain's planned payments to Mr. Massi was that Mr. Chain planned to distribute unlawfully-obtained commissions on the sale of real estate (because Mr. Chain was not in a written agreement with an Arizona-licensed real estate broker to allow Mr. Chain to receive commissions on sales of Arizona real estate) to Mr. Massi, who was also not acting as an Arizona real estate  broker under Mr. Massi's Nevada law license and was thus not entitled under law to receive those commissions either.  Under any circumstance, Mr. Chain's plan to make a preferred profit distribution to Mr. Massi demonstrates Mr. Massi's self-interest, which is not the same interest as those of the Massi-Represented Entities, and thus demonstrates Mr. Massi's resulting conflict of interest in representing the Massi-Represented Entities.  Mr. Massi's self-interest places Mr. Massi in the position of preserving Mr. Massi's self-interest rather than the interests of the Massi-Represented Entities, and to increase legal fees billed to the Massi-Represented Entities in a manner designed for self-preservation rather than advancement of the interests of the Massi-Represented Entities.

<em>c.</em>   <strong><em>Mr. Massi Effectuated Loans To Millennium Investment Companies From Funds Under Mr. Massi's Apparent Control.</em></strong>

Mr. Massi apparently loaned, or effectuated loans to, Massi-Represented Entities early on in those entities' lives, further demonstrating that Mr. Massi's role with respect to the Massi-Represented Entities was not as passive as Mr. Massi claims and this Court previously believed. *See* Exhibit 21, which appears to reflect Mr. Massi's loan of $257,280 to Buckeye West 80, LLC, and Exhibit 8, which appears to reflect Mr. Massi's loan of at least $262,623.59, and potentially as much as $297,137.21, to Buckeye Canamex 286 LLC.

<em>d.</em>   <strong><em>Mr. Massi Is Part Of The "Community Of Power In Administration" Of The Investment Partnership.</em></strong>

The volume of investors recruited by Mr. Massi into the Massi-Represented Entities (and related entities under the umbrella of the Millennium Investment Companies) apparently led to the administrative categorization of a significant subset of investors as the "Massi crew" or

"Massi camp," demonstrating Mr. Massi's role in the "community of power in administration"[9] of the Investment Partnership and reinforcing Mr. Massi's status as a general partner in the Investment Partnership.  Multiple Chain-Produced Documents reflect that Mr. Massi recruited at least 17 investors, characterized by the Investment Partnership as the "Massi crew" or "Massi camp."  *See, e.g.,* Exhibit 6, in which the Benessere constituent properties identified as "Blankenship" and "Younker"[10] are characterized as having been capitalized with funds raised from the "Massi Crew."  Multiple Chain-Produced Documents additionally label investors in the Millennium Investment Companies with the names of, apparently, those investors' "crew" or "camp" leaders; Mr. Massi's name appears with frequency in this regard.  Mr. Chain testified in deposition on February 2, 2012 that the Investment Partnership treated the "crew" or "camp" leaders as nodes in effectively a "telephone tree" arrangement by which, if the members of the Investment Partnership wished to communicate information to all investors, the "crew"/"camp" leaders would be responsible for making those communications to their respective "crews"/"camps."  Mr. Massi thus played a significant role in the Investment Partnership's communications and administration structure, belying Mr. Massi's emphatic position that Mr. Massi was "merely an investor in the [Massi-Represented Entities], amongst numerous other investors" (September 2011 Massi Declaration at ¶3).

> e.     ***Mr. Massi Holds "Some Degree And Right Of Control" Over, At A Minimum, The Massi-Represented Entities.***

Mr. Martinez's testimony demonstrates that, at least with respect to the Massi-Represented Entities, Mr. Massi continues to hold "some degree and right over control"[11] over those entities, an attribute consistent with membership in a general partnership.  For example, Mr. Massi orchestrated the formation of an investor "advisory board" for Cipriani, as Mr.

---

[9] *Fenwick v. Unemployment Comp. Comm'n of N.J.,* 44 A.2d 172, 174 (N.J. 1945).
[10] Benessere and Cipriani were both apparently formed from the "roll-up" of a number of separate real-property-owning LLCs.  In Plaintiffs' case, those original separate real-property-owning LLCs were Buckeye Canamex 77 One, LLC (ultimately part of Benessere) and Buckeye 80 West Three, LLC (ultimately part of Cipriani).  At least at the outset of the Investment Partnership's operations, investors were apparently recruited into the individual Buckeye entities rather than into Benessere or Cipriani *per se.*
[11] *Shaw v. Delta Airlines, Inc.,* 798 F. Supp. 1453, 1456 (D. Nev. 1992).

Martinez testified.  As discussed *infra,* Mr. Massi continues to act as a general partner in the Investment Partnership who takes an integral role in, at a minimum, the operation of Cipriani, going so far as to enlist the services of Mr. Massi's legal assistant as a Cipriani administrative assistant.  This active engagement in control of Investment Partnership entities, which does not appear ever to have been challenged by any other member of the Investment Partnership, strongly reflects Mr. Massi's status as an Investment Partnership general partner.

*f.*   **Mr. Massi Continues To Act As A Partner In The Investment Partnership.**

Mr. Massi apparently continues to act as a partner in the Investment Partnership who takes an integral role in, at a minimum, the operation of Cipriani. Recent investor communications from Cipriani (Exhibit 9) have directed recipients to respond via e-mail to the address mamasoto@yahoo.com (the "MamaSoto Address"), which is the e-mail address belonging to Mr. Massi's own secretary, Ms. Soto.  Mr. Massi's apparent official e-mail address within this Court's CM/ECF system is the MamaSoto Address.  Exhibit 10.  Mr. Janga, an indirect manager of Cipriani, actually went so far as to characterize Ms. Soto as an administrative assistant employed by Cipriani.  It is not known at this time to what extent Mr. Massi receives additional compensation for Mr. Massi's actions as Cipriani's effective manager.

> **D.**   **Mr. Massi's Actionable Conflict Of Interest Is Exacerbated By Mr. Massi's Active Role In The Investment Partnership.**
>
> **1.**   **Magistrate Judge Johnston's Order Was Premised On Mr. Massi's Passive-Investor Status.**

Magistrate Judge Johnston premised denial of Plaintiffs' original Motion to Disqualify on, in pertinent part, what Magistrate Judge Johnston perceived as Mr. Massi's representations of mere passive-investor status in the Massi-Represented Entities.  Mr. Massi led Magistrate Judge Johnston to believe that "[Mr.] Massi's role in the transaction was simply that he invested money with the defendants," which led Magistrate Judge Johnston to conclude, "The Court does not see nor will it speculate how investing money with a company is adverse to that company."  Doc. No. 334 at 6:14-15, 23-24.  Since the time of Plaintiffs' original Motion and Magistrate Judge

Johnston's decision, of course, considerable new evidence has come to light regarding Mr. Massi's role in the Investment Partnership that demonstrates emphatically that Mr. Massi's role within the Investment Partnership was *not* "simply that he invested money with the defendants."

### 2.      New Information Exacerbates Mr. Massi's Conflict.

Mr. Massi's representation of the Massi-Represented Entities can only be limited by Mr. Massi's personal interests, because Mr. Massi's preferred payoff structure based on events involving the sale of assets of Massi-Represented Entities places Mr. Massi's interests at odds with those of the Massi-Represented Entities.  The preferred payoff structure described in the May 1 Chain Letter and the Van Aken/Massi Letter, which is based on events involving the sale of one of the Massi-Represented Entities' assets, means that Mr. Massi's interests may be better served by an earlier sale of those assets, while the entities themselves and the entities' other investors would be better served by a delayed sale to allow for further increase in property value.  As counsel, Mr. Massi has an incentive to make strategic decisions that foster such short-term appreciation and sale, even though such decisions would not be in the best interest of the entities or other investors.  Particularly given what Dr. Moehrle described as a total or near-total abdication of authority by the managers of Benessere and Cipriani[12] to Mr. Massi with respect to legal strategy in this matter, the individual investors in Benessere and Cipriani, and in Gila Bend as well, are effectively at the mercy of Mr. Massi and the extent to which Mr. Massi chooses to aggrandize Mr. Massi's interests over those of other investors.  As Mr. Corbo testified:

> MR. GIBSON:        … [M]r. Massi has the opportunity to influence you on the management of the company and the defense of the litigation more so than any other member, doesn't he?
>
> …
>
> A.:     Yes.
>
> …
>
> Q.:     … [I]f, hypothetically, Mr. Massi felt that as a member it was in the best interests of the company to pursue the litigation in a

---

[12] Mr. Corbo agreed in deposition that "if Mr. Massi's personal interests were in line with the company's best interests," there would likely be no issue with respect to a potential conflict of interest.  Corbo Dep. at 334:17-24.  However, Mr. Corbo admitted, "My vote as a member may be different than his or anyone else's as a member, that's true."  *Id.* at 336:25-337:1.

particular way, he was—he would be in a very unique position to influence management in affecting that mission, wouldn't he?

…

A.:      Yes.

Q.:      … [I]f Mr. Massi's interest—membership interests diverged from his duties as counsel to you, in order for him to be effective counsel for the company, he would have to put aside his … conflicting membership interests in order to adequately represent the company; isn't that fair?

…

A.:      Hypothetically, yes, but I'm not aware that there's any conflict in that way.

Corbo Dep. at 342:17-344:1.  Mr. Janga additionally made clear that Mr. Massi is a voting member of Cipriani and that no Cipriani members' vote has ever been unanimous, meaning that, axiomatically, with respect to every issue that has come before the Cipriani members for a vote, Mr. Massi's position has been at odds with at least some cohort of Cipriani members.  Mr. Massi thus cannot be seen as a representative of the entire membership of Cipriani with respect to every issue facing Cipriani members.

### 3.      Mr. Massi's "Defense" Of The Massi-Represented Entities Is Compromised By Mr. Massi's Self-Interest.

Mr. Massi's actions and tactics in defense of the Massi-Represented Entities appear in fact to have been compromised by Mr. Massi's self-interest, further demonstrating Mr. Massi's impermissible conflict of interest.  For example, as demonstrated by the testimony excerpted, remarkably, in the Massi-Represented Entities' Supplement to Response in Opposition to Motion for Leave to File First Amended Complaint (Doc. No. 425), Mr. Massi's recent deposition of Plaintiff Mrs. Kabins took as a principal focus, for multiple hours, Mr. Massi's own defense and interest rather than the Massi-Represented Entities' defense and interest.  To the extent Mr. Massi prepared for that line of questioning and engaged in that line of questioning, and billed the Massi-Represented Entities for same, the Massi-Represented Entities' other members have been forced to foot the bill for Mr. Massi's self-representation.  To the extent Mr. Massi's mental energies are focused on Mr. Massi's own defense as opposed to the defense of the Massi-

Represented Entities, the Massi-Represented Entities and their other members have been

deprived of full representation of counsel.

### E.   Mr. Massi's Declarations Have Misled The Court.

Through no fault of Magistrate Judge Johnston, Mr. Massi's fraud on the Court rendered

Magistrate Judge Johnston's Order in error.  To the extent this Court believes that Magistrate

Judge Johnston's Order provides a basis for this Court to reject Plaintiffs' proposed First

Amended Complaint, Plaintiffs respectfully request that this Court consider Magistrate Judge

Johnston's Order in light of the following apparent material misrepresentations by Mr. Massi that

both predate and postdate Magistrate Judge Johnston's Order.

### 1.   "Unlike Dr. Kabins, I never had any secret deals with Mr. Chain." (Doc. No. 386-2 at ¶18)

It now appears indisputable that, notwithstanding Mr. Massi's fixation on a putative

"secret deal" Plaintiffs purportedly entered with Mr. Chain, Mr. Massi himself had a "secret

deal" with Mr. Chain.  Not only would Mr. Massi receive preferred reimbursement of Mr.

Massi's Cipriani investments—a side deal that Mr. Chain specifically characterized as

"confidential between the parties and... not to be discussed or reproduced in any manner what so

ever" [*sic*]—but a preferred share of profits not available to other investors.  While Plaintiffs

strongly dispute Mr. Massi's characterization of the Millennium Entities' guarantee of the

Plaintiffs' investments as a "secret deal," Mr. Massi's emphatic denial under the penalties of

perjury, in the October 2011 Massi Declaration, of  any "secret deals with Mr. Chain" strongly

appears at best not to have been candid with the Court.

### 2.   "Other than the ownership interests I have itemized… I have not personally engaged in any business transactions or financial dealings with the LLC Defendants." (Doc. No. 290 at ¶20)

The Chain-Produced Documents demonstrate that Mr. Massi has personally engaged in

multiple "business transactions or financial dealings" with the Massi-Represented Entities that

go well beyond the acquisition of ownership interests.  Mr. Massi apparently loaned money to at

least two Buckeye entities.  Exhibits 8 and 21.  Mr. Massi had deals in place entitling Mr. Massi

1   to preferred profit distribution and preferred return of capital from Cipriani.  Exhibit 3.  While

2   Mr. Massi may attempt to argue that these transactions and agreements were not "with the LLC

3   Defendants," but, rather, were with Buckeye entities that are not Defendants in this matter or no

4   longer extant, or were with Mr. Chain individually, it is clear that Mr. Massi has attempted to

5   convince this Court that Mr. Massi's role as an investor in the Massi-Represented Entities was

6   much more circumscribed than appears actually to have been the case.  Given that Mr. Massi

7   made this claim under penalty of perjury in support of Mr. Massi's Opposition to Plaintiffs'

8   Motion to Disqualify, the set of "facts" upon which Magistrate Judge Johnston relied in denying

9   that Motion appears to have been materially inaccurate.

3.      **"I have never had anything to do with any aspect of the promotion, assemblage, development, engineering, improvements, sales, marketing and/or operations of the LLC Defendants or any other companies and/or investments relating to this Action." (Doc. No. 386-2 at ¶11)**

Mr. Massi apparently recruited multiple investors into the Millennium Investment Companies, played an integral role in the organization of the Investment Partnership, and loaned money to at least two of the defendant entities, making Mr. Massi's declaration that Mr. Massi "never had anything to do with any aspect of the promotion, assemblage, development, engineering, improvements, sales, marketing and/or operations" of the Millennium Investment Companies apparently disingenuous and less than candid at best. The May 1 Chain Letter refers to the "many investors that [Mr. Massi has] allowed us to meet with," and sets forth a reward to Mr. Massi of a promised $400,000 preferred profit distribution in consideration of not only such investor meetings, but additional "investment and assistance" by Mr. Massi. The apparently significant role Mr. Massi played in the promotion and marketing of Cipriani thus could not be more clear. The repeated references in the Chain-Produced Documents to the "Massi camp" and "Massi team" as an apparent recognized administrative unit of the Investment Partnership also strongly belie Mr. Massi's feigned non-involvement in the operations, marketing, and promotion of the Massi-Represented Defendants. Even at present, Cipriani's apparent use of Mr. Massi's own secretary as Cipriani's secretary and recipient of investor e-mails reflects significant involvement by Mr. Massi in the operation of Cipriani. It is frankly unfathomable to Plaintiffs how Mr. Massi may have been able to rationalize Mr. Massi's above-referenced assertion of non-involvement.

4.     **"I have never been a partner, either real or imagined, with… Mr. Chain… or… Mr. Gutzman… or any of the other party-Defendants in this Action relating to any matter involving the LLC Defendants and/or this Action." (Doc. No. 386-2 at ¶6)**

Mr. Gutzman's testimony appears to make clear that Mr. Chain and Mr. Gutzman considered Mr. Massi to be Mr. Chain's and Mr. Gutzman's partner with respect to the Millennium Investment Companies.  Further, Mr. Massi's recruitment of investors and provision of unspecified other assistance to the Massi-Represented Entities entitled Mr. Massi to, at a minimum, a preferred profit distribution from Cipriani.  Exhibit 3.  As Mr. Gutzman testified, such preferred-profit-distribution spiffs or "kickers" were not available to investors in the Massi-Represented Entities.  Rather, such "kickers" were reserved for members of the Investment Partnership such as Mr. Bergman, Mr. Martinez, and Mr. Massi.  As such, Mr. Massi's claim to have been "merely an investor… amongst numerous other investors" is at best disingenuous and lacking in candor.

5.     **"I am merely an investor in the [Massi-Represented Entities], amongst numerous other investors." (Doc. No. 382 at ¶3) / "I and my family members have acted only as investors in the LLC Defendants, just as hundreds of other person(s) and/or entity(ies)." (Doc. No. 386-2 at ¶8)**

The testimony of, at a minimum, Mr. Gutzman and Dr. Moehrle, as well as the Chain-Produced Documents, demonstrate that Mr. Massi was hardly "merely an investor… amongst numerous other investors" in the Massi-Represented Entities.  Mr. Massi was the head of a "crew" or "camp" of investors that were apparently recruited by Mr. Massi.  Exhibits 5, 7.  Mr. Massi's recruitment of investors and provision of unspecified other assistance to the Massi-Represented Entities entitled Mr. Massi to, at a minimum, a preferred profit distribution from Cipriani.  Exhibit 3.  As Mr. Gutzman testified, preferred-profit-distribution spiffs or "kickers" were not available to rank-and-file investors in the Massi-Represented Entities.  Rather, such "kickers" were reserved for members of the Investment Partnership such as Mr. Bergman, Mr.

Martinez, and Mr. Massi.  As such, Mr. Massi's claim to have been "merely an investor…

amongst numerous other investors" is at best disingenuous and lacking in candor.

### F.  Mrs. Kabins' Inability To Explain The Fine Points Of Plaintiffs' Complex Claims Does Not Give Defendants A Defense Under Fed.R.Civ.P. 9(b).

The fact that Plaintiff Lori Kabins could not articulate in deposition all of the nuances of

Plaintiffs' complex fraud claims does not provide Defendants with a defense under Fed.R.Civ.P.

9(b) that Plaintiffs have failed to plead Plaintiffs' fraud claims with specificity.  Federal Rule of

Civil Procedure 9(b)—a subsection of Fed.R.Civ.P. 9, notably entitled "***Pleading*** Special

Matters" (emphasis supplied), and falling within Title III of the Federal Rules of Civil Procedure,

entitled "Pleadings and Motions"—requires that "[i]n alleging fraud or mistake, a party must

state with particularity the circumstances constituting fraud or mistake."  Federal Rule of Civil

Procedure 9 is not about deposition testimony, but about ***pleading***.  Federal Rule of Civil

Procedure 7(a) provides that "pleadings" comprise "a complaint," "an answer to a complaint,"

"an answer to a counterclaim designated as a counterclaim," "an answer to a crossclaim," "a

third-party complaint," "an answer to a third-party complaint," and "if the court orders one, a

reply to an answer."  Deposition testimony is not a "pleading."  Merely from a technical rule-

based standpoint, the basis upon which the Massi-Represented Defendants believe Fed.R.Civ.P.

9 somehow provides a defense based upon ***a party's deposition testimony*** is entirely unclear.

More substantively, however, ***it is not Mrs. Kabins', or Dr. Kabins', or either of their***

***entities' responsibility in this case to "explain" Plaintiffs' claims to Defendants.***  The Massi-

Represented Defendants—as with all of the Defendants in this case—appear to be operating

under the misconception that Plaintiffs have somehow failed to substantiate Plaintiffs' claims by

being unable to explain articulately in deposition testimony the precise evidentiary bases for

same.  Nothing in the Federal Rules of Civil Procedure requires a party to "explain" that party's

claims in deposition to the other side.  That is why parties hire attorneys to prepare and file

pleadings and papers, and to analyze the other side's pleadings and papers and make appropriate

strategic recommendations based on same.  The continued refrain by Defendants that Plaintiffs'

1   claims are somehow specious because Plaintiffs cannot articulate all the complex legal and

2   factual bases underlying the *de facto* general partnership constituting the Investment Partnership

3   has no legal basis and should not be taken seriously by this Court.

4   **IV.   CONCLUSION**

5        For the additional reasons set forth herein, Plaintiffs respectfully request that this Court

6   grant Plaintiffs' Motion for Leave.

7        Respectfully submitted this 22nd day of March, 2012.

8                                   DICKINSON WRIGHT PLLC

9

10                          By   /s/ J.D. Lowry.

11                               STEVEN A. GIBSON
                                 Nevada Bar No. 6656
12                               JODI DONETTA LOWRY
                                 Nevada Bar No. 7798
13                               City Center West
                                 7201 West Lake Mead Boulevard, Suite 503
14                               Las Vegas, Nevada 89128

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## CERTIFICATE OF SERVICE

Pursuant to Local Rule 5 of this Court, I certify that I am an employee of Dickinson Wright PLLC and that on this 22nd day of March, 2012, I caused a correct copy of the foregoing **SUPPLEMENT TO MOTION FOR LEAVE TO FILE FIRST AMENDED COMPLAINT** to be served via CM/ECF to:

Chad A. Bowers, Esq.
chadbowers@lawyer.com
Albert D. Massi, Esq.
mamasoto@yahoo.com
Albert D. Massi, Ltd.
Allen A. Cap, Esq.
allencap@capandkudler.com
Cap & Kudler
3202 West Charleston Boulevard
Las Vegas, Nevada  89102
Telephone: (702) 878-8778
Facsimile: (702) 878-9350

Mario P. Lovato, Esq.
mpl@lovatolaw.com
Lovato Law Firm, P.C.
8670 West Cheyenne Avenue, Suite 120
Las Vegas, Nevada  89129
Telephone: (702) 979-9047
Facsimile: (702) 554-3858

Matthew L. Johnson, Esq.
mjohnson@mjohnsonlaw.com
Matthew L. Johnson & Associates, P.C.
Lakes Business Park
8831 West Sahara Avenue
Las Vegas, Nevada  89117
Telephone:  (702) 471-0065
Facsimile:  (702) 471-0075

William Kerry Skaggs, Esq.
kerryskaggs@msn.com
David H. Putney, Esq.
dputneylaw@gmail.com
Law Office of William Kerry Skaggs
808 South Seventh Street
Las Vegas, Nevada  89101
Telephone: (702) 445-6700
Facsimile: (702) 475-4060

Barbara I. Johnston, Esq.
barbara.johnston@rocketmail.com
Johnston & Associates
8309 Shad Bush Avenue
Las Vegas, Nevada 89149
Telephone: (702) 684-6163
Facsimile: (702) 541-6743

James E. Smyth II, Esq.
jsmyth@kcnvlaw.com
Lisa J. Zastrow, Esq.
lzastrow@kcnvlaw.com
Kaempfer Crowell Renshaw
Gronauer & Fiorentino
8345 West Sunset Road, Suite 250
Las Vegas, Nevada  89113
Telephone:  (702) 796-7000
Facsimile:  (702) 796-7181

/s/ J.D. Lowry.
An employee of Dickinson Wright PLLC